UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                                                                 :
**In re**                                                        :    Chapter 11
                                                                 :
**THE WECK CORPORATION,**                                        :    Case No. 10-_____ (____)
**d/b/a Gracious Home, et al.**[1]                               :
                                                                 :    Motion to Consolidate Pending
              **Debtors.**                                       :
                                                                 :
---------------------------------------------------------------- x

**APPLICATION IN SUPPORT OF ENTRY OF INTERIM ORDER GRANTING EMERGENCY MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 364(c)(1) & (2), AND 364(e), FED. R. BANKR. P. 2002, 4001, AND 9014, (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING ON SUPERPRIORITY AND SECURED BASIS, (II) PERMITTING THE USE OF THE CASH COLLATERAL, (III) GRANTING INTERIM RELIEF, AND (IV) SCHEDULING A FINAL HEARING UNDER FED. R. BANKR. P. 4001(b)(2) and (c)**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Weck Corporation, West Weck, LLC, Gracious Home.com, LLC and Weck Chelsea, LLC, as debtors and debtors-in-possession, by their undersigned counsel, respectfully represents as follows:

1. On the August 13, 2010 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are operating their business and managing their property as debtors-in-possession.

2. The Debtors make this application ("Application") for an order authorizing them, pursuant to Sections 363 and 364 of the Bankruptcy Code, to (a) enter into a post-petition financing arrangement (the "DIP Financing Arrangement") with NewAlliance Bank, acting

---

[1] The Debtors in these cases, together with the last four digests of their respective federal tax identification numbers, are as follows: The Weck Corporation 6057; West Weck, LLC 1934; Gracious Home.com, LLC 4754; Weck Chelsea, LLC 3431.

through its NewAlliance Commercial Finance Operating Division (in its capacity as the holder of the Pre-Petition Obligations (as defined below)), herein the "Pre-Petition Lender," in its capacity as lender under the DIP Financing Agreement (as defined below), herein the "DIP Lender," and collectively in both capacities, herein the "Lender"), pursuant to the terms and conditions of (i) the proposed interim order (the "Interim Order") annexed hereto as Exhibit "1" and such final order as the Court may later enter with respect thereto (the "Final Order"), (ii) the Debtor-in-Possession Loan and Security Agreement (the "DIP Agreement") annexed as Exhibit "A" to the Interim Order and (iii) the budget annexed as Exhibit "B" to the Interim Order (the "Budget" and, collectively with the DIP Agreement and the Interim Order, the "DIP Loan Documents"), and (b) otherwise provide adequate protection to Pre-Petition Lender for use of Cash Collateral and on account of various Pre-Petition Obligations (as defined below) as granted by and secured under various Pre-Petition Loan Documents (as defined below).

### Debtors' Pre-Petition Lending Arrangement

3. The Debtors are party to (a) that certain Secured Revolving Credit Note and Agreement dated as of April 22, 2005, as amended by that certain Increased, Modified and Extended Secured Revolving Credit Note and Agreement dated as of November 2, 2007, as further amended by that certain Modified and Decreased Secured Revolving Credit Note and Agreement dated as of August 7, 2009, as further amended by that certain Modified and Decreased Secured Revolving Credit Note and Agreement dated as of November 5, 2009, as further amended by that certain Modified and Extended Secured Revolving Credit Note and Agreement dated as of February 16, 2010 as further amended by that certain Forbearance Agreement and Amendment to Modified and Extended Secured Non-Revolving Credit Note and Agreement dated as of August 11, 2010 (as the same may have been modified, supplemented or otherwise modified from time to time to the Petition Date, the "Pre-Petition Credit Agreement");

(b) various security agreements entered into by Debtors, Weck Corp., West Weck, and GH.com LLC on April 22, 2005 and Weck Chelsea on November 2, 2007 (collectively, the "Pre-Petition Security Agreements"); and (c) all other documents and agreements executed and delivered in connection therewith (each of the foregoing, as amended, modified and/or supplemented, collectively, the "Pre-Petition Loan Documents").

