UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| THE WECK CORPORATION, | : | **Case No. 10-_____ (____)** |
| d/b/a Gracious Home, et al.[1] | : | |
| | | Motion to Procedurally Consolidate Pending |
| Debtors. | : | |
| | : | |

-------------------------------------------------------------- x

**AFFIDAVIT OF JORDAN SMILOWITZ**
**PURSUANT TO BANKRUPTCY RULE 1007-2 OF THE LOCAL**
**BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

**JORDAN SMILOWITZ**, being duly sworn, deposes and says:

1.    I am the Presiden t and Chief Operating Officer("COO ") of the above-captioned debtors and debtors-in-possession (the "Debtors", "Gracious Home" or the "Companies").  I am authorized to submit this Declaration in support of the Debtors' chapter 11 petitions and the first day ple adings desc ribed here in.  I am    f amiliar with th e Debtors ' day-to -day opera tions, businesses and financial affairs.

2.    I  have been em  ployed with the Com  pany for  alm ost eighteen years and was named President and Chief Operating Officer in    early 2010.  During my tenure, I held various

---

[1]    The  Debtors i n these cas es, togethe r  with the last fo  ur d igits of th  eir resp ective  federal tax  i dentification numbers, are a s follows:  T he Weck C orporation 6 057;  West Weck, L LC 1 934;  G racious H ome.com, LLC 4754; Weck Chelsea, LLC 3431.

other senior management positions, including responsibilities for the companies' merchandising division, operations and distribution.

3. On the date hereof (the "Petition Date____"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (collectively, the "First Day Pleadings").

4. The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases. Among other things, the First Day Pleadings are designed to meet the Debtors' goals of: (i) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (ii) maintaining the confidence and support of their customers, employees, vendors and service providers during the Debtors' reorganization process; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' businesses, and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

5. In my capacity as President and COO, I am familiar with the Debtors' day-to-day operations, financial affairs, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge; (ii) my review of relevant documents; (iii) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (iv) my opinions based

on my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6. Parts I through III of this Declaration provide an overview of the Debtors' businesses, capital structure, and the circumstances giving rise to the commencement of these chapter 11 cases. Part IV summarizes the relief requested in each of the First Day Pleadings. Part V lists the schedules of information requested by Local Bankruptcy Rule 1007-2.

## I.

## THE DEBTORS' BUSINESSES

### Background

7. Founded in 1963, when now Chairman Natan Wekselbaum ("NW") and his brother emigrated from Cuba, the Debtors began as a small neighborhood hardware store on Manhattan's Upper East Side. Remaining family owned and operated for the ensuing 47 years, the Debtors today operate a housewares and home furnishings business at six (6) retail store locations, utilizing seven (7) store leases, a warehouse lease and an office lease, and an internet-based business, all under the name "*Gracious Home*". In addition to basic hardware and housewares, stores feature extensive selections of bedding and bath products, kitchen appliances, decorative hardware, decorative plumbing, window treatments, home décor, tableware, lighting and fixtures, fabrics, household appliances and vacuums and travel accessories.

8. Gracious Home also offers a wide range of customized products and services, including personal shopping, corporate and bridal gifts, decorative hardware, lighting and plumbing, key making, knife sharpening, lamp re-wiring, vacuum repairs, custom window treatments and stationary. Having built their reputation and clientele on quality of service, the stores cater not only to the sophisticated, higher-end, metropolitan consumer, but also architects, contractors, interior designers, electricians, plumbers, carpenters and developers.

## Organizational Structure

9.      Debtor, The W eck Corporation ("Weck Co rp.") is a Subchapt er S corporation, organized under the laws of the State of New York. W eck Corp. serves as the p rincipal obligor on the leases for the Eastside Location (as d efined below) and the principal buying agent for inventory sold and distributed in all retail locations. As suc h, inventory is purchased by W eck Corp. and Weck Corp. stands as the obligor f or most of the Debtors' accounts payable and as principal ob ligee on the Debtors' account receiva ble. W est W eck, LLC ("W est Weck") is a limited liab ility co rporation organized under the laws of the State of New York and stands as principal obligor on the lease for the Westside Location (as defined below). Weck Chelsea, LLC ("Weck Chelsea") is a lim ited liability corporation organized under the laws of the State of Ne w York and stands as principal obligor on the leas e for the Chelsea Location (as defined below). Gracioushome.com, LLC ("GH.com") is a li mited liability corporation organized under the law s of the State of New York which ope rates the Debtors' retail internet site. As set forth more fully herein, all four Debtors are bor rowers and have pledged their assets under the D ebtors' pre-petition senior secured lending facility.

## Retail Locations

10.      Gracious H ome prim arily sells its products through its retail stores. The six Gracious Home retail locations are detailed as follows:

(a)      1992 Broadway, New York, NY 10023 (the "Westside Location");

(b)      1220 Third Avenue, N ew York, NY 10021 (the "Eastside 1220 Third Store");

(c)      1217 Third Avenue, N ew York, NY 10021 (the "Eastside 1217 Third Store");

(d)     1201 Third Avenue, N ew York, NY    10021 (the "Eastside 1201 Third Store," and collectively  with the Eastside 1220 Third Store   and the Eastside 1217 Third Store, the "Eastside Location");

(e)     766 Sixth Avenue, New York, NY 10010 (the "Chelsea Main Store");

(f)     45 W est 25th Street, N ew York,  NY 10010 (the "Chelsea Plum  bing & Decorative Hardware S howroom" and collectiv ely with the Chelsea Main Store, the "Chelsea Location").

For the fiscal year end  ing Decem ber 31, 2009 , th e retail stores accou  nted for ap proximately ninety-seven percent (97%) of the Debtors' revenues.

11.     <u>Corporate Accounts</u> .  The Debtors have devel      oped an extensive and loyal following of comm    ercial and trade custom      ers, including architects, interior designers, contractors, electricians, plum bers, carpenters and developers working in and around New York City.  Although new trade traffic        may visit the displays at a      ny of the Debtors' stores, a substantial amount of the Debtors'  trade business is now  on a re-order basis.  The D  ebtors have also develo ped substan  tial commercia l busine  ss with hotels, schools and residential and commercial real estate firm s which have corp orate Gracious Hom e accounts for autom atic and immediate order and re-order of janitorial supp lies, light bulbs, house wares, and other operating essentials.  In connection with the Debtors'        commercial and trade accounts, the Debtors' professionals offer expe rt product advice, instal lation inform ation, ope rating tutorials, detailed price estimates, special delivery services and other services as requested by the customer.