4. Pursuant to the Pre-Petition Loan Documents, (a) Manufacturers and Traders Trust Company ("M&T) (which assigned all of its right, title and interest in the Pre-Prepetition Loan Documents and its rights and obligations thereunder to the Pre-Petition Lender) made certain loans and financial accommodations to the Debtors (including, without limitation, accrued but unpaid interest, fees and expenses, collectively, the "Pre-Petition Obligations"), which Pre-Petition Obligations were in the approximate amount of $8.9 million (inclusive of interest, facility fees, costs and expenses), plus (i) outstanding letter of credit exposure in excess of $2.3 million, plus (ii) other fees, costs, expenses and indemnities as provided for in the Pre-Petition Credit Agreement; and (b) the Pre-Petition Obligations are secured by fully perfected liens and security interests (collectively, the "Pre-Petition Liens") in substantially all of the Debtors' assets, including accounts, inventory, chattel paper, investment property, deposit accounts, documents, equipment, general intangibles, instruments, letters of credit rights and other personal property, and all proceeds of the foregoing (collectively the "Pre-Petition Collateral"). The Pre-Petition Liens were properly perfected by the filing of appropriate UCC-1 financing statements, copies of which are available upon request.

**Events Leading up to the Filing**

5. As set forth more fully in the Declaration of Jordan Smilowitz in Support of the Chapter 11 Petition filed on the Petition Date (the "Smilowitz Affidavit"), since early Spring of 2010, the Debtors have been engaged in a review of various leases and operational issues in an

effort to develop a long term strategy for operation of the Debtors' various retail stores. In connection therewith, the Debtors aggressively sought sources of capital which would allow the Debtors to accomplish this restructuring in a Chapter 11 proceeding.

6. In this context, the Debtors entered into negotiations with Meridian Ventures, LLC ("Meridian Investor"), a potential investor, with respect to an infusion of capital by the Meridian Investor on specific terms and conditions which would allow the Debtors to achieve their goals of a restructuring and reorganization serving the best interests of the Debtors' estates. The result of those discussions is that the Debtors have reached an agreement with the Meridian Investor and its pre-petition equity holders, including co-founder and Chairman, Nathan Wekselbaum ("Wekselbaum" and together with the Meridian Investor, the "Plan Investor") to restructure the Debtors' balance sheets in the context of a Chapter 11 bankruptcy proceeding.

7. Under the terms of the agreement among the parties, the Lender has agreed to provide debtor-in-possession financing and permit use of Pre-Petition Cash Collateral on certain stated terms and conditions, including (a) the agreement by the Plan Investor to provided a capital contribution in connection with a proposed Plan of Reorganization (the "Plan"); and (b) the agreement of the Debtors to expeditiously file and seek confirmation of such Plan. The Lender has further agreed to seek internal credit approval to provide exit financing for the Debtors to enable the Debtors to confirm such Plan and emerge from these Bankruptcy Cases. Pursuant to the agreements among the Debtors and Plan Investor, the Debtors have hired Thomas Shull and Paul Jen, seasoned and experienced retailers and principals of the Meridian Investor, in senior management capacities, and the Lender has approved the same.

8. The Debtors contemplate the establishment of an "auction" process for the right for competing plan sponsorship, approval of which is subject to a separate Motion for Entry of

an Order Pursuant to Sections 104(a) and 363 of the Bankruptcy Code Approving Bidding Procedures and Notice of the Auction Relating Thereto and granting Related Relief, to be filed at or around the time of the filing of the Debtors' petitions for relief (the "Auction Process").

**The Debtors' Need for Additional Liquidity Pursuant to the DIP Financing Arrangement**

9. The Debtors require post-petition financing to pay expenses necessary to effectuate the reorganization strategy contemplated by the Auction Process and the Plan and otherwise maintain the orderly operations of their businesses. The absence of additional working capital availability would immediately and irreparably harm the Debtors, their estates and their creditors and would impair the Debtors' ability to continue operating, effectuate their reorganization and confirm the Plan.