12.     <u>Internet</u>.  The Debtors also sell their products  directly to their consum ers through their internet site, located at <u>www.gracioushome.com</u>.  The Debtors' website allows the Debtors significant access to th eir custom ers, which the   Debtors track  in a databas  e po pulated with

information from approximately 50,000 customers. The Debtors' website provides customers with the opportunity to sign up to obtain exclusive email-only offers, obtain internet-only promotions, and provides information about the Debtors' product lines and retail store locations. For the trailing 12 month period, the Debtors' website produced total sales of approximately $2,000,000 which accounted for approximately three percent (3%) of the Debtors' revenues.

13.     In addition to the forgoing, Debtor Weck Corp. is lessor of certain commercial warehouse space located in Woodside, Queens, New York, which serves as a central warehouse, storage and distribution center for all store locations and the internet sales (the "Warehouse").

14.     Debtor Weck Corp. is also the lessor of certain commercial space located at 632 Broadway, New York, New York 10012, which serves as the Debtors' corporate headquarters (the "Corporate Headquarters"). A majority of the Debtors' business activities, including senior management, purchasing, strategic planning, corporate communications, marketing, finance, human resources, internet and IT take place at the Corporate Headquarters.

**Employees and Labor Matters**

15.     The Debtors currently employ approximately 315 non-union employees, comprised of 255 employed at the retail stores and 60 who are considered part of the Corporate Headquarters. Historically, the Debtors have enjoyed favorable relationships with their highly qualified and enthusiastic personnel. The Debtors believe that their labor relations are good, and they have never experienced a work stoppage.

**Properties and Assets**

16.     The Debtors' primary assets include inventory, contract rights, intellectual property rights, and accounts receivable for goods sold. As indicated, the Debtors lease, and do not own, their headquarters, distribution center and warehouse in Woodside, Queens and their six retail store locations.

### Branded Products and Sourcing

17.     The Debtors sell and distribute certa      in Gracious Hom    e-branded products, including linens, cand les and cleaning produ cts. These branded produc ts are sourced from external manufacturers and distributed through the Debtors.

### II.

### CAPITAL STRUCTURE[2]

### Secured Debt

18.     The Debtors are party    to that certai  n Modified and Extended Secured Non-Revolving Credit Note and Agreem ent dated as  of February 16, 2010 (the "Revolving Credit Agreement") entered into between The W      eck Corporation, W   est W  eck LLC, Gracious Home.com LLC and Weck Chelsea LLC, as Bo    rrowers an d Manufacturers and T raders T rust Company as Lender ("M&T" or "Lender") under th e terms of which the Debtors were indebted to Lender for the principal sum of approxim ately $11,475,000 (inclusive of Standby Letters of Credit in the principal am   ount of approxim ately $2,385,000), exclus ive of interest and fees unpaid as o f the Petition Date (th   e "Pre-Petit ion Senior Secured Ind  ebtedness"). The Pre-Petition Senior Secured Indebtedne ss is secu red by fully perfected liens and security interests in substantially all of the Debtors' assets, including accounts, invent ory, chattel paper, investm ent property, deposit accou nts, docum ents, equ ipment, ge neral intang ibles, instrum ents, letters of credit rights and other persona l property, and all proceeds of     the foregoing (collectively the "Senior Secured Collateral"), which lien   s and s ecurity in terests we re granted under various General Security Agreem ents entered into by  Debtors, Weck Corp.,   West W eck, and GH.com LLC on April 22, 2005 and Weck Chelsea on November 2, 2007 (collectively, the "GSA") .

---

[2]     The s ummary of t he loa n document and  security agreem ent set fo rth herein  is qualified in  its en tirety b y the documents themselves. To t he extent there is a di screpancy between the descriptions set fo rth herein an d the documents, the documents control.

19.     The Revolving Credit Agreement, as modified and extended on February 16, 2010, provided for payments of principal during 2010, which last principal payment of approximately $90,000 was made on or after March 31, 2010.  No further principal payments have been made since March 31, 2010 although a principal payment of $250,000 was due on or about June 15, 2010.  The Debtors have made interest payments on the Revolving Credit Agreement as scheduled thereunder.  The Pre-Petition Senior Secured Indebtedness under the Revolving Credit Agreement matured by its terms on June 15, 2010.  As of July 31, 2010, such Pre-Petition Senior Secured Indebtedness totaled approximately $11,312,000.

20.     On August 11, 2010, the Pre-Petition Senior Secured Indebtedness was sold by M&T to NewAlliance Bank ("NAB").  As more fully set forth herein, NAB has agreed to provide the Debtors with post-petition loans and advances, which will allow the Debtors to achieve its Chapter 11 reorganization goals.  In connection with NAB's acquisition of the Prepetition Senior Secured Indebtedness, the Debtors and NAB entered into a Forbearance Agreement and Amendment to Modified and Extended Non-Revolving Credit Note and Agreement.[3]

21.     Separate and apart from the Revolving Credit Agreement, as of the Petition Date, the Debtors are indebted to GE Commercial Distribution Finance Corporation ("GE")[4] in the amount of approximately $18,000 on account of "floor financing" provided in connection with major appliance floor sample displays and air condition inventory, which indebtedness is secured by products and appliances located as display models in the various retail locations.

---

[3]     Certain other prepetition loan agreements were modified as part of NAB's acquisition of the Pre-Petition Senior Secured Indebtedness.

[4]     Upon information and belief, Capital Solutions recently acquired GE's secured debt.

**Unsecured Debt**

22.     Historically, the Debtors have enjoye     d outstanding relationships with their suppliers.  In 2010, the Debtors purchased th          eir m erchandise from approxim    ately 1,000 suppliers, with the la     rgest supp  lier accoun  ting for approxim    ately 13% of the Debtors' merchandise purchases and the Debtors' 10 larg est suppliers accounting  for approximately 30% of such purchases.  The Debtors purchase substa    ntially all of their m  erchandise in the United States, the majority from domestic sources and the balance from importers.  The Debtors have no material long term contracts obligating them to purchase a minimum level of merchandise.

23.     The Debtors owe their trade vendors a pproximately $7,000,000 as of the Petition Date.  Thes e claim s are for the delivery of goods      and services to the Debtors.  In addition, monthly rental obligations for va  rious of the Debtors ' leas es ar e outstanding as of the Petition Date in the approximate amount of $700,000.