10. Without the DIP Financing Arrangement, **through which up to $3,425,000 of new loans are made available to the Debtors by the DIP Lender (on an availability formula basis)**, the Debtors would not have access to any liquidity. At the present time, the Debtors are in limited forbearance with the Pre-Petition Lender having materially defaulted under the terms of the Pre-Petition Loan Documents. In any event, the Debtors have determined that use of cash collateral alone would not permit sufficient cash utilization to provide the requisite liquidity. Indeed, without the excess liquidity provided by the DIP Lender's agreement to extend additional loans and advances in an amount up to $3,425,000, the Debtors would be compelled to cease operations, causing loss of employment, closure of stores and major losses for all constituencies.

11. As such, the Debtors' ability to effectuate a reorganization which provides for maximum recovery to creditor constituencies will be significantly impaired if the Debtors are unable to operate in the ordinary course and maintain their going concern value. A successful reorganization pursuant to the provisions of Chapter 11 of the Bankruptcy Code will preserve the value of the Debtors' estates to the benefit of all stakeholders.

12. Substantially all of the Debtors' assets are encumbered by liens and security interests in favor of Pre-Petition Lender. Prior to making this Application, the Debtors canvassed the available credit markets but were unable to obtain financing on an unsecured, junior secured or non-priority basis. Indeed, it is only by virtue of Lender agreeing to a consensual priming of its own Pre-Petition Obligations, that the Debtors are able to gain this critical excess liquidity. In the Debtors' business judgment, the terms and condition of the DIP Financing Arrangement are fair and represent the best financing option available under the circumstances.

13. Prior to the Petition Date, the Debtors negotiated the proposed DIP Financing Arrangement with the Lender, including providing the Lender with the Budget. The Debtors negotiated the terms of the DIP Financing Arrangement with the Lender at arm's length and in good faith as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel. For all of these reasons, the Debtors submit that the proposed DIP Financing Arrangement is in the best interests of the Debtors, their estates and their creditors and should be approved.

**Material Terms of the DIP Financing Arrangement
and the Adequate Protection of Lender's Pre-Petition Interests**

14. *Amounts to be Borrowed.* Under the DIP Financing Arrangement, the Debtors, jointly and severally, will be authorized on an interim basis to enter into the DIP Loan Documents, and borrow monies and obtain financial accommodations pursuant to the DIP Agreement, in an aggregate principal amount of up to $500,000.00 for the interim period, inclusive of "new money" post-petition advances, new post-petition letters of credit issued thereunder and post-petition letters of credit issued in replacement of pre-petition letters of credit

issued under the Pre-Petition Loan Documents ("Replacement Letters of Credit")[2], pending entry of the Final Order (the "Interim DIP Obligations"). Upon entry of the Final Order, subject to the terms and conditions of the DIP Financing Arrangement, (a) additional advances and financial accommodations by the DIP Lender shall be made such that the aggregate outstanding amount of advances and letters of credit issued under the DIP Financing Arrangement shall not exceed $3,425,000, but exclusive of Replacement Letters of Credit, and (b) Replacement Letters of Credit may be issued in aggregate amount not to exceed $2,358,441.71 inclusive of those issued under the Interim Order (such Obligations, collectively, the "DIP Obligations"). The advances made to the Debtors shall only be used for purposes permitted or prescribed under the DIP Loan Documents, including, without limitation, the Budget, provided that notwithstanding the Budget, the DIP Lender shall have no obligation to make advances and/or issue letters of credit in excess of the "Borrowing Base" (the lesser of (i) $3,425,000 or (ii) the sum of 85% of eligible accounts, plus 90% of eligible credit card receivables, plus 100% of restricted cash, minus specified reserves). The Debtors estimate that during the interim period they will have availability of approximately $900,000 under the DIP Loan Documents, with availability gradually increasing in the weeks thereafter. The Debtors believe that the DIP Financing Arrangement should provide them with sufficient liquidity to allow their payment of post-petition expenses as and to the extent set forth in the Budget that accrue and/or become due during the time periods contemplated by the Budget. The Debtors submit that the DIP Loan Documents do not contain