**Equity Interests**

24.     The Debtor corporations (i.e., T      he  Weck Corporation, W   est W eck, LLC, GraciousHome.com, LLC and W eck Chelsea, L LC) are all owned and controlled by founder or interests of the fa mily of f ounder, NW, including spouse and child ren (except for 8% of W est Weck, LLC which is held by two management employees).

**Recent Financial Information**

25.     The Debtors attained revenue of appr  oximately $60 m illion in fiscal y ear 2009 (year end ing Decem ber 31, 2009), which represents   a decline from  fiscal year 2008 revenue, which was approxim ately $70.4 m illion.  Current re venue projections for  fiscal year 2010 (year ending December 31, 2010) are approximately $58 million.

26.     The Debtors have suffered substantial ne     t earnings lo sses for the past several years.  The loss in fiscal year 2008 was approxim ately $2.7 million.  The loss in fiscal year 2009

was approxim ately $3.4 m illion.  The loss for fiscal year 2010 loss is projected to be approximately $3 million, exclusive of restructuring-related charges.

III.

**EVENTS LEADING TO THE CHAPTER 11 CASES**

27.     Several recent internal and  external factors have severe ly im pacted the Debtors, and, in particular their retail  businesses, ultim ately prompting th e near-term liquidity pressures that precipitated the decision to commence these chapter 11 cases.

**Market Conditions**

28.     The Debtors operate in the highly -competitive r etail indu stry, specifically in th e home sector.  Due to their ex tensive merchandise assortment, the Debtors compete against many different types and sizes of retailers operating in    several different retail  distribution channels. The Debtors, along with their com petitors, are influenced by a number of factors affecting retail sales of hom e goods on a national level, in      cluding but not lim ited to, general econom ic conditions (including the housing m arket), the ove rall macroeconomic environment and related changes in the retailing environment, consumer preferences and spending habits.

29.     Since the collapse of the U.S. subprim      e and Alt-A m ortgage industry in the second quarter of 2008, the decline in the housing market and the tightening of the credit markets have led to a decline in consum   er discretionary spending.  This decline has had a significant adverse im pact on m any retail  sectors, including house w ares and hom e i mprovement, in the form of decreased sales.

30.     In addition to the difficult conditions a ffecting the national econom y, the Debtors have been specifically affected by the health of   the New York City ec onomy.  As  reported in May 2010, since August 2008, the net job loss in New York City was 131,000 jobs (down from a peak of 184,000 jobs as recently as Dece      mber 2009) , with m ost of those jobs in the private

- 10 -

sector--particularly the financial and legal industries. These are the jobs held by many of the Debtors' customers, adversely impacting the Debtors' sales levels since fiscal year ending December 31, 2007.

31.     It is well known that the Debtors are not the only retailer to struggle in the current economic climate, the most difficult downturn experienced in both New York City and the United States in many decades. In fact, over the last few years, retailers such as Jennifer Convertibles, Lenox, Eddie Bauer, Filene's Basement, Fortunoff, KB Toys, Goody's, Steve & Barry's, Mervyn's, Crabtree & Evelyn, Boscov's and Gottschalks have all sought relief under chapter 11.

### Operational Issues

32.     The Debtors recently have experienced a number of operational challenges which have impacted the performance of their various business sectors. These challenges, combined with their declining revenues and operating losses, have severely impacted the Debtors' ability to operate successfully in the marketplace.

33.     In the early Spring of 2010, the Debtors engaged Triton Equity Partners, LLC ("Triton") to assist them in addressing these various operational issues, including the implementation of a workforce reduction, consolidation of product lines, institution of credit card receivable financing and other efficiencies designed to realize significant cost reductions. Over the ensuing ninety (90) days, the Debtors, assisted by Triton, negotiated, structured and implemented these various measures, including a prepetition reduction of work force, however, the Debtors have determined that any further workforce reduction would risk severely impinging on the Debtors' hallmark service standards and, therefore, were not appropriate to further long term strategies of reorganization.

## Prepetition Lease Negotiations

34.     The Debtors, assisted by Triton, furthe     r undertook a review of the Debtors'
obligations under their va rious leases and in co njunction with the Debtor s' counsel, determined
that cer tain of such le ases and  locations con tain over m arket term s, are subject to   near-term
expiration dates which could force   the Debto rs to r enegotiate som e of their key st ore l eases at
potentially m aterially higher rent al rates, prov ide for space that   is in excess of the Debtors'
current needs and/or m ay allow the Debtors an  opportunity to seek econom ic value via transfer
and assignment.  Accordingly, the  Debtors, assisted by Triton, ar e exploring various options and
alternatives on a   le ase by lease   b asis tha t maxim ize the  Debtors ' s trategic pos ition in  th e
marketplace and/or maximizes asset value.

35.     The Debtors ultim ately determ ined that a re structuring of their busin esses could
not be com pleted outside of the chapter 11 pro   cess, and that the co  mmencement of this  cas e
would provide the opportunity to,  among other things, right-size the Debtors' businesses through
(i) the eva luation and elim ination of liabilities that serve as a drain on th e Debtors' profitability,
(ii) operational im provements, a nd (iii) consolidation   or improvem ent of re tail operations by
rejection and/or the transfer and assignment of certain leases.

## Alternate Eastside Space

36.     Prior to the Petition Date, the Debtors e  xplored alternative retail space availab le
on a lower cost basis w  hich would  facilitate cost saving and opera tional consolidation.  In that
context, the Debtors are in advanced discussi     ons with Vornado Realty Trust ("V    NO") with
respect to certain altern   ative retail space poten   tially available on two levels at 1      133 Third
Avenue, New York, New York, running the entire city block from        66 th Street  to 67 th Street

("1133 Third Store"). [5] From the Debtors' perspective, the 1133 Third Store represented an opportunity to consolidate all Third Avenue Stores into a single lo cation, within three blocks of the existing Eastside L ocation, at an overall re ntal and operational savings with an extended lease term . Further, the 1133 Third Store prov ides signif icant opportunity for sales growth through improved merchandising presentation and customer convenience under one roof.