---

[2] The Debtors recognize, and highlight for the benefit of the Court and parties in interest, that the issuance of Replacement Letters of Credit shall effect a "roll-up" of their pre-petition Letter of Credit obligations to the Lender. The Debtors submit that this is non-prejudicial to the rights of any creditor given that the Lender has a pre-petition lien on virtually all assets of the Debtors (including pre-petition inventory in excess of $10 million) and could, accordingly, seek to have a much larger amount of the Pre-Petition Obligations paid down as its Pre-Petition Collateral (including such inventory) is sold in the ordinary course. The Debtors submit that this limited roll-up, which is restricted solely to the issuance of new post-petition letters of credit (albeit replacement letters of credit) is reasonable under the circumstances and does not serve to prejudice the interests of the estates.

any unusual or non-"market" conditions on their ability to borrow and/or obtain financial accommodations from the DIP Lender.

15. *Interest Rates; Fees* The advances made to the Debtors at the "Base Rate" shall bear interest at the per annum rate equal to the Base Rate plus 4.0% (but in no event less than 5.5% per annum), and advances made to the Debtors at the "LIBOR Rate" shall bear interest at the per annum rate equal to the LIBOR Rate plus 5.0% per annum (but in no event less than 5.5% per annum). The DIP Lender shall receive a commitment fee of $300,000 and an annual administrative fee in the amount of $36,000 per year, payable monthly in advance with the first payment of $3,000 due and payable on the "Effective Date." The Debtors shall pay an unused Line of Credit Fee, which shall accrue at a rate equal to 0.50% per annum times the average daily unused portion of the "Line of Credit," payable monthly in arrears on the first day of each month. The Debtors shall pay a letter of credit fee, which shall accrue at a rate equal to 1.5% per annum times the daily balance of the undrawn amount of all outstanding standby Letters of Credit (including Replacement Letters of Credit), payable monthly in arrears on the first day of each month. The "Maturity Date" shall be November 30, 2010, unless extended in accordance with the terms and conditions of the DIP Agreement.

16. *Collateral Security.* In accordance with Section 364(c)(1) of the Bankruptcy Code, as security for the DIP Obligations, the DIP Lender will be granted a valid, perfected, priming, first-priority senior security interest in and liens on all of the Debtors' now owned and hereafter acquired, created or arising Collateral (as defined herein), subject only to the payment of the Carve-Out more fully described below (all such liens and security interests granted to the Lender, pursuant to this Order and the DIP Loan Documents, the "DIP Liens") and Permitted Liens. "Collateral" is defined as all assets and property of the Debtors and their estates, as more

fully described in the DIP Agreement. The DIP Liens will extend and attach to all Collateral and any proceeds of Collateral whether in existence or arising pre-petition or post petition, and is contemplated to include upon issuance of the Final Order (but not in the context of the Interim Order) recoveries of avoidance actions under sections 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code (the "Avoidance Action Recoveries"). The Debtors respectfully submit that the grant of the Super-Priority Claim against and the DIP Lien in the Avoidance Action Recoveries under these circumstances is appropriate. The Lender is extending an additional $3,425,000 in new money loaned on a post-petition basis. In exchange therefor, the DIP Lender should be entitled to assert a lien on and claims against any and every asset of the Debtors, which includes the Avoidance Action Recoveries. Significantly, the proposed order does not grant the Lender an interest in Avoidance Action Recoveries to secure the Pre-Petition Obligations or the Pre-Petition Adequate Protection Claim. Debtors respectfully submit that this distinction is significant and serves to limit any interest in the Avoidance Action Recoveries solely to the DIP Obligations. At the request of the Office of the United States Trustee, the Debtors requested that the DIP Lender defer any request for an affirmative grant of an interest in the Avoidance Action Recoveries to the Final Hearing in this matter, and the DIP Lender has acquiesced.