### Restructuring and Plan Support Agreement

37.     At the sam e tim e as the Debtors an d Triton worked to accom plish operational savings and explore lease alternatives, the Debt ors and Triton aggressively sought sources of capital which would allow the Debtors to a ccomplish this re structuring in a Chapter 11 proceeding. In this context, after ex ploring various alternatives, the Debtors and Triton decided to enter into negotiations with Meridian Acquisition Ventures, LLC or its design ee ("Meridian") with respect to an infusion of capital by Meridi an on specific term s and conditions which would allow th e Debtors to a chieve their goals of a r estructuring and reorgani zation serving the best interests of the va rious parties in interes t, in cluding the Debtors' cred itors. Af ter extens ive negotiations, the Debtors reached an agreement with Meridian and the other pre-petition equity holders, including NW, to restructure the Debtors' financial position in th e context of a Chapter 11 bankrup tcy proceed ing under which, subject to certain conditio ns, NewAlliance Bank ("NAB") agreed to acq uire Pre-Petition Senio r Secured Indebtedness and provide debtor-in-possession and exit financing, and Meridian and NW agreed to provide capital to fund the Debtors' exit from Chapter 11. In connection with the agreem ent of NAB to provide DIP and exit financing and the agreement of Meridian to provide investment capital, the Debtors engaged

---

[5]    In the c ontext of s uch act ive di scussions, the De btors f urther e xplored wi th V NO, al ternatives which m ight facilitate the Debtors' operational and consolidation goals by means of a potential capital infusion by VNO into the Deb tors. Such d iscussions we re u ltimately ter minated b y m utual ag reement o f the Deb tors an d VNO although lease negotiations are in the advanced stages.

Thomas Shull and Paul Jen, seasoned and experien ced retailers, as Chief Executive Officer and Senior Vice President of Strategic Planning, respectively. Mr. Natan W ekselbaum, the Debtors' founder, will continu e in the capacity of Chairm an along with the un dersigned as President and COO.

38. The agreement among the Debtors and Meridian's designee GH Acquisition, LLC ("GHA") is reflected in the Investment and Stan dby Purchase Agreem ent (the "ISPA") dated as of August 11, 2010. Consistent with the ISPA, th e Debtors intend to f ile shortly, with the support of other parties, a proposed Plan of Reorganization (the "Plan") and Disclosure Statement which provides for, among other things : (a) NAB's treatm ent of its pre-petition secured claim aggregating approxim ately $11.3 m illion th at would allow for a distribu tion to unsecured creditors based on a voluntary reduc tion of the proposed distribution on NAB's secured claim; (b) NAB to provide a debtor-in-possession credit facility to fund the Chapter 11 Cases and a ssist the Companies' cr itical need to purchase a dditional in ventory hea ding into th e Fall retail season; (c) N AB to provide an exit credit facility; (d) GHA, through investm ents by Meridian and NW , to provide cap ital to support the Debtors' exit from Chapter 11. Also in connection with the foregoing, the Plan currently envisions that the Debtors will enter into a new lease of the 1133 Third Store from VNO, which would replac e and supplant the Eastside Location and serve as th e new eastside flagship st ore. Meridian would r eceive certain preferred equity interests in GHA and NW and certain fa mily or managem ent team me mbers providing capital would receive subordinated minority equity interests.

### Market Test Program & Auction Process

39. The Meridian has ag reed with the Debtors that the appropriate course of action in order to insure that the proposal in the Plan represents the highest and best return for stakeholders is to conduct post-petition a m arketing process, which began prior to these chapter

11 cases, and a poss ible auction ( the "Auction") at which a dditional qualified proposals for the sponsorship and funding of a plan of reorganiza tion for the Debtors would be entertained. The Auction will provide a vehicle fo r the Debtors and their credito rs to obtain the highest or b est offer from potential investors, provide ultimate transparency to the marketing process, enable the Debtors to ensure that they have received m aximum value f or their ass ets, and bring finality to the Debtors' reorganization efforts.

40. The Debtors will seek B ankruptcy Court approval of bidding procedures that will govern the Auction ("Bidding Pro cedures"). The Bidding Proced ures will afford potential sponsors the opportunity to obtain infor mation from the Debtors, subm it qualified higher or better proposals than the ISPA and participate in the Auction. The Bi dding Procedures were developed by Triton and the Debtors' counsel, and approved by Meridian. However, the Debtors intend to work with any statutory creditor s' committee appointed in th ese chapter 11 cases and NAB to discuss and incorporate as m any of thei r comm ents and suggests as the Debtors dee m appropriate.

41. As the COO, I am one of the officers of the Debtors responsible for devising and implementing the Debtors' business plans and st rategies, overseeing the Debtors' financial, operational, and other busi ness affairs. I also am responsible for supervising the m aintenance of the Debtors' books and records. Moreover, in m y capacity as COO, I have been involved in the Debtors' restructuring process (the "Restructuring"), including, inter a lia, (a) partic ipating in the development, negotiation and im plementation of va rious strategic alternatives for restructuring, reducing or m odifying the Debt ors' indebtedness; (b) m anaging prof essionals engaged by the Debtors in connection with the Restructuring; (c) supe rvising the preparation of the documentation necessary to im plement the Restructuring; and (d) consulting, on a regular basis,

with the Debtors' other officers and executives. I also have been advised by counsel that this Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334.

42. The Debtors according ly have determ ined that the comm encement of these Chapter 11 cases would provide the best alternative to eliminate underproductive operations and to restructure their bus inesses and f inancial affairs. The goal of this chapter 11 proc ess will be the im plementation of a business plan that w ill recas t an d stream line the Debto rs' various business se gments to p osition the Debtors to compete successfully in the retail, e-comm erce industries and continue to provide superior products and service to its valued custom ers. The Debtors also intend to use the chapter 11 case to c ontinue to negotiate with their other landlords and to evaluate their lease portfolio. These immediate restructuring initiatives will allow the Debtors to focus their resources on (i) stabiliz ing and strengthening their core an d histo rically profitable stores, and (ii) exploring and im plementation of stra tegies for exiting th is chapter 11 case in an expeditious and cost effective m anner, all while continu ing to operate its reta il and internet businesses.