17. *Super-Priority Claim.* Also in connection with the DIP Obligations, the Lender will be granted pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed super-priority administrative expense claim, which allowed super-priority claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors' estates and the proceeds thereof, including upon issuance of the Final Order (but not in the context of this Interim Order) the Avoidance Action Recoveries, with priority over any and all administrative expenses, claims for adequate protection, and all other claims against the Debtors, now existing or hereafter

arising including, those of the kind specified in sections 503(b) and 507(b) (if any) of the Bankruptcy Code, and sections 105, 326, 328, 330, 331, 365, 502(b), 506(c), 507(a), 546, 726, 1113 and 1114 of the Bankruptcy Code and including administrative expenses arising under or out of any superseding case under chapter 7 of the Bankruptcy Code (collectively, the "Super-Priority Claim"), subject only to payment of the Carve-Out (as defined herein).

18. *Adequate Protection of the Pre-Petition Lender's Interest.* Further, the Pre-Petition Lender is willing to consent to the use of Cash Collateral in accordance with this Order and the Budget, in exchange, under sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code, for adequate protection of its interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to the amount of the aggregate diminution in the value of the Pre-Petition Lender's interests in the Pre-Petition Collateral, including any such diminution resulting from (a) the use of Cash Collateral, (b) the sale, lease, or use by the Debtors (or other decline in value) of the Pre-Petition Collateral, and (c) the imposition of the automatic stay under section 362 of the Bankruptcy Code (the aggregate amount of such diminution, which shall expressly include, among other things, the aggregate amount of the Cash Collateral used by the Debtors from and after the Petition Date, the "Adequate Protection Obligations"). To secure the Adequate Protection Obligations, the Pre-Petition Lender will be granted a valid, perfected, security interest in and liens on all of the Debtors' now owned and hereafter acquired, created or arising Collateral, but excluding Avoidance Action Recoveries, subject only to DIP Liens and the Carve-Out (all such liens and security interests granted to the Pre-Petition Lender to secure the Adequate Protection Obligations pursuant to this Order, the "Adequate Protection Liens"). Also in connection with the use of the Pre-Petition Cash Collateral of Lender, the proposed order seeks to grant to lender, an allowed, super-priority administrative expense claim (the "Cash

Collateral Super-priority Claim") under section 507(b) of the Bankruptcy Code with respect to all Adequate Protection Obligations. The Cash Collateral Super-priority Claim shall have priority over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, but excluding the Avoidance Action Recoveries. The Cash Collateral Super priority Claim is subject and subordinate only to the Super-priority Claim and the Carve-Out.

19. *Carve-Out*. As set forth above, the Interim Order and the DIP Agreement provides for an appropriate Carve-Out. Specifically, the DIP Financing Arrangement provides for a Carve-Out from the superpriority liens and administrative claims as granted to the Lender for (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code; and (ii) to the extent not otherwise payable from proceeds of Collateral, all allowed fees and expenses incurred in the Chapter 11 Case by professionals retained by the Debtors or by the Committee (collectively, the "Retained Professionals") in amount not to exceed the sum of (A) all allowed fees and expenses incurred by the Retained Professionals prior to the occurrence of the Termination Date (whether allowed before or after the Termination Date) not to exceed the amounts set forth in the Budget for such Retained Professional through the applicable Termination Date, plus (B) after the occurrence of the Termination Date, an amount not to exceed (i) $60,000 in the aggregate for the Retained Professionals of the Debtors, (ii) $15,000 in the aggregate for the Retained

Professionals of the Committee and (iii) $5,000 in the aggregate for the Chapter 7 Trustee, if any.

20. *Events of Default; Remedies.* The Debtors submit that the DIP Financing Arrangement contemplates Events of Default that are usual and customary in comparable debtor-in-possession financing facilities approved in other cases. Events of Default that relate to the Debtors' Chapter 11 cases include the Debtors' failure, within forty-five days of the Petition Date, to have filed the Plan (which Plan is satisfactory in form and substance to Lender in all respects). It shall also be an Event of Default if the Plan fails to become effective on or before the Maturity Date unless the Maturity Date has been extended in accordance with the terms of the DIP Agreement. The DIP Financing Arrangement also contemplates that the DIP Lender shall enjoy enforcement rights and remedies upon the occurrence and existence of an Event of Default (subject to applicable cure rights), including without limitation, the ability to accelerate the DIP Obligations and the ability to take possession of its Collateral with the automatic stay being deemed lifted for all such purposes, except that the Debtors shall have a period of five days following the receipt of notice of default within which to seek an order of the Court enjoining the DIP Lender from exercising rights and remedies, during which time the Debtors use that amount of Cash Collateral necessary to preserve and protect the Collateral.