## IV.

## SUMMARY OF FIRST DAY PLEADINGS

43. The Debtors intend to seek relief from the Court as soon as possible after the Petition Date through each of the motions described below:

| **TITLE** | **PURPOSE OF MOTION** |
|---|---|
| Debtors' Motion for Joint Administration | Authorization to ha ve case s join tly administered and procedurally consolidated. |
| Motion Pursuant to Bankruptcy Rule 1007(c) for an Extension of the Tim e to File the Debtors' (I) Schedules of Assets and Liabilities, (II) Schedules of Current Incom e and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, and (IV) Statements of Financial Affairs | A 30-day e xtension of the tim e required to file schedules and statem ents of financial affairs is requested |
| Motion Pursuant to Sec tions 105(a), 342(a), and 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a) and 2002(a), (f), and (l) and Local Bankruptcy Rule 1007-1 for (I) W aiver of Requirement to File List of Creditors, and (II) Authority to Establish Procedure s to Notif y Creditors of the Commencem ent of the Debtors' Chapter 11 Cases | Waiver of the requir ement to f ile a list of creditors, and to es tablish procedures by which to notif y parties of the commencement of these chapter 11 cases, is requested. |
| Motion for an Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Im plementing Certain Notice and Case Management Procedures | Authorization to establish certain notice and case management procedures is requested. |
| Motion for an Order Pursua nt to Sections 105(a), 345(b), 363(c) and 364(a) of the Bankruptcy Code Authorizing the Debtors to (I) Continue Using Existing Cash Management System, (II) Maintain Existing Bank Accounts and Business Form s, and (III) Waive Requirements of Section 345(b) of the Bankruptcy Code | Authorization to use the Debtors' existing bank acco unts and cash m anagement system is requested. |
| Motion Pursuant to Secti ons 105(a) and 363(b) of the Bankruptcy Code (I) Authorizing Paym ent of Wages, Compensation and Employee Benefits and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations | Authorization to pay prepetition wage claims and continue existing employee benefit programs is requested. |

| TITLE | PURPOSE OF MOTION |
|---|---|
| Motion for Order Pursuant to Sections 105(a), 363, 503(b)(1), 1107(a) a nd 1108 the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to Honor Certain          Prepetitio n Customer Programs | Authorization to honor certain existing prepetition customer programs is requested. |
| Motion for an Order Pursua nt to Sections 105(a), 362(d), 363(b) and 503(b) of the Bankruptcy Code (I) Authorizing the Debtors to (A) Continue th eir Workers' Com   pensation Program and its Insurance Program s and (B) Pay All Obligations in Respect Thereof and (II) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations | Authorization to continue workers' compensation programs and insurance programs, and pay all obligations in respect thereof, is requested. |
| Debtors' Motion, Pursuant to Sections 105(a), 363(b), and 541 of the Bankruptcy Code, (i) for Authorization to Pay P  repetition S ales and  Use Taxes and (ii) to Schedule a Final Hearing | Authorization to pay a   ll prepe tition sales and use taxes is requested. |
| Emergency Motion for Order under Sections 105, 363, 364(c)(1) & (2), and 364(e), Fed. R. Bankr. P, 2002, 4001, and 9014, (I) Authorizing Debtors to Obtain   Post-Petit ion Financing on Super-priority and  Secured Basis, (    II) Perm itting the Use of Cash Collateral, (III) Gran       ting Interim Relief, and (IV) Scheduling a Final Hearing under Fed. R. Bankr. P. 4001(c) | Authorization to incur debtor in possession financing is requested. |

**V.**

**INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2**

44.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

45.     In acco rdance with  Local Bankrup tcy Rule  1007-2(a)(3), and to the be st of m y knowledge, information, and belief, no prepetition committee has been formed in this chapter 11 case.

46.     In accordance with Local Bankruptcy Rule 1007-2(a)(4), Schedule 1 hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the 40 largest unsecured claims (excluding insiders, unless otherwise noted) against the Debtors. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on Schedule 1 regarding, among other things, the actual validity of any such claims.

47.     In accordance with Local Bankruptcy Rule 1007-2(a)(5), Schedule 2 is a list of the names and addresses of the creditors holding the five largest secured claims against the Debtors, as well as the names and addresses for the holders of record of such secured claims. Such list includes the amount of the claim, an estimate of the value of the collateral, and whether the claim or lien is disputed, subject, however, to the reservations of rights stated on Schedule 2.

48.     In accordance with Local Bankruptcy Rule 1007-2(a)(6), Schedule 3 hereto provides a summary of the Debtor's assets and liabilities.

49.     In accordance with Local Bankruptcy Rule 1007-2(a)(7), Schedule 4 hereto provides a list of the number and classes of shares of stock, debentures or other securities of the debtor that are publicly held, and the number of holders thereof, listing separately those held by each of the Debtor's officers and directors and the amounts so held.

50.     In accordance with Local Bankruptcy Rule 1007-2(a)(8), Schedule 5 hereto is a list of the Debtors' property not in the Debtors' possession, including property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

51.     In accordance with Local Bankruptcy Rule 1007-2(a)(9), S chedule 6 hereto is a list of the prem ises owned, leased, or held un der other arrangem ent, from which the Debtors operate their business.

52.     In acco rdance with Lo cal Bankrup tcy Rule 1 007-2(a)(10), Schedule 7 hereto provides the location of the Debtors' substantial assets, the location of its books and records, and the value of any assets held by the Debtors outside the territorial limits of the United States.

53.     In accordance with Local Bankruptcy Rule 1007-2(a)(1l), Schedule 8 hereto is a list of litigation commenced against the Debtors.

54.     In acco rdance with Lo cal Bankrup tcy Rule 1 007-2(a)(12), Schedule 9 hereto contains the nam es of t he individuals who comp rise the Debtors' exis ting senior m anagement, their tenure with the Debtors, and a brief su         mmary of their relevant responsibilities and experience.  The Debto rs in tend to  continue to operate   as debtors in posse   ssion pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

55.     In accordance with Local Bankruptcy Rule 1007-2(b)(I), Schedule 10 hereto is the estimated amount of the payroll to employees of the Debtors (exclu sive of officers, directors and stockholders) for the 30-day pe   riod following the comm  encement of the Debtors' chapter 11 case

56.     In accordance with Local Bankruptcy Rule 1007 -2(b )(2)(A), Schedule 11 hereto contains the am ounts to be paid to  the Debtors' officers,  directors, and stoc kholders for services for the 30-day period following the commencement of the Debtors' chapter 11 cases.

57.     In accordan ce with Local Bankru   ptcy Rule I007-2(b)(3),   Schedule 12 hereto contains the estim ated cash receipts and disbur  sements, net cash gain or loss, obligations and

receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the commencement of the Debtors' chapter 11 cases.

58.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Accordingly, I respectfully request that the Court grant all of relief requested in the First Day Pleadings and such other and further relief as may be just and appropriate.