21. *Debtors' Stipulations and Releases with Respect to the Pre-Petition Lender; Challenge Period.* The Debtors stipulate, in the Interim Order, as to the amount, enforceability, validity, priority and perfection of the Pre-Petition Obligations and the Pre-Petition Liens, and stipulate that they have no objections, offsets, defenses or counterclaims thereto. The Debtors also contemplate, in the Interim Order, their release of the Pre-Petition Lender from all claims, counterclaims, causes of action, defenses and offset rights with respect to the Pre-Petition

Obligations, the Pre-Petition Liens and the Pre-Petition Loan Documents. However, the Interim Order proposes that all such stipulations and releases shall be, for all purposes, subject to the rights of any party in interest other than the Debtors to commence an adversary proceeding seeking to invalidate, subordinate or otherwise challenge the Pre-Petition Obligations or the Pre-Petition Liens, if commenced within the later of forty-five (45) days after the appointment of a Creditors' Committee or sixty (60) days after the entry of the Interim Order. So that the Committee may properly investigate any potential challenges in this regard, the Interim Order proposes that the Committee may use up to $25,000 of Cash Collateral for an investigation.

22. *Other Material Provisions.* The Interim Order contemplates that the Lender's right to credit bid up to the sum of all post-petition and pre-petition Obligations, with respect to any sale of assets or equity under either section 363 of the Bankruptcy Code or a Plan of Reorganization, shall be recognized and not impaired by any further orders of the Court. The Debtors submit that this is not an unreasonable provision given the uncertain state of the law with respect to credit-bidding under reported decisions in certain federal judicial circuits other than the Second Circuit. Interim Order contemplates that the Debtors shall waive their rights under sections 522 and 506(c) of the Bankruptcy Code, as well as their rights to seek post-petition financing from third parties, cash collateral usage and/or the further encumbrance of their assets, other than pursuant to the terms and conditions of the DIP Loan Documents. The Debtors submit that these provisions are usual and customary in comparable debtor-in-possession financing facilities approved in other cases.

**Form and Manner of Notice**

23. The DIP Financing Arrangement requires that a Final Order approving this Application be entered within 30 days after the Petition Date. The Debtor therefore requests that

the Court (i) fix the date and time of the Final Hearing and (ii) approve the form and manner of notice with respect to the Final Hearing.

24. The Debtors have given notice of the Application and the interim hearing to consider the proposed Interim Order, and propose to send notice of the Final Hearing to consider this Application pursuant to a Final Order, by telecopy, e-mail (if agreed to by the recipient), overnight courier, by hand delivery or by first-class mail. Pursuant to Bankruptcy Rule 4001, the Debtor proposes to send notice of the Final Hearing to (i) the United States Trustee, (ii) the attorneys for the Lender, (iii) the attorneys for the Meridian Investor; (iv) all creditors known to the Debtors who may assert liens against any of the Debtors' assets, (iv) the Internal Revenue Service ("IRS"), (vi) the United States Attorney; (vii) the Pension Benefit Guaranty Corporation ("PBGC"), (viii) the parties appearing on the Debtor's List of 20 Largest Unsecured Creditors and (ix) those parties that have requested special notice pursuant to Rule 2002 of the Bankruptcy Rules. The Debtor submits that such notice is adequate and sufficient.

25. The Debtor further asks that the Court specify that any and all objections to this Application be in writing and be filed and served so that the same are received no later than five days prior to the date scheduled for the Final Hearing.

**Authority for Requested Relief**

26. Section 364 of the Bankruptcy Code allows debtors to (i) obtain unsecured credit in the ordinary course of business, (ii) obtain unsecured credit out of the ordinary course of business and (iii) obtain credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the court may authorize obtaining credit or incurring debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on the debtor's unencumbered property or a junior

14

lien on encumbered property, or combination of the foregoing under Section 364(c) of the Bankruptcy Code.