By:     */s/ Jordan Smilowitz*
                JORDAN SMILOWITZ
                President & COO


Sworn to before me this
13th day of August, 2010

*/s/ Jill Posephney*
Notary Public, State of New York

Notary Public, State of New York
No. 02PO6162323
Qualified in Dutchess County
Commission Expires March 12, 2011

**SCHEDULE 1**

**CONSOLIDATED LIST OF CREDITORS
HOLDING 40 LARGEST UNSECURED CLAIMS AGAINST THE DEBTORS[1]**

      The following is a list of creditors holding the forty (40) largest unsecured claims against the Debtors. This list has been prepared from the unaudited books and records of the Debtors. The list reflects am ounts from the Debtors' books and records as of July 31, 2010. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtor's chapter 11 case. This list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101 except as otherwise noted, or (2    ) secured creditors, unl ess the value of the collateral is such that the unsecured d eficiency places the creditor among the holders of the forty (40) large st unsecur ed claim s. The inf ormation here in s hall no t co nstitute an adm ission of liability by, nor is it binding on, the Debtors. Mo reover, nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated, disputed or subject to set-off [2] | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| TRUE VALUE COMPANY | P.O. BOX 3316 BOSTON, MA 02241-3316 | Trade | | $722,102 |
| LINCOLN METROCENTER PARTNERS LP | 1995 Broadway, 3rd Floor New York, NY 10023 | Rent/RE Tax | $270,161 | |
| JOHN MATOUK & CO INC | 11 East 26th Street New York, NY10010 | Trade | | $165,883 |
| FRAYDUN REALTY CO | 150 E. 58th Street New York, NY 10155-2899 | Rent/RE Tax | $143,096 | |
| HABIDECOR & ABYSS. | P.O. Box 429 Windsor, NJ 08561-0429 | Trade | | $136,173 |
| SATCO PRODUCTS INC | 110 Heartland Blvd. Brentwood, NY 11717 | Trade | | $134,973 |
| ROCKROSE DEVELOPMENT CORP | 290 Park Avenue South, New York, NY 10010 | Rent/RE Tax | $133,675 | |
| YVES DELORME | 1725 Broadway Charlottesville, VA, 22902 | Trade | | $132,350 |

---

[1]    The Debtors will continue to update this information and will p rovide a co mplete List of Cred itors as so on as practicable.

[2]    **The claims listed herein are currently under investigation and, as a result, unless otherwise indicated herein, remain contingent, unliquidated, disputed or subject to set-off.**

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated, disputed or subject to set-off [2] | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| SCANDIA DOWN LLC | P.O. Box 2465 La Crosse, WI 54602-2465 | Trade | | $92,860 |
| THE NEW YORK TIMES W7770 RA | 620 Eighth Avenue New York, NY 10018 | Expense | | $90,585 |
| VISUAL COMFORT & CO | PO Box 974399 Dallas, TX 75397-4399 | Trade | | $90,330 |
| MIELE APPLIANCES INC.(8810) | 9 Independence Way Princeton, NJ 08540 | Trade | | $88,326 |
| SFERRA BROS LTD | 15 Mayfield Avenue P.O. Box 6690 Edison, NJ 08818-6690 | Trade | | $86,264 |
| AMERICAN EXPRESS CO | P.O. Box 2855 New York, NY 10116 | Credit Card | | $84,505 |
| VORNADO AIR CIRCULATION | P.O. Box 873895 Kansas City, MO 64187-3895 | Trade | | $76,950 |
| H.GEORGE CASPARI CO. | 99 Cogwheel Lane Seymour, CT 06483 | Trade | | $74,999 |
| HOLTKOETTER INT'L INC | 155 Hardman Avenue South P.O. Box 623 South St. Paul, MN 55075 | Trade | | $74,621 |
| OXFORD INSURANCE | Attn:  Matt Power 225 Broadhollow Road Melville, NY 11747 | Benefits | | $66,224 |
| CONTINENTAL SUPERBAG LLC | PO Box 65753 Charlotte, NC 28265 | Trade | | $65,703 |
| BRADFORD SWETT MANAGEMENT LLC | 1536 Third Avenue, 3rd Fl. New York, NY 10028-2110 | Rent/RE Tax | $62,139 | |
| ANTICA FARMAISTA | 2013 4th Avenue, Suite 205 Seattle, WA 98121 | Trade | | $60,610 |
| TOWNSEND HOUSE CORP. | P.O. Box 21008 New York, NY 10286-2525 | Rent/RE Tax | $56,000 | |
| DIPTYQUE | 303 Park Avenue So #1060 New York, NY 10011 | Trade | | $53,138 |

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated, disputed or subject to set-off [2] | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| BALDWIN HARDWARE | 13212 Collections Center Drive Chicago, IL 60693 | Trade | | $50,409 |
| SCHONBEK WORLDWIDE LIGHTING IN | P.O. Box 415343 Boston, MA 02241-5343 | Trade | | $49,245 |
| BLUEAIR INC. | 17 N. State St. Suite 1830 Chicago, IL 60602 | Trade | | $48,999 |
| TIZO DESIGN INC. | 7722 Densmore Avenue Van Nuys, CA 91406 | Trade | | $45,569 |
| TENTINA | 1186 Route 109 P.O. Box 615 Lindenhurst, NY 11757 | Trade | | $44,771 |
| BONAFIDE ESTATES, INC. | 630 Fifth Ave., Suite 3165 New York, NY 10111 | Rent/RE Tax | $43,850 | |
| BENJAMIN MOORE & CO | Newark NJ Area 12 P.O.Box 4023 Church Street Station New York, NY 10261-4023 | Trade | | $43,467 |
| SAMUEL HEATH & SONS PLC | 111 East 39th St., Suite 2R New York, NY 10016 | Trade | | $42,721 |
| BELLINO INC. | 18 West Forest Avenue Englewood, NJ 07631 | Trade | | $42,248 |
| H.SCHULTZ & SONS | P.O. Box 1557 777 Leigh Avenue Union, NJ 07083 | Trade | | $41,050 |
| OMNIA INDUSTRIES, INC. | P.O. Box 330 Five Cliffside Drive Cedar Grove, NJ 07009 | Trade | | $40,759 |
| ROHL CORPORATION | 3 Parker Irvine, CA 92618 | Trade | | $40,348 |
| TRG GROUP | 2047 Westport Center Drive St. Louis, MO 63146 | Trade | | $39,763 |
| 179 E 70TH STREET CORP | 179 E. 70th Street New York, NY 10021 | Rent/RE Tax | $39,705 | |
| TUMI INC. | 1001 Durham Avenue South Plainfield, NJ 07080 | Trade | | $38,013 |
| HANSGROHE, INC | 1490 Bluegrass Lakes Pkwy Alpharetta, GA 30392 | Trade | | $37,970 |