27. The Debtor proposes to obtain financing under the DIP Financing Arrangement by providing security interests in and liens on substantially all of their assets pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

### Standard of Approval under Section 364(c) of the Bankruptcy Code

28. In order to obtain credit under Section 364(c), the Debtors must prove that (i) they are not able to obtain unsecured credit under Section 364(b) (i.e., by granting a lender administrative expense priority); (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Aqua Assocs.,* 123 B.R. 192, 195-6 (Bankr. E.D. Pa. 1991); *In re Crouse Group, Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *In re Ames Dept Stores, Inc.,* 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

29. Since substantially all of the Debtors' assets are already encumbered and given the Debtors' current liquidity condition, it was not possible to obtain credit on either an unsecured basis or by granting junior liens. In addition, the Debtors could not find a lender willing to extend credit on a non-priority basis. The Debtors believe that the terms set forth in the DIP Financing Arrangement represents the best financial package currently available to the Debtors.

30. The Debtors submits that during the negotiations with Lender, it engaged in a reasonable process to identify other potential lending sources and that no further search is required. *See Bray v. Shenandoah Fed. Sav. & Loan Assn (In re Snowshoe Co., Inc.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992); *In re Reading Tube Indus.,* 72 B.R. 329, 332 (E.D. Pa. 1987). Where there are

15

few lenders likely to be able and/or willing to extend the necessary credit to the Debtors, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117,120 n.4 (N.D. Ga. 1989); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34,40 (Bankr. S.D.N.Y. 1990).

31.     The Debtors believe that the terms set forth in the DIP Financing Arrangement are appropriate and reasonable, and it submits that this reasonable business judgment should be approved. *See In re Trans World Airlines, Inc.,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Group of lnstitutional Investors v. Chicago Mil. St. P. & Pac.* Ry., 318 U.S. 523, 550 (1943); *In re Simasko Prod.* Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). Bankruptcy courts typically defer to debtors' business judgment on most matters, including the decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.* 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

32.     In conclusion, the Debtors' management determined that the DIP Financing Arrangement is the best and possibly only financing option available to the Debtors and that the

terms of the DIP Financing Arrangement are fair, reasonable and in the best interests of the Debtors, their estates and their creditors. Therefore, the Debtors should be authorized to enter into the DIP Financing Arrangement.

**Good Faith**

33. As set forth above, the Debtors negotiated the terms of the DIP Financing Arrangement with the Lender at arm's length and in good faith as required by Section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel. Accordingly, DIP Lender should be entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code to the extent that any or all of the provisions of the Financing Arrangement, or any interim or final order of this Court pertaining thereto are hereinafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

**Request for Interim Hearing**

34. Rule 4001 of the Bankruptcy Rules permits a court to approve a debtor's request for the use of post-petition financing on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001. The Debtors' ability to reorganize their businesses will be impaired without access to the DIP Financing Arrangement on an interim basis. The Debtors submit that the requested interim relief should be approved because it is necessary in order to avoid the immediate and irreparable damage to the Debtors, their estates and their creditors.

35. Therefore, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing as soon as practicable after the Petition Date to consider the Debtors' application for authorization to obtain interim financing under the DIP Financing Arrangement.

### Request for Final Hearing

36. Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, the Debtors request the Court to set a date for the Final Hearing that is on or before September 8, 2010, but in any event no later than 30 days from the Petition Date.

### Conclusion

**WHEREFORE,** the Debtor respectfully requests that the Court enter the attached proposed Interim Order and otherwise schedule a hearing with respect to the proposed Final Order, and that the Court grant such other and further relief as may be just and proper.

**HAHN & HESSEN LLP**
Proposed Attorneys for the Debtor-in-Possession
488 Madison Avenue
New York, New York 10022
212-478-7200 tel
212-478-7400 fax

By: */s/ Rosanne T. Matzat*
      Rosanne T. Matzat
      A Member of the Firm