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated, disputed or subject to set-off [2] | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| TOTO USA LTD | P.O. Box 101388 Atlanta, GA 30392 | Trade | | $37,113 |
| CON EDISON | JAF P.O. Box 1702 New York, NY 10060-0016 | Utility | | $36,135 |

## SCHEDULE 2

## LIST OF CREDITORS
## HOLDING TOP 5 SECURED CLAIMS

The following is a con densed list of credito rs holding the 5 largest secured claim s agai nst the Debtors. Th is list has been prepared in accordance with Local Bankruptcy Rule 1007-2(a)(5 ). The inform ation herein sh all not cons titute an ad mission of liability by, nor is binding on, the Debtors.

| Name of Creditor | Mailing Address | Description of Collateral | Estimate of the Value of the Collateral Securing the Claim | Amount of Claim | Disputed |
|---|---|---|---|---|---|
| NewAlliance Bank | New Alliance Bank, 690 Canton Street, Suite 214 Westwood, MA 02090 | Substantially all of the assets of The Weck Corporation, West Weck, LLC, Weck Chelsea, LLC and Gracious Home.com | Undetermined 11,3 | 2,269.86 | |
| GE Commercial Distribution Finance Corporation[1] | 500 Momany Drive St. Joseph, MI 49085 | Products and appliances located as display models in various retail locals | Undetermined | $18,000 | The claims listed herein are currently under investigation and, as a result, unless otherwise indicated herein, remain contingent, unliquidated, disputed or |

---

[1] Upon information and belief, Capital Solutions recently acquired GE's secured debt.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | subject to set-off. |
| Hitachi Capital America Corporation | 21925 Network Place Chicago, IL 60673 | Two *Gracious Home* delivery Trucks | Undetermined | $73,654 | The claims listed herein are currently under investigation and, as a result, unless otherwise indicated herein, remain contingent, unliquidated, disputed or subject to set-off. |

## SCHEDULE 3

## DEBTORS' BALANCE SHEET
### (as of July 31, 2010 unaudited)

| ASSETS: | |
|---|---:|
| **Current assets:** | |
| Cash and cash equivalents | 1,775,826 |
| Accounts receivable, net of allowance | 396,503 |
| Inventory | 9,195,725 |
| Prepaid expenses and other current assets | 926,164 |
| Intercompany | (0) |
| **Total Current Assets** | 12,294,218 |
| Property & equipment | 19,680,984 |
| Accumulated depreciation - property and equipment | (7,965,982) |
| Investments | 323,347 |
| Intangible assets | 90,000 |
| Accumulated depreciation - intangible assets | (90,000) |
| Other assets (rent and other security deposits) | 1,375 |
| **Total Assets** | **24,333,941** |

| LIABILITIES AND OWNERS' EQUITY (DEFICIENCY): | |
|---|---:|
| **Current liabilities:** | |
| Accounts payable and accrued expenses | 7,677,658 |
| Accrued income taxes | (104,682) |
| Other current liabilities | 1,545,042 |
| Current maturities of long term debt | 124,992 |
| **Total Current Liabilities** | 9,243,010 |
| Line of credit | 8,988,682 |
| Capital lease obligations net of current portions | 26,619 |
| Shareholder loans | 168,469 |
| Deferred rent | 11,521,086 |
| **Total Liabilities** | **29,947,865** |
| **Owners' equity:** | |
| Common stock | 850,000 |
| Unrealized gain on investments | (0) |
| Paid-in capital | 530,237 |
| Treasury stock | (1,341,221) |
| Accumulated earnings (deficiency) | (1,114,209) |
| Shareholder distributions | (1,523,721) |
| Allocated retained earnings | (3,015,009) |
| **Owners' Equity (deficiency)** | **(5,613,923)** |
| **Total Liabilities and Owners' Equity (deficiency)** | **24,333,942** |

# SCHEDULE 4

## NUMBER AND CLASSES OF SHARES OF STOCK, DEBENTURES OR OTHER SECURITIES OF THE DEBTORS THAT ARE PUBLICLY HELD; THE NUMBER OF HOLDERS THEREOF

## N/A

## STOCK, DEBENTURES OR OTHER SECURITIES OF THE DEBTORS HELD BY EACH OF THE DEBTORS' OFFICERS AND DIRECTORS, AND THE AMOUNTS SO HELD

## N/A

## SCHEDULE 5

## DEBTORS' PROPERTY NOT IN DEBTORS' POSSESSION

| Type of Property | Value of Property | Person or Entity in Possession | Address and Telephone Number |
|---|---|---|---|
| Common Stock | $50,000 | Appliance Dealers Co-op | 2 Matrix Drive<br>Monroe Twp, NJ 08831-3702<br>(609) 235-1000 |
| Common Stock / Note | $264,473 | True Value (Weck Corp.) | P.O. Box 3316<br>Boston, MA 02241-3316 |
| Common Stock | $8,874 | True Value (West Weck) | P.O. Box 3316<br>Boston, MA 02241-3316 |
| Cash Deposit | $1,375 | Con Edison. (Weck Chelsea) | JAF P.O. Box 1702<br>New York, NY 10060-0016 |
| Cash Deposit | $363,807 | JP Morgan Chase (Weck Corp. Checking) | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, NY 10036 |
| Cash Deposit | $81,491 | JP Morgan Chase (West Weck Checking) | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, NY 10036 |
| Cash Deposit | $173,906 | JP Morgan Chase (Weck Chelsea Checking) | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, NY 10036 |
| Cash Deposit | $74,659 | JP Morgan Chase (Weck Corp. Savings) | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, NY 10036 |
| Cash Deposit | $65,265 | HSBC (Weck Corp. Checking) | HSBC<br>80 8th Avenue<br>New York, NY 10011 |
| Cash Deposit | $609 | HSBC (West Weck Checking) | HSBC<br>80 8th Avenue<br>New York, NY 10011 |
| Cash Deposit | $828 | HSBC (Weck Chelsea Checking) | HSBC<br>80 8th Avenue<br>New York, NY 10011 |
| Cash Deposit | $7,432 | HSBC (GH.com Checking) | M&T<br>401 Broad Hollow Road<br>Melville, NY 11747 |
| Cash Deposit | $424,309 | M&T (Sweep Savings) | M&T<br>401 Broad Hollow Road<br>Melville, NY 11747 |
| Cash Deposit | $826,223 | M&T (Weck Corp. Savings) | M&T<br>401 Broad Hollow Road<br>Melville, NY 11747 |
| Cash Deposit | $9,294 | M&T (Weck Corp. | M&T |

| Type of Property | Value of Property | Person or Entity in Possession | Address and Telephone Number |
|---|---|---|---|
| | | Funding) | 401 Broad Hollow Road Melville, NY 11747 |
| Cash Deposit | $13,225 | M&T (GH.com Funding) | M&T 401 Broad Hollow Road Melville, NY 11747 |
| Cash Deposit | $2,640 | M&T (Weck Chelsea Funding) | M&T 401 Broad Hollow Road Melville, NY 11747 |
| Cash Deposit | $3,093 | M&T (West Weck Funding) | M&T 401 Broad Hollow Road Melville, NY 11747 |

## SCHEDULE 6

## PREMISES OWNED, LEASED, OR HELD UNDER OTHER ARRANGEMENT FROM WHICH THE DEBTORS OPERATES THEIR BUSINESSES

### Owned Real Property

| Location of Property |
| --- |
| N/A |

### Leased Real Property

| Location of Property | Lessor | Lessee |
| --- | --- | --- |
| 1220 Third Avenue, New York, NY 10021 | Townsend Housing Corp. | The Weck Corporation |
| 179 East 70th Street New York, NY 10021 | 170 East 70th Street Corporation | The Weck Corporation |
| 1201 Third Avenue New York, NY 10021 | 201 E 69 LLC f/k/a Fairfax LLC | The Weck Corporation |
| 1217 Third Avenue New York, NY 10021 | Fraydun Realty Co. | The Weck Corporation |
| 1992 Broadway New York, NY 10023 | Lincoln Metrocenter Partners LP | West Weck, LLC |
| 766 Sixth Avenue New York, NY 10010 | Marine Estates LLC | Weck Chelsea, LLC |
| 45 West 25th Street New York, NY 10010 | Bonafide Estates | Weck Chelsea, LLC |
| 632 Broadway New York, NY 10012 | Renaissance 632 Broadway, LLC | The Weck Corporation |
| 30-30 60th Street Woodside, NY 11377 | Dolton Associates, LLC (Successor-in-Interest to Allomatic Industries, Inc., the Metropolitan Opera Association, Inc., and the New York City Opera, Inc.) | The Weck Corporation |

## SCHEDULE 7

## LOCATION OF DEBTORS' ASSETS, BOOKS AND RECORDS

Pursuant to Local Bankruptcy Rule 1007-2(a)(1 0), the following lists the locations of the Debtors' substantial assets and the location of their books and records.

| Location of Debtors' Substantial Assets | | | |
|---|---|---|---|
| 1220 Third Avenue | New York | NY | 10021 |
| 1201 Third Avenue | New York | NY | 10021 |
| 1217 Third Avenue | New York | NY | 10021 |
| 1992 Broadway | New York | NY | 10023 |
| 766 Sixth Avenue | New York | NY | 10010 |
| 45 West 25th Street | New York | NY | 10010 |
| 632 Broadway | New York | NY | 10012 |
| 30-30 60th Street | Woodside | NY | 11377 |

| Location of Debtors' Books and Records | | | |
|---|---|---|---|
| 632 Broadway | New York | NY | 10012 |
| 30-30 60th Street | Woodside | NY | 11377 |

# SCHEDULE 8

## SIGNIFICANT LITIGATION COMMENCED
## AGAINST THE DEBTORS PRIOR TO THE PETITION DATE

## N/A

**DEBTORS' EXISTING SENIOR MANAGEMENT**

| Name/Position | Summary of Responsibilities and Experience |
|---|---|
| Thomas Shull/CEO | **Responsibilities:** Leads the strategic direction of the company and establishes overall business plan.<br><br>**Experience:** Held senior management retail positions at several national leading retailers over 25 years. |
| Natan Wekselbaum/Chairman | **Responsibilities:** Promote customer, employee and merchandise vendor relationships, including continued good will, for enhancing the Company's current and future growth and profitability.<br><br>**Experience:** Overall founder of Gracious Home in 1963. |
| Jordan Smilowitz/President & COO | **Responsibilities:** Leads overall company operations.<br><br>**Experience:** 18 years of experience at Gracious Home and 30 years in the retail industry. |
| Paul Jen/Senior Vice President of Strategic Planning | **Responsibilities:** Responsible for strategic planning.<br><br>**Experience:** Over 15 years of retail and financial management. |
| Robert Battista/Vice President | **Responsibilities:** Lead customer service and store operations.<br><br>**Experience:** Over 30 years at Gracious Home. |
| James Linsalata/CIO | **Responsibilities:** responsible for internet, IS, marketing and inventory.<br><br>**Experience:** Over 6 years at Gracious Home and 30 years in the retail industry. |
| Kenneth McDermott/CFO | **Responsibilities:** finance and human resources.<br><br>**Experience:** 3 years at Gracious Home and 15 years combined retail and financial management. |

# SCHEDULE 10

## ESTIMATED AMOUNT OF WEEKLY PAYROLL TO EMPLOYEES EXCLUSIVE OF OFFICERS, DIRECTORS, AND SHAREHOLDERS FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE

| Week | Estimated Gross Payroll |
|------|------------------------|
| Week ending August 15, 2010 | $250,000 |
| Week ending August 22, 2010 | $250,000 |
| Week ending August 29, 2010 | $250,000 |
| Week ending September 5, 2010 | $250,000 |
| Week ending September 12, 2010 (2 days) | $70,000 |

**SCHEDULE 11**

**ESTIMATED AMOUNT OF WEEKLY PAYROLL**
**TO OFFICERS, DIRECTORS, AND SHAREHOLDERS**
**FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE**

| Week | Payments to Officers, Directors and Stockholders |
|------|--------------------------------------------------|
| Week ending August 15, 2010 | $40,000 |
| Week ending August 22, 2010 | $40,000 |
| Week ending August 29, 2010 | $40,000 |
| Week ending September 5, 2010 | $40,000 |
| Week ending September 12, 2010 (2 days) | $12,000 |

## SCHEDULE 12

## DEBTOR'S ESTIMATED CASH DISBURSEMENTS AND RECEIPTS
## FOR THE 30-DAY PERIOD FOLLOWING THE PETITION DATE

| | |
|---|---|
| Cash Receipts (inclusive of DIP draw) | $5,400,000 |
| Cash Disbursements | $5,300,000 |
| Net Cash Gain (Loss) | $100,000 |
| Unpaid Obligations | Assumes payment on current basis |
| Outstanding Receivables | $900,000 |