# **Exhibit A**

# DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT

dated as of August 12, 2010

by and among

## THE WECK CORPORATION, WEST WECK, LLC, GRACIOUS HOME.COM, LLC AND WECK CHELSEA, LLC,
as Borrowers

and

## NEWALLIANCE BANK,
as Lender

# TABLE OF CONTENTS

1.    DEFINITIONS.................................................................................................. 2

2.    AMOUNT AND TERMS OF THE CREDIT FACILITY ................................. 18

2.1.    Lines of Credit and Limitations on Borrowings; Termination Date;
         Consolidated Credit Facility; Borrower Representative; Use of Proceeds. ..........18
2.2.    Borrowing Base; Mandatory Prepayment. ....................................................20
2.3.    Procedures for Advances. ...........................................................................21
2.4.    Collection of Accounts. ..............................................................................22
2.5.    Interest and Interest Related Matters. ..........................................................23
2.6.    Fees. ........................................................................................................24
2.7.    Interest Accrual; Principal and Interest Payments; Computation...................24
2.8.    Reserved. .................................................................................................25
2.9.    Payments Free of Taxes .............................................................................25
2.10.   Letters of Credit. .......................................................................................25
2.11.   Illegality ..................................................................................................29
2.12.   Inability to Determine Rates .......................................................................29
2.13.   Increased Costs. ........................................................................................30
2.14.   Survival ...................................................................................................31

3.    SECURITY INTEREST AND OCCUPANCY OF BORROWERS' PREMISES ............ 31

3.1.    Grant of Security Interest............................................................................31
3.2.    Notifying Account Debtors and Other Obligors; Collection of Collateral...............31
3.3.    Assignment of Insurance ............................................................................31
3.4.    Borrowers' Premises...................................................................................32
3.5.    License .....................................................................................................32
3.6.    Financing Statements..................................................................................33
3.7.    Setoff........................................................................................................33
3.8.    Collateral Related Matters ..........................................................................33
3.9.    Notices Regarding Disposition of Collateral .................................................34

4.    CONDITIONS PRECEDENT ...................................................................... 34

4.1.    Conditions Precedent to Initial Line of Credit Usage and Issuance of Initial
         Letter of Credit..........................................................................................34
4.2.    Additional Conditions Precedent to All Line of Credit Usage and Letters of
         Credit.......................................................................................................34

5.    REPRESENTATIONS AND WARRANTIES ................................................. 35

| 5.1. | Existence and Power; Name; Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number | 35 |
|---|---|---|
| 5.2. | Capitalization | 35 |
| 5.3. | Authorization of Borrowing; No Conflict as to Law or Agreements | 35 |
| 5.4. | Legal Agreements | 36 |
| 5.5. | Subsidiaries | 36 |
| 5.6. | Financial Condition; No Adverse Change | 36 |
| 5.7. | Litigation | 36 |
| 5.8. | Intellectual Property Rights. | 36 |
| 5.9. | Taxes | 37 |
| 5.10. | Titles and Liens | 37 |
| 5.11. | No Defaults | 38 |
| 5.12. | Submissions to Lender | 38 |
| 5.13. | Financing Statements | 38 |
| 5.14. | Rights to Payment | 38 |
| 5.15. | Employee Benefit Plans | 38 |
| 5.16. | Environmental Matters. | 39 |
| 5.17. | Administrative Priority; Lien Priority. | 39 |
| 5.18. | Appointment Examiner; Liquidation | 40 |
| 5.19. | The Chapter 11 Case | 40 |
| 5.20. | West Weck, LLC | 40 |
| 6. | COVENANTS | 40 |
| 6.1. | Reporting Requirements | 41 |
| 6.2. | Financial Covenants | 44 |
| 6.3. | Other Liens and Permitted Liens. | 45 |
| 6.4. | Indebtedness | 45 |
| 6.5. | Guaranties | 46 |
| 6.6. | Investments and Subsidiaries | 46 |
| 6.7. | Dividends and Distributions | 46 |
| 6.8. | Salaries | 47 |
| 6.9. | Books and Records; Collateral Examination; Inspection and Appraisals. | 47 |
| 6.10. | Account Verification; Payment of Permitted Liens. | 48 |
| 6.11. | Compliance with Laws. | 48 |
| 6.12. | Payment of Taxes and Other Claims | 48 |
| 6.13. | Maintenance of Collateral and Properties. | 49 |
| 6.14. | Insurance | 49 |
| 6.15. | Preservation of Existence | 49 |
| 6.16. | Delivery of Instruments, etc | 50 |
| 6.17. | Sale or Transfer of Assets; Consolidation and Merger; Suspension of Business Operations; Asset Acquisitions | 50 |
| 6.18. | Sale and Leaseback | 50 |
| 6.19. | Restrictions on Nature of Business | 51 |
| 6.20. | Accounting | 51 |
| 6.21. | Discounts, etc | 51 |

| 6.22. | Pension Plans | 51 |
| 6.23. | Place of Business; Name | 51 |
| 6.24. | Constituent Documents | 51 |
| 6.25. | Performance by Lender | 51 |
| 6.26. | Lender Appointed as Borrowers' Attorney in Fact | 52 |
| 6.27. | Deposit Accounts | 52 |
| 6.28. | Financing Orders; Administrative Priority; Lien Priority; Payment of Claims | 52 |
| 6.29. | Section 506(c) of the Bankruptcy Code | 52 |
| 6.30. | Claims | 52 |
| 7. | EVENTS OF DEFAULT AND REMEDIES | 53 |
| 7.1. | Events of Default | 53 |
| 7.2. | Rights and Remedies | 55 |
| 8. | MISCELLANEOUS | 56 |
| 8.1. | No Waiver; Cumulative Remedies | 56 |
| 8.2. | Amendment; Consents and Waivers; Authentication | 57 |
| 8.3. | Execution in Counterparts; Delivery of Counterparts | 57 |
| 8.4. | Notices, Requests, and Communications | 57 |
| 8.5. | Borrowers Information Reporting; Confidentiality | 58 |
| 8.6. | Further Documents | 59 |
| 8.7. | Costs and Expenses | 59 |
| 8.8. | Indemnity | 60 |
| 8.9. | Lender as Party-in-Interest | 61 |
| 8.10. | Waiver of Right to Obtain Alternative Financing | 61 |
| 8.11. | Credit Bids | 61 |
| 8.12. | Application of Payments to Obligations; Application of Proceeds of Collateral | 61 |
| 8.13. | Retention of Borrowers' Records | 62 |
| 8.14. | Binding Effect; Assignment; Complete Agreement | 62 |
| 8.15. | Sharing of Information | 62 |
| 8.16. | Severability of Provisions | 62 |
| 8.17. | Headings | 62 |
| 8.18. | Definitional Terms and Rules of Interpretation | 62 |
| 8.19. | Governing Law; Jurisdiction, Venue; Waiver of Jury Trial | 63 |
| 8.20. | WAIVER OF JURY TRIAL AND DAMAGES | 63 |

**Exhibits**

Exhibit A:  Budget
Exhibit B:  Interim Order
Exhibit C:  Conditions Precedent
Exhibit D:  Compliance Certificate
Exhibit E:  Borrowing Base Certificate
Exhibit F:  Revolving Note

6,650,432v5}

Exhibit G:  Existing Letters of Credit

**Schedules**

| | |
|---|---|
| Schedule 5.1: | Trade Names; Chief Executive Office/Principal Place of Business; Other Inventory and Equipment Locations |
| Schedule 5.2: | Capital Chart/Organizational Chart |
| Schedule 5.5: | Subsidiaries |
| Schedule 5.7: | Litigation Matters |
| Schedule 5.8: | Intellectual Property Disclosures |
| Schedule 5.15: | Employee Benefit Plans |
| Schedule 5.16: | Environmental Matters |
| Schedule 6.3: | Permitted Liens |
| Schedule 6.4: | Indebtedness |
| Schedule 6.5: | Guaranties |
| Schedule 6.6: | Investments in Subsidiaries |
| Schedule 6.27: | Deposit Accounts |

## DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT

This DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT (this "Agreement") is dated as of August 12, 2010, and is entered into by and among **THE WECK CORPORATION**, a New York corporation, **WEST WECK, LLC**, a New York limited liability company, **GRACIOUS HOME.COM, LLC**, a New York limited liability company and **WECK CHELSEA, LLC**, a New York limited liability company (each a "Borrower" and collectively, "Borrowers"), each a debtor and debtor-in-possession in the Chapter 11 Case (as hereinafter defined), and **NEWALLIANCE BANK**, a Connecticut state chartered bank ("Lender"), acting through its NewAlliance Commercial Finance operating division.

## RECITALS

WHEREAS, on August 12, 2010 (the "Petition Date"), Borrowers jointly filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, Borrowers and Lender are parties to that certain Secured Revolving Credit Note and Agreement dated as of April 22, 2005 (as amended by that certain Increased, Modified and Extended Secured Revolving Credit Note and Agreement dated as of November 2, 2007, as further amended by that certain Modified and Decreased Secured Revolving Credit Note and Agreement dated as of August 7, 2009, as further amended by that certain Modified and Decreased Secured Revolving Credit Note and Agreement dated as of November 5, 2009, as further amended by that certain Modified and Extended Secured Revolving Credit Note and Agreement dated as of February 16, 2010, as further amended by that certain Forbearance Agreement and Amendment to Modified and Extended Secured Non-Revolving Credit Note and Agreement dated as of August 11, 2010, as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Credit Agreement"), by and between Borrowers and Lender (successor to Manufacturers and Traders Trust Company), pursuant to which Lender has made and Borrowers are indebted to Lender for certain pre-petition loans, advances and other amounts thereunder (including, without limitation, accrued but unpaid interest, fees and expenses, collectively, the "Pre-Petition Obligations"); and

WHEREAS, Borrowers have asked Lender to make debtor-in-possession post-petition loans and advances to Borrowers consisting of (i) a revolving line of credit facility in an aggregate principal amount not to exceed $3,425,200.00 at any time outstanding (the "Line of Credit"), and (ii) a separate letter of credit facility in an aggregate amount not to exceed $2,323,587.89 available solely and exclusively for the issuance of Replacement Letters of Credit (the "Replacement L/C Line" and, together with the Line of Credit, collectively, the "Credit Facility"); and

WHEREAS, Borrowers are unable to obtain funds or credit on any other terms; and

WHEREAS, Lender is willing to provide such financing, subject to the terms and conditions set forth herein, including that all of the Obligations hereunder and under the other Loan Documents constitute allowed super-priority administrative expense claims pursuant to

Sections 364(c) and 364(d) of the Bankruptcy Code in the Chapter 11 Case and are secured by a priming first priority lien on substantially all of Borrowers' personal property, in each case as set forth herein and in the Financing Order.

NOW THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## 1.    DEFINITIONS

Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in this Section 1. All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided by the UCC to the extent such terms are defined therein.

"Account Funds" is defined in Section 2.4(b) of this Agreement.

"Accounts" shall have the meaning given it under the UCC in effect in the state whose laws govern this Agreement.

"Adjusted LIBOR Rate" means an interest rate per annum equal to the LIBOR Rate (which rate shall change whenever the LIBOR Rate changes) plus the Applicable LIBOR Margin.

"Advance" and "Advances" means an advance or advances under the Line of Credit.

"Affiliate" or "Affiliates" means any other Person controlled by, controlling or under common control with any Borrower, including without limitation any Subsidiary of any Borrower. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Debtor in Possession Loan and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Applicable Base Rate Margin" means four percent (4.0%).

"Applicable LIBOR Rate Margin" means five percent (5.0%).

"Authenticate" or "Authenticated" means (a) to have signed, or (b) to have executed or to have otherwise adopted a symbol, or have encrypted or similarly processed a Record in whole or in part, with the present intent of the authenticating Person to identify the Person and adopt or accept a Record.

"Availability" means, on any date of determination, an amount equal to (i) the Borrowing Base, less (ii) the sum of the aggregate Line of Credit Usage as of such date,

"Availability Reserve" means the sum of $400,000.

"Bank Products" means any service or facility extended to Borrowers by Lender or any Affiliate of Lender including, without limitation: (i) credit cards; (ii) credit card processing

services; (iii) debit cards; (iv) purchase cards; (v) ACH transactions; or (vi) cash management, including controlled disbursement, accounts or services.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Case.

"Base Rate" means an interest rate per annum equal to the Prime Rate (which interest rate shall change whenever the Prime Rate changes).

"Base Rate Advance" means an Advance that bears interest based on the Base Rate.

"Borrower Representative" means The Weck Corporation, in its capacity as Borrower Representative pursuant to Section 2.1(f) hereof.

"Borrowers" has the meaning set forth in the preamble of this Agreement. For the avoidance of doubt, Borrowers are the post-petition debtors and debtors-in possession upon the filing of the Chapter 11 Case.

"Borrowing Base" is defined in Section 2.2(a) of this Agreement.

"Borrowing Base Reserves" means, as of any date of determination, an amount or a percentage of a specified category or item that Lender establishes in its reasonable discretion from time to time to reduce availability under the Borrowing Base to reflect (a) events, conditions, contingencies or risks which affect the assets, business or prospects of Borrowers, or any component of the Borrowing Base, (b) the Collateral or its value, or the enforceability, perfection or priority of Lender's Security Interest therein, or impediments to Lender's ability to realize upon the Collateral, or claims and liabilities that Lender determines will need to be satisfied in connection with its realization upon the Collateral, (c) Lender's judgment that any collateral report or financial information relating to Borrowers and furnished to Lender may be incomplete, inaccurate or misleading in any material respect, or (d) to reflect that a Default or Event of Default then exists. Without limiting the generality of the foregoing, the Borrowing Base Reserves may include (but are not limited to) reserves based on (i) outstanding taxes and other governmental charges, including, without limitation, ad valorem, personal property, sales and other taxes which Lender determine could reasonably be expected to have priority over the interests of Lender in the Collateral, (ii) salaries, wages and benefits of employees of Borrowers which are due and have not been paid; (iii) Gift Certificate and Merchandise Credit Liabilities; (iv) warehousemen's or bailee's charges and other Permitted Liens which Lender determines could reasonably be expected to have priority over the interests of Lender in the Collateral; (v) exposure to Lender in respect of cash management services and Bank Products provided to Borrowers, including ACH deposits and credits, (vi) exposure to Lender in respect of Funds Transfer and Deposit Account Liability, (vii) credit card chargebacks and customer disputes, and (viii) accounts payable owed by Borrowers with respect to consigned inventory (to the extent included in the Borrowing Base), and (ix) the amount of the Pre-Petition Obligations less $2,934,617.02.

"Budget" means Borrowers' rolling thirteen 13 week cash flow budget showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) delivered to Lender pursuant to this Agreement, covering the period commencing on the Effective Date and ending on November 28, 2010. The Budget shall be substantially in the form of **Exhibit A** annexed hereto and made a part hereof, with such modifications (if any) agreed to by Lender in its sole discretion.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business and, if such day relates to a LIBOR Rate Advance, a day on which dealings are carried on in the London interbank Eurodollar market.

"Business Plan" is defined in Section 6.1(d) of this Agreement.

"Capital Expenditures" means any expenditure of money for the purchase or construction of assets, or for improvements or additions to such assets, which are or may be capitalized on Borrowers' balance sheet.

"Carve-Out" means (i) prior to the occurrence of an Event of Default, the payment of estate professional fees and disbursements incurred in the Chapter 11 Case to the extent approved from time to time by the Bankruptcy Court and to the extent such fees and disbursements are in accordance with the Budge approved by Lender, and U.S. Trustee fees pursuant to 28 U.S.C. § 1930 to the extent such fees and disbursements are in accordance with the Budget approved by Lender and (ii) subsequent to an Event of Default, the payment of approved fees of estate professionals, in an amount not to exceed (A) $60,000 for the professionals retained by Borrowers, and (B) $15,000 for the professionals retained by any official committee of unsecured creditors appointed in the Chapter 11 Case, and (iii) U.S. Trustee fees pursuant to 28 U.S.C. § 1930, and (C) $5,000 for any Chapter 7 Trustee appointed in any successor case under Chapter 7 of the Bankruptcy Code.

"Carve-Out Reserve" means a reserve established by Lender to reduce availability under the Borrowing Base in an amount equal to the sum of (i) the amount reasonably determined by Lender is equal to accrued but unpaid estate professional fees incurred in the Chapter 11 Case, plus (ii) (A) from the Effective Date until September 12, 2010, $25,000, and (B) thereafter, $80,000.

"Cash Collateralization" means, with respect to outstanding Letters of Credit, the pledge and delivery of cash collateral by Borrowers to Lender in an amount not less than 105% of the maximum amount available to be drawn or funded on such Letter of Credit.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty; (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority; or (iii) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Change of Control" means the occurrence of any of the following events:

(a)     Any Person or "group" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934) who does not have an ownership interest in Borrowers on the date of the initial Advance is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that any such Person, entity or group will be deemed to have "beneficial ownership" of all securities that such Person, entity or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than fifty percent (50%) of the voting power of all classes of ownership of Borrowers; or

(b)     During any consecutive two-year period, individuals who at the beginning of such period constituted the board of Directors of Borrowers (together with any new Directors whose election to such board of Directors, or whose nomination for election by the Owners of Borrowers, was approved by a vote of two thirds of the Directors then still in office who were either Directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the board of Directors of Borrowers then in office; or

(c)     Any Borrower shall cease to own one hundred percent (100%) of the capital stock of each of its Subsidiaries.

"Chapter 11 Case" means the Chapter 11 case commenced by Borrowers in the Bankruptcy Court.

"Collateral" means all of Borrowers' Accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), deposit accounts, documents, Equipment, General Intangibles (including, without limitation, all Intellectual Property Rights), commercial tort claims, goods, instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, all sums on deposit in any Collection Account, and any items in any Lockbox; together with (i) all substitutions and replacements for and products of such property; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, Equipment and repairs now or subsequently attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title that cover such goods now or in the future; (v) all collateral subject to the Lien of any of the Security Documents; (vi) any money, or other assets of Borrowers that come into the possession, custody, or control of Lender now or in the future; (vii) Proceeds of any of the above Collateral; and (viii) all books and records of Borrowers, including, without limitation, all mail or e-mail addressed to Borrowers all of the above Collateral, whether now owned or existing or acquired now or in the future or in which Borrowers have rights now or in the future and wherever located.

"Collection Account" means the "Collection Account" as described in Section 2.4(a) of this Agreement and defined in the Commercial Loan Agreement Addendum and/or any applicable Treasury Management Agreements.

"Commercial Loan Agreement Addendum" means the Commercial Loan Agreement Addendum entered into between Borrowers and Lender dated as of the Effective Date.

"Compliance Certificate" is defined in Section 6.1(a) of this Agreement and is in the form attached hereto as **Exhibit D**.

"Confidential Information" means all Borrowers' non-public, confidential or proprietary that is identified as "confidential" by Borrowers and disclosed to Lender prior to or during the term of this Agreement by any Borrower or any of its officers, employees, agents or representatives, and includes, without limitation, any trade secrets, research and development test results, marketing or business plans, strategies, forecasts, budgets, projections, customer and supplier information, and any other analyses, computations or studies prepared by or for Borrowers.

"Constituent Documents" means with respect to any Person, as applicable, that Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Control Agreement" means each deposit account control agreement or similar agreement executed by a financial institution in favor of Lender with respect to any deposit account, securities account or other account of any Borrower, and pursuant to which Lender has "control" of such account, as contemplated by Section 9-104 of the UCC, and which is satisfactory to Lender in form and substance.

"Credit Card Agreements" means all agreements now or hereafter entered into by any Borrower with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Credit Card and Account Funds" is defined in Section 2.4(b) of this Agreement.

"Credit Card Collection Account" means any deposit account maintained by any Borrower for the purpose of collecting proceeds of Credit Card Receivables, which is subject to the Security Interest and Lender's exclusive control pursuant to a Control Agreement, provided, that notwithstanding Lender's exclusive control, the applicable Credit Card Processor may, if permitted by Lender in its commercially reasonable discretion, have rights to debit such deposit account for unpaid processing fees, chargebacks and other amounts due under the applicable Credit Card Agreement.

"Credit Card Issuer" means any Person (other than any Borrower) who issues or whose members issue credit cards (but specifically excluding Borrowers or any Affiliate of Borrowers as issuer of any proprietary or house credit card).

"Credit Card Processor" means any servicing or processing agent that facilitates, services, processes or manages the credit authorization, billing, transfer and/or payment procedures with respect to Borrowers' sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Receivables" means, collectively, (i) all present and future rights of Borrowers to payment from any Credit Card Issuer or Credit Card Processor arising from the sale of goods or provision of services to customers who have purchased such goods or services using a credit or debit card, and (ii) all present and future rights of Borrowers to payment from any Credit Card Issuer or Credit Card Processor in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or provision of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the applicable Credit Card Agreement(s) or otherwise.

"Credit Facility" has the meaning set forth in the Recitals to this Agreement.

"Daily One Month LIBOR" means, for any day, the rate of interest equal to LIBOR then in effect for delivery for a one (1) month period. When interest is determined in relation to Daily One Month LIBOR, each change in the interest rate shall become effective each Business Day that Lender determines that Daily One Month LIBOR has changed.

"Default" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Period" is defined in Section 2.5(b) of this Agreement.

"Default Rate" is defined in Section 2.5(b) of this Agreement.

"Director" means a director if any Borrower is a corporation, or a governor or manager if any Borrower is a limited liability company.

"Effective Date" means the date upon which the Interim Order has been entered approving this Agreement and all conditions precedent to the making of the initial Advance or issuance of the initial Letter of Credit hereunder have been satisfied or waived, which in no event shall be later than August 31, 2010.

"Electronic Record" means a Record that is created, generated, sent, communicated, received, or stored by electronic means, but does not include any Record that is sent, communicated, or received by fax.

"Eligible Accounts" means all unpaid Accounts of Borrowers arising from the sale of goods or the performance of services, net of any credits, but excluding any Accounts having any of the following characteristics:

(a)     That portion of Accounts unpaid 90 days or more after the invoice date;

(b)     That portion of Accounts related to goods or services with respect to which a Borrower has received notice of a claim or dispute, which are subject to a claim of offset or a contra account, or which reflect a reserve for warranty claims or returns;

(c)     That portion of Accounts not yet earned by the final delivery of goods or that portion of Accounts not yet earned by the final provision of services by Borrowers to the account

debtor, including with respect to both goods and services, progress billings, and that portion of Accounts for which an invoice has not been sent to the applicable account debtor;

(d)     Accounts constituting (i) proceeds of copyrightable material unless such copyrightable material shall have been registered with the United States Copyright Office, or (ii) proceeds of patentable inventions unless such patentable inventions have been registered with the United States Patent and Trademark Office;

(e)     Accounts owed by any unit of government, whether foreign or domestic (except that there shall be included in Eligible Accounts that portion of Accounts owed by such units of government for which Borrowers have provided evidence satisfactory to Lender that (i) Lender's security interest constitutes a perfected first priority Lien in such Accounts, and (ii) such Accounts may be enforced by Lender directly against such unit of government under all applicable laws);

(f)     Accounts denominated in any currency other than United States Dollars;

(g)     Accounts owed by an account debtor located outside the United States which are not (i) backed by a bank letter of credit naming Lender as beneficiary or assigned to Lender, in Lender's possession or control, or with respect to which a control agreement concerning the letter-of-credit rights is in effect, and acceptable to Lender in all respects, in sole discretion, or (ii) covered by a foreign receivables insurance policy acceptable to Lender in its sole discretion;

(h)     Accounts owed by an account debtor who is insolvent or is the subject of bankruptcy on insolvency proceedings or who has gone out of business;

(i)     Accounts owed by an Owner, Subsidiary, Affiliate, Officer or employee of Borrowers;

(j)     Accounts not subject to Lender's first priority, perfected Security Interest or which are subject to any Lien in favor of any Person other than Lender, except Permitted Liens;

(k)     That portion of Accounts that has been restructured, extended, amended or modified;

(l)     That portion of Accounts that constitutes advertising, finance charges, service charges or sales or excise taxes;

(m)     Accounts owed by an account debtor, regardless of whether otherwise eligible, to the extent that the aggregate balance of such Accounts exceeds ten percent (10%) of the aggregate amount of all Accounts;

(n)     Accounts owed by an account debtor, regardless of whether otherwise eligible, if twenty-five percent (25%) or more of the total amount of Accounts due from such debtor is ineligible under clauses (a), (b), or (k) above; and

(o)     Accounts, or portions of Accounts, otherwise deemed ineligible by Lender in its sole discretion.

"Eligible Credit Card Receivables" means Credit Card Receivables that satisfy each of the criteria set forth below:

(a)     such Credit Card Receivable arises from the actual and bona fide sale and delivery of goods or provision of services by Borrowers in the ordinary course of Borrowers' business, which transaction is completed in accordance with the terms and provisions contained in any agreements binding on Borrowers or the other party or parties related thereto;

(b)     such Credit Card Receivable is not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreement(s) with the applicable Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which give rise to such Credit Card Receivable;

(c)     such Credit Card Receivable is not unpaid more than five (5) Business Days after the date of the sale of inventory or provision of services giving rise to such Credit Card Receivable;

(d)     all material procedures required by the Credit Card Issuer and/or the Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivable shall have been followed by Borrowers, and all authorizations and approvals of such Credit Card Issuer and/or Credit Card Processor shall have been obtained in connection with the sale giving rise to such Credit Card Receivable;

(e)     there are no facts, events or occurrences which would impair the validity, enforceability or collectability of such Credit Card Receivable in any material respect or reduce the amount payable or delay payment thereunder (other than for setoffs for fees and chargebacks consistent with the practices of the applicable Credit Card Issuer or Credit Card Processor with Borrowers as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of Borrowers);

(f)     such Credit Card Receivable is subject to the first priority, valid and perfected Security Interest and Lien of Lender, and the Inventory that was sold and gave rise to such Credit Card Receivable is not, and was not at the time of the sale thereof, subject to any security interest or Lien in favor of any Person other than Lender, except Permitted Liens;

(g)     such Credit Card Receivable is owed by a Credit Card Issuer or Credit Card Processor deemed creditworthy at all times by Lender in good faith (such that in the good faith determination of Lender, such Credit Card Issuer or Credit Card Processor has or could reasonably be expected to have, the financial ability to satisfy its outstanding obligations);

(h)     the Inventory that was sold and gave rise to such Credit Card Receivable shall not have been returned; and

(i)     Lender shall not have deemed such Credit Card Receivable ineligible in its sole discretion.

"Eligible Inventory" means all Inventory of Borrowers, valued at the lower of cost or market in accordance with GAAP, but excluding Inventory having any of the following characteristics:

(a)     Inventory that is: (i) in-transit; (ii) located at any warehouse, job site or other premises not approved by Lender in an Authenticated Record delivered to Borrowers; (iii) not subject Lender's first priority, perfected Security Interest; (iv) covered by any negotiable or non-negotiable warehouse receipt, bill of lading or other document of title which does not note Lender's interest thereon; (v) on consignment from any consignor; or (vi) on consignment to any consignee or subject to any bailment unless the consignee or bailee has executed an agreement with Lender in form and substance satisfactory to Lender;

(b)     Supplies, packaging or parts, or customer supplied parts or Inventory;

(c)     Inventory consisting of raw materials or work-in-process;

(d)     Inventory that is damaged, defective, contaminated, or not currently saleable in the normal course of Borrowers' operations (including, without limitation, Inventory of a type that has been discontinued by Borrowers and/or marked down and not sold consistent with prior practices), Inventory consisting of special orders, or the amount of any Inventory that has been reduced by shrinkage;

(e)     Inventory that Borrowers have returned, have attempted to return, are in the process of returning or intend to return to the applicable vendor;

(f)     Inventory that is perishable or live;

(g)     Inventory manufactured by Borrowers pursuant to a license, unless the applicable licensor has agreed in a Record that has been Authenticated by the applicable licensor to permit Lender to exercise its rights and remedies against such Inventory;

(h)     Inventory that is subject to a Lien in favor of any Person other than Lender, except Permitted Liens; and

(i)     Inventory otherwise deemed ineligible by Lender in its sole discretion.

For the avoidance of doubt, Eligible Inventory shall include Inventory delivered on the same day that such Inventory is included in Borrower's Inventory, upon Lender's reasonable satisfaction that the vendor of such Inventory has been fully paid therefor (or will, upon delivery of such Inventory be fully paid on the same day).

"Environmental Law" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" shall have the meaning given it under the UCC.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group which includes Borrowers and which is treated as a single employer under Section 414 of the IRC.

"Event of Default" is defined in Section 7.1 of this Agreement.

"Existing Letters of Credit" means each of the letters of credit issued for the account of Borrowers by Manufacturers and Traders Trust Company described on **Exhibit G** attached hereto.

"Fee Letter" means that certain letter agreement, dated the date hereof, by and among Borrowers and Lender.

"Final Order" means a final order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code, approving this Agreement, the other Loan Documents, confirming the Interim Order, and authorizing on a final basis the incurrence by Borrowers of permanent post-petition secured and super-priority indebtedness in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, which is in form and substance satisfactory to Lender.

"Financing Orders" means each and both the Interim Financing Order and the Final Financing Order.

"Funds Transfer and Deposit Account Liability" means the liability of any Borrower owing to Lender, or any Affiliates of Lender, arising out of (i) the execution or processing of electronic transfers of funds by automatic clearing house transfer, wire transfer or otherwise to or from the deposit accounts of any Borrower and/or any Subsidiary now or hereafter maintained with Lender or its Affiliates, (ii) the acceptance for deposit or the honoring for payment of any check, draft or other item with respect to any such deposit accounts, and (iii) any other deposit, disbursement, and cash management services afforded to any Borrower or any such Subsidiary by Lender or its Affiliates.

"GAAP" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements described in Section 5.6 of this Agreement.

"General Intangibles" shall have the meaning given it under the UCC.

"Gift Certificate and Merchandise Credit Liabilities" means, at any time, 50% of the aggregate face value at such time, of (i) outstanding gift certificates and gift cards of Borrowers,

and (ii) outstanding merchandise credits of Borrowers in each case, issued to customers of Borrowers.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross Margin" means (i) Gross Profit divided by (ii) net sales.

"Gross Profit" means the difference between (i) gross sales (excluding any sales or revenue not attributable to sales of Inventory), less (ii) cost of goods sold.

"Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, or petroleum, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"Indebtedness" means, with respect to any Person, all items of indebtedness or liability which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of a balance sheet for such Person, and shall also include the aggregate payments required to be made by such Person at any time under any lease that is considered a capitalized lease under GAAP.

"Indemnified Liabilities" is defined in Section 8.8 of this Agreement.

"Indemnitee" is defined in Section 8.8 of this Agreement.

"Infringement" or "Infringing" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including without limitation all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"Interim Order" means that certain order entered by the Bankruptcy Court in substantially the form of **Exhibit B** hereto and otherwise in form and substance satisfactory to Lender.

"Interest Payment Date" is defined in Section 2.7(a) of this Agreement.

"Inventory" shall have the meaning given it under the UCC in effect in the state whose laws govern this Agreement.

"Inventory Advance Rate" means, with respect to Eligible Inventory, ninety-five percent (95%) of the Net Orderly Liquidation Value of such Eligible Inventory, based upon the most recent Inventory appraisal received by Lender, provided, that in the event that the Maturity Date

is extended beyond November 30, 2010 in accordance with the terms of this Agreement, the Inventory Advance Rate shall be reduced to ninety percent (90%) of the Net Orderly Liquidation Value of such Eligible Inventory.

"Investment Property" shall have the meaning given it under the UCC.

"ISP" means the International Standby Practices 1998 a publication by the International Chamber of Commerce, or any substitution therefor or replacement thereof."

"Issuing Lender" means Lender and/or any other issuer of a Letter of Credit selected by Lender and reasonably acceptable to Borrowers.

"L/C" is defined in Section 2.10 of this Agreement.

"L/C Application" means an application for the issuance of standby or documentary Letters of Credit pursuant to the terms of a Letter of Credit Agreement, in form acceptable to Lender.

"L/C Disbursement" is defined in Section 2.10 of this Agreement.

"L/C Undertaking" is defined in Section 2.10 of this Agreement.

"Lender" means NewAlliance Bank in its broadest and most comprehensive sense as a legal entity, and is not limited in its meaning to Lender's NewAlliance Commercial Finance operating division, or to any other operating division of Lender.

"Lender Expenses" is defined in Section 8.7 of this Agreement.

"Letter of Credit" means an L/C or an L/C Undertaking, as the context requires.

"Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit plus one hundred percent (100%) of the amount of outstanding time drafts accepted by an Underlying Issuer as a result of drawings under Underlying Letters of Credit in each case, under the Line of Credit and the Replacement L/C Line.

"Licensed Intellectual Property" is defined in Section 5.8(b) of this Agreement.

"LIBOR Rate" means the variable rate per annum determined by Lender utilizing www.bankrate.com (or such other electronic or other quotation sources as Lender considers appropriate), to be the Daily One Month LIBOR Rate (being the rate offered on the London Inter-Bank Market for U.S. Dollar deposits for delivery for a one month period).

"LIBOR Rate Advance" means an Advance that bears interest based on the LIBOR Rate.

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including, without limitation, the interest of each lessor under any capitalized lease and the interest of any

bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Line of Credit" has the meaning set forth in the Recitals to this Agreement.

"Line of Credit Usage" means, as of any date of determination, the sum of (i) the outstanding principal balance of the Advances, plus (ii) Letter of Credit Usage.

"Loan Documents" means this Agreement, the Revolving Note, the Financing Orders, each Treasury Management Agreement, each Letter of Credit Agreement, the Standby Letter of Credit Agreement, any L/C Applications, and the Security Documents, together with every other agreement, note, document, contract or instrument to which Borrowers now or in the future may be a party and which may be required by Lender in connection with, or as a condition to, the execution of this Agreement or the continued access to credit hereunder. For the avoidance of doubt, the Loan Documents do not include the Pre-Petition Credit Documents.

"Lockbox" means the "Lockbox", as defined in the Treasury Management Agreements, together with any related lockbox or collection account utilized in connection therewith and described in the Treasury Management Agreements.

"Material Adverse Effect" means (a) a material impairment in the perfection or priority of Lender's Security Interest in the Collateral or in the value of such Collateral; (b) a material adverse change in the business, operations, or condition (financial or otherwise) of Borrowers, taken as a whole; (c) a material impairment of the prospect of repayment of any portion of the Obligations; (d) Lender's determination, based upon information available to it and in its reasonable business judgment, that there is a reasonable likelihood that Borrowers shall fail to comply with one or more of the financial covenants set forth in Section 6.2 of this Agreement during the next succeeding financial reporting period; or (e) Lender's determination, based upon information available to it and in its reasonable business judgment, that there is a reasonable likelihood that Lender will not be able to enforce its rights and remedies pursuant to this Agreement, the Financing Orders and the Loan Documents.

"Maturity Date" means November 30, 2010 unless extended in accordance with the terms of Section 2.1(b) hereof.

"Maximum Line of Credit" means $3,425,200.00.

"Maximum Replacement L/C Line of Credit" means $2,323,587.89.

"Multiemployer Plan" means a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which Borrowers or any ERISA Affiliate contributes or is obligated to contribute.

"Net Orderly Liquidation Value" or "NOLV" means the value of Eligible Inventory that is estimated to be recoverable in an orderly liquidation of such Eligible Inventory, net of liquidation expenses, such value to be as determined from time to time by Lender in its reasonable credit judgment or by a qualified appraisal company selected by Lender. As of the Effective Date, Tiger Valuation Services is deemed a qualified appraisal company.

"Obligations" means any debts, obligations and liabilities of Borrowers to Lender under or in respect of this Agreement or the other Loan Documents (including, but not limited to any Funds Transfer and Deposit Account Liability), whether incurred in the past, present or future, whether voluntary or involuntary, and however arising, and whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and including without limitation all obligations arising under any derivative, foreign exchange, deposit, treasury management, or similar transaction or arrangement, or any other Bank Products however described or defined that Borrowers may enter into at any time with Lender or with NewAlliance Merchant Services or any other Affiliate of Lender, whether or not Borrowers may be liable thereunder individually or jointly with others, or whether recovery upon such Obligations may subsequently become unenforceable. For the avoidance of doubt, the "Obligations" do not include the Pre-Petition Obligations.

"OFAC" is defined in Section 6.11(b) of this Agreement.

"Officer" means with respect to any Borrower, an officer if any Borrower is a corporation, a manager if any Borrower is a limited liability company, or a partner if any Borrower is a partnership.

"Operating Account" means Borrowers' deposit account maintained with Lender defined and referred to as such in Section 2.3(a) of this Agreement, which account is maintained in accordance with the terms of the Commercial Loan Agreement Addendum.

"Overadvance" means the amount, if any, by which the sum of the aggregate Line of Credit Usage is in excess of the then-existing Borrowing Base.

"Owned Intellectual Property" is defined in Section 5.8(a) of this Agreement.

"Owner" means with respect to each Borrower, each Person having legal or beneficial title to an ownership interest in such Borrower or a right to acquire such an interest.

"Patent and Trademark Security Agreement" means the Patent and Trademark Security Agreement entered into between Borrowers and Lender.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of Borrowers or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Account" is defined in Section 6.27 of this Agreement.

"Permitted Lien" and "Permitted Liens" are defined in Section 6.3(a) of this Agreement.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of Borrowers or any ERISA Affiliate.

"Plan of Reorganization" means any Chapter 11 plan or plans for Borrowers to be filed with the Bankruptcy Court in the Chapter 11 Case; provided, however, that notwithstanding anything to the contrary set forth herein, any Plan of Reorganization (or any amendments or modifications thereto) shall provide for (i) the payment in full in cash of all outstanding Obligations under this Agreement and the cancellation or Cash Collateralization of all Letters of Credit, and (ii) the payment in full in cash or Cash Collateralization of all of the Pre-Petition Obligations (except as otherwise consented to by Lender) on the effective date of the Plan of Reorganization.

"Premises" is defined in Section 3.4(a) of this Agreement.

"Pre-Petition Credit Agreement" has the meaning set forth in the Recitals of this Agreement.

"Pre-Petition Credit Documents" means the Pre-Petition Credit Agreement, and all documents, instruments and agreements relating thereto, including, without limitation, that certain Forbearance Agreement and Amendment to Modified and Extended Secured Non-Revolving Note and Agreement and that certain Letter of Credit Reimbursement Agreement, each dated on or about the Petition Date and by and among Lender and Borrowers, each as amended an in effect from time to time.

"Pre-Petition Lender" means Lender, in its capacity as "Lender" under the Pre-Petition Credit Agreement.

"Pre-Petition Obligations" has the meaning set forth in the Recitals of this Agreement.

"Prime Rate" means the variable rate per annum determined by Lender utilizing www.bankrate.com (or such other electronic or other quotation sources as Lender considers appropriate), to be the "WSJ Prime Rate" (being the consensus prime rate quoted by the thirty (30) largest United States banks surveyed by the Wall Street Journal). The applicable prime rate for any date on which such rate is not published shall be the rate set forth for the last preceding date. In the event that www.bankrate.com ceases to publish a prime rate or its equivalent, the term "Prime Rate" shall mean a variable rate of interest per annum equal to the highest of the "prime rate", "reference rate", "base rate", or other similar rate announced from time to time by any of the three largest banks (based on combined capital and surplus) headquartered in New York, New York and published in The Wall Street Journal (with the understanding that any such rate may merely be a reference rate and may not necessarily represent the lowest or best rate actually charged to any customer by any such bank or by Lender).

"Proceeds" shall have the meaning given it under the UCC in effect in the state whose laws govern this Agreement.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, and includes all information that is required to be reported by Borrowers to Lender pursuant to Section 6.1 of this Agreement.

"Replacement L/C Line" has the meaning set forth in the Recitals to this Agreement.

"Replacement Letters of Credit" means Letters of Credit issued by Lender for the benefit of Borrowers under the Replacement L/C Line, from time to time, to replace Existing Letters of Credit.

"Reportable Event" means a reportable event (as defined in Section 4043 of ERISA), other than an event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the Pension Benefit Guaranty Corporation.

"Restricted Cash" means cash maintained at Lender in a savings account or money market account but specifically excluding the Collection Account, any Credit Card Collection Account and the Operating Account.

"Revolving Note" is defined in Section 2.1(e) of this Agreement.

"Security Documents" means this Agreement, the Patent and Trademark Security Agreement, each Control Agreement and any other document delivered to Lender from time to time to secure the Obligations.

"Security Interest" is defined in Section 3.1 of this Agreement.

"Sponsor Plan of Reorganization" means that certain Debtors' Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated August [__], 2010, as annexed to that certain Restructuring and Plan Support Agreement entered into among Tom Shull, Meredian Acquisition Ventures LLC, Wekselbaum, the Pre-Petition Lender and the Debtors on August [__], 2010, and which Sponsor Plan of Reorganization is satisfactory in form and substance to Lender in all respects.

"Store Account" means any deposit account maintained by Borrowers for the purpose of collecting Proceeds of Inventory and other Collateral (other than Credit Card Receivables), which is subject to Lender's Security Interest and Lender's exclusive control pursuant to a Control Agreement in form and substance satisfactory to Lender.

"Store Funds" is defined in Section 2.4(a) of this Agreement.

"Subsidiary" means any Person of which more than fifty percent (50%) of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of Directors or the equivalent of such Person, irrespective of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by Borrowers, by Borrowers and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Termination Date" means the earliest of (i) the Maturity Date, (ii) the effective date of a Plan of Reorganization confirmed by the Bankruptcy Court; (iii) 30 days after the Petition Date if the Final Order has not been entered by that date; or (iv) the occurrence of an Event of Default pursuant to Section 7 of this Agreement.

"Treasury Management Agreements" means the Commercial Loan Agreement Addendum, any Control Agreements, lockbox agreements, credit card processor agreements, business deposit account handbooks, the fee schedules provided by Lender in connection therewith (as the same may be amended and updated by Lender from time to time) and any other similar document or agreement between or among Borrowers, Lender, New Alliance Merchant Services, or any other Affiliate of Lender, in each case in form and substance satisfactory to Lender.

"UCC" means the Uniform Commercial Code in effect in the state designated herein as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement or perfection of Lender's Security Interest in any portion of the Collateral.

"Underlying Issuer" means a third Person which is the beneficiary of an L/C Undertaking and which has issued a letter of credit at the request of the Issuing Lender for the benefit of Borrowers and, in the case of a proposed documentary Letter of Credit, has agreed, in writing, to hold documents of title as agent for Lender.

"Underlying Letter of Credit" means a letter of credit that has been issued by an Underlying Issuer.

## 2. AMOUNT AND TERMS OF THE CREDIT FACILITY

**2.1. Lines of Credit and Limitations on Borrowings; Termination Date; Consolidated Credit Facility; Borrower Representative; Use of Proceeds.**

(a) <u>Line of Credit</u>. Subject to the terms and conditions set forth in this Agreement, Lender shall make Advances to Borrowers and issue Letters of Credit for the account of Borrowers under the Line of Credit, as follows: (i) upon entry of the Interim Order, an initial Advance or issuance of Letters of Credit in an aggregate amount (together with any Replacement Letters of Credit issued during such interim period under the Replacement L/C Line) not to exceed $500,000, and (ii) thereafter, following entry of the Final Order, Advances or issuances of Letters of Credit in the aggregate amount (including Advances outstanding under <u>Section 2.1(a)(i)</u>) of up to $3,425,200.00, in each case, solely in accordance with the Budget.

(b) <u>Replacement L/C Line</u>. Subject to the terms and conditions set forth in this Agreement, in addition to Advances and Letters of Credit which are available to Borrowers under the Line of Credit, Lender shall issue Replacement Letters of Credit for the benefit of Borrowers (i) upon entry of the Interim Order, in an aggregate stated amount (together with any outstanding Advances and Letters of Credit issued during such interim period under the Line of Credit) not to exceed $500,000, and thereafter, following entry of the Final Order, Replacement Letters of Credit in an aggregate stated amount (including Replacement Letters of Credit outstanding under <u>Section 2.1(b)(i)</u>) of up to $2,323,587.89.

(c) Lender has no obligation to make any Advance or issue any Letter of Credit hereunder, (i) at any time that a Default or Event of Default has occurred and is continuing, or (ii) if the Line of Credit Usage (after giving effect to the amount of any requested Advance or issuance of any requested Letter of Credit) would exceed the Borrowing Base, (iii) if after giving

effect to the requested Advance or Letter of Credit, (A) the aggregate principal balance of the Advances plus the aggregate stated amount of Letters of Credit issued under the Line of Credit would exceed the Maximum Line of Credit, or (B) the aggregate stated amount of Replacement Letters of Credit exceed the Maximum Replacement L/C Amount, as the case may be, or (iv) if after giving effect to the requested Advance or Letter of Credit, the Line of Credit Usage exceeds the amount set forth in the Budget for the date on which such extension of credit is to be made.

(d)     <u>Termination Date</u>.  Borrowers may request Advances and Letters of Credit under the Line of Credit and Replacement L/C Line from the Effective Date until the Termination Date; <u>provided</u>, <u>however</u>, that so long as no Default or Event of Default or other termination event under the Financing Orders has occurred, upon Borrowers' written request delivered to Lender no later than ten (10) days prior to the scheduled Maturity Date, the Maturity Date shall be extended to a date specified by Borrowers which is consistent with the proposed effective date of the Sponsor Plan of Reorganization, which date shall in no event be later than one hundred eighty (180) days after the Effective Date.

(e)     <u>Consolidated Credit Facility</u>.  Each Borrower acknowledges that it is jointly and severally liable for all of the Obligations.  Each Borrower expressly understands, agrees and acknowledges that (i) Borrowers are all affiliated entities by common ownership, (ii) each Borrower desires to have the availability of one common credit facility instead of separate credit facilities, (iii) each Borrower has requested that Lender extend such a common credit facility to Borrowers on the terms provided herein, (iv) Lender will be lending against, and relying on a Lien upon, all or substantially all of the assets of Borrowers even though the proceeds of any particular Advance or issuance of Letter of Credit made hereunder may not be advanced directly to or on behalf of a particular Borrower, (v) each Borrower will benefit by the making of Advances, issuances of Letters of Credit and the availability of a credit facility of a size greater than each could independently warrant, and (vi) all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in the Loan Documents shall be applicable to and shall be binding upon each Borrower.

(f)     <u>Borrower Representative</u>.  Each Borrower hereby designates The Weck Corporation as its representative and agent on its behalf for the purposes of issuing notices, giving instructions with respect to disbursement of proceeds of the Advances, requesting Letters of Credit, effecting repayment of the Advances, and giving and receiving all other notices and consents under this Agreement or under any of the other Loan Documents and taking all other actions (including with respect to compliance with covenants) on behalf of any Borrower or Borrowers under the Loan Documents.  The Weck Corporation hereby accepts such appointment.  Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers, and shall give any notice or communication required or permitted to be given to any Borrower or Borrowers under the Loan Documents to Borrower Representative on behalf of such Borrower or Borrowers.  Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

(g)     Use of Proceeds.  Borrowers shall use the proceeds of extensions of credit hereunder (i) to pay fees, costs and expenses of this Agreement, including payment of Lender's reasonable attorney's fees and other out of pocket expenses; (ii) to pay post-petition operating expenses of Borrowers and their Subsidiaries incurred in the ordinary course of business (inclusive of purchases of inventory); (iii) to pay costs and expenses of administration of the Chapter 11 Case, including payment of approved professional fees; (iv) to pay other amounts as specified in the Budget and/or operative documentation and that have not been disallowed by the Bankruptcy Court; and (v) in the case of Letters of Credit issued under the Replacement L/C Line, to replace Existing Letters of Credit, in the case of (ii), (iii) and (iv), in amounts and categories consistent with the applicable Budget.  Except as expressly agreed by Lender and set forth in the Financing Orders, no proceeds of any Advance may be used to investigate or challenge the validity, perfection, priority, extent or enforceability of this Agreement, the other Loan Documents, the Pre-Petition Credit Agreement and related documents, the Liens or security interests securing this Agreement or the Pre-Petition Credit Agreement and Pre-Petition Obligations, or any claim against Lender under this Agreement or the Pre-Petition Lender under the Pre-Petition Credit Agreement.

(h)     Revolving Note.  Borrowers' obligation to repay the Advances and other amounts owing hereunder, regardless of how initiated under Section 2.3 hereof, shall be evidenced by a revolving promissory note (as renewed, amended, restated, modified, substituted or replaced from time to time, the "Revolving Note") in substantially the form attached hereto as **Exhibit F**.

## 2.2.     Borrowing Base; Mandatory Prepayment.

(a)     Borrowing Base.   On any date of determination, the borrowing base (the "Borrowing Base") is an amount equal to the lesser of:

    (i)     the Maximum Line of Credit; and

    (ii)    the sum of:

        (A)     a percentage, which is equal to the Inventory Advance Rate in effect at such time, of Eligible Inventory, plus

        (B)     eighty-five percent (85%) of Eligible Accounts, plus

        (C)     ninety percent (90%) of Eligible Credit Card Receivables, plus

        (D)     one hundred percent (100%) of Restricted Cash, minus

        (E)     the Borrowing Base Reserves, minus

        (F)     the Availability Reserve; minus

        (G)     the Carve-Out Reserve.

(b)     Mandatory Prepayment; Overadvances.  Lender shall have no obligation to make any Advance or issue any Letter of Credit if an Overadvance would result.  If at any time the

Line of Credit Usage exceeds the Borrowing Base, then Borrowers shall immediately prepay the Revolving Note in an amount sufficient to eliminate the excess, and if payment in full of the Revolving Note is insufficient to eliminate such excess, then Borrowers shall deliver cash to Lender in an amount equal to the remaining excess, unless Lender has delivered to Borrowers an Authenticated Record consenting to the Overadvance, in which event the Overadvance shall be temporarily permitted on such terms and conditions as Lender in its sole discretion may deem appropriate, including, without limitation, the payment of additional fees or interest, or both.

**2.3.     Procedures for Advances.**

(a)     <u>Advances Credited to Operating Account</u>.   All Advances shall be credited to Borrowers' demand deposit account maintained with Lender (the "<u>Operating Account</u>"), unless the parties agree in an Authenticated Record to disburse to another account.

(b)     <u>Advances upon Borrowers' Request</u>.    Borrowers may request one or more Advances on any Business Day by delivery of an Authenticated Record to Lender (an "<u>Advance Request</u>") no later than 12 noon, eastern standard time, on the Business Day on which Borrowers desire the Advance to be funded, which Advance Request shall specify the amount of the requested Advance, whether such Advance is desired to be a Base Rate Advance or a LIBOR Rate Advance, and the proposed date of funding of such Advance, and shall be accompanied by a Borrowing Base Certificate executed by an Officer.   Unless Borrowers shall specify in an Advance Request that the requested Advance is to be a LIBOR Rate Advance, each request shall be deemed a request for a Base Rate Advance.   No request for an Advance will be deemed received until Lender acknowledges receipt, and Borrowers, if requested by Lender, confirm the request in an Authenticated Record (<u>provided</u>, <u>however</u>, that Lender shall use reasonable commercial efforts to be available to Borrowers' on-going borrowing requests).   Borrowers shall repay all Advances when due, even if the Person requesting the Advance on behalf of Borrowers lacked authorization.

(c)     <u>Expiration of LIBOR Rate Advances</u>.   Each LIBOR Rate Advance shall continue to bear interest at the Adjusted LIBOR Rate plus the Applicable LIBOR Margin until the Business Day following the date on which Borrowers deliver to Lender an Authenticated Record indicating that Borrowers desire that such LIBOR Rate Advance bear interest with reference to the Base Rate.

(d)     <u>Protective Advances; Advances to Pay Obligations Due</u>.   Lender may initiate an Advance on the Line of Credit in its commercially reasonable discretion at any time, with notice to Borrowers of such Advance promptly thereafter, without Borrowers' compliance with any of the conditions of this Agreement, and (i) disburse the proceeds directly to third Persons in order to reserve or protect Lender's interest in Collateral or to perform any of Borrowers' obligations under this Agreement, or (ii) apply the proceeds to the amount of any Obligations then due and payable to Lender.   Any such Advance initiated by Lender pursuant to this <u>Section 2.3(d)</u> shall be a Base Rate Advance.

**2.4.   Collection of Accounts.**

(a)   <u>Store Accounts</u>.  Borrowers have granted a security interest to Lender in the Collateral, including, without limitation, all Inventory, Credit Card Receivables and other Accounts.  Except as otherwise set forth in <u>Section 2.4(b)</u> hereof with respect to Credit Card Receivables and other Accounts, and except for cash on hand maintained at store locations in the ordinary course of Borrowers' business and consistent with historical practices (but in an amount not to exceed $10,000) for any store location at the beginning of any Business Day), or as otherwise agreed by both parties in an Authenticated Record, all Proceeds of Inventory and other Collateral, upon receipt or collection, shall be deposited each Business Day into the Collection Account, or into a Store Account for transfer each Business Day (except to the extent that Lender in its commercially reasonable discretion agrees to less frequent transfers) from such Store Account to the Collection Account.  Funds so deposited ("<u>Store Funds</u>") are the property of Lender, and may only be withdrawn from Store Accounts for deposit to the Collection Account.  Store Funds may only be withdrawn from the Collection Account by Lender.  Until deposited into a Store Account or the Collection Account, Borrowers will hold all such payments and Proceeds in trust for Lender without commingling with other funds or property.  All deposits held in any Store Account or the Collection Account shall constitute Proceeds of Collateral and shall not constitute payment of Obligations.

(b)   <u>Payment of Credit Card Receivables and Other Accounts</u>.  Borrowers shall instruct all account debtors other than in respect of Credit Card Receivables to make payments in respect of such accounts directly to the Collection Account, or to a Store Account for transfer to the Collection Account in accordance with <u>Section 2.4(a)</u> hereof.  Borrowers shall instruct all Credit Card Processors to make payments in respect of Credit Card Receivables directly to a Credit Card Collection Account or, instruct them to deliver such payments to Lender by wire transfer, ACH, or other means as Lender may direct for deposit to a Credit Card Collection Account.  All payments and Proceeds of Credit Card Receivables deposited into a Credit Card Collection Account shall be remitted each Business Day from such Credit Card Collection Account to the Collection Account, except to the extent that Lender in its commercially reasonable discretion agrees to less frequent transfers.  If Borrowers receive a payment or the Proceeds of Credit Card Receivables or other Accounts directly, Borrowers will promptly deposit the payment or Proceeds into a Store Account for transfer to the Collection Account in accordance with <u>Section 2.4(a)</u> hereof.  Funds so deposited ("<u>Credit Card and Account Funds</u>" and, collectively with Store Funds, "<u>Account Funds</u>") are the property of Lender, and may only be withdrawn from the Store Account, Credit Card Collection Account, or Collection Account by Lender.  Until deposited into the Collection Account, Borrowers will hold all such payments and Proceeds in trust for Lender without commingling with other funds or property.  All deposits held in any Credit Card Collection Account or the Collection Account shall constitute Proceeds of Collateral and shall not constitute the payment of Obligations.

(c)   <u>Application of Payments to Revolving Note</u>.  Lender will withdraw Account Funds deposited to the Collection Account and pay down borrowings on the Line of Credit by applying them to the Revolving Note, or, if payments are received by Lender that are not first deposited to the Collection Account pursuant to any treasury management service provided to Borrowers by Lender, such payments shall be applied to the Revolving Note as provided in the Treasury Management Agreements.  For purposes of calculating Availability hereunder, all

Account Funds deposited in the Collection Account shall be applied to the outstanding balance of the Advances on the first Business Day following the Business Day of deposit to the Collection Account. All payments shall be applied first to any unpaid Base Rate Advances, and once paid, to outstanding LIBOR Rate Advances. Without limiting the foregoing, at any time during a Default Period, Account Funds shall be applied first, to Lender Expenses; second, to fees payable under Section 2.6 hereof; third, to fees and expenses otherwise payable hereunder; fourth, to interest on Advances; fifth to the outstanding Line of Credit Usage; and sixth, to any other outstanding Obligations.

**2.5.     Interest and Interest Related Matters.**

(a)     <u>Interest Rates Applicable to Line of Credit</u>. Except as otherwise provided in this Agreement, the unpaid principal amount of each Advance evidenced by the Revolving Note shall accrue interest as follows:

(i)     Base Rate Advances shall bear interest rate per annum equal to sum of (i) the Base Rate, <u>plus</u> (ii) the Applicable Base Rate Margin; <u>provided</u>, that notwithstanding adjustments in the Base Rate and/or adjustments in the Applicable Base Rate Margin, the effective interest rate on Base Rate Advances shall at no time be less than five and one-half percent (5.5%) per annum, which will apply regardless of fluctuations in the Base Rate and/or the Applicable Base Rate Margin that would otherwise cause the interest rate applicable to Base Rate Advances to be less than this minimum interest rate floor; and

(ii)     LIBOR Rate Advances shall bear an interest rate per annum equal to sum of (i) the LIBOR Rate, <u>plus</u> the Applicable LIBOR Rate Margin; <u>provided</u>, that notwithstanding adjustments in the LIBOR Rate and/or adjustments in the Applicable LIBOR Rate Margin, the effective interest rate on LIBOR Rate Advances shall at no time be less than five and one-half percent (5.5%) per annum, which will apply regardless of fluctuations in the LIBOR Rate and/or the Applicable LIBOR Rate Margin that would otherwise cause the interest rate applicable to LIBOR Rate Advances to be less than this minimum interest rate floor.

(b)     <u>Default Interest Rate</u>. Commencing on the day an Event of Default occurs, through and including, without limitation, the date identified by Lender in a Record as the date that the Event of Default has been cured or waived (each such period a "<u>Default Period</u>"), or during a time period specified in Section 2.8 hereof, or at any time following the Termination Date, in Lender's sole discretion and without waiving any of its other rights or remedies and without prior notice of its application, or any notice of retroactive application in the event that Lender does not impose the Default Rate on the first day of any Default Period, the outstanding balance of the Obligations shall bear interest at a rate that is two percent (2.0%) above the contractual rate set forth in Section 2.5(a) hereof, and outstanding Letters of Credit shall accrue Letter of Credit Fees at a rate that is two percent (2.0%) above the contractual rate set forth in Section 2.6(b) hereof for each such Letter of Credit, as the case may be (the "<u>Default Rate</u>").

(c)     <u>Interest Accrual on Payments Applied to Revolving Note</u>. Payments received by Lender shall be applied to the Revolving Note as provided in Section 2.4(c) hereof, but the

principal amount paid down shall continue to accrue interest through the end of the second Business Day following the Business Day that the payment was applied to the Revolving Note.

(d)     Usury.  No interest rate shall be effective which would result in a rate greater than the highest rate permitted by law.  Payments in the nature of interest described in or related to this Agreement that are later determined to be in excess of the limits imposed by applicable usury law will be deemed to be a payment of principal, and the Obligations shall be reduced by that amount so that such payments will not be deemed usurious.

**2.6.     Fees.**

(a)     Fee Letter.  Borrowers shall pay to Lender the fees set forth in the Fee Letter as and when such fees are due therein as set forth.

(b)     Administrative Fee.  Borrowers shall pay Lender an annual administrative fee in the amount of $36,000 per year, payable monthly in advance with the first payment of $3,000 due and payable on the Effective Date.

(c)     Letter of Credit Fees.  In addition to the charges, commissions, fees, and costs set forth in Section 2.10 hereof, Borrowers shall pay Lender a letter of credit fee ("Letter of Credit Fees"), which shall accrue at a rate equal to one and one-half percent (1.5%) per annum times the daily balance of the undrawn amount of all outstanding standby Letters of Credit, which Letter of Credit Fee shall be payable monthly in arrears on the first day of each month and on the Termination Date.

(d)     Unused Revolving Line Facility Fee.  Borrowers shall pay an unused Line of Credit fee, which shall accrue at a rate equal to one-half of one percent (0.50%) per annum times the average daily unused portion of the Line of Credit, which Unused Line of Credit fee shall be payable monthly in arrears on the first day of each month and on the Termination Date.

(e)     Treasury Management Fees.  Borrowers shall pay service fees to Lender, as applicable, for treasury management services provided pursuant to the Treasury Management Agreements or any other agreement entered into by the parties, in the amount prescribed therein or in Lender's current service fee schedule.

(f)     Late Payment Fee.  If any payment hereunder is not made within term (10) days of its due date, Borrowers shall pay on demand a late payment charge equal to five percent (5%) of the amount of such payment.  Nothing in the preceding sentence shall affect Lender's right to accelerate the amounts due hereunder in the event of any default in the payment.

**2.7.     Interest Accrual; Principal and Interest Payments; Computation.**

(a)     Interest Payments and Interest Accrual.  Accrued and unpaid interest under the Revolving Note shall be due and payable on the first day of each month (each an "Interest Payment Date") and on the Termination Date, and shall be paid in the manner provided in Section 2.4(c) hereof.  Interest shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of Advance to the Interest Payment Date.

(b)     Payment of Revolving Note Principal.  The principal amount of the Revolving Note shall be paid from time to time as provided in this Agreement, and shall be fully due and payable on the Termination Date.

(c)     Payments Due on Non Business Days.  If any payment required to be made hereunder is due on a day which is not a Business Day (including, without limitation, any Interest Payment Date or the Termination Date), payment shall be made on the next Business Day, and interest shall continue to accrue during that time period.

(d)     Computation of Interest and Fees.  Interest accruing on the unpaid principal amount of the Revolving Note and fees payable under this Agreement shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(e)     Liability Records.  Lender shall maintain accounting and bookkeeping records of all Advances and payments under the Line of Credit and all other Obligations due to Lender pursuant to this Agreement in such form and content as Lender in its reasonable discretion deems appropriate.  Lender's calculation of current Obligations shall be presumed correct unless proven otherwise by Borrowers.  Upon Lender's request, Borrowers will admit and certify in a Record the exact principal balance of the Obligations that Borrowers then believe to be outstanding pursuant to this Agreement.  Any billing statement or accounting provided by Lender shall be conclusive and binding unless Borrowers notify Lender in a detailed Record of its intention to dispute the billing statement or accounting within 30 days of receipt.

**2.8.    Reserved.**

**2.9.    Payments Free of Taxes**.  Any and all payments by or on account of any Obligations hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any taxes, assessments and governmental charges, provided, that if Borrowers shall be required by applicable law to deduct any taxes, assessments or governmental charges from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Agreement) Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrowers shall make such deductions and (iii) Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

**2.10.   Letters of Credit.**

(a)     Subject to the terms and conditions of this Agreement, and subject to Borrowers' entry into such additional agreements as may be required by Lender or any other Issuing Lender, in its discretion, may issue letters of credit for the account of Borrowers (each, an "L/C"), or purchase participations or execute indemnities or reimbursement obligations (each such undertaking, an "L/C Undertaking") with respect to letters of credit issued by an Underlying Issuer for the account of Borrowers.  Letters of Credit may be issued under the Line of Credit and the Replacement L/C Line; provided, however, that Letters of Credit issued under the Replacement L/C Line shall be Replacement Letters of Credit only.  To request the issuance of an L/C or an L/C Undertaking (or the amendment, renewal, or extension of an outstanding L/C

or L/C Undertaking), Borrowers shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Lender) to Lender (and, if applicable, the Issuing Lender) (reasonably in advance of the requested date of issuance, amendment, renewal, or extension) a notice requesting the issuance of an L/C or L/C Undertaking, or identifying the L/C or L/C Undertaking to be amended, renewed, or extended, the date of issuance, amendment, renewal, or extension, the date on which such L/C or L/C Undertaking is to expire, the amount of such L/C or L/C Undertaking, the name and address of the beneficiary thereof (or of the Underlying Letter of Credit, as applicable), whether such Letter of Credit is a Replacement Letter of Credit, and such other information as shall be necessary to prepare, amend, renew, or extend such L/C or L/C Undertaking. If requested by the Issuing Lender, Borrowers also shall be applicants under the application with respect to any Underlying Letter of Credit that is to be the subject of an L/C Undertaking. Lender shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the requested Letter of Credit:

(i) the Letter of Credit Usage would exceed (A) $1,000,000 under the Line of Credit, or (B) $2,323,587.89 under the Replacement L/C Line; or

(ii) the Line of Credit Usage would exceed the Borrowing Base; or

(iii) the expiration of any Letter of Credit would be later than the earlier of ten (10) days prior to the Maturity Date or one (1) year from the date of its original issue.

(b) Borrowers and Lender acknowledge and agree that certain Underlying Letters of Credit may be issued to support letters of credit that already are outstanding as of the Effective Date. Each Letter of Credit (and corresponding Underlying Letter of Credit) shall be in form and substance acceptable to Lender and, if applicable, the Issuing Lender (in the exercise of their respective discretion), including the requirement that the amounts payable thereunder must be payable in Dollars. If Issuing Lender is obligated to advance funds under a Letter of Credit, Borrowers immediately shall reimburse such funds ("L/C Disbursement") to Issuing Lender by paying to Lender an amount equal to such L/C Disbursement not later than 2:00 p.m., New Haven Connecticut time, on the date that such L/C Disbursement is made, if Borrowers shall have received written or telephonic notice of such L/C Disbursement prior to 1:00 p.m. (New Haven Connecticut time) on such date, or, if such notice has not been received by Borrowers prior to such time on such date, then not later than 1:00 p.m. (New Haven Connecticut time) on the Business Day after the day that Borrowers receive such notice. In the absence of such reimbursement, the amount of such L/C Disbursement shall bear interest at the rate then applicable to Advances that are Base Rate Advances and, in Lender's sole discretion, such amount shall be deemed to be an Advance hereunder. To the extent an L/C Disbursement is deemed to be an Advance hereunder, Borrowers' obligation to reimburse such L/C Disbursement shall be discharged and replaced by the resulting Advance. Promptly following receipt by Lender of any payment from Borrowers pursuant to this paragraph, Lender shall distribute such payment to the Issuing Lender or, to the extent that Lender has made payments pursuant to Section 2.10(c) hereof to reimburse the Issuing Lender, then to Lender and the Issuing Lender as their interest may appear.

(c)     Borrowers hereby agree to indemnify, save, defend, and hold Lender (and any Issuing Lender, if applicable) harmless from any loss, cost, expense, or liability, and reasonable attorneys fees incurred by Lender arising out of or in connection with any Letter of Credit, other than those arising as a result of the gross negligence or willful misconduct of Lender (and any Issuing Lender, if applicable).  Borrowers agree to be bound by the Underlying Issuer's regulations and interpretations of any Underlying Letter of Credit or by Issuing Lender's interpretations of any L/C issued by Issuing Lender to or for Borrowers' account, even though this interpretation may be different from Borrowers' own, and Borrowers understand and agree that Lender shall not be liable for any error, negligence, or mistake, whether of omission or commission, in following Borrowers' instructions or those contained in the Letter of Credit or any modifications, amendments, or supplements thereto.  Borrowers understand that the L/C Undertakings may require Issuing Lender to indemnify the Underlying Issuer for certain costs or liabilities arising out of claims by Borrowers against such Underlying Issuer.  Borrowers hereby authorize and direct any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

(d)     Borrowers hereby authorize and direct any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

(e)     Any and all charges, commissions, fees, and costs incurred by the Issuing Lender relating to Underlying Letters of Credit shall be Lender Expenses for purposes of this Agreement and immediately shall be reimbursable by Borrowers to Lender for the account of Issuing Lender; it being acknowledged and agreed by Borrowers that the Underlying Issuer imposes a schedule of a standard set of fees and expenses, and charges for amendments, extensions, drawings, and renewals, all of which may be changed from time to time.

(f)     If by reason of (i) any change in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by Issuing Lender or any Underlying Issuer with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(A)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued hereunder, or

(B)     there shall be imposed on the Issuing Lender of the Underlying Issuer or Lender any other condition regarding any Underlying Letter of Credit or any Letter of Credit issued pursuant hereto;

and the result of the foregoing is to increase, directly or indirectly, the cost to Lender of issuing, making, guaranteeing, or maintaining any Letter of Credit or to reduce the amount receivable by Lender in respect thereof, then, and in any such case, Lender may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrowers in an Authenticated Record, and Borrowers shall pay on demand such amounts as Lender may specify to be necessary to compensate Lender for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Advances hereunder. The determination by Lender of any amount due pursuant to this Section 2.10(f), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

    (g)   Liability of Issuing Lender.

        (i)    The International Standby Practices 1998 a publication by the International Chamber of Commerce, or any substitution therefor or replacement thereof (the "ISP"), shall be binding on the parties except to the extent otherwise from time to time agreed by them in writing. As between the Issuing Lender and Borrowers, Borrowers assume all risks of the acts or omissions of the beneficiary(ies) of any Letter of Credit and any transferee of any Letter of Credit authorized by Borrowers with respect to the use of any Letter of Credit. In furtherance of, and not in limitation of, the rights and powers of the Issuing Lender or under the ISP, but subject to all the other provisions of this Section 2.10(h), neither the Issuing Lender nor any of its officers or directors shall be liable or responsible for, and Borrowers assume all responsibility for: (A) the use which may be made of any Letter of Credit or for any acts or omissions of the beneficiaries and any transferee in connection therewith; (B) the validity or genuineness of documents, or of any endorsement(s) thereon, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged, unless prior to their presentment Borrowers notify the Issuing Lender in writing that invalid, insufficient, fraudulent or forged documents are about to the represented and Borrowers agree to indemnify the Issuing Lender; (C) payment by the Issuing Lender against presentation of documents that do not comply with the terms of any Letter of Credit, including without limitation failure of any documents to bear any reference or adequate reference to the Letter of Credit; (D) the failure of any instrument to bear any reference or adequate reference to the applicable Letter of Credit or the failure of any person to surrender a Letter of Credit or to forward documents in the manner required by a Letter of Credit or otherwise to comply with the terms and conditions of any Letter of Credit; (E) the good faith or acts of any person other than the Issuing Lender and its agents and employees; (F) any delay in giving or failure to give any notice, demand or protest (other than notices expressly required under this Agreement); (G) any error, omission, delay in or nondelivery of any notice or other communication, if properly sent; or (H) any other circumstances whatsoever in making or failing to make payment under any Letter of Credit; provided, however, that Borrowers shall have a claim against the Issuing Lender, and the Issuing

Lender shall be liable to Borrowers, for direct (but not consequential) damages suffered by Borrowers which Borrowers prove were caused by (1) the Issuing Lender's willful misconduct or gross negligence in determining whether documents presented under any Letter of Credit comply with the terms of such Letter of Credit or (2) the Issuing Lender's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of the Letter of Credit of a sight draft and certificate strictly complying with the terms and conditions of such Letter of Credit. In furtherance and not in limitation of the foregoing, the Issuing Lender may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any information to the contrary.

(ii)     The determination whether the required documents are presented prior to the expiration of any Letter of Credit and whether such other documents are in proper and sufficient form for compliance with such Letter of Credit shall be made by the Issuing Lender in its commercially reasonable discretion, which determination shall be conclusive and binding upon Borrowers. Any action, inaction or omission on the part of the Issuing Lender under or in connection with any Letter of Credit or related instrument or documents, if in good faith and in conformity with such laws, regulations or commercial or banking customs as the Issuing Lender may reasonably believe to be applicable, shall be binding upon Borrowers, shall not place the Issuing Lender under any liability to Borrowers, and shall not affect, impair or prevent the vesting of any of the rights or powers of Lender hereunder or Borrowers' obligation hereunder to make reimbursement.

(iii)     If Borrowers request or consent in writing to any modification or extension of any Letter of Credit or waive failure of any draft, certificate or other document to comply with the terms of any Letter of Credit, the Issuing Lender shall be deemed to have relied and be entitled to rely on such request, consent or waiver with respect to any action taken or omitted by the Issuing Lender pursuant thereto, and such modification, extension or waiver shall be binding upon Borrowers.

**2.11.    Illegality.** If Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful for Lender to make, maintain or fund LIBOR Rate Advances, or to determine or charge interest rates based upon the Adjusted LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by Lender to Borrowers, any obligation of Lender to make or continue LIBOR Rate Advances shall be suspended until Lender notifies Borrowers that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, all LIBOR Rate Advances shall immediately convert to Base Rate Advances.

**2.12.    Inability to Determine Rates.** If Lender determines that for any reason in connection with any request for a LIBOR Rate Advance that (a) adequate and reasonable means do not exist for determining LIBOR, or (b) LIBOR does not adequately and fairly reflect the cost to Lender of funding such Advance, Lender will promptly so notify Borrowers. Thereafter, the

obligation of Lender to make or maintain LIBOR Rate Advances shall be suspended until Lender revokes such notice or the conditions(s) giving rise to the suspension no longer exist. Upon receipt of such notice, any pending Advance Request specifying a LIBOR Rate Advance will be deemed to be a request for a Base Rate Advance in the amount specified therein.

**2.13.  Increased Costs.**

(a)  <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by Lender;

(ii)  subject Lender to any tax of any kind whatsoever with respect to this Agreement or any Advances made by it, any Letter of Credit, any participation in a Letter of Credit or change the basis of taxation of payments to Lender in respect thereof; or

(iii)  impose on Lender any other condition, cost or expense affecting this Agreement or Advances made by Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any Advance, or to increase the cost to Lender of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit) or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or any other amount) then, upon request of Lender, Borrowers will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)  <u>Capital Requirements</u>.  If Lender determines that any Change in Law affecting Lender regarding capital requirements has or would have the effect of reducing the rate of return on Lender's capital as a consequence of this Agreement, including the Advances made by, or the Letters of Credit issued by Lender hereunder, to a level below that which Lender could have achieved but for such Change in Law (taking into consideration Lender's policies with respect to capital adequacy), then from time to time Borrowers will pay to Lender such additional amount or amounts as will compensate Lender for any such reduction suffered.

(c)  <u>Certificates for Reimbursement</u>.  Lender's Authenticated Record setting forth the amount or amounts necessary to compensate Lender as specified in subsection (a) or (b) of this <u>Section 2.13</u> in reasonable detail sufficient to allow Borrowers to verify such calculation, and delivered to Borrowers shall be conclusive absent manifest error.  Borrowers shall pay Lender the amount shown as due in any such Authenticated Record within five (5) days after receipt thereof.

(d)  <u>Delay in Requests</u>.  Failure or delay on the part of Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 2.13</u> shall not constitute a waiver of Lender's right to demand such compensation, <u>provided</u>, that Borrowers shall not be required to compensate Lender pursuant to the foregoing provisions of this <u>Section 2.13</u> for any increased costs incurred or reductions suffered more than six (6) months prior to the date that

Lender notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six (6) month period referred to above shall be extended to include the period of retroactive effect thereof).

**2.14. Survival**. All of Borrowers' obligations under <u>Sections 2.10</u> through <u>2.13</u> shall survive termination of Lender's obligation to make any Advance and of the and repayment of all Obligations hereunder.

## 3. SECURITY INTEREST AND OCCUPANCY OF BORROWERS' PREMISES

**3.1. Grant of Security Interest**. Borrowers hereby pledge, assign and grant to Lender, for the benefit of Lender (and as agent for NewAlliance Merchant Services to the extent that NewAlliance Merchant Services is now or may in the future become a party to any Treasury Management Agreements or other agreements with Borrowers) a Lien and security interest (collectively referred to as the "<u>Security Interest</u>") in the Collateral, as security for the payment and performance of all Obligations. All of the Obligations shall constitute administrative expenses of Borrowers in the Chapter 11 Case with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, and 1114 of the Bankruptcy Code, subject only to the Carve-Out. All Liens which secure the Obligations shall constitute first priority Liens under Section 364(d)(iii) and (d)(iv) of the Bankruptcy Code, subject only to Liens securing the Pre-Petition Obligations and other Permitted Liens having priority under applicable law. No other claims having a priority superior or pari passu to that granted to or on behalf of Lender shall be granted or approved while any of the Obligations remain outstanding.

**3.2. Notifying Account Debtors and Other Obligors; Collection of Collateral**. Lender may, at any time (whether or not a Default Period then exists) deliver a Record giving an account debtor or other Person obligated to pay an Account, a General Intangible, or other amount due, notice that the Account, General Intangible, or other amount due has been assigned to Lender for security and must be paid directly to Lender. Borrowers shall join in giving such notice and shall Authenticate any Record giving such notice upon Lender's request. Lender may, but need not, in Lender's or in Borrowers' name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, such Account, General Intangible, or other amount due, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including, without limitation, collateral obligations) of any account debtor or other obligor. Lender may, in Lender's name or in Borrowers' name, as Borrowers' agent and attorney-in-fact, notify the United States Postal Service to change the address for delivery of Borrowers' mail to any address designated by Lender, otherwise intercept Borrowers' mail, and receive, open and dispose of Borrowers' mail, applying all Collateral as permitted under this Agreement and holding all other mail for Borrowers' account or forwarding such mail to Borrowers' last known address.

**3.3. Assignment of Insurance**. As additional security for the Obligations, Borrowers hereby assign to Lender all rights of Borrowers under every policy of insurance covering the Collateral and all business records and other documents relating thereto, and all monies

(including, without limitation, all proceeds and refunds) that may be payable to Borrowers under any such policy, and Borrowers hereby direct the issuer of each such policy to pay all such monies directly to Lender. At any time, whether or not a Default Period then exists, Lender may (but need not), in Lender's or Borrowers' name, execute and deliver proofs of claim, receive payment of proceeds and endorse checks and other instruments representing payment under any policy of insurance, and adjust, litigate, compromise or release claims against the issuer of any policy. Any monies received under any insurance policy assigned to Lender, other than liability insurance policies, or received as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid to Lender and, as determined by Lender in its reasonable discretion, either be applied to prepayment of the Obligations or disbursed to Borrowers under staged payment terms reasonably satisfactory to Lender for application to the cost of repairs, replacements, or restorations which shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed.

### 3.4. Borrowers' Premises.

(a)     <u>Lender's Right to Occupy Borrowers' Premises</u>.  Borrowers hereby grant to Lender the right, at any time during a Default Period and without notice or consent, to take exclusive possession of all locations where Borrowers conduct their business or have any rights of possession, including without limitation the locations described on <u>Schedule 5.1</u> hereto (the "Premises"), until the earlier of (i) payment in full and discharge of all Obligations and termination of the Line of Credit, or (ii) final sale or disposition of all items constituting Collateral and delivery of those items to purchasers. During a Default Period, Lender may use the Premises to store, process, manufacture, sell, use, and liquidate or otherwise dispose of items that are Collateral, and for any other incidental purposes deemed appropriate by Lender in good faith.

(b)     <u>Borrowers' Obligation to Reimburse Lender</u>.  Lender shall not be obligated to pay rent or other compensation for the possession or use of any Premises, but if Lender elects to pay rent or other compensation to the owner of any Premises in order to have access to the Premises, then Borrowers shall promptly reimburse Lender all such amounts, as well as all taxes, fees, charges and other expenses at any time payable by Lender with respect to the Premises by reason of the execution, delivery, recordation, performance or enforcement of any terms of this Agreement, and all such amounts incurred or expended by Lender shall constitute Obligations hereunder.

### 3.5. License.  Without limiting the generality of any other Security Document, Borrowers hereby grant to Lender a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of Borrowers for the purpose of: (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by Borrowers for their own manufacturing and subject to Borrowers' reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

**3.6.    Financing Statements.**

(a)    <u>Authorization to File</u>.  Borrowers authorize Lender to file financing statements describing the Collateral to perfect Lender's Security Interest therein, and Lender may describe the Collateral as "all personal property" or "all assets" or describe specific items of Collateral including, without limitation, any commercial tort claims.  All financing statements filed before the date of this Agreement to perfect the Security Interest were authorized by Borrowers and are hereby ratified and re-authorized.  Following the termination of the Line of Credit and payment of all Obligations (including, without limitation, the cash collateralization of any contingent Obligations in an amount equal to no less than 105% of the face amount of such contingent Obligations), Lender shall, at Borrowers' expense and within the time periods required under applicable law, release or terminate any filings or other agreements that perfect the Security Interest.

(b)    <u>Termination</u>.  Lender shall, at Borrowers' expense, release or terminate any filings or other agreements that perfect the Security Interest (<u>provided</u>, that there are no suits, actions, proceedings or claims pending or threatened against any Indemnitee under this Agreement with respect to any Indemnified Liabilities), upon Lender's receipt of the following, in form and content reasonably satisfactory to Lender: (i) cash payment in full of all Obligations (including, without limitation, the cash collateralization of any contingent Obligations in an amount equal to no less than 105% of the face amount of such contingent Obligations) and completed performance by Borrowers with respect to their other monetary obligations under this Agreement, (ii) a release of all claims against Lender by Borrowers relating to Lender's performance and obligations under the Loan Documents, and (iii) an agreement by Borrowers and any new lender to Borrowers to indemnify Lender for any payments received by Lender that are applied to the Obligations as a final payoff that may subsequently be returned or otherwise not paid for any reason.

**3.7.    Setoff**.  Regardless of the adequacy of any collateral, Lender may at any time, in its commercially reasonable discretion and without demand or notice to Borrowers or any other Person, set off any liability owed to Borrowers by Lender against any Obligations, whether or not due.

**3.8.    Collateral Related Matters**.  This Agreement does not contemplate a sale of Accounts or chattel paper, and, as provided by law, Borrowers are entitled to any surplus and shall remain liable for any deficiency.  Lender's duty of care with respect to Collateral in its possession (as imposed by law) will be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or third Person, and Lender need not otherwise preserve, protect, insure or care for such Collateral. Lender shall not be obligated to preserve rights Borrowers may have against prior parties, to liquidate the Collateral at all or in any particular manner or order or apply the Proceeds of the Collateral in any particular order of application.  Lender has no obligation to clean up or prepare Collateral for sale.  Borrowers waive any right it may have to require Lender to pursue any third Person for any of the Obligations.

**3.9.   Notices Regarding Disposition of Collateral**.  If notice to Borrowers of any intended disposition of Collateral or any other intended action is required by applicable law in a particular situation, such notice will be deemed commercially reasonable if given in the manner specified in Section 8.4 hereof at least ten (10) calendar days before the date of intended disposition or other action.

## 4.   CONDITIONS PRECEDENT

**4.1.   Conditions Precedent to Initial Line of Credit Usage and Issuance of Initial Letter of Credit**.  Lender's obligation to make the initial Advance or issue the initial Letter of Credit shall be subject to the conditions that (i) Lender shall have received this Agreement and each of the Loan Documents, and any document, agreement, or other item described in or related to this Agreement, and all fees and information described in **Exhibit C**, duly executed by each party thereto (other than Lender) and in form and content reasonably satisfactory to Lender or Lender has waived such requirement, (ii) all representations and warranties described in Section 5 hereof and elsewhere in the Loan Documents are true and correct as of the Effective Date and the date of such initial Advance or Letter of Credit and (iii) no event has occurred and is continuing, or would result from the requested Advance or issuance of the Letter of Credit that would result in a Default or an Event of Default.

**4.2.   Additional Conditions Precedent to All Line of Credit Usage and Letters of Credit**.  Lender's obligation to make any Advance or issue any Letter of Credit (including, without limitation, the initial Advance or Letter of Credit) shall be subject to the further additional conditions that (i) each of the representations and warranties described in Section 5 hereof and elsewhere in the Loan Documents are true and correct on the date of the Advance or issuance of the Letter of Credit except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date) and except for changes in factual circumstances not prohibited under this Agreement or the other Loan Documents, (ii) no event has occurred and is continuing, or would result from the requested Advance or issuance of the Letter of Credit that would result in a Default or an Event of Default (iii) in Lender's reasonable discretion, since the Effective Date, there has not been a Material Adverse Effect and (iv) the Bankruptcy Court shall have entered the Interim Order and, if the requested funding date of the Advance or Letter of Credit is more than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, in each case, in form and substance satisfactory to Lender, entered on notice to such parties as may be satisfactory to Lender, among other things, (A) authorizing and approving the Line of Credit and the transactions contemplated thereby, including, without limitation, the granting of the super-priority status, security interests and liens, and the payment of all fees, referred to herein, and (B) authorizing the lifting of the automatic stay to permit Lender to exercise its rights and remedies with respect to the Credit Facility upon the occurrence of an Event of Default (subject to the terms of such Financing Orders), which Financing Orders shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of Lender.

## 5.    REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement, Borrowers make the representations and warranties described in this Section 5 hereof and elsewhere in the Loan Documents. Any request for an Advance or issuance of Letter of Credit under the Line of Credit will be deemed a representation by Borrowers that all representations and warranties are true, correct, and complete in all material respects (or in all respects with respect to any extension of credit on the Effective Date) as of the time of the request, unless they relate exclusively to an earlier date (in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date) and except for changes in factual circumstances not prohibited under this Agreement or the other Loan Documents. Borrowers shall promptly deliver a Record notifying Lender of any change in circumstance that would affect the accuracy of any representation or warranty, unless the representation and warranty specifically relates to an earlier date.

**5.1.    Existence and Power; Name; Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number**.  Each Borrower is a corporation or limited liability company organized, validly existing and in good standing under the laws of the State of New York and is licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.  Each Borrower has all requisite power and authority to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, those Loan Documents and any other documents or agreements that it has entered into with Lender related to this Agreement.  During its existence, each Borrower has done business solely under the names set forth on Schedule 5.1 in addition to its correct legal name.  Each Borrower's chief executive office and principal place of business is located at the address set forth on Schedule 5.1, and all of its records relating to its business or the Collateral are kept at that location.  All Inventory and Equipment is located at that location or at one of the other locations set forth on Schedule 5.1. Each Borrower's name, Federal Employer Identification Number and Organization Identification Number are correctly set forth at the end of the Agreement next to such Borrower's signature.

**5.2.    Capitalization**.  The capitalization chart set forth on Schedule 5.2 constitutes a correct and complete list of all ownership interests of each Borrower and all rights to acquire ownership interests, including, without limitation, the record holder, number of interests and percentage interests on a fully diluted basis, and the organizational chart on Schedule 5.2 shows the ownership structure of all Subsidiaries of each Borrower.

**5.3.    Authorization of Borrowing; No Conflict as to Law or Agreements**.  The execution, delivery and performance by Borrowers of the Loan Documents and any other documents or agreements described in or related to this Agreement, and all borrowing under the Line of Credit, upon entry of the Interim Order, have been authorized and do not (i) require the consent or approval of any Borrower's Owners; (ii) require the authorization, consent or approval by, or registration, declaration or filing with, or notice to, any governmental agency or instrumentality, whether domestic or foreign, or any other Person, except to the extent obtained, accomplished or given prior to the date of this Agreement; (iii) violate any provision of any law,

rule or regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to any Borrower or of any Borrower's Constituent Documents; (iv) result in a breach of or constitute a default or event of default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which any Borrower is a party or by which it or its properties may be bound or affected; or (v) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or subsequently acquired by any Borrower.

5.4. **Legal Agreements**. This Agreement, the other Loan Documents, and any other document or agreement described in or related to this Agreement, will upon entry of the Interim Order, constitute the legal, valid and binding obligations of Borrowers, enforceable against Borrowers in accordance with their respective terms.

5.5. **Subsidiaries**. Except as disclosed on Schedule 5.5, each Borrower has no Subsidiaries.

5.6. **Financial Condition; No Adverse Change**. Borrowers have furnished to Lender its audited financial statements for its fiscal year ended December 31, 2009 and unaudited financial statements for the fiscal-year-to-date period ended June 30, 2010 and those statements fairly present Borrowers' financial condition as of those dates and the results of Borrowers' operations and cash flows for the periods then ended and were prepared in accordance with GAAP (subject, in the case of unaudited financial statements to the absence of footnotes and ordinary year end adjustments). Since the date of the most recent financial statements, there has been no Material Adverse Effect (other than as a result of the commencement of the Chapter 11 Case).

5.7. **Litigation**. Except as disclosed on Schedule 5.7, there are no actions, suits or proceedings pending or, to Borrowers' knowledge, threatened against or affecting any Borrower or any of its Subsidiaries or the properties of any Borrower or any of its Subsidiaries before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to any Borrower or any of its Subsidiaries, (i) would result in a final judgment or judgments against any Borrower or any of its Subsidiaries in an amount in excess of $50,000, or (ii) could reasonably be expected to have a Material Adverse Effect, apart from those matters specifically disclosed on Schedule 5.7.

5.8. **Intellectual Property Rights.**

(a) **Owned Intellectual Property.** Set forth on Schedule 5.8 is a complete list of all patents, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress, domain names, and copyrights for which any Borrower is the owner of record (the "Owned Intellectual Property"). Except as set forth on Schedule 5.8, (A) Borrowers own the Owned Intellectual Property free and clear of all restrictions (including, without limitation, covenants not to sue any Person), court orders, injunctions, decrees, writs or Liens, whether by agreement memorialized in a Record Authenticated by Borrowers or otherwise, (B) no Person other than Borrowers own or has been granted any right in the Owned Intellectual Property, (C) all Owned Intellectual Property is valid,

subsisting and enforceable, and (D) Borrowers have taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property that are necessary for Borrowers' business as presently conducted or as Borrowers reasonably foresee conducting it.

(b) **Intellectual Property Rights Licensed from Others.** Set forth on <u>Schedule 5.8</u> is a complete list of all agreements under which any Borrower has licensed Intellectual Property Rights from another Person ("<u>Licensed Intellectual Property</u>") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("<u>Off-the-shelf Software</u>") and a summary of any ongoing payments any Borrower is obligated to make with respect to Licensed Intellectual Property. Except as set forth on <u>Schedule 5.8</u> or in any other Record, copies of which have been given to Lender, any Borrower's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs, whether agreed to in a Record Authenticated by Borrowers or otherwise. Except as disclosed on <u>Schedule 5.8</u>, Borrowers are not contractually obligated to make royalty payments of a material nature, or pay fees to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(c) **Other Intellectual Property Needed for Business.** Except for Off-the-shelf Software and as disclosed on <u>Schedule 5.8</u>, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct Borrowers' business as it is presently conducted or as Borrowers reasonably foresee conducting it.

(d) **Infringement.** Except as disclosed on <u>Schedule 5.8</u>, no Borrower has any knowledge of, and has not received notice either orally or in a Record alleging, any Infringement of another Person's Intellectual Property Rights (including, without limitation, any claim set forth in a Record that Borrowers must license or refrain from using the Intellectual Property Rights of any Person) nor, to Borrowers' knowledge, is there any threatened claim or any reasonable basis for any such claim, in either case, that could reasonably be expected to have a Material Adverse Effect.

**5.9. Taxes.** Each Borrower and its Subsidiaries have paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by each of them. Each Borrower and its Subsidiaries have filed all federal, state and local tax returns which to the knowledge of the Officers of Borrowers or any Subsidiary, as the case may be, are required to be filed, and each Borrower and its Subsidiaries have paid or caused to be paid to the respective taxing authorities all taxes as shown on these returns or on any assessment received by any of them to the extent such taxes have become due, except as where the same are currently being contested in good faith by appropriate proceedings and for which Borrowers have set aside on its books adequate reserves in accordance with GAAP.

**5.10. Titles and Liens.** Borrowers have good and absolute title to all Collateral free and clear of all Liens, other than Permitted Liens. No financing statement naming a Borrower as debtor is on file in any office except to perfect only Permitted Liens.

**5.11. No Defaults.** Borrowers are in compliance with all provisions of all agreements, instruments, decrees and orders to which it is a party or by which it or its property is bound or affected, the breach or default of which could have a Material Adverse Effect.

**5.12. Submissions to Lender.** All financial and other information, including without limitation, the Budget, provided to Lender by or on behalf of Borrowers in connection with this Agreement (i) is true and correct in all material respects, (ii) does not omit any material fact that would cause such information to be misleading, and (iii) as to projections, valuations or pro forma financial statements, presents a good faith opinion as to such projections, valuations and pro forma condition and results.

**5.13. Financing Statements.** Borrowers have previously authorized the filing of financing statements sufficient when filed to perfect the Security Interest and other Liens created by the Security Documents. When such financing statements are filed, Lender will have a valid and perfected security interest in all Collateral capable of being perfected by the filing of financing statements. None of the Collateral is or will become a fixture on real estate, unless a sufficient fixture filing has been filed with respect to such Collateral.

**5.14. Rights to Payment.** Each right to payment and each instrument, document, chattel paper and other agreement in excess of $10,000 constituting or evidencing Collateral is (or, in the case of all future Collateral, will be when arising or issued) the valid, genuine and legally enforceable obligation, subject to no defense, setoff or counterclaim of the account debtor or other obligor named in that instrument.

**5.15. Employee Benefit Plans.**

(a) **Maintenance and Contributions to Plans.** Except as disclosed on <u>Schedule 5.15</u>, no Borrower nor any ERISA Affiliate (A) maintains or has maintained any Pension Plan, (B) contributes or has contributed to any Multiemployer Plan, or (C) provides or has provided post-retirement medical or insurance benefits to employees or former employees (other than benefits required under Section 601 of ERISA, Section 4980B of the IRC, or applicable state law).

(b) **Knowledge of Plan Noncompliance with Applicable Law.** Except as disclosed on <u>Schedule 5.15</u>, no Borrower nor any ERISA Affiliate has (A) knowledge that Borrowers or the ERISA Affiliate is not in full compliance with the requirements of ERISA, the IRC, or applicable state law with respect to any Plan, (B) knowledge that a Reportable Event occurred or continues to exist in connection with any Pension Plan, or (C) sponsored a Plan that it intends to maintain as qualified under the IRC that is not so qualified, and no fact or circumstance exists which may have an adverse effect on such Plan's tax qualified status.

(c) **Funding Deficiencies and Other Liabilities.** No Borrower nor any ERISA Affiliate has liability for any (A) accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the IRC) under any Plan, whether or not waived, (B) withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan under Section 01 or 43 of ERISA, or (C) event or circumstance which could result in financial obligation to the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor or

any participant in connection with any Plan (other than routine claims for benefits under the Plan).

**5.16. Environmental Matters.**

(a)    **Hazardous Substances on Premises.** Except as disclosed on <u>Schedule 5.16</u>, there are not present in, on or under the Premises any Hazardous Substances in such form or quantity as to create any material liability or obligation for any Borrower or Lender under the common law of any jurisdiction or under any Environmental Law, and, to the knowledge of Borrowers, no Hazardous Substances have ever been stored, buried, spilled, leaked, discharged, emitted or released in, on or under the Premises in such a way as to create a material liability.

(b)    **Disposal of Hazardous Substances.** Except as disclosed on <u>Schedule 5.16</u>, Borrowers have not disposed of Hazardous Substances in such a manner as to create any material liability under any Environmental Law.

(c)    **Claims and Proceedings with Respect to Environmental Law Compliance.** Except as disclosed on <u>Schedule 5.16</u>, to the knowledge of Borrowers, there have not existed in the past, nor are there any threatened or impending requests, claims, notices, investigations, demands, administrative proceedings, hearings or litigation relating in any way to the Premises or Borrowers, alleging material liability under, violation of, or noncompliance with any Environmental Law or any license, permit or other authorization issued pursuant to such an Environmental Law.

(d)    **Compliance with Environmental Law; Permits and Authorizations.** Except as disclosed on <u>Schedule 5.16</u>, each Borrower (A) conducts its business at all times in compliance with applicable Environmental Law, except where failure to do so could not reasonably be expected to have a Material Adverse Effect, (B) possesses valid licenses, permits and other authorizations required under applicable Environmental Law for the lawful and efficient operation of its business, none of which are scheduled to expire, or withdrawal, or material limitation within the next 12 months, except where failure to do so could not reasonably be expected to have a Material Adverse Effect, and (C) has not been denied insurance on grounds related to potential environmental liability.

(e)    **Status of Premises.** Except as disclosed on <u>Schedule 5.16</u>, and to the knowledge of Borrowers, the Premises are not and never have been listed on the National Priorities List, the Comprehensive Environmental Response, Compensation and Liability Information System or any similar federal, state or local list, schedule, log, inventory or database.

(f)    **Environmental Audits, Reports, Permits and Licenses.** Borrowers have delivered to Lender all material environmental assessments, audits, reports, permits, licenses and other documents describing or relating in any way to the Premises or Borrowers' businesses.

**5.17. Administrative Priority; Lien Priority.**

(a)    The Obligations will, at all times after the Effective Date, constitute allowed administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against Borrowers now existing or hereafter

arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, except as to the Carve-Out;

(b)     Pursuant to Section 364(d)(1) of the Bankruptcy Code, the Interim Order and the Final Order, all Obligations will be secured by a perfected priming first priority Lien on the Collateral, subject only to the Carve-Out and Permitted Liens;

(c)     On the Effective Date and upon entry of the Interim Order and the Final Order, the Interim Order and the Final Order shall be, as applicable, in full force and effect and shall not have been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to Lender, and shall not be subject to a pending appeal or stayed in any respect;

(d)     The Pre-Petition Obligations will be secured by a replacement Lien on all post-petition assets (but excluding Avoidance Action Recoveries (as defined in the Financing Orders)), to the extent of any diminution of value of any pre-petition collateral and the use of cash collateral, in each case, junior only to (i) the Liens of Lender securing the Obligations, and (ii) the Carve-Out; and

(e)     The Pre-Petition Lender shall receive the adequate protection rights as set forth in the Financing Orders.

**5.18.     Appointment Examiner; Liquidation**.  No order has been entered or is pending in the Chapter 11 Case (i) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (ii) to convert the Chapter 11 Case to a Chapter 7 case or to dismiss the Chapter 11 Case.

**5.19.     The Chapter 11 Case**.  The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and has not been dismissed as of the date of this Agreement.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules and the rules and procedures of the Bankruptcy Court.

**5.20.     West Weck, LLC**.  West Weck, LLC is not currently, and will not at any time in the future, incur indebtedness or obligations (including obligations in respect of trade payables to Truserv Corporation) in an amount greater than $5,000.

# 6.     COVENANTS

So long as the Obligations remains unpaid, or the Line of Credit has not been terminated, Borrowers shall comply with each of the following covenants, unless Lender shall consent otherwise in an Authenticated Record delivered to Borrowers.

**6.1.    Reporting Requirements**.  Borrowers shall deliver to Lender the following information, compiled where applicable using GAAP consistently applied, and all in form and content reasonably acceptable to Lender:

(a)    Quarterly Financial Statements.  As soon as available and in any event within sixty (60) days after the end of each fiscal quarter, a Borrower prepared balance sheet, income statement and statement of cash flows prepared for that fiscal quarter and for the year-to-date period then ended, prepared, if requested by Lender, on a combined and combining basis to include each Borrower and its Subsidiaries, and stating in comparative form the figures for the corresponding date and periods in the prior fiscal year, subject to ordinary year-end adjustments and the absence of footnotes.  The financial statements shall be accompanied by a certificate (the "Compliance Certificate") in the form of **Exhibit D** attached hereto that is signed by the chief financial officer.

(b)    Monthly Financial Statements.  As soon as available and in any event within thirty (30) days after the end of any other month, a Borrower prepared balance sheet, income statement and statement of cash flows prepared for that month and for the year-to-date period then ended, prepared, if requested by Lender, on a combined and combining basis to include each Borrower and its Subsidiaries, and stating in comparative form the figures for the corresponding date and periods in the prior fiscal year, subject to ordinary year-end adjustments and the absence of footnotes.

(c)    Budget.  Within two (2) Business Days after the end of each week, (i) a reconciliation of the actual cash receipts and disbursements of Borrowers and existing Advances under this Agreement for such week to the budgeted line item amounts set forth in the Budget for such week; provided, however, that the initial period measured shall begin at the end of week 3 of the Budget and thereafter shall be measured weekly, and (ii) an updated Budget extending the Budget by one additional week, in each case, in form and substance acceptable to Lender in its sole but reasonable discretion, and substantially consistent with the form of the Budget.

(d)    Projections and Cash Flow Forecasts.  No later than (i) thirty (30) days prior to each fiscal year end, drafts of Borrowers' projected balance sheet, income statement and statement of cash flows for each month of the next fiscal year, and (ii) forty-five (45) days after each fiscal year end, final versions of Borrowers' projected balance sheet and income statement and statement of cash flows for each month of the current fiscal year, each certified by the chief financial officer as having been prepared in good faith on reasonable assumptions in light of the circumstances at such time, and accompanied by a statement of assumptions and supporting schedules and information, and which are acceptable to Lender in its reasonable discretion (the "Business Plan").

(e)    Chapter 11 Case Pleadings.  Promptly after filing thereof, Borrowers shall provide Lender with copies of all pleadings, motions, applications, financial information and other papers and documents filed by Borrowers in the Chapter 11 Case, which papers and documents shall also be given or served on Lender's counsel.

(f)    Committee Reports.  Promptly after sending thereof, Borrowers shall provide Lender with copies of all written reports given by Borrowers to any official or unofficial

creditors' committee in the Chapter 11 Case, other than any such reports subject to privilege; provided, that Borrowers may redact any confidential information contained in any such report if it provides to Lender a summary of the nature of the information so redacted.

(g)     Collateral Reports.  No later than ten (10) days after each month end (or more frequently if Lender shall request it), Borrowers shall provide Lender with (i) detailed agings of Borrowers' accounts payable, (ii) a detailed inventory report (including an inventory certification report and inventory aging report), and (iii) a calculation of Borrowers' Accounts, Eligible Credit Card Receivables, Inventory and Eligible Inventory as of the end of that month or shorter time period requested by Lender, which agings and calculations are to be submitted electronically to Lender through its electronic mail portal or through such other electronic reporting method as Lender may reasonably require.  In addition, no later than Wednesday of each week (or more frequently if Lender shall reasonably request), Borrowers shall provide Lender with a weekly stock ledger report as of the close of business on Friday of the immediately preceding week.

(h)     Borrowing Base Certificates; Supplemental Reports.  Weekly, or on each day that Borrowers request an extension of credit hereunder, or more frequently if Lender reasonably requests, Lender's standard form of Borrowing Base Certificate in substantially the form attached hereto as **Exhibit E**, together with a sales report and a roll-forward report of Inventory (at retail and at cost and including sales discounts, markdowns and ineligibles), and reports of Credit Card Receivables and collections thereof.  Daily, on each Business Day, a summary report of credit card receipts for the preceding day(s), including a roll forward of ending balance.

(i)     Litigation.  No later than three (3) days after discovery, a Record notifying Lender of any litigation or other proceeding before any court or governmental agency that seeks a monetary recovery against any Borrower or any of its Subsidiaries in excess of $100,000.

(j)     Intellectual Property.  With respect to any Borrower and each of its Subsidiaries, (i) no later than thirty (30) days before any such Person acquires material Intellectual Property Rights, a Record notifying Lender of such Person's intention to acquire such rights; (ii) except for transfers permitted under Section 6.17 hereof, no later than thirty (30) days before any such Person disposes of material Intellectual Property Rights, a Record notifying Lender of such Person's intention to dispose of such rights, along with copies of all proposed documents and agreements concerning the disposal of such rights as requested by Lender; (iii) promptly upon discovery, a Record notifying Lender of (A) any Infringement of any Intellectual Property Rights necessary for any Borrower's and its Subsidiaries' business by any Person, (B) claims that Borrowers or any Subsidiary is Infringing another Person's Intellectual Property Rights, and (C) any threatened cancellation, termination or material limitation of any Borrower's or any of its Subsidiaries' Intellectual Property Rights; and (iv) promptly upon receipt, copies of all registrations and filings with respect to any Borrower's and its Subsidiaries' Intellectual Property Rights.

(k)     Defaults.  No later than three (3) days after learning of the occurrence of any Event of Default, a Record notifying Lender of the Event of Default and the steps being taken by Borrowers to cure the Event of Default.

(l)     Disputes.  Promptly upon discovery, a Record notifying Lender of (i) any disputes or claims by Borrowers' customers exceeding $5,000 individually or $10,000 in the aggregate during any monthly period; (ii) credit memos not previously reported in Section 6.1(h) hereof; and (iii) any goods returned to or recovered by Borrowers with a value in excess of $5,000.

(m)     Changes in Officers and Directors.  Promptly following occurrence, a Record notifying Lender of any change in the persons constituting any Borrower's Officers and Directors.

(n)     Collateral.  Promptly upon discovery, a Record notifying Lender of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of its payment.

(o)     Commercial Tort Claims.  Promptly upon discovery, a Record notifying Lender of any commercial tort claim in excess of $50,000 brought by any Borrower or any of its Subsidiaries against any Person, including, without limitation, the name and address of each defendant, a summary of the facts, an estimate of any Borrower's or the applicable subsidiary's damages, copies of any complaint or demand letter submitted by such Borrower or such Subsidiary, and such other information as Lender may request, including, without limitation, such additional documents as Lender may request in order to grant to Lender for the benefit of Lender (and as agent for NewAlliance Merchant Services to the extent that NewAlliance Merchant Services is now or may in the future become a party to any Treasury Management Agreements or other agreements with such Borrower), a Lien and security interest in such claim.

(p)     Reports to Directors and Owners.  Promptly upon distribution, copies of all material financial statements, reports, proxy statements and presentations which any Borrower shall have sent to its Directors and/or Owners.

(q)     Violations of Law.  No later than three (3) days after discovery of any violation, a Record notifying Lender of the violation by any Borrower or any of its Subsidiaries of any law, rule or regulation, the non-compliance with which could have a Material Adverse Effect on Borrowers, identifying the applicable violation in reasonable detail and the steps being taken by Borrowers relative thereto.

(r)     Pension Plans.  (i) Promptly upon discovery, and in any event within thirty (30) days after any Borrower knows or has reason to know that any Reportable Event with respect to any Pension Plan has occurred, a Record authenticated by an Officer notifying Lender of the Reportable Event in detail and the actions which such Borrower proposes to take to correct the deficiency, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; (ii) promptly upon discovery, and in any event within ten (10) days after any Borrower fails to make a required quarterly Pension Plan contribution under Section 412(m) of the IRC, a Record authenticated by an Officer notifying Lender of the failure in detail and the actions that such Borrower will take to cure the failure, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; and (iii) promptly upon discovery, and in any event within ten (10) days after any Borrower knows or has reason to know that it may be liable or may be reasonably expected to have liability for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan under Sections 4201 or 4243 of

ERISA, a Record authenticated by an Officer notifying Lender of the details of the event and the actions that such Borrower proposes to take in response.

(s) <u>New Leases and Landlord Transfers</u>. Promptly upon entering into any new lease, or upon any Borrower or any Subsidiary obtaining knowledge of the transfer of ownership by an existing landlord of any Premises leased by such Borrower or such Subsidiary, a Record notifying Lender of the identity of and contact information for any new landlord and, if applicable, a copy of such new lease.

(t) <u>Tax Returns of Borrowers</u>. No later than April 30th of each year, or five (5) days after they are required to be filed, whichever is later, the signed and dated state and federal income tax returns and related schedules of Borrowers (and copies of any extension requests).

(u) <u>Other Reports</u>. From time to time, with reasonable promptness, all material inventory reports, collection reports, deposit records, and equipment schedules, and such other materials, reports, records or information as Lender may reasonably request.

**6.2. Financial Covenants**. Borrowers agree to comply with the financial covenants described below, which shall be calculated using GAAP consistently applied, except as they may be otherwise modified below.

(a) <u>Compliance with Budget</u>. Borrowers shall strictly perform in accordance with the Budget subject to the following variances: (i) Borrowers' actual aggregate cumulative cash shall not be less than ninety percent (90%) of the projected cumulative cash line item set forth in the Budget; and (ii) Borrowers' Inventory balance shall not be less than ninety percent (90%) of the projected Inventory balance line item set forth in the Budget (<u>provided, however,</u> that to the extent that for any period of determination actual cumulative net sales at the Borrowers' store located at 766 Avenue of the Americas, New York, New York (the "<u>Main Chelsea Store</u>") exceed the projected cumulative net sales for such store location set forth in the Budget (any such excess being referred to as "<u>Excess Chelsea Sales</u>"), then for purposes of the calculation under this <u>Section 6.2(a)(ii)</u>, in determining Borrowers' actual Inventory balance, the Inventory sold which is attributable to the Excess Chelsea Sales (if any) shall be added back to the Borrowers' actual Inventory balance (such amount to equal the Excess Chelsea Sales multiplied by the cost of goods sold percentage (such percentage to be calculated by subtracting 100% minus the Gross Margin percentage) achieved at the Main Chelsea Store during the period of such Excess Chelsea Sales), but in no event shall such add-back exceed the sum of $1,000,000). The covenants described above in clause (i) and (ii) shall be tested on each Tuesday, commencing with (a) Tuesday, August 31, 2010, for the 3 week period ending Saturday, August 28, 2010 and (b) for each Tuesday after August 31, 2010, for the one week period just ended on the prior Saturday.

(b) <u>Maximum Capital Expenditures</u>. Borrowers shall not incur or contract to incur Capital Expenditures of more than $100,000 in excess of the amount specified in the Budget.

(c) <u>Minimum Gross Margin</u>. Borrowers' aggregate Gross Margin at all times shall not be less than (i) forty percent (40%), and (ii) thirty percent (30%) with respect to the Main Chelsea Store, in each case, tested each Tuesday commencing with (a) Tuesday, August 31,

2010, for the 3 week period ending Saturday, August 28, 2010 and (b) for each Tuesday after August 31, 2010, for the one week period just ended on the prior Saturday.

### 6.3. Other Liens and Permitted Liens.

(a)     Other Liens; Permitted Liens.  Borrowers shall not, and shall not permit any Subsidiary to, create, incur or suffer to exist any Lien upon any of its assets, now owned or later acquired, as security for any Indebtedness, with the exception of the following (each a "Permitted Lien" and collectively, "Permitted Liens"):

(i)     in the case of real property, covenants, restrictions, rights, easements and minor irregularities in title which do not materially interfere with such Person's business or operations as presently conducted;

(ii)     Liens in existence on the date of this Agreement that are described in Schedule 6.3 and secure Indebtedness for borrowed money permitted under Section 6.4 hereof;

(iii)     the Security Interest and Liens created by the Security Documents and Financing Orders;

(iv)     Liens securing the Pre-Petition Obligations;

(v)     Liens for taxes, assessments or other governmental charges not delinquent or being properly contested by appropriate proceedings and for which proper reserves have been established and that do not have priority over Lender's Security Interest;

(vi)     deposits or pledges to secure bids, tenders, contracts, leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the ordinary course of business;

(vii)     pledges or deposits to secure payment of worker's compensation, unemployment insurance and similar obligations and deposits or indemnities to secure public or statutory obligations for similar purposes; and

(viii)     Liens imposed by law, such as carriers, warehouseman's and mechanic's liens and other similar Liens arising in the ordinary course of business which secure payment of obligations which are not past due.

(b)     Financing Statements.  Except with respect to Permitted Liens, Borrowers shall not, and shall not permit any Subsidiary to, authorize the filing of any financing statement by any Person as Secured Party with respect to any of Borrowers' and their Subsidiaries' assets, other than Lender.  No Borrower nor any Subsidiary shall amend any financing statement filed by Lender as Secured Party except as permitted by law.

### 6.4. Indebtedness.  Borrowers shall not, and shall not permit any Subsidiary to, incur, create, assume or permit to exist any Indebtedness or liability on account of deposits or letters of

credit issued on any Borrower's behalf, or advances or any Indebtedness for borrowed money of any kind, whether or not evidenced by an instrument, except:

(a)     the Obligations described in this Agreement and the other Loan Documents;

(b)     Indebtedness under the Pre-Petition Credit Documents;

(c)     Indebtedness in existence as of the date of this Agreement and described in Schedule 6.4;

(d)     Indebtedness in respect of the Existing Letters of Credit;

(e)     Unsecured Indebtedness and trade payables arising prior to the Petition Date; and

(f)     other unsecured Indebtedness consisting of trade payables arising in the ordinary course of business and not more than thirty (30) days past due or such other time period consistent with past practices.

**6.5.     Guaranties**.  Borrowers shall not, and shall not permit any Subsidiary to, assume, guarantee, endorse or otherwise become directly or contingently liable for the obligations of any Person, except: (a) the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; and (b) guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other Persons in existence on the date of this Agreement and described in Schedule 6.5.

**6.6.     Investments and Subsidiaries**.  Borrowers shall not, and shall not permit any Subsidiary to, make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any Person or Affiliate, including without limitation any partnership or joint venture, nor purchase or hold beneficially any stock or other securities or evidence of Indebtedness of any Person or Affiliate, except:

(a)     Investments in direct obligations of the United States of America or any of its political subdivisions whose obligations constitute the full faith and credit obligations of the United States of America and have a maturity of one year or less, commercial paper issued by U.S. corporations rated "A 1" or "A 2" by Standard & Poor's Ratings Services or "P 1" or "P 2" by Moody's Investors Service or certificates of deposit or bankers' acceptances having a maturity of one year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation); and

(b)     Current investments in Subsidiaries in existence on the date of this Agreement which are identified in Schedule 6.6.

**6.7.     Dividends and Distributions**.  No Borrower nor any Subsidiary shall declare or pay any dividends (other than dividends payable solely in stock of a Borrower, or dividends paid by a Subsidiary to its corporate parent) on any class of its stock, or make any payment on account of the purchase, redemption or retirement of any shares of its stock, or other securities or

evidence of its Indebtedness or make any distribution regarding its stock, either directly or indirectly.

**6.8.** **Salaries.** No Borrower nor any Subsidiary shall pay salaries, bonuses, commissions, consultant fees or other compensation in excess of the amounts set forth in the Budget.

**6.9.** **Books and Records; Collateral Examination; Inspection and Appraisals.**

(a) <u>Books and Records; Inspection</u>. Each Borrower and its Subsidiaries shall keep complete and accurate books and records with respect to the Collateral and their business and financial condition and any other matters that Lender may request, all in accordance with GAAP. Each Borrower and its Subsidiaries shall permit any employee, attorney, accountant or other agent of Lender to audit, review, make extracts from and copy any of their books and records at any time during ordinary business hours upon reasonable prior notice (and with no notice requirement upon the occurrence and during the continuation of a Default or an Event of Default), and to discuss Borrowers' affairs with any of its Directors, Officers, employees, Owners or agents.

(b) <u>Authorization to Borrowers' Agents to Make Disclosures to Lender</u>. Borrowers authorize all accountants and other Persons acting as its agent to disclose and deliver to Lender's employees, accountants, attorneys and other Persons acting as its agent, at Borrowers' expense, all financial information, books and records, work papers, management reports and other information in their possession regarding Borrowers.

(c) <u>Physical Inventory, Collateral Exams and Inspections</u>. Borrowers', at their own expense, shall cause physical inventory to be taken within thirty (30) days of the Effective Date, in a manner, scope and using procedures acceptable to Lender in its commercially reasonable discretion. Borrowers' within thirty (30) days following the completion of such inventory taking, shall provide Lender with a reconciliation of the results of such inventory and shall post such results to Borrowers' stock ledgers and general ledgers, as applicable. Borrowers shall permit Lender's employees, accountants, attorneys or other Persons acting as its agent, to examine and inspect any Collateral or any other property of any Borrower and its Subsidiaries at any time during ordinary business hours.

(d) <u>Inventory Appraisals</u>. Lender may obtain, from time to time, at Borrowers' expense, an appraisal of Borrowers' Inventory, by an appraiser acceptable to Lender in its commercially reasonable discretion.

(e) <u>Background Investigations</u>. Lender may obtain, from time to time at Borrowers' expense, background investigations and verifications relative to any Borrower, its senior management employees, and material Owners, which investigations may include, without limitation, information regarding business affiliations, background verification, verification of education and certifications, civil and criminal litigation histories, judgments, tax liens, bankruptcies, credit histories, verification of information provided and other possible public records information available; <u>provided, however</u>, that unless a Default Period exists, Lender

shall not conduct such investigations more frequently than once in each twelve month period following the Effective Date.

**6.10. Account Verification; Payment of Permitted Liens.**

(a) <u>Account Verification</u>. Lender or its agents may (i) contact account debtors and other obligors at any time to verify Borrowers' Accounts; and (ii) require Borrowers to send requests for verification of Accounts or send notices of assignment of Accounts to account debtors and other obligors.

(b) <u>Covenant to Pay Permitted Liens</u>. Each Borrower and its Subsidiaries shall pay when due each account payable due to any Person holding a Permitted Lien (as a result of such payable) on any Collateral unless such account is subject to a bona fide dispute and is being properly contested in good faith by appropriate proceedings and for which proper reserves have been made.

**6.11. Compliance with Laws.**

(a) <u>General Compliance with Applicable Law; Use of Collateral</u>. Each Borrower shall (i) comply, and cause each Subsidiary to comply, with the requirements of applicable laws and regulations, the non-compliance with which could reasonably be expected to have a Material Adverse Effect, and (ii) use and keep the Collateral, and request that others use and keep the Collateral, only for lawful purposes, without violation of any applicable federal, state or local law, statute or ordinance, the non-compliance with which could reasonably be expected to have a Material Adverse Effect.

(b) <u>Compliance with Federal Regulatory Laws</u>. Each Borrower shall (i) prohibit, and cause each Subsidiary to prohibit, any Person that is an Owner or Officer from being listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("<u>OFAC</u>"), the Department of the Treasury or included in any Executive Orders, (ii) not permit the proceeds of the Line of Credit or any other financial accommodation extended by Lender to be used in a manner that violates any foreign asset control regulations of OFAC or other applicable law, (iii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act and Lender's related policies and procedures.

(c) <u>Compliance with Environmental Laws</u>. Each Borrower shall (i) comply, and cause each Subsidiary to comply, with the requirements of applicable Environmental Laws and obtain and comply with all permits, licenses and similar approvals required by them, and (ii) not generate, use, transport, treat, store or dispose of any Hazardous Substances in such a manner as to create any material liability or obligation under the common law of any jurisdiction or any Environmental Law.

**6.12. Payment of Taxes and Other Claims.** Each Borrower shall pay or discharge, when due, and cause each Subsidiary to pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including, without limitation, the Collateral) or upon or against the

creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach, (b) all federal, state and local taxes required to be withheld by it, and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of such Borrower or any Subsidiary, although, in each case, such Borrower and its Subsidiaries shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

### 6.13.  Maintenance of Collateral and Properties.

(a)  Each Borrower shall, and shall cause each Subsidiary to, keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, although such Borrower and its Subsidiaries may discontinue the operation and maintenance of any properties if such Borrower believes that such discontinuance is desirable to the conduct of its business and not disadvantageous in any material respect to Lender.  Each Borrower and its Subsidiaries shall take all commercially reasonable steps necessary to protect and maintain their Intellectual Property Rights.

(b)  Each Borrower shall, and shall cause each Subsidiary to, (i) defend the Collateral against all Liens, claims and demands of all third Persons claiming any interest in the Collateral, and keep all Collateral free and clear of all Liens except Permitted Liens; and (ii) take all commercially reasonable steps necessary to prosecute any Person Infringing its Intellectual Property Rights and to defend itself against any Person accusing it of Infringing any Person's Intellectual Property Rights.

### 6.14.  Insurance.  Each Borrower shall, and shall cause each Subsidiary to, at all times maintain insurance with insurers acceptable to Lender, in such amounts and on such terms (including, without limitation, deductibles) as Lender in its discretion may require and including, as applicable and without limitation, business interruption insurance (including, without limitation, force majeure coverage), hazard coverage on an "all risks" basis for all tangible Collateral, and theft and physical damage coverage for Collateral consisting of motor vehicles. All insurance policies must contain appropriate evidence of Lender named as loss payee and additional insured on all applicable insurance policies to the satisfaction of Lender.  Applicable insurance policies are required to have a minimum thirty (30) days notice of cancellation or non-renewal.  Prior to the Effective Date, Lender shall have received declaration pages with respect to all such insurance policies, with complete forms and endorsement schedules related thereto. Without limiting the foregoing, all such insurance carriers must be rated at minimum A- VIII by A.M. Best Company, and be an admitted insurance carrier in all states relevant to the operations of Borrowers and their Subsidiaries.

### 6.15.  Preservation of Existence.  Each Borrower shall, and shall cause each of its Subsidiaries to, preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business, and shall conduct its business in an orderly, efficient and regular manner.

**6.16. Delivery of Instruments, etc**. Upon request by Lender, each Borrower shall, and cause each Subsidiary to, promptly deliver to Lender in pledge all instruments, documents and chattel paper constituting Collateral, duly endorsed or assigned by such Borrower or such Subsidiary.

**6.17. Sale or Transfer of Assets; Consolidation and Merger; Suspension of Business Operations; Asset Acquisitions**. No Borrower shall, nor shall it permit any of its Subsidiaries to:

(a)    Sell, lease, assign, transfer or otherwise dispose of (i) the stock or other equity interests of any Subsidiary, (ii) all or a substantial part of its assets, or (iii) any Collateral, any interest in Collateral (whether in one transaction or in a series of transactions) or any other assets to any other Person other than (A) the sale of Inventory in the ordinary course of business, (B) the disposition or transfer of obsolete, damaged and worn-out Equipment, provided, that the proceeds thereof are used to acquire replacement Equipment or other capital assets used or useful in such Borrower's business, and (C) pursuant to the Sponsor Plan of Reorganization;

(b)    Liquidate, dissolve or suspend business operations;

(c)    Transfer any part of its ownership interest in any Intellectual Property Rights, or permit its rights as licensee of Licensed Intellectual Property to lapse, or license any other Person to use any of such Borrower's Intellectual Property Rights, except that such Borrower and its Subsidiaries may (A) transfer such rights or permit them to lapse if such Borrower has reasonably determined that such Intellectual Property Rights are no longer useful in its business, and (B) each Borrower and its Subsidiaries may grant licenses in the ordinary course of business in connection with sales of Inventory or the provision of services to customers. If such Borrower or any Subsidiary transfers any Intellectual Property Rights for value, such Borrower shall pay the Proceeds to Lender for application to the Obligations;

(d)    Consolidate with or merge into any other entity, or permit any other entity to merge into it, except that (i) any Subsidiary may merge into any Borrower or another Subsidiary, so long as such Borrower or any Subsidiary which is a Borrower shall be the surviving entity in such transaction; provided, that West Weck, LLC shall not merge into any other Borrower or another Subsidiary and will not at any time in the future, incur indebtedness or obligations (including obligations in respect of trade payables to Truserv Corporation) in an amount greater than $5,000; or

(e)    Acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all of the assets of any other entity.

**6.18. Sale and Leaseback**. No Borrower shall, nor permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, with any other Person pursuant to which such Borrower shall sell or transfer any real or personal property, whether owned now or acquired in the future, and then rent or lease all or part of such property or any other property which such Borrower intends to use for substantially the same purpose or purposes as the property being sold or transferred.

**6.19. Restrictions on Nature of Business.** No Borrower nor any of its Subsidiaries will engage in any line of business materially different from that presently engaged in by them or substantially related thereto, and will not purchase, lease or otherwise acquire assets not related to their business.

**6.20. Accounting.** Borrowers will not adopt any material change in accounting principles except as required by GAAP, consistently applied. Borrowers will not change their fiscal year.

**6.21. Discounts, etc.** Borrowers and their Subsidiaries will not grant any discount, credit or allowance to any customer, or accept any return of goods sold, except in the ordinary course of business and consistent with past practices. Borrowers and their Subsidiaries will not at any time modify, amend, subordinate, cancel or terminate any Account, except in the ordinary course of business and consistent with past practices.

**6.22. Pension Plans.** Except as disclosed to Lender in a Record prior to the date of this Agreement, no Borrower nor any ERISA Affiliate will (a) adopt, create, assume or become party to any Pension Plan, (b) become obligated to contribute to any Multiemployer Plan, (c) incur any obligation to provide post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required by law), or (d) amend any Plan in a manner that would materially increase its funding obligations.

**6.23. Place of Business; Name.** No Borrower or its Subsidiaries will transfer their chief executive office or principal place of business without providing Lender fifteen (15) days prior written notice and, if requested by Lender, a duly executed landlord waiver and consent in form and substance satisfactory to Lender. Each Borrower will provide written notice to Lender not less than fifteen (15) days prior to moving, relocating or closing any retail store location or other business Premises and, in the case of any new Premises location, a duly executed landlord waiver and consent in form and substance satisfactory to Lender. No Borrower will permit any tangible Collateral or any records relating to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest. No Borrower will, or will permit its Subsidiaries to, change its name or jurisdiction of organization.

**6.24. Constituent Documents.** No Borrower will, or will permit its Subsidiaries to, amend its Constituent Documents in a manner materially adverse to Lender.

**6.25. Performance by Lender.** If any Borrower fails to perform or observe any of its obligations under this Agreement at any time, Lender may, but need not, perform or observe such obligations on behalf of such Borrower and may, but need not, take any other actions which Lender may reasonably deem necessary to cure or correct such failure; and such Borrower shall pay Lender upon demand, all Lender Expenses, including without limitation, the amount of all out-of pocket costs and expenses (including, without limitation, reasonable attorneys' fees and legal expenses) incurred by Lender in performing such obligations, together with interest on all such amounts at the Default Rate.

**6.26.  Lender Appointed as Borrowers' Attorney in Fact**.  To facilitate Lender's performance or observance of Borrowers' obligations under this Agreement, each Borrower hereby irrevocably appoints Lender and Lender's agents, as such Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) to create, prepare, complete, execute, deliver, endorse or file on behalf of such Borrower any instruments, documents, assignments, security agreements, financing statements, applications for insurance and any other agreements or any Record required to be obtained, executed, delivered or endorsed by such Borrower in accordance with the terms of this Agreement.

**6.27.  Deposit Accounts**.  No Borrower shall open or maintain any deposit accounts, securities account, or investment account at any financial institution other than Lender, except for (i) the Store Accounts and other accounts existing as of the Effective Date and described on Schedule 6.27 attached hereto, and (ii) any additional deposit accounts as may be established from time to time in connection with the opening of new retail store locations as permitted under this Agreement (collectively, the "Permitted Accounts"), provided, that each such Permitted Account is subject to a Control Agreement in form and substance satisfactory to Lender.

**6.28.  Financing Orders; Administrative Priority; Lien Priority; Payment of Claims**.  Borrowers shall not:

(a)  at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of the Interim Order or the Final Order, except for modifications and amendments agreed to by Lender;

(b)  at any time, suffer to exist a priority for any administrative expense or unsecured claim against Borrowers (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of Lender in respect of the Obligations, except for the Carve-Out;

(c)  at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens in favor of Lender or, as applicable, the Adequate Protection Liens in favor of the Pre-Petition Lender (which the Pre-Petition Lender hereby acknowledges are subject to Lender's Liens), except for the Carve-Out and Permitted Liens; and

(d)  prior to the date on which all Obligations have been fully paid and satisfied, Borrowers shall not pay any administrative expense claims except (i)  Obligations due and payable hereunder and (ii) administrative expenses incurred in the ordinary course of Borrowers' business as contemplated by this Agreement and the Budget.

**6.29.  Section 506(c) of the Bankruptcy Code**.  Borrowers shall not assert any surcharge under Section 506(c) of the Bankruptcy Code with respect to Lender's Liens under this Agreement or the Pre-Petition Lender's liens under the Pre-Petition Credit Agreement.

**6.30.  Claims**.  Borrowers shall not use the Advances or any cash collateral to assert claims against Lender or the Pre-Petition Lender.

# 7.   EVENTS OF DEFAULT AND REMEDIES

**7.1.   Events of Default**. An "Event of Default" means any of the following:

(a)   Borrowers fail to pay the amount of any Obligations on the date that it becomes due and payable; or

(b)   Borrowers fail to observe or perform any covenant or agreement of Borrowers set forth in this Agreement (excluding Sections 6.1 through 6.8, 6.9(a), 6.14, 6.15, 6.17 through 6.24 and 6.27 through 6.30 where no cure period shall be applicable), or in any of the other Loan Documents, or in any other document or agreement described in or related to this Agreement or to any Obligations, which failure shall continue for ten (10) days after the earlier of (i) the date upon which an Officer of Borrowers obtains knowledge of such failure or (ii) the date upon which Borrowers have received a Record of such failure from Lender; or

(c)   Any representation or warranty made by Borrowers in this Agreement or any other Loan Document, or by Borrowers (or any of their Officers) in any agreement, certificate, instrument or financial statement or other statement delivered to Lender in connection with this Agreement is untrue or misleading in any material respect when made or deemed made; or

(d)   A final, non-appealable arbitration award, judgment, or decree or order for the payment of money in an amount in excess of $100,000 which is not insured or subject to indemnity, is entered against Borrowers that is not immediately stayed or appealed; or

(e)   Any Reportable Event, which Lender in good faith believes to constitute sufficient grounds for termination of any Pension Plan or for the appointment of a trustee to administer any Pension Plan, has occurred and is continuing thirty (30) days after Borrowers gives Lender a Record notifying it of the Reportable Event; or a trustee is appointed by an appropriate court to administer any Pension Plan; or the Pension Benefit Guaranty Corporation institutes proceedings to terminate or appoint a trustee to administer any Pension Plan; or any Borrower or any ERISA Affiliate files for a distress termination of any Pension Plan under Title IV of ERISA; or any Borrower or any ERISA Affiliate fails to make any quarterly Pension Plan contribution required under Section 412(m) of the IRC, which Lender in good faith believes may, either by itself or in combination with other failures, result in the imposition of a Lien on any Borrower's assets in favor of the Pension Plan; or any withdrawal, partial withdrawal, reorganization or other event occurs with respect to a Multiemployer Plan which could reasonably be expected to result in a material liability by any Borrower to the Multiemployer Plan under Title IV of ERISA; or

(f)   Any event or circumstance occurs that Lender in good faith believes may impair the prospect of payment of all or part of the Obligations, or any Borrower's ability to perform any of its material obligations under any of the Loan Documents, or any other document or agreement described in or related to this Agreement or the Obligations; or

(g)   A Material Adverse Effect shall occur; or

(h)   Any material segregation of Borrowers' funds resulting from an adverse regulatory or judicial ruling; or

(i)     A Change of Control shall occur; or

(j)     Borrowers' failure to pay post-petition rent for any of Borrowers' leased locations or pay other administrative claims as they become due; or

(k)     The filing of a motion by Borrowers for entry of an order staying or otherwise prohibiting the prosecution of any enforcement action by Lender or any motion or pleading seeking to challenge the Pre-Petition Lender's Liens or otherwise commencing any cause of action against the Pre-Petition Lender; or

(l)     Borrowers (except following Lender's prior written request or with Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of Lender)) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders, this Agreement or any of the Loan Documents; or

(m)     Borrowers shall fail to file the Sponsor Plan of Reorganization within forty-five (45) days after the Petition Date; or

(n)     The Sponsor Plan of Reorganization fails to become effective on or before the Maturity Date unless the Maturity Date has been extended in accordance with the terms of Section 2.1(b) hereof; or

(o)     Conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily; or

(p)     An examiner or officer with special powers is appointed pursuant to Section 1104(a) of the Bankruptcy Code; or

(q)     The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of Borrowers or to terminate any license, franchise, or similar agreement, where such termination could have a Material Adverse Effect; or

(r)     Borrowers shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to Lender under the Financing Orders or the Loan Documents or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders; or

(s)     The Final Order has not been entered by the Bankruptcy Court on or before thirty (30) days after the Petition Date; or

(t)     The Financing Orders shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court; or

(u)     The occurrence of any default or event of default pursuant to the terms of the Financing Order; or

(v)     If any creditor of Borrowers receive any adequate protection payment which is not fully acceptable to Lender in its sole discretion, or any Lien is granted as adequate protection other than as set forth in the Financing Orders; or

(w)     The Interim Financing Order or Final Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender); or

(x)     Any Borrower shall liquidate, dissolve, terminate or suspend its business operation or otherwise fail to operate its business in the ordinary course or merge with another Person unless such Borrower is the surviving entity (provided that in no event shall West Weck LLC merge with or into any other Borrower or any of their Subsidiaries), or any Borrower shall consummate a sale of all or a material portion of such Borrower's assets without paying the aggregate amount of the Obligations due to Lender, unless Lender has consented; or

(y)     The Liens or super-priority claims granted with respect to this Agreement cease to be valid, perfected and enforceable in all material respects.

**7.2.     Rights and Remedies.**  During any Default Period, Lender may exercise any or all of the following rights and remedies and, to the extent provided by the Financing Orders, the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed lifted or modified to the extent necessary to allow Lender to take the actions described in this Section 7.2, or under any other Loan Document, without further notice or a hearing, which rights are hereby waived:

(a)     Lender may terminate the Line of Credit and decline to make Advances or issue Letters of Credit, and terminate any services extended to Borrowers under the Treasury Management Agreements;

(b)     Lender may declare the Obligations to be immediately due and payable and accelerate payment of the Revolving Note, and all Obligations shall immediately become due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which Borrowers hereby expressly waive; and without limiting the foregoing, Lender may require that Borrowers Cash Collateralize the then outstanding Letter of Credit Usage, which amount shall be held by Lender in a cash collateral account with Lender, as security for the payment in full of all Obligations in respect of Letter of Credit Usage (and Borrowers hereby pledge and grant to Lender a security interest in all such funds);

(c)     Lender may, without notice to Borrowers, set off and apply any monies owing by Lender to Borrowers to payment of the Obligations;

(d)     Lender may exercise and enforce any rights and remedies available upon default to a secured party under the UCC, including, without limitation, the right to take possession of Collateral (without posting a bond or other form of security, which Borrowers hereby waive), to proceed with or without judicial process (without a prior hearing or notice of hearing, which Borrowers hereby waive), and to sell, lease or otherwise dispose of Collateral for cash or on credit (with or without giving warranties as to condition, fitness, merchantability or title to Collateral, and in the event of a credit sale in such manner and at such places (including Borrowers' Premises) as Lender determines is commercially reasonable discretion, including, conducting one or more going out of business or liquidation sales, in Lender's own right or by one or more agents or contractors, which sales may be conducted upon any Premises owned, leased, or occupied by Borrowers.   To the extent permitted by applicable law (except as otherwise provided in any order of the Bankruptcy Court), Lender and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of which other goods shall remain the sole property of the agent or such agent or contractor). Borrowers will upon Lender's demand assemble the Collateral and make it available to Lender at any place designated by Lender which is reasonably convenient to both parties.   Borrowers' Obligations to Lender shall be reduced only to the extent that payments are actually received by Lender;

(e)     Without notice to or demand upon Borrowers, make such payments and do such acts as Lender considers necessary or reasonable to protect its Security Interest in the Collateral. Borrowers authorize agent to enter any Premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien that in Lender's determination appears to conflict with Lender's Security Interest and to pay all expenses incurred in connection therewith and to charge Borrowers' loan account therefor.   With respect to any of Borrowers' owned or leased Premises, Borrowers hereby grant lender a license to enter into possession of such Premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(f)     Lender may exercise and enforce any of its rights and remedies under any of the Loan Documents and any other document or agreement described in or related to this Agreement or the Obligations, or at law or in equity;

(g)     Lender may for any reason apply for the appointment of a receiver of the Collateral (to which appointment Borrowers hereby consent) without the necessity of posting a bond or other form of security (which Borrowers hereby waive); and

(h)     Lender may exercise any other rights and remedies available to it by law or agreement.

## 8.     MISCELLANEOUS

**8.1.     No Waiver; Cumulative Remedies**.  No delay or any single or partial exercise by Lender of any right, power or remedy under the Loan Documents, or under any other document or agreement described in or related to this Agreement, shall constitute a waiver of any other right, power or remedy under the Loan Documents or granted by Borrowers to Lender

under other agreements or documents that are unrelated to the Loan Documents. No notice to or demand on Borrowers in any circumstance shall entitle Borrowers to any additional notice or demand in any other circumstances. The remedies provided in the Loan Documents or in any other document or agreement described in or related to this Agreement are cumulative and not exclusive of any remedies provided by law. Lender may comply with applicable law in connection with a disposition of Collateral, and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

**8.2. Amendment; Consents and Waivers; Authentication**. No amendment or modification of any Loan Documents, or any other document or agreement described in or related to this Agreement, or consent to or waiver of any Event of Default, or consent to or waiver of the application of any covenant or representation set forth in any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or any release of Lender's Security Interest in any Collateral, shall be effective unless it has been agreed to by Lender and memorialized in a Record that: (a) specifically states that it is intended to amend or modify specific Loan Documents, or any other document or agreement described in or related to this Agreement, or waive any Event of Default or the application of any covenant or representation of any terms of specific Loan Documents, or any other document or agreement described in or related to this Agreement, or is intended to release Lender's Security Interest in specific Collateral; and (b) is Authenticated by the signature of an authorized employee of both parties, or by an authorized employee of Lender with respect to a consent or waiver. The terms of an amendment, consent or waiver memorialized in any Record shall be effective only to the extent, and in the specific instance, and for the limited purpose to which Lender has agreed.

**8.3. Execution in Counterparts; Delivery of Counterparts**. This Agreement and all other Loan Documents, or any other document or agreement described in or related to this Agreement, and any amendment or modification to them may be Authenticated by the parties in any number of counterparts, each of which, once authenticated and delivered in accordance with the terms of this Section 8.3, will be deemed an original, and all such counterparts, taken together, shall constitute one and the same instrument. Delivery by fax or by encrypted e-mail or e-mail file attachment of any counterpart to any Loan Document Authenticated by an authorized signature will be deemed the equivalent of the delivery of the original Authenticated instrument. Borrowers shall send the original Authenticated counterpart to Lender by first class U.S. mail or by overnight courier, but any party's failure to deliver a Record in this form shall not affect the validity, enforceability, and binding effect of this Agreement or the other Loan Documents, or any other document or agreement described in or related to this Agreement.

**8.4. Notices, Requests, and Communications**. Except as otherwise expressly provided in this Agreement:

(a) _Delivery of Notices, Requests and Communications_. Any notice, request, demand, or other communication by either party that is required under the Loan Documents, or any other document or agreement described in or related to this Agreement, to be in the form of a Record (but excluding any Record containing information Borrowers must report to Lender under Section 6.1 hereof) may be delivered (i) in person, (ii) by first class U.S. mail, (iii) by overnight courier of national reputation, or (iv) by fax, or (v) the Record may be sent as an

Electronic Record and delivered (A) by an encrypted e-mail, or (B) through Lender's electronic mail portal or other secure electronic channel to which the parties have agreed.

(b)     Addresses for Delivery.  Delivery of any Record under this Section 8.4 shall be made to the appropriate address set forth on the signature pages of this Agreement (which either party may modify by a Record sent to the other party), or through Lender's electronic mail portal or other secure electronic channel to which the parties have agreed.

(c)     Date of Receipt.  Each Record sent pursuant to the terms of this Section 8.4 will be deemed to have been received on (i) the date of delivery if delivered in person, (ii) the date two (2) Business Days after deposit in the mail if sent by mail, (iii) the date one (1) Business Day after delivery to the courier if sent by overnight courier, (iv) the date of transmission if sent by fax, or (v) the date of transmission if sent as an Electronic Record by electronic mail or through Lender's electronic mail portal or similar secure electronic channel to which the parties have agreed; except that any request for an Advance or any other notice, request, demand or other communication from Borrowers required under Section 2 hereof, and any request for an accounting under Section 9-210 of the UCC, will not be deemed to have been received until actual receipt by Lender on a Business Day by an authorized employee of Lender.

**8.5.    Borrowers Information Reporting; Confidentiality**.  Except as otherwise expressly provided in this Agreement:

(a)     Delivery of Borrowers Information Records.  Any information that Borrowers are required to deliver under Section 6.1 hereof in the form of a Record may be delivered to Lender (i) in person, or (ii) by first class U.S. mail, (iii) by overnight courier of national reputation, (iv) by fax, or (v) the Record may be sent as an Electronic Record (A) by encrypted e-mail, or (B) through the file upload service of Lender's electronic mail portal or other secure electronic channel to which the parties have agreed.

(b)     Addresses for Delivery.  Delivery of any Record to Lender under this Section 8.5 shall be made to the appropriate address set forth on the signature pages of this Agreement (which Lender may modify by a Record sent to Borrowers), or through Lender's electronic mail portal or other secure electronic channel to which the parties have agreed.

(c)     Date of Receipt.  Each Record sent pursuant to this Section 8.5 will be deemed to have been received on (i) the date of delivery if delivered in person to an authorized employee of Lender, (ii) the date two (2) Business Days after deposit in the mail if sent by mail, (iii) the date one (1) Business Day after delivery to the courier if sent by overnight courier, (iv) the date of transmission if sent by fax, or (v) the date of transmission, if sent as an Electronic Record through Lender's electronic mail portal or similar secure electronic channel to which the parties have agreed.

(d)     Authentication of Borrowers Information Records.  Borrowers shall Authenticate any Record delivered (i) in person, or by U.S. mail, overnight courier, or fax, by the signature of the Officer or employee of each Borrower who prepared the Record; (ii) as an Electronic Record sent via encrypted e-mail, by the signature of the Officer or employee of each Borrower who prepared the Record by any file format signature that is acceptable to Lender, or by a separate

certification signed and sent by fax; or (iii) as an Electronic Record via the file upload service of Lender's electronic mail portal or similar secure electronic channel to which the parties have agreed, through such credentialing process as Lender and Borrowers may agree to under any agreement relative to such secure electronic channel.

(e)     Certification of Borrowers Information Records.  Any Record (including, without limitation, any Electronic Record) Authenticated and delivered to Lender under this Section 8.5 will be deemed to have been certified as materially true, correct, and complete by Borrowers and each Officer or employee of each Borrower who prepared and Authenticated the Record on behalf of such Borrower, and may be legally relied upon by Lender without regard to method of delivery or transmission.

(f)     Confidentiality of Borrowers Information Records Sent by Unencrypted E-mail.  Borrowers acknowledge that if it sends an Electronic Record to Lender without encryption by e-mail or as an e-mail file attachment, there is a risk that the Electronic Record may be received by unauthorized Persons, and that by so doing it will be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.  Borrowers acknowledge that it may deliver Electronic Records containing Borrowers information to Lender by e-mail pursuant to any encryption tool acceptable to Lender and Borrowers, or through Lender's electronic mail portal file upload service without risk of unauthorized disclosure.

(g)     Publicity.  Lender may, in its commercially reasonable discretion and at its expense, publicize or otherwise advertise by press release, so called 'tombstone" advertising or otherwise Lender's financing transaction with Borrowers and Borrowers consent to use of its name, logo or other trademarks in connection with the same.

**8.6.     Further Documents**.  Borrowers will from time to time execute, deliver, endorse and authorize the filing of any instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements that Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or Lender's rights under the Loan Documents, or any other document or agreement described in or related to this Agreement (but any failure to request or assure that Borrowers execute, deliver, endorse or authorize the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents, or any other document or agreement described in or related to this Agreement, and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

**8.7.     Costs and Expenses**. Borrowers shall pay the reasonable fees and disbursements of Lender's counsel in connection with this debtor in possession credit facility, including but not limited to the preparation and negotiation of all term sheets, this Agreement, the Loan Documents, all agreements, instruments, documents, pleadings related thereto and any amendments thereto or to the Collateral, and any and all reasonable fees and expenses related to the Collateral, including, without limitation, all expenses related to any federal or state regulatory filings.  Borrowers shall also pay the reasonable costs of implementation and enforcement of the this Agreement and the Financing Orders, including reasonable fees and disbursements of Lender's counsel and other professionals, periodic field audits, monitoring of assets, and other miscellaneous disbursements.  Borrowers shall pay all reasonable out-of-pocket costs and

expenses of Lender in connection with this Agreement and the Chapter 11 Case, including, but not limited to reasonable travel expenses. Borrowers shall pay the reasonable fees and disbursements of Lender's counsel for representation at all stages and in all aspects of the Chapter 11 Case including, but not limited to, the first meeting of creditors, review of all pleadings whether filed by Lender, Borrowers, or others, preparation for and appearance at hearings on all motions and adversary proceedings whether or not filed or brought by Lender or Borrowers, negotiations of all compromises or agreements, preparation of all pleadings and motions, attendance at all depositions and examinations, activities related to approval or objection to disclosure statements and plans of reorganization (collectively, the "Lender Expenses"). At the sole discretion of Lender, the Lender Expenses may be added monthly to the Obligations rather than being paid monthly in cash.

**8.8.** **Indemnity**. In addition to its obligation to pay Lender Expenses under the terms of this Agreement, Borrowers shall indemnify, defend and hold harmless Lender, its parent, and any of their respective affiliates and successors, and all of their present and future Officers, Directors, employees, attorneys and agents (each an "Indemnitee") from and against any of the following (collectively, "Indemnified Liabilities"):

(a)     Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents, or any other document or agreement described in or related to this Agreement or any extension of credit hereunder;

(b)     Any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained herein proves to be incorrect in any respect or as a result of any violation of the covenants contained in Section 6.11 hereof; and

(c)     Any and all other reasonable, out-of-pocket liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel) in connection with this Agreement and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party to such proceedings, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the Credit Facility and the Loan Documents, or any other document or agreement described in or related to this Agreement, or the use or intended use of the proceeds of the Advances, with the exception of any Indemnified Liability caused by the gross negligence or willful misconduct of an Indemnitee.

If any investigative, judicial or administrative proceeding described in this Section 8.8 is brought against any Indemnitee, upon the Indemnitee's request, Borrowers, or counsel designated by Borrowers and satisfactory to the Indemnitee, will resist and defend the action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at Borrowers' sole cost and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If this agreement to indemnify is held to be unenforceable because it violates any law or public policy, Borrowers shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities to the extent permissible

under applicable law. Borrowers' obligations under this <u>Section 8.8</u> shall survive the termination of this Agreement and the discharge of Borrowers' other obligations under this Agreement.

8.9. **Lender as Party-in-Interest**. Borrowers hereby stipulate and agree that Lender is and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of Lender's rights or remedies under applicable law or documentation. Without limitation of the foregoing, Lender shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Advances, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease), <u>provided</u>, that Lender will not exercise such right if the action or inaction by Borrowers which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

8.10. **Waiver of Right to Obtain Alternative Financing**. In consideration of the Advances to be made to Borrowers by Lender, each Borrower hereby further waives any right it may have to obtain an order by the Bankruptcy Court authorizing Borrowers to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than Lender, unless such financing would result in all of the Obligations and Pre-Petition Obligations (whether arising before, on or after the date of this Agreement) being paid in full, in cash, on or before the expiration of the term of this Agreement.

8.11. **Credit Bids**. Lender shall maintain its right to credit bid Lender's claims under this Agreement, the Pre-Petition Credit Documents and the Financing Orders pursuant to Section 363(k) of the Bankruptcy Code.

8.12. **Application of Payments to Obligations; Application of Proceeds of Collateral**.

(a) All proceeds from the sale of Collateral shall be immediately paid in cash by Borrowers to Lender, and shall be applied by Lender (i) first, in satisfaction of outstanding Obligations under this Agreement until paid (or Cash Collateralized) in full, and (ii) then, held by Lender as cash collateral for the outstanding balance of the Pre-Petition Obligations.

(b) All payments of Obligations by Borrowers to Lender shall be made as and when due hereunder, and shall be applied by Lender (i) first, in satisfaction of outstanding Obligations under this Agreement until paid (or Cash Collateralized) in full, and (ii) then, held by Lender as cash collateral for the outstanding balance of the Pre-Petition Obligations.

For the avoidance of doubt, except in the case of the issuance of Replacement Letters of Credit resulting in the reduction or termination of any pre-petition letter of credit issued by Lender for the account of Borrowers, or the return of any cash collateral posted by Lender, in each case securing obligations of the Borrowers in respect of Existing Letters of Credit, no proceeds of Collateral or payments by Borrowers or proceeds of Advances shall be applied to the

Pre-Petition Obligations, except as permitted by the Bankruptcy Court following the occurrence of an Event of Default hereunder.

**8.13.  Retention of Borrowers' Records**. Lender shall have no obligation to maintain Electronic Records or retain any documents, schedules, invoices, agings, or other Records delivered to Lender by Borrowers in connection with the Loan Documents, or any other document or agreement described in or related to this Agreement for more than thirty (30) days after receipt by Lender. If there is a special need to retain specific Records, Borrowers must notify Lender of its need to retain or return such Records with particularity, which notice must be delivered to Lender in accordance with the terms of this Agreement at the time of the initial delivery of the Record to Lender.

**8.14.  Binding Effect; Assignment; Complete Agreement**. The Loan Documents, or any other document or agreement described in or related to this Agreement, shall be binding upon and inure to the benefit of Borrowers and Lender and their respective successors and assigns, except that no Borrower shall have the right to assign its rights under this Agreement or any interest in this Agreement without Lender's prior consent, which must be confirmed in a Record Authenticated by Lender. To the extent permitted by law, Borrowers waive and will not assert against any assignee any claims, defenses or set-offs which Borrowers could assert against Lender. This Agreement, together with the Loan Documents, or any other document or agreement described in or related to this Agreement, comprises the complete and integrated agreement of the parties on the subject matter of this Agreement and supersedes all prior agreements, whether oral or evidenced in a Record. To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents other than this Agreement, or any other document or agreement described in or related to this Agreement, this Agreement shall control.

**8.15.  Sharing of Information**. Lender shall hold all confidential information obtained from Borrowers in accordance with Lender's customary procedures for handling confidential information of such nature. Lender may share any Confidential Information that it may have regarding Borrowers and their Affiliates with its accountants, lawyers, and other advisors, and with each business unit and line of business within Lender, and each direct and indirect subsidiary of Lender.

**8.16.  Severability of Provisions**. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining terms of this Agreement.

**8.17.  Headings**. Section and subsection headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**8.18.  Definitional Terms and Rules of Interpretation**. All accounting terms not otherwise defined in this Agreement shall have the meanings given them in accordance with GAAP. Unless the context clearly requires otherwise, the word "or" has the inclusive meaning represented by the phrase "and/or". Reference to any agreement (including, without limitation, the Loan Documents), document or instrument means the agreement, document or instrument as

amended or supplemented, subject to any restrictions on amendment contained therein (and, if applicable, in accordance with the terms of this Agreement and the other Loan Documents). Unless otherwise specified, any reference to a statute or regulation means that statute or regulation as amended or supplemented from time to time, and any corresponding provisions of successor statutes or regulations.

**8.19. Governing Law; Jurisdiction, Venue; Waiver of Jury Trial.** The Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of New York. The parties to this Agreement (a) consent to the personal jurisdiction of the state and federal courts located in the State of New York in connection with any controversy related to this Agreement; (b) waive any argument that venue in any such forum is not convenient; (c) agree that any litigation initiated by Lender or Borrowers in connection with this Agreement or the other Loan Documents may be venued in either the state courts of the State of New York sitting in the borough of Manhattan or federal courts located in the Southern District of New York; and (d) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**8.20. WAIVER OF JURY TRIAL AND DAMAGES. BORROWERS AND LENDER WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT. BORROWERS WAIVE ANY RIGHTS TO RECOVER SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN. EACH BORROWER REPRESENT THAT IT HAS REVIEWED THESE WAIVERS AND KNOWINGLY AND VOLUNTARILY WAIVES SUCH RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

[Remainder of page intentionally left blank; signatures begin on following page.]

**IN WITNESS WHEREOF**, each of the parties hereto has executed this Agreement under seal through its authorized officer on the date set forth above.

| | |
|---|---|
| The Weck Corporation<br>c/o Gracious Home<br>632 Broadway<br>New York, NY 10021<br>Attention: Jordan Smilowitz<br>E-Mail: jsmilowitz@gracioushome.com<br>Facsimile: 212-677-8097<br>State Organizational ID No.: None<br>Federal Employee ID No.: 13-199 6057 | **BORROWERS:**<br><br>**THE WECK CORPORATION**<br><br>By: _Natan W_____<br>Name: _Natan Wekselbaum_<br>Title: _Managing Member_ |
| West Weck, LLC<br>c/o Gracious Home<br>632 Broadway<br>New York, NY 10021<br>Attention: Jordan Smilowitz<br>E-Mail: jsmilowitz@gracioushome.com<br>Facsimile: 212-677-8097<br>State Organizational ID No.: None<br>Federal Employee ID No.: 13-398 1934 | **WEST WECK, LLC**<br><br>By: _Natan W_____<br>Name: _Natan Wekselbaum_<br>Title: _Managing Member_ |
| Gracious Home.Com, LLC<br>c/o Gracious Home<br>632 Broadway<br>New York, NY 10021<br>Attention: Jordan Smilowitz<br>E-Mail: jsmilowitz@gracioushome.com<br>Facsimile: 212-677-8097<br>State Organizational ID No.: None<br>Federal Employee ID No.: 01-07 84 754 | **GRACIOUS HOME.COM, LLC**<br><br>By: _Natan W_____<br>Name: _Natan Wekselbaum_<br>Title: _Managing Member_ |
| Weck Chelsea, LLC<br>c/o Gracious Home<br>632 Broadway<br>New York, NY 10021<br>Attention: Jordan Smilowitz<br>E-Mail: jsmilowitz@gracioushome.com<br>Facsimile: 212-677-8097<br>State Organizational ID No.: None<br>Federal Employee ID No.: 26-12 33 431 | **WECK CHELSEA, LLC**<br><br>By: _Natan W_____<br>Name: _Nathan Wekselbaum_<br>Title: _Managing Member_ |

With a copy to:

Hahn & Hessen LLP
488 Madison Avenue
New York, NY  10022
Attn:  Rosanne Thomas Matzat
E-Mail:  RMatzat@hahnhessen.com
Facsimile:  (212)-478-7400

New Alliance Bank,
690 Canton Street, Suite 214
Westwood, MA  02090
Attention:  Daniel F. O'Rourke
E-Mail:  dorourke@newalliancebank.com
Facsimile: (781) 326-6963
With a copy to:

Greenberg Traurig, LLP
One International Place, 20th Floor
Boston, Massachusetts  02110
Attn:  Jeffrey M. Wolf, Esq.
E-Mail:  wolfje@gtlaw.com
Facsimile:  (617) 310-6001

**LENDER:**
**NEWALLIANCE BANK**

By: _____

Name: _____ ALLAN  MARDEN

Title: _____ FIRST  VP

**Exhibit A**

**<u>BUDGET</u>**

**Attached**

# DIP LOAN BUDGET

**CONFIDENTIAL FORECAST FOR GRACIOUS HOME**

August 10, 2010
16:01 PM

| 8/10/2010 16:01 PM |
| --- |

| DIP LOAN BUDGET |
| --- |

*Notwithstanding anything herein to the contrary, all information is subject to errors, omissions, change, revocation or actual or future results. Future result may materially differ from actual or future performance. Note (1): Assumes certain stores may close at certain times, but the Company may make other plans that is intended cumulatively to be cash neutral, although the cash receipts is subject to actual results that can not be assured or guaranteed; accordingly, the foregoing may result in higher or lower receipts and higher or lower disbursements*

| Week Beginning Sunday / Week Ending Saturday | 15-Aug / 22-Aug | 22-Aug / 29-Aug | 29-Aug / 5-Sep | 5-Sep / 12-Sep | 12-Sep / 19-Sep | 19-Sep / 26-Sep |
| --- | ---: | ---: | ---: | ---: | ---: | ---: |
| Cash Balance Beginning | 893,900 | 1,416,300 | 1,271,000 | 908,228 | 967,157 | 1,495,785 |
| | | | | | | |
| Cash / Check Deposits | 160,000 | 160,000 | 120,000 | 180,000 | 180,000 | 180,000 |
| Credit Card Deposits | 915,000 | 915,000 | 915,000 | 1,015,000 | 1,015,000 | 1,015,000 |
| Chelsea Clearance Event | | | 100,000 | 100,000 | 100,000 | 100,000 |
| Total Sales (+ST) Receipts (Note 1) | 1,075,000 | 1,075,000 | 1,135,000 | 1,295,000 | 1,295,000 | 1,295,000 |
| | | | | | | |
| DIP Proceeds Take Down for Week | 300,000 | 200,000 | 200,000 | 100,000 | 100,000 | 100,000 |
| | | | | | | |
| Rent | | | 728,000 | | | 40,000 |
| Payroll | | 449,700 | | 474,700 | | 432,400 |
| Severance and Retention | | | | | | |
| Payroll - related | 32,000 | | 32,000 | | 30,000 | |
| Sales Tax | 50,000 | 300,000 | 50,000 | | | 350,000 |
| Credit Card fees | 50,000 | 50,000 | 50,000 | | | |
| Stores & Corp Operating Expenses | 99,000 | 99,000 | 92,072 | 92,072 | 92,072 | 92,072 |
| Other Expenses and Deductions | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Bank Interest and Fees | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 |
| Merchandise | 419,500 | 469,500 | 676,100 | 649,700 | 574,700 | 574,700 |
| Capital Expenditure | 100,000 | - | - | - | - | - |
| Post-pet. Creditors' Committee | 13,300 | 13,300 | 13,300 | 13,300 | 13,300 | 13,300 |
| US Trustee Fees | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Claims Agent | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 |
| Post-pet. Debtor professionals | 47,100 | 47,100 | 64,600 | 64,600 | 64,600 | 64,600 |
| **Total Disbursements** | 852,600 | 1,420,300 | 1,697,772 | 1,336,072 | 866,372 | 1,608,772 |
| **Closing Cash Balance** | 1,416,300 | 1,271,000 | 908,228 | 967,157 | 1,495,785 | 1,282,014 |

**8/10/2010 16:01 PM**

**DIP LOAN BUDGET**

| | 26-Sep<br>3-Oct | 3-Oct<br>10-Oct | 10-Oct<br>17-Oct | 17-Oct<br>24-Oct | 24-Oct<br>31-Oct | 31-Oct<br>7-Nov | 7-Nov<br>14-Nov |
|---|---|---|---|---|---|---|---|
| Week Beginning Sunday<br>Week Ending Saturday | | | | | | | |
| Cash Balance Beginning | 1,282,014 | 1,717,762 | 1,055,175 | 1,337,471 | 1,353,266 | 1,444,678 | 920,207 |
| Cash / Check Deposits | 165,000 | 165,000 | 165,000 | 165,000 | 173,250 | 173,250 | 173,250 |
| Credit Card Deposits | 858,000 | 858,000 | 858,000 | 843,000 | 885,150 | 885,150 | 885,150 |
| Chelsea Clearance Event | 100,000 | | | | | | |
| Total Sales (+ST) Receipts **(Note 1)** | 1,123,000 | 1,023,000 | 1,023,000 | 1,008,000 | 1,058,400 | 1,058,400 | 1,058,400 |
| DIP Proceeds Take Down for Week | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | |
| Rent | | 567,483 | | | | 567,483 | |
| Payroll | | 407,400 | | 378,400 | | 378,400 | |
| Severance and Retention | 30,000 | 40,000 | | | | | |
| Payroll - related | | | 30,000 | | 30,000 | | 40,000 |
| Sales Tax | | | 40,000 | 50,000 | 350,000 | | 30,000 |
| Credit Card fees | 50,000 | | | | | 50,000 | |
| Stores & Corp Operating Expenses | 92,072 | 80,524 | 80,524 | 80,524 | 80,524 | 80,524 | 80,524 |
| Other Expenses and Deductions | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Bank Interest and Fees | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 |
| Merchandise | 495,580 | 570,580 | 570,580 | 463,680 | 486,864 | 486,864 | 586,864 |
| Capital Expenditure | - | - | - | - | - | | |
| Post-pet. Creditors' Committee | 13,300 | 13,300 | 13,300 | 13,300 | 13,300 | 13,300 | 13,300 |
| US Trustee Fees | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Claims Agent | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 | 4,700 |
| Post-pet. Debtor professionals | 64,600 | 64,600 | 64,600 | 64,600 | 64,600 | 64,600 | 64,600 |
| **Total Disbursements** | 787,252 | 1,785,587 | 840,704 | 1,092,204 | 1,066,988 | 1,682,871 | 856,988 |
| **Closing Cash Balance** | 1,717,762 | 1,055,175 | 1,337,471 | 1,353,266 | 1,444,678 | 920,207 | 1,121,619 |

CONFIDENTIAL FORECAST FOR GRACIOUS HOME

August 10, 2010
16:01 PM

| 8/10/2010 16:01 PM |
| --- |

| **DIP LOAN BUDGET** |
| --- |

|  | POR Exit - 16 | POR Exit - 16 |
| --- | --- | --- |
| Week Beginning Sunday | 14-Nov | 21-Nov |
| Week Ending Saturday | 21-Nov | 28-Nov |
| Cash Balance Beginning | 1,121,619 | 974,630 |
| Cash / Check Deposits | 173,250 | 198,000 |
| Credit Card Deposits | 885,150 | 1,029,600 |
| Chelsea Clearance Event | | |
| Total Sales (+ST) Receipts **(Note 1)** | 1,058,400 | 1,227,600 |
| DIP Proceeds Take Down for Week | | |
| Rent | | |
| Payroll | 378,400 | |
| Severance and Retention | | 30,000 |
| Payroll - related | | 350,000 |
| Sales Tax | | |
| Credit Card fees | 40,000 | |
| Stores & Corp Operating Expenses | 80,524 | 80,524 |
| Other Expenses and Deductions | 25,000 | 25,000 |
| Bank Interest and Fees | 10,500 | 10,500 |
| Merchandise | 586,864 | 614,696 |
| Capital Expenditure | - | - |
| Post-pet. Creditors' Committee | 13,300 | 13,300 |
| US Trustee Fees | 1,500 | 1,500 |
| Claims Agent | 4,700 | 4,700 |
| Post-pet. Debtor professionals | 64,600 | 64,600 |
| **Total Disbursements** | 1,205,388 | 1,194,820 |
| **Closing Cash Balance** | 974,630 | 1,007,410 |

# DIP LOAN BUDGET

| | Week Beginning Sunday<br>Week Ending Saturday | | | | | |
|---|---|---|---|---|---|---|
| | 15-Aug<br>22-Aug | 22-Aug<br>29-Aug | 29-Aug<br>5-Sep | 5-Sep<br>12-Sep | 12-Sep<br>19-Sep | 19-Sep<br>26-Sep |
| **DIP LOAN BUDGET ADVANCES:** | | | | | | |
| **Inventory Advances** | | | | | | |
| Perpetual Inventory | 9,850,000 | 9,825,000 | 9,979,000 | 10,033,000 | 10,012,000 | 9,991,000 |
| Total Reserves (shk, sup, cus cred, prof) | (505,000) | (505,000) | (505,000) | (555,000) | (555,000) | (555,000) |
| Net Inventory | 9,345,000 | 9,320,000 | 9,474,000 | 9,478,000 | 9,457,000 | 9,436,000 |
| NOLV | 85% | 85% | 85% | 85% | 85% | 85% |
| Advance Rate | 95% | 95% | 95% | 95% | 95% | 95% |
| *INVENTORY AVAILABILITY* | 7,546,088 | 7,525,900 | 8,550,285 | 8,553,895 | 8,534,943 | 8,515,990 |
| **Accounts Receivable Advances** | | | | | | |
| House Accounts | | | | | | |
| HA Reserve | 500,000 | 500,000 | 525,000 | 525,000 | 525,000 | 525,000 |
| HA Eligible | 10% | 10% | 10% | 10% | 10% | 10% |
| | 450,000 | 450,000 | 472,500 | 472,500 | 472,500 | 472,500 |
| AR Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% |
| **HOUSE ACCTS AVAILABILITY** | 382,500 | 382,500 | 401,625 | 401,625 | 401,625 | 401,625 |
| **CC Receivables Advances** | | | | | | |
| Eligible C.C. Accounts Receivable | 500,000 | 500,000 | 525,000 | 525,000 | 525,000 | 525,000 |
| C.C. Advance Rate @ 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| **CREDIT CARD AVAILABILITY** | 450,000 | 450,000 | 472,500 | 472,500 | 472,500 | 472,500 |
| **TOTAL GROSS AVAILABILITY** | | | | | | |
| **TOTAL NET AVAILABILITY** | | | | | | |
| Total Net Availability | 8,378,588 | 8,358,400 | 9,424,410 | 9,428,020 | 9,409,068 | 9,390,115 |
| Secured Loan Funding | 8,344,813 | 8,344,813 | 8,344,813 | 8,344,813 | 8,344,813 | 8,344,813 |
| Excess/(Deficit) Net Availability | 33,775 | 13,587 | 1,079,598 | 1,083,208 | 1,064,255 | 1,045,303 |
| Cash | 1,416,300 | 1,271,000 | 908,228 | 967,157 | 1,495,785 | 1,282,014 |
| Minimum Cash | (400,000) | (400,000) | (400,000) | (400,000) | (400,000) | (400,000) |
| DIP Loan Cumulative Outstanding | (300,000) | (500,000) | (700,000) | (800,000) | (900,000) | (1,000,000) |
| Contingency Reserves | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| **NET UNUSED AVAILABILITY** | 650,075 | 284,587 | 787,826 | 750,364 | 1,160,040 | 827,316 |

## DIP LOAN BUDGET ADVANCES:

| | Week Beginning Sunday<br>Week Ending Saturday | 26-Sep<br>3-Oct | 3-Oct<br>10-Oct | 10-Oct<br>17-Oct | 17-Oct<br>24-Oct | 24-Oct<br>31-Oct | 31-Oct<br>7-Nov | 7-Nov<br>14-Nov |
|---|---|---|---|---|---|---|---|---|
| **Inventory Advances** | | | | | | | | |
| Perpetual Inventory | | 9,970,000 | 10,070,000 | 10,170,000 | 10,170,000 | 10,170,000 | 10,170,000 | 10,270,000 |
| Total Reserves (shk, sup, cus cred, prof) | | (555,000) | (555,000) | (555,000) | (555,000) | (555,000) | (555,000) | (555,000) |
| Net Inventory | | 9,415,000 | 9,515,000 | 9,615,000 | 9,615,000 | 9,615,000 | 9,615,000 | 9,715,000 |
| NOLV | | 95% | 95% | 95% | 95% | 95% | 95% | 95% |
| Advance Rate | | 95% | 95% | 95% | 95% | 95% | 100% | 100% |
| *INVENTORY AVAILABILITY* | | 8,497,038 | 8,587,288 | 8,677,538 | 8,677,538 | 8,677,538 | 9,134,250 | 9,229,250 |
| **Accounts Receivable Advances** | | | | | | | | |
| House Accounts | | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 575,000 | 575,000 |
| HA Reserve | | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| HA Eligible | | 495,000 | 495,000 | 495,000 | 495,000 | 495,000 | 517,500 | 517,500 |
| AR Advance Rate | | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| **HOUSE ACCTS AVAILABILITY** | | 420,750 | 420,750 | 420,750 | 420,750 | 420,750 | 439,875 | 439,875 |
| **CC Receivables Advances** | | | | | | | | |
| Eligible C.C. Accounts Receivable | | 550,000 | 550,000 | 550,000 | 550,000 | 550,000 | 575,000 | 575,000 |
| C.C. Advance Rate @ 90% | | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| **CREDIT CARD AVAILABILITY** | | 495,000 | 495,000 | 495,000 | 495,000 | 495,000 | 517,500 | 517,500 |
| **TOTAL GROSS AVAILABILITY** | | | | | | | | |
| Total Net Availability | | 9,412,788 | 9,503,038 | 9,593,288 | 9,593,288 | 9,593,288 | 10,091,625 | 10,186,625 |
| Secured Loan Funding | | 8,344,813 | 8,344,813 | 8,344,813 | 8,344,813 | 8,344,813 | 8,344,813 | 8,344,813 |
| Excess/(Deficit) Net Availability | | 1,067,975 | 1,158,225 | 1,248,475 | 1,248,475 | 1,248,475 | 1,746,813 | 1,841,813 |
| Cash | | 1,717,762 | 1,055,175 | 1,337,471 | 1,353,266 | 1,444,678 | 920,207 | 1,121,619 |
| Minimum Cash | | (400,000) | (400,000) | (400,000) | (400,000) | (400,000) | (400,000) | (400,000) |
| DIP Loan Cumulative Outstanding | | (1,100,000) | (1,200,000) | (1,300,000) | (1,400,000) | (1,500,000) | (1,600,000) | (1,600,000) |
| Contingency Reserves | | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) | (100,000) |
| **NET UNUSED AVAILABILITY** | | 1,185,737 | 513,400 | 785,946 | 701,741 | 693,153 | 567,019 | 863,431 |

CONFIDENTIAL FORECAST FOR GRACIOUS HOME

August 10, 2010
16:01 PM

| | Week Beginning Sunday 14-Nov<br>Week Ending Saturday 21-Nov | 21-Nov<br>28-Nov |
|---|---|---|
| **DIP LOAN BUDGET ADVANCES:** | | |
| **Inventory Advances** | | |
| Perpetual Inventory | 10,370,000 | 10,420,000 |
| Total Reserves (shk, sup, cus cred, prof) | (555,000) | (555,000) |
| Net Inventory | 9,815,000 | 9,865,000 |
| NOLV | 100% | 100% |
| Advance Rate | 95% | 95% |
| *INVENTORY AVAILABILITY* | 9,324,250 | 9,371,750 |
| **Accounts Receivable Advances** | | |
| **House Accounts** | | |
| HA Reserve | 575,000 | 575,000 |
| HA Reserve | 10% | 10% |
| HA Eligible | 517,500 | 517,500 |
| AR Advance Rate | 85% | 85% |
| **HOUSE ACCTS AVAILABILITY** | 439,875 | 439,875 |
| **CC Receivables Advances** | | |
| Eligible C.C. Accounts Receivable | 575,000 | 575,000 |
| C.C. Advance Rate @ 90% | 90% | 90% |
| **CREDIT CARD AVAILABILITY** | 517,500 | 517,500 |
| **TOTAL GROSS AVAILABILITY** | | |
| Total Net Availability | 10,281,625 | 10,329,125 |
| Secured Loan Funding | 8,344,813 | 8,344,813 |
| Excess/(Deficit) Net Availability | 1,936,813 | 1,984,313 |
| Cash | 974,630 | 1,007,410 |
| Minimum Cash | (400,000) | (400,000) |
| DIP Loan Cumulative Outstanding | (1,600,000) | (1,600,000) |
| Contingency Reserves | (100,000) | (100,000) |
| **NET UNUSED AVAILABILITY** | 811,443 | 891,723 |

**Exhibit B**

**<u>INTERIM ORDER</u>**

**Attached**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:                              :
                                    :
THE WECK CORPORATION, et al.,       :     Case No. 10-
                                    :
                    Debtors.        :     Chapter 11
                                    :     (Procedurally Consolidated)
                                    :
_____     :

**INTERIM ORDER GRANTING EMERGENCY MOTION FOR ORDER
UNDER 11 U.S.C. §§ 105, 363, 364(c)(1) & (2), AND 364(e), FED. R. BANKR.
P. 2002, 4001, AND 9014, (I) AUTHORIZING DEBTORS TO OBTAIN POST-
PETITION FINANCING ON SUPER-PRIORITY AND SECURED BASIS,
(II) PERMITTING THE USE OF THE CASH COLLATERAL,
(III) GRANTING INTERIM RELIEF, AND (IV) SCHEDULING A FINAL
HEARING UNDER FED. R. BANKR. P. 4001(c)**

Upon the *Emergency Motion for Order Under 11 U.S.C. §§ 105, 363, 364(c)(1) & (2),*

*and 364(e), Fed. R. Bankr. P. 2002, 4001, and 9014 (I) Authorizing Debtors To Obtain Post-*

*petition Financing On Super-priority and Secured Basis, (II) Permitting the Use of Cash*

*Collateral, (III) Granting Interim Relief, and (IV) Scheduling a Final Hearing Under Fed. R.*

*Bankr. P. 4001(c)*, dated August 12, 2010 (the "Motion[1]") filed by The Weck Corporation, West

Weck, LLC, Gracious Home.com, LLC and Weck Chelsea, LLC (collectively, the "Debtors"),

debtors and debtors in possession in the above-captioned cases; an interim hearing (the "Interim

Hearing") having been held before the Court on August [ ], 2010; due and sufficient notice of

the Motion and the Interim Hearing having been given; and upon the entire record made at the

Interim Hearing before this court (the "Bankruptcy Court") to consider the Motion; and this

Court having found good and sufficient cause appearing therefore;

---

1    Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the
DIP Agreement (as such term is defined herein).

THE DEBTORS STIPULATE AND THE COURT HEREBY FINDS, DETERMINES, AND CONCLUDES THAT:[2]

A.    <u>Jurisdiction</u>.  The Bankruptcy Court has core jurisdiction over the above-captioned chapter 11 cases (the "<u>Cases</u>"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of this Motion constitutes a core proceeding as defined 28 U.S.C. §§ 157(b)(8).

B.    <u>Notice</u>.  Notice of the Motion and the Hearing was provided to all secured creditors, the Debtors' twenty (20) largest unsecured creditors and the United States Trustee, which constitutes due and sufficient notice thereof pursuant to Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>" 2002 and 4001(b) and (c).

C.    <u>Petition Date</u>.  On August 12, 2010 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to manage their affairs as debtors in possession.  No trustee or examiner has been appointed in the Chapter 11 Cases.  At this time, the Debtors' Cases have been consolidated under Bankruptcy Case No. 10-_____ for procedural purposes only.

D.    <u>Debtors' Stipulations</u>.  Without prejudice to the rights, remedies, and claims of the Committee (as such term is defined herein) contained in Paragraph 20 below, the Debtors acknowledge, admit, and confirm the following:

(a)    The Debtors are party to that certain Secured Revolving Credit Note and Agreement dated as of April 22, 2005, as amended by that certain Increased, Modified and Extended Secured Revolving Credit Note and Agreement dated as of November 2, 2007, as

---

2 Findings of fact contained herein shall be construed as conclusions of law, and conclusions of law contained herein shall be construed as findings of fact.

further amended by that certain Modified and Decreased Secured Revolving Credit Note and Agreement dated as of August 7, 2009, as further amended by that certain Modified and Decreased Secured Revolving Credit Note and Agreement dated as of November 5, 2009, as further amended by that certain Modified and Extended Secured Revolving Credit Note and Agreement dated as of February 16, 2010, as amended by that certain Forbearance Agreement and Amendment to Modified and Extended Secured Revolving Credit Note dated as of August 11, 2010 (as the same may be further modified, supplemented or otherwise modified from time to time to the Petition Date, the "Pre-Petition Credit Agreement"), pursuant to which NewAlliance Bank, acting through its NewAlliance Commercial Finance operating division (as successor to Manufacturers and Traders Trust Company) (the "Pre-Petition Lender"), made certain loans and financial accommodations to the Debtors (including, without limitation, accrued but unpaid interest, fees and expenses, collectively, the "Pre-Petition Obligations").

(b)     The Debtors are truly and justly indebted and liable to the Pre-Petition Lender for the Pre-Petition Obligations without defense, counterclaim or offset of any kind in respect of loans made pursuant to the Pre-Petition Credit Agreement, and that as of the Petition Date, such Pre-Petition Obligations amount equaled approximately $8,988,681.97 (inclusive of interest, facility fees, costs and expenses), plus outstanding letter of credit exposure in the amount of $2,358,441.71, and other fees, costs, expenses and indemnities as provided for in the Pre-Petition Credit Agreement.

(c)     To induce the Pre-Petition Lender to extend loans and financial accommodations under the Pre-Petition Credit Agreement, each of the Debtors executed a General Security Agreement (the "Pre-Petition Security Agreements"), pursuant to which each of the Debtors granted liens on, and irrevocable pledges and security interests in, all of its personal property and

assets (the "Pre-Petition Collateral") to and/or for the benefit of the Pre-Petition Lender to secure the Pre-Petition Obligations (collectively, the "Pre-Petition Liens").

(c)     The Pre-Petition Liens are (i) valid, binding, perfected, enforceable liens on the Pre-Petition Collateral and, subject to section 552 of the Bankruptcy Code, on all post-petition proceeds, products, offspring, rents and profits thereof, (ii) not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination under the Bankruptcy Code or applicable non-bankruptcy law, and (iii) subject and subordinate only to (A) the Adequate Protection Liens (as such term is defined herein), (B) the Carve-Out (as such term is defined herein and to which the Adequate Protection Liens are subject), (C) the DIP Liens (as such term is defined herein), and (D) valid, existing, prior perfected liens, if any. The Pre-Petition Credit Agreement and Pre-Petition Security Agreements are valid and binding agreements and obligations of the Debtors.

(d)     The Pre-Petition Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms and no objection, offset, defense, or counterclaim of any kind or nature to the Pre-Petition Obligations exists. The Pre-Petition Obligations, and any amounts previously paid to the Pre-Petition Lender on account thereof or with respect thereto, are not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors do not have, hereby forever release, and are forever barred from bringing, any claims, counterclaims, causes of action, defenses, or setoff rights, whether arising under the Bankruptcy Code or otherwise, with respect to the Pre-Petition Obligations or against the Pre-Petition Lender and its predecessors-in-interest, affiliates, subsidiaries, agents, officers, directors,

employees, and attorneys, with respect to the Pre-Petition Obligations, the Pre-Petition Security Agreements and the Pre-Petition Credit Agreement.

(e)     The Pre-Petition Lender perfected its security interests and the Pre-Petition Liens in and on the Pre-Petition Collateral by, among other methods, the filing of UCC-1 financing statements, instruments filed in federal, state, and county offices, mortgages, and other required documents against the Debtors and such Pre-Petition Collateral with the proper federal, state, and county offices for the perfection of such security interests and Pre-Petition Liens.

E.     <u>Events of Default Under the Pre-Petition Credit Agreement</u>.  Various Events of Default have occurred and are continuing under the Pre-Petition Credit Agreement (including, without limitation, the failure of the Debtors to repay the Pre-Petition Obligations on the scheduled maturity date of the Pre-Petition Credit Agreement), and as a result, the Pre-Petition Lender has the right, subject to the Pre-Petition Credit Agreement, to accelerate the Pre-Petition Obligations, foreclose on the Pre-Petition Collateral (with relief from the automatic stay), and cease advancing funds pursuant to the Pre-Petition Credit Agreement.

F.     <u>Cash Collateral</u>.  For purposes of this Order, the following constitute "<u>Cash Collateral</u>" of the Pre-Petition Lender within the meaning of section 363(a) of the Bankruptcy Code: (a) all funds of the Debtors (including any funds subject to a right of setoff in favor of the Pre-Petition Lender, any funds on deposit or maintained in any account subject to a control agreement with the Pre-Petition Lender, and any proceeds of the Pre-Petition Collateral) as of the Petition Date, and (b) all cash proceeds of Pre-Petition Collateral received after the Petition Date.

G.     <u>Pre-Petition Lender's Consent</u>.  The Pre-Petition Lender consents to the Debtors' use of the Pre-Petition Lender's Cash Collateral and the priming of the Pre-Petition Liens by the DIP Liens, solely on the terms and conditions set forth in this Order, and in accordance with the

BOS 46,652,297v6
115350/214-1910147.2

Budget (as such term is defined herein). The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent.

H.  Findings Regarding the Use of Cash Collateral.  (a)  Good cause has been shown for the entry of this Interim Order. The Debtors have an immediate and critical need to use the Cash Collateral and obtain post-petition financing on a super-priority basis in order to continue to operate their businesses, and effectuate a reorganization of their businesses. The Debtors' use of Cash Collateral has been deemed sufficient to meet the Debtors' immediate post-petition liquidity needs, subject to the terms of this Order, and all other agreements, documents, notes, or instruments delivered pursuant hereto or thereto or in connection herewith or therewith, including, without limitation, the Budget.

(b)  The ability of the Debtors to have sufficient available sources of working capital to continue their businesses, effectuate a reorganization of their businesses, and maximize the value of their assets depends upon the Debtors' use of Cash Collateral. The Debtors have requested that the Pre-Petition Lender, through its agents, consent to (i) the use of its Cash Collateral, to be used by the Debtors solely in accordance with the terms of this Order and the Budget, and (ii) the priming of its liens on the Pre-Petition Collateral solely to the extent provided herein. In consideration of such accommodations, the Pre-Petition Lender shall be granted adequate protection (including, without limitation, the Adequate Protection Liens (as such term is defined herein)), as more particularly described herein.

(c)  Based on the record presented to the Court at the Interim Hearing, good, adequate and sufficient cause has been shown to justify the immediate grant of the relief requested in the Motion to avoid irreparable harm to the Debtors' estates pursuant to section

4001(b)(2) of the Bankruptcy Code. The terms of the DIP Agreement (as such term is defined herein) as well as the Debtors' use of the Cash Collateral, as more fully set forth herein, are (i) fair and reasonable, (ii) reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, (iii) constitute reasonably equivalent value and fair consideration for the Pre-Petition Lender consent thereto, and (iv) are essential and appropriate for the continued operation and management of the Debtors' businesses and the preservation of their assets and properties. Entry of this Order is in the best interests of the Debtors' estates and all parties in interest in these Chapter 11 Cases.

I.    Necessity for Post-Petition Financing.

(a)    Good cause has been shown for the entry of this Order.

(b)    The Debtors have an immediate need to obtain post-petition financing to avoid irreparable harm. Obtaining post-petition financing is in the best interests of the Debtors' estates.

(c)    The Debtors are unable to obtain (i) adequate unsecured credit allowable under sections 503(b)(1) or 364(c)(1) of the Bankruptcy Code, as an administrative expense or (ii) secured credit allowable only under sections 364(c)(2) or 364(c)(3) of the Bankruptcy Code, without the Debtors granting to the DIP Lender (as such term is defined herein) (the Pre-Petition Lender and the DIP Lender, collectively, the "Lender") the Super-Priority Claim and the DIP Liens (as such terms are defined herein).

J.    Reasonable Terms; Good Faith.

(a)    The terms of the proposed post-petition financing (the "Post-Petition Financing") and use of Cash Collateral are fair and reasonable, are supported by reasonably

equivalent value and fair consideration, and reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties.

(b)     The Post-Petition Financing and the terms of use of the Cash Collateral has been negotiated in good faith and at arm's-length among the Debtors and the Lender.

(c)     All of the Debtors' indebtedness and other obligations to the NewAlliance Bank, acting through its NewAlliance Commercial Finance operating division (the "DIP Lender") arising under, in respect of or in connection with (i) the Debtor in Possession Loan and Security Agreement annexed hereto as **Exhibit A** (the "DIP Agreement"), and all related security and other agreements, documents, notes and instruments (together with all exhibits, schedules, annexes and appendices thereto, delivered pursuant hereto or thereto, or in connection herewith or therewith, collectively, the "DIP Loan Documents"); and (ii) this Order (collectively, the "DIP Financing Arrangement") shall be deemed to have been extended by the Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code.

K.     Protections of Section 364(e) of the Bankruptcy Code.  All of the credit extended pursuant to the DIP Loan Documents (including all the DIP Obligations (as such term is defined herein)) after entry of this Order was extended by the DIP Lender in good faith and in express reliance upon the protections afforded to post-petition lenders pursuant to section 364(e) of the Bankruptcy Code and, accordingly, all of the DIP Obligations shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event this Order or any provision hereof is vacated, reversed or modified (including pursuant to a final order on the Motion (the "Final Order") entered after a final hearing on the Motion (the "Final Hearing")), whether on appeal or otherwise, and upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against the

Debtors in accordance with the terms of the DIP Loan Documents, this Order, and section 364(e) of the Bankruptcy Code.

The Pre-Petition Lender is permitting the use of its Cash Collateral and the priming of its Pre-Petition Liens in good faith and in express reliance upon the protections afforded to the Pre-Petition Lender pursuant to section 364(e) of the Bankruptcy Code, and, accordingly, shall be entitled to the full protections of section 364(e) of the Bankruptcy Code in the event this Order or any provision hereof is vacated, reversed or modified (including pursuant to a Final Order on the Motion entered after a Final Hearing on the Motion).

IT IS HEREBY ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY, AND AGREED AMONG THE PARTIES THAT:

1.      Authorization to use Cash Collateral.  Subject to the terms and conditions set forth in this Order and the DIP Loan Documents (including, without limitation, the granting of the Adequate Protection Obligations and the Adequate Protection Liens (as such terms are defined herein) provided herein), upon entry of this Order, the Debtors are authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use the Cash Collateral solely and exclusively for the disbursements set forth in the Budget for the period of time from the date hereof until the earliest to occur of (a) the date that this Order or the Final Order (when applicable) ceases to be in full force and effect, or (b) the occurrence of the Termination Date in accordance with Paragraph 13 hereof, at which time all accrued interest and fees and all other Adequate Protection Obligations shall be immediately due and payable and the Pre-Petition Lender shall have all other rights and remedies provided in this Order and under applicable law and the Debtors' authority to use the Cash Collateral shall automatically terminate without further order or relief from the Court.  Notwithstanding anything herein to the contrary, all of the rights,

remedies, benefits, and protections provided to the Pre-Petition Lender under this Order shall survive the Termination Date.

2. <u>Use of Cash Collateral</u>. Subject to the terms and conditions of this Order, the Pre-Petition Lender is willing to consent to the use of Cash Collateral in accordance with this Order and the Budget. No Cash Collateral shall be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of action against the Lender and/or challenging or raising any defenses to the Pre-Petition Obligations, the DIP Obligations, the Adequate Protection Obligations or the Pre-Petition Liens, the advances or other obligations under the Post-Petition Facility or the liens or security interests of the Lender.

3. <u>Adequate Protection Obligations</u>. The Pre-Petition Lender is entitled, under sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code, to adequate protection of its interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to the amount of the aggregate diminution in the value of the Pre-Petition Lender's interests in the Pre-Petition Collateral, including any such diminution resulting from (a) the use of Cash Collateral, (b) the sale, lease, or use by the Debtors (or other decline in value) of the Pre-Petition Collateral, and (c) the imposition of the automatic stay under section 362 of the Bankruptcy Code (the aggregate amount of such diminution, which shall expressly include, among other things, the aggregate amount of the Cash Collateral used by the Debtors from and after the Petition Date, the "<u>Adequate Protection Obligations</u>"). The Debtors shall each be jointly and severally liable for the Adequate Protection Obligations.

4. <u>Authorization to Enter into DIP Loan Documents and Incur DIP Obligations</u>.

(a)    The Debtors are hereby authorized on an interim basis to enter into the DIP Loan Documents and borrow monies pursuant to the DIP Loan Agreement in an aggregate principal amount of up to five hundred thousand dollars ($500,000.00) for this interim period

(the "DIP Obligations") in accordance with the terms of this Order and the DIP Loan Documents. Such funds shall only be used for purposes permitted or prescribed under the DIP Loan Documents including, without limitation, only as provided and limited by the Budget, and this Order and the DIP Loan Documents.

(b)     The Debtors are expressly authorized and directed to do and perform all acts and to make, execute and deliver all instruments and documents as may be reasonably required by the DIP Loan Documents (including, without limitation, the execution or recordation of security agreements, control agreements, mortgages and financing statements).

(c)     The Debtors are authorized to execute and deliver amendments to the DIP Loan Documents as may be agreed by the parties thereto except for (i) any increase in the maximum amount of the DIP Obligations, (ii) any increase in the applicable interest rates (other than through application of the default interest rate, if applicable), or (iii) any modification of the maturity of the DIP Loan Documents, each of which shall require a further order of the Court. Any such amendment shall become effective five (5) days after copies of all such amendments are filed with the Court and served upon the counsel to the United States Trustee, the official committee of unsecured creditors, if any, retained pursuant to sections 327 or 1103(a) of the Bankruptcy Code (the "Committee") and all persons who properly filed notices of appearances and requests for service pursuant to Bankruptcy Rule 2002.

5.     Conditions to Lending. The Lender's obligation to fund any of the Post-Petition Financing is conditioned upon and subject to execution of final, definitive DIP Loan Documents, including the DIP Agreement, each in a form acceptable to the Lender in its sole discretion. Subject to the terms and conditions of the DIP Agreement, upon entry of this Order on an interim basis, the Lender shall fund the initial advance under the DIP Agreement of $500,000.00.

Thereafter, subject to the terms and conditions of the DIP Financing Arrangement, additional advances by the Lender shall be made such that the aggregate outstanding amount of the DIP Obligations shall not exceed $3,425,200.00, which amounts shall be advanced solely in accordance with the Budget, plus up to $2,323,587.89 for issuance of replacement letters of credit.

      6.      <u>Super-Priority Claims</u>.

      (a)      For all of the DIP Obligations, the DIP Lender is hereby granted pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed super-priority administrative expense claim (which allowed super-priority claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors' estates and the proceeds thereof) with priority over any and all administrative expenses, claims for adequate protection, and all other claims against the Debtors, now existing or hereafter arising (whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment), including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) (if any) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 502(b), 506(c), 507(a), 546, 726, 1113 and 1114 of the Bankruptcy Code and including administrative expenses arising under or out of any superseding case under chapter 7 of the Bankruptcy Code (collectively, the "Super-Priority Claim"), subject only to payment of the Carve-Out (as defined herein).

      (b)      The Pre-Petition Lender is hereby granted in each of the Debtors' Chapter 11 Cases, an allowed, super-priority administrative expense claim (the "Cash Collateral Super-priority Claim") under section 507(b) of the Bankruptcy Code with respect to all Adequate Protection Obligations. The Cash Collateral Super-priority Claim shall have priority over all

administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, or otherwise (whether incurred in any of the Chapter 11 Cases or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto), which Cash Collateral Super-priority Claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, but excluding recoveries of avoidance actions under sections 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code (the "Avoidance Action Recoveries"). The Cash Collateral Superpriorty Claim shall be subject and subordinate only to the Super-priority Claim and the Carve-Out.

7.   Liens.   (a) In accordance with Section 364(c)(1) of the Bankruptcy Code, as security for the DIP Obligations, deemed effective and perfected as of the Petition Date and without the necessity of the Debtors incurring the expense for the execution, recordation of filings of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or possession or control of applicable assets, the DIP Lender shall be granted a valid, perfected, priming, first-priority senior security interest in and liens on all of the Debtors' now owned and hereafter acquired, created or arising Collateral (as defined herein), subject only to the payment of the Carve-Out (all such liens and security interests granted to the Lender, pursuant to this Order and the DIP Loan Documents, the "DIP Liens") and Permitted Liens. For purposes hereof, "Collateral" is defined as all assets and property of the Debtors and their estates, including without limitation all present and future accounts, deposit accounts, chattel paper, equipment, documents, general intangibles, held items,

investment property, instruments, inventory, items of payment, owned real property and proceeds of real property leases, if applicable, proceeds, products, records and all other collateral described in the DIP Loan Agreement. The DIP Liens shall extend and attach to all Collateral and any proceeds of Collateral which is presently in existence or hereafter arises or acquired (whether arising or acquired prior to or subsequent to the Petition Date) and which is owned by the Debtors or in which Debtors have any interest, whether held by any of Debtors or by others for any of Debtors' account, wherever located. Subject to the entry of the Final Order, the DIP Liens shall not include a lien on the proceeds of Avoidance Action Recoveries.

(b) To secure the Adequate Protection Obligations, deemed effective and perfected as of the Petition Date and without the necessity of the Debtors incurring the expense for the execution, recordation of filings of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or possession or control of applicable assets, the Pre-Petition Lender shall be granted a valid, perfected, priming, security interest in and liens on all of the Debtors' now owned and hereafter acquired, created or arising Collateral, but excluding Avoidance Action Recoveries, subject only to DIP Liens and the Carve-Out (all such liens and security interests granted to the Pre-Petition Lender to secure the Adequate Protection Obligations pursuant to this Order, the "Adequate Protection Liens"). The Adequate Protection Liens shall extend and attach to all Collateral and any proceeds of Collateral which is presently in existence or hereafter arises or acquired (whether arises or acquired prior to or subsequent to the Petition Date) and which is owned by the Debtors or in which Debtors have any interest, whether held by any of Debtors or by others for any of Debtors' account, wherever located, to the same extent as the Liens, but excluding Avoidance Action Recoveries.

8.    Automatic Stay; Remedies.

(a)     Upon the occurrence of an Event of Default under the DIP Loan Documents, all stays and injunctions in this Case, including, but not limited to, the automatic stay arising under section 362(a) of the Bankruptcy Code will be terminated automatically and irrevocably as to the DIP Lender, thereby permitting the DIP Lender, *inter alia*, to enforce its remedies against the Collateral, without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading in order to:

(i)     Lender may terminate the Line of Credit under the DIP Agreement and decline to make Advances or issue Letters of Credit;

(ii)    Lender may declare the DIP Obligations to be immediately due and payable and accelerate payment thereof, and all DIP Obligations shall immediately become due and payable, without presentment, notice of dishonor, protest or further notice of any kind; Lender may require that Debtors provide cash collateral for all outstanding Letters of Credit as security for the payment in full of all DIP Obligations in respect of Letters of Credit; and

(iii)   Declare the Debtors' right to use Cash Collateral to be terminated, where upon the same shall forthwith terminate, provided that, (i) with the written agreement of the DIP Lender or (ii) pursuant to an order of the Court upon emergency motion and upon no less than three full business days' notice to DIP Lender (which may be filed by the Debtors or the Committee), the Debtors may use only that amount of Cash Collateral necessary to preserve and protect the Collateral, which may include ongoing operations for a period not to exceed five (5) days or such additional period of time to which Lenders agree in their sole discretion.

(b)     Notwithstanding anything herein or in the DIP Agreement to the contrary, and notwithstanding the applicability of section 362 of the Bankruptcy Code (to the extent necessary to exercise such remedies, relief from automatic stay shall be deemed granted), upon notice of the occurrence of an Event of Default by the DIP Lender to the Debtors and the Debtors' failure to cure any such Event of Default within five (5) days after receipt of such notice, the DIP Lender shall also be entitled to immediately exercise any of the following rights and remedies, without further order of the Bankruptcy Court and without the need for filing any

motion for relief from the automatic stay or any other pleading in order, during which time the Debtors may seek an order of the Court that an Event of Default has not occurred, thereby enjoining the Lender from such exercise (provided, however, that in the event the Debtors seek a court hearing with respect to the DIP Lender exercising its remedies, the sole issue to be adjudicated shall be whether an Event of Default has occurred):

(i)    Lender may, without notice to Debtors, set off and apply any monies owing by Lender to Debtors to payment of the DIP Obligations;

(ii)    Lender may exercise and enforce any rights and remedies available upon default to a secured party under the UCC, including, without limitation, the right to take possession of Collateral (without posting a bond or other form of security), to proceed with or without judicial process (without a prior hearing or notice of hearing), and to sell, lease or otherwise dispose of Collateral for cash or on credit (with or without giving warranties as to condition, fitness, merchantability or title to Collateral, and in the event of a credit sale in such manner and at such places (including Debtors' Premises) as Lender determines is commercially reasonable discretion, including, conducting one or more going out of business or liquidation sales, in Lender's own right or by one or more agents or contractors, which sales may be conducted upon any Premises owned, leased, or occupied by Debtors. To the extent permitted by applicable law (except as otherwise provided in any order of the Bankruptcy Court), Lender and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of which other goods shall remain the sole property of the agent or such agent or contractor). Debtors will upon Lender's demand assemble the Collateral and make it available to Lender at any place designated by Lender which is reasonably convenient to both parties. Debtors' Obligations to Lender shall be reduced only to the extent that payments are actually received by Lender;

(iii)    Without notice to or demand upon Debtors, make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral. Debtors authorize Lender to enter any premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien that in Lender's determination appears to conflict with Lender's security

interest and to pay all expenses incurred in connection therewith and to charge Debtors' loan account therefor;

(iv)    Lender may exercise and enforce any of its rights and remedies under any of the DIP Loan Documents and any other document or agreement described in or related to the DIP Agreement or the DIP Obligations, or at law or in equity.

(v)    Lender may for any reason apply for the appointment of a receiver of the Collateral (to which appointment Debtors hereby consent) without the necessity of posting a bond or other form of security (which Debtors hereby waive); and

(vi)    Lender may exercise any other rights and remedies available to it by law or agreement.

(c)    The automatic stay imposed by section 362 of the Bankruptcy is hereby modified to the extent necessary to permit or effectuate the terms of this Order, including, without limitation, to permit the execution and recordation of documents in the Lender's discretion to evidence the creation and perfection of the Lender's liens on the Collateral.

9.    <u>Use of Proceeds; Bank Accounts</u>.

(a)    The Debtors shall use the proceeds of the loans obtained under the DIP Loan Documents solely in accordance with and subject to the conditions set forth in this Order, the DIP Loan Documents and the Budget. Nothing in this Order shall be construed to require the Lender to make advances or extensions of credit or other financial accommodations to permit the Debtors to make any payments, except to the extent expressly provided for in this Order and the DIP Loan Documents.

(b)    Any proceeds of the sale, lease or other disposition of the Collateral shall be used in accordance with the provisions of this Order and the DIP Loan Documents. To the extent they are applied to reduce the DIP Obligations, they shall be applied in payment of the Debtors' obligations under, and in the manner provided in, the DIP Loan Documents, and the Debtors are deemed to have irrevocably waived any right to direct the manner of application of

any payments to the Lender or any other receipts by the Lender of proceeds of any of the Collateral, including all of the Lender's Cash Collateral, other than as expressly set forth in this Order and the DIP Loan Documents.

(c)     The Lender shall issue replacement letters of credit for the benefit of the Debtors pursuant to the DIP Loan Agreement, which replacement letters of credit will replace existing letters of credit issued pursuant to the Pre-Petition Credit Agreement and constitute DIP Obligations.

10.     <u>Perfection of Liens and Replacement Liens.</u>

(a)     This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect such liens or security interests in the Collateral or to entitle the Lender to the priorities granted herein. The automatic stay imposed by Section 362 is modified to permit the Lender, but not require the Lender, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control of collateral, or take any other action in order to validate and perfect the liens and security interests granted to it hereunder. Whether or not the Lender shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession or control of collateral, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this

Order. Upon the request of the Lender, the Debtors, without any further consent of any party or further order of this Bankruptcy Court, are authorized to take, execute and deliver such instruments and agreements (including, without limitation, delivery of control agreements and possessory collateral) to enable the Lender to further validate, perfect, preserve and enforce the DIP Liens and Adequate Protection Liens.

(b)     A certified copy of this Order may, in the discretion of the Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

11.     Preservation of Rights Granted Under This Order.

(a)     Except for the Carve-Out and, with respect to the Adequate Protection Liens and the DIP Liens, no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Lender shall be granted or allowed while any portion of the Pre-Petition Obligations and the DIP Obligations (collectively, the "Obligations") remains outstanding, and the DIP Liens and the Adequate Protection Liens shall not be subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all the Obligations shall have been indefeasibly paid in full, the Debtors shall not, and shall not seek to, (i) in any way prime or otherwise adversely affect the liens granted under this Order by offering a subsequent lender or a party in interest a superior or *pari passu* lien or claim pursuant to sections 364(c)(1), 364(d) or section 507(b) of the Bankruptcy Code or otherwise, (ii) in any way grant junior encumbrances on any Collateral, or (iii) otherwise encumber otherwise unencumbered assets or estate property of the Debtors.

(c)     Unless all the Obligations shall have been indefeasibly paid in full, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Agreement if the Debtors seek, or if there are entered, any modifications or extensions of this Order without the prior written consent of the Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the Lender.

(d)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any of the DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Agreement with respect to any of the DIP Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of the Post-Petition Financing, Adequate Protection Obligations or other DIP Obligations by the Debtors prior to the actual receipt of written notice of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Lender shall be entitled to all the rights, remedies, privileges and benefits granted by section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Loan Documents with respect to all DIP Obligations and Adequate Protection Obligations.

(e)     Except as expressly provided in this Order or in the DIP Loan Documents or as agreed in writing by the Lender, the DIP Liens, the Adequate Protection Liens, the Super-Priority Claim, the Cash Collateral Super-Priority Claim and all other rights and remedies of any of the Lender granted by the provisions of this Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by (i) the conversion of the Chapter 11 Cases,

(ii) the dismissal of any of the Chapter 11 Cases, or (iii) the entry of an order confirming a chapter 11 plan in the Case. The terms and provisions of this Order and the DIP Loan Documents shall continue in the Chapter 11 Cases, in any successor cases if any of the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the Super-Priority Claim, Cash Collateral Super-Priority Claim and all other rights and remedies of the Lender granted by the provisions of this Order and the DIP Loan Documents shall continue in full force and effect until the Obligations are indefeasibly paid in full.

12.    <u>Limitation on Use of Financing Proceeds and Collateral</u>.    Notwithstanding anything herein or in any other order of the Bankruptcy Court to the contrary, no borrowings under the DIP Loan Documents, and none of the Collateral (including cash and cash equivalents and Cash Collateral) or the Carve-Out, may be used to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Loan Documents, the liens or claims granted under this Order or the DIP Loan Documents, the Pre-Petition Obligations or the liens or claims granted under the Pre-Petition Security Agreements and Pre-Petition Credit Agreement, (ii) assert any claims, counterclaims, defenses, causes of action, objections or contests (including, without limitation, any claims or causes of action arising under chapter 5 of the Bankruptcy Code) against the Lender or its respective agents, affiliates, representatives, attorneys or advisors, or (iii) seek to modify any of the rights granted to the Lender hereunder or under the DIP Loan Documents.

13.    <u>Termination</u>.    The agreement by the Lender to make any post-petition financing available to the Debtors under the DIP Loan Documents and to allow the use of Cash Collateral pursuant to the terms of this Order shall continue until the earlier of (i) the conclusion of the

Final Hearing, (ii) September [___], 2010, if the Final Order has not been entered by that date, (iii) the date 180 days after the Petition Date, which may be extended solely at the option of the Lender and the Debtors in writing, without the need for any further Court approval or as otherwise set forth in the DIP Loan Documents, (vi) the date of the acceleration of any outstanding extensions of credit under the DIP Loan Documents, or (vii) the occurrence of an Event of Default under the DIP Loan Documents (hereinafter, the "Termination Date"). As used herein, an "Event of Default" under the DIP Loan Documents shall occur upon the occurrence of any of Event of Default under the DIP Agreement.

14.     For purposes hereof, the "Carve Out" shall mean:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code; and (ii) to the extent not otherwise payable from proceeds of Collateral, all allowed fees and expenses incurred in the Chapter 11 Case by professionals retained by the Debtors or by the Committee (collectively, the "Retained Professionals") in amount not to exceed the sum of (A) all allowed fees and expenses incurred by the Retained Professionals prior to the occurrence of the Termination Date (whether allowed before or after the Termination Date) not to exceed the amounts set forth in the Budget for such Retained Professional through the applicable Termination Date, plus (B) after the occurrence of the Termination Date, an amount not to exceed (i) $60,000 in the aggregate for the Retained Professionals of the Debtors, (ii) $15,000 in the aggregate for the Retained Professionals of the Committee and (iii) $5,000 in the aggregate for the Chapter 7 Trustee, if any.

15.     No Marshalling.  In no event shall the Lender be subject to the equitable doctrine of marshalling or any similar doctrine with respect to the Obligations or any of the property comprising the Collateral.

16.     Limits on the Lender's Liability. Nothing in this Order or in any of the DIP Loan Documents or Pre-Petition Loan Documents or any other documents related to the financing transactions authorized hereby shall in any way be construed or interpreted to impose or allow the imposition upon the Lender of any liability for any claims arising from the pre-petition or post-petition activities by the Debtors in the operation of their businesses, or in connection with their restructuring efforts. The Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

17.     Lender's Right to Credit Bid. The Lender shall have the right to credit bid with respect to any sale of assets or equity under either section 363 of the Bankruptcy Code or a Plan of Reorganization (i) the amount advanced under the Post-Petition Financing, and (ii) Pre-Petition Obligations, which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner. For the avoidance of ambiguity, no future order or plan may impair the credit bid rights of the Lender.

18.     No Waiver by Lender. Notwithstanding anything to the contrary herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights of the Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Lender to (a) request the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the appointment of a chapter 11 trustee, examiner, fiduciary, or responsible person with expanded powers, (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code,

a chapter 11 plan or plans of reorganization or liquidation for the Debtors, or (c) request modification of the automatic stay pursuant to section 362 of the Bankruptcy Code.

19. <u>Release</u>. In consideration for the Post-Petition Financing and the use of Cash Collateral, each of the Debtors, on behalf of itself and its successors and assigns (collectively, the "<u>Releasors</u>"), hereof, shall forever release, discharge and acquit the Lender and its officers, directors, employees, agents, attorneys and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, damages, liabilities, responsibilities, disputes, remedies, actions, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" claims or defenses, which arose on or prior to the date this Order is entered with respect to the Debtors, the Post-Petition Financing and/or the Pre-Petition Credit Agreement; <u>provided</u>, <u>however</u>, the foregoing release shall not release the Lender from its obligations under this Order.

20. <u>Committee Review Period</u>

(a) Notwithstanding anything contained herein to the contrary, the extent, validity, priority, perfection, and enforceability of the Pre-Petition Obligations, the Pre-Petition Liens, and all acknowledgments, admissions, and confirmations of the Debtors and their affiliates above, are for all purposes subject to the rights of any party in interest (including any trustee elected or appointed in these Chapter 11 Cases), other than any Debtor or any of its respective affiliates, to file a complaint pursuant to Bankruptcy Rule 7001 seeking to invalidate, subordinate, or otherwise challenge (collectively, the "<u>Challenges</u>") the Pre-Petition Obligations or the Pre-Petition Liens; <u>provided</u>, <u>however</u>, that any such complaint must be filed in this Court within the later of forty-five (45) days after the date of appointment of the Committee (but in no event later than sixty (60) days after entry of this Order) or any subsequent date that may be agreed to in

writing by the Lender with respect to the time to file any such complaint relating to the Pre-Petition Obligations and/or the Pre-Petition Liens. If no such complaint is filed within such time period (or such timely filed complaint does not result in a final and non-appealable order of this Court that is inconsistent with clauses (i) through (iii) of subparagraph (b) of this Paragraph 20), then any and all Challenges shall be, without further notice to or order of the Court, deemed to have been forever relinquished, released, and waived as to the Committee and other person or entity, and if such complaint is timely filed on or before such date, any and all claims and defenses against the Pre-Petition Lender shall be deemed, immediately and without further action, to have been forever relinquished, released, and waived as to the Committee and other person or entity, except with respect to claims and defenses that are expressly asserted in such complaint.

(b)     If no such complaint as to the Pre-Petition Obligations or Pre-Petition Liens is filed within such time period, or such timely filed complaint does not result in a final and non-appealable order of this Court that is inconsistent with the clauses of this paragraph, then, without the requirement or need to file any proof of claim with respect thereto, (i) the Pre-Petition Obligations shall constitute allowed secured claims for all purposes in the Chapter 11 Cases and any subsequent cases or proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceedings if any Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code (each, a "Successor Case"), (ii) the Pre-Petition Liens shall be deemed legal, valid, binding, enforceable, perfected liens not subject to recharacterization, subordination (except as expressly specified in this Order as to the Carve-Out, the DIP Liens and the Adequate Protection Liens) or avoidance for all purposes in the Chapter 11 Cases and any Successor Case, and (iii) the Pre-Petition Obligations, the Pre-Petition Liens, and prior payments on account of or with respect to the Pre-Petition Obligations shall not be subject to any other or further claims,

cause of action, recharacterization, objection, contest, setoff, defense, or challenge by any party

in interest for any reason, including, without limitation, by any successor to or estate

representative of any Debtor; provided, however, the Committee may use up to $25,000 of such

amounts to investigate any claims or causes of action against the Pre-Petition Lender in respect

of the Pre-Petition Obligations or the Pre-Petition Liens securing the Pre-Petition Obligations.

Nothing herein shall be construed as consent to the allowance of any fees and expenses of any

professional retained in the Chapter 11 Cases, or shall affect the rights of the DIP Lender or any

other interested party to object to the allowance and payment of such fees and expenses.

21.     Section 506(c) Waiver.  Except for the Carve-Out, no costs or expenses of

administration which have been or may be incurred in the Chapter 11 Cases or any future

proceedings or cases related hereto, at any time, shall be charged against the Lender, its claims,

or the Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise,

without the prior written consent of the Lender and no such consent shall be implied from any

other action, inaction, or acquiescence by the Lender.

22.     Successors and Assigns.  To the extent permitted by law, the DIP Loan

Documents and the provisions of this Order shall be binding upon the Lender and the Debtors

and each of their respective successors and assigns (including any chapter 7 or chapter 11 trustee

hereinafter appointed or elected for the estate of any of the Debtors or any examiner appointed

pursuant to section 1104 of the Bankruptcy Code in the Chapter 11 Cases or any subsequent

chapter 7 case) and the Committee, and shall inure to the benefit of the Lender and the Debtors

and (except with respect to any trustee hereinafter appointed or elected for the estate of the

Debtors) their respective successors and assigns; provided, however, that the Lender shall have

no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtors.

23. <u>Subsequent Liens</u>. If the Court grants liens or security interests to others pursuant to Section 364(d) of the Bankruptcy Code or any other provision of the Bankruptcy Code in the Collateral (collectively, the "<u>Subsequent Liens</u>"), any proceeds of the loans or extensions of credit secured by Subsequent Liens shall be applied to payment of either the DIP Obligations or the Pre-Petition Obligations, in the Lender's sole discretion.

24. <u>Binding Nature of Findings</u>. The findings contained in this Order shall be binding upon all parties in interest.

25. <u>Immediate Effectiveness</u>. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

26. <u>Conflicts</u>. In the event of any conflict between or among the express terms or provisions of any of the DIP Loan Documents, and the terms and provision of this Order on the other hand, the terms and provisions of this Order shall govern.

27. <u>No Proof of Claim</u>. The Lender is hereby relieved of the requirements to file a proof of claim in the Chapter 11 Cases or any proceeding cases with respect to any DIP Obligations and/or the Pre-Petition Obligations.

28. <u>Rights of Recoupment or Setoff</u>. Notwithstanding anything to the contrary in this Order, nothing in this Order shall (a) compromise, modify or affect the ability of any party in interest to assert a right of recoupment or setoff with respect to amounts allegedly owed to the

Debtors, or (b) create any right of recoupment or setoff with respect to amounts allegedly owed to the Debtors (except to the extent expressly provided for in the DIP Loan Documents).

29. <u>No Third Party Beneficiaries</u>. Nothing in this Order shall create any right for the direct or indirect benefit of any person other than the parties to the DIP Loan Documents and/or the Pre-Petition Loan Documents.

30. <u>Retention of Jurisdiction</u>. The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from this Order and its implementation.

31. <u>Authority</u>. The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements the Lender may reasonably require, as evidence of and for the protection of the Post-Petition Financing, or which otherwise may be deemed reasonably necessary by the Lender to effectuate the terms and conditions of this Order and the Post-Petition Loan Documents.

32. <u>Final Hearing</u>.

(a) A final hearing on the Motion (the "<u>Final Hearing</u>") is hereby scheduled for _____, 2010 at _____ a.m./p.m. Eastern Time.

(b) Upon the scheduling of the Final Hearing, the Debtors shall promptly mail copies of this Order to counsel for the Lender, counsel for the Committee, the United States Trustee, any other persons entitled to notice under Bankruptcy Rule 4001(b). Any party in interest objecting to the entry of a final order approving the Motion shall file a written objection with the Clerk of the Court no later than 4:30 p.m. Eastern Time on _____, 2010, which objection shall be served, at a minimum, on the following parties: (i) Hahn & Hessen, LLP, 488 Madison Avenue, New York, New York 10022 (Attn: Rosanne T. Matzat, Esq. and Mark T. Power, Esq.) rmatzat@hahnhessen.com and mpower@hahnhessen.com; (ii)

Greenberg Traurig, LLP, One International Place, Boston, Massachusetts 02110 (Attn: Jeffrey M. Wolf, Esq.) wolfje@gtlaw.com; (iii) Greenberg Traurig, LLP, 200 Park Avenue, Florham Park, New Jersey 07932 (Attn: Alan J. Brody, Esq.) brodya@gtlaw.com; and (iv) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Susan Golden, Esq.) Susan.Golden@usdoj.gov.


_____
Hon. _____
United States Bankruptcy Judge


Dated:    August [___], 2010

# Exhibit C

## CONDITIONS PRECEDENT

Lender's obligation to make the initial Advance under the Agreement shall be subject to the condition that Lender shall have received the following, each executed, if applicable, and in form and content satisfactory to Lender. The following descriptions are limited descriptions for reference purposes only and should not be construed as limiting in any way the subject matter that Lender requires each document to address.

### A. Bankruptcy Court Documents and Related Matters

(1)   The Interim Order shall have been entered by the Bankruptcy Court not later than August 12, 2010, and Lender shall have received a certified copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of Lender and Borrowers;

(2)   All first-day and related orders entered by the Bankruptcy Court in the Chapter 11 Case shall be in form and substance reasonably satisfactory to Lender;

(3)   The Bankruptcy Court shall have entered an order authorizing the use of cash collateral by Borrowers;

(4)   On or before the Effective Date, Lender shall have received the Budget, in form and substance satisfactory to Lender; and

(5)   Borrowers shall have appointed a new chief executive officer, which chief executive officer and the terms of his/her engagement shall be satisfactory to Lender in all respects (and Lender approves the appointment of Thomas C. Shull as the Chief Executive Officers of Borrowers as of August 1, 2010 and the terms of the engagement agreement entered into by Meridian Ventures, LLC and Borrowers that provides for the services of Mr. Shull and another Meridian member being provided to Borrowers);

### A. Loan Documents to be Executed by Borrowers:

(1)   Debtor in Possession Loan and Security Agreement;

(2)   Revolving Note;

(3)   Each Treasury Management Agreement, including, but not limited to the Commercial Loan Agreement Addendum; and

(4)   Patent and Trademark Security Agreement.

### B. Loan Documents to be Executed by Third Parties:

(1)       Certificates of Insurance required under this Agreement, with all hazard insurance containing a lender's interest endorsement in Lender's favor and with all liability insurance naming Lender as additional insured.

(2)       Control Agreements with respect to any deposits accounts of Borrowers with respect to which Lender requires a Control Agreement.

**C.**       **Federal Tax, State Tax, Judgment, UCC and Intellectual Property Lien Searches**

(1)       Current searches relative to Borrowers in appropriate filing offices showing that (i) no Liens have been filed and remain in effect against Borrowers and the Collateral except Permitted Liens or Liens held by Persons who have agreed in an Authenticated Record that upon receipt of proceeds of the initial Advances, they will satisfy, release or terminate such Liens in a manner satisfactory to Lender, and (ii) Lender has filed all UCC financing statements necessary to perfect the Security Interest, to the extent the Security Interest is capable of being perfected by filing.

(2)       Current searches of third Persons in appropriate filing offices with respect to any of the Collateral that is in the possession of a Person other than any Borrower that is held for resale, showing that (i) UCC financing statements sufficient to protect such Borrower's and Lender's interests in such Collateral have been filed, and (ii) no other secured party has filed a financing statement against such Person and covering property similar to such Borrower's, other than such Borrower, or if there exists any such secured party, evidence that each such party has received notice from such Borrower and Lender sufficient to protect such Borrower's and Lender's interests in such Borrower's goods from any claim by such secured party.

**E.**       **Constituent Documents:**

(1)       Resolutions of each Borrower's Directors, authorizing the execution, delivery and performance of those Loan Documents and other documents or agreements described in or related to this Agreement to which such Borrower is a party.

(2)       Customer Identification Information Form and such other forms and verification for each Borrower as Lender may need to comply with the U.S.A. Patriot Act.

**F.**       **Miscellaneous Matters or Documents**:

(1)       Payment of all fees and Lender Expenses through the date of the initial Advance or issuance of initial Letter of Credit including, without limitation, all reasonable legal expenses of Lender incurred through the Effective Date.

(3)       Any documents or other agreements entered into by Borrowers and Lender that relate to any foreign exchange, deposit, treasury management or similar product or transaction extended to Borrowers by Lender not already provided pursuant to the requirements of (B)-(D) above.

(4)     Such financial statements (including, without limitation, income statements), balance sheets, projections (including, without limitation, Borrowers' projected balance sheet and income statement and statement of cash flows for each of the completed calendar months for the fiscal year 2010) and other financial documentation as Lender may require.

(5)     Evidence that Borrowers have established, in a manner acceptable to Lender in its commercially reasonable discretion, deposit accounts to be maintained at Lender, together with evidence of the closure of any deposit accounts previously maintained by Borrowers at any other financial institution (except to the extent otherwise permitted by this Agreement).

(6)     Evidence that Borrowers have opened the Collection Account and the Credit Card Collection Account.

(7)     There has been no change in the business or financial condition of Borrowers since the date of Lender's receipt of the most recent financial statement of Borrowers that could reasonably be expected to have a Material Adverse Effect.

(8)     Such other documents as Lender in its reasonable discretion may require.

## COMPLIANCE CERTIFICATE

To: NewAlliance Bank
Date: [_____, 200__]
Subject: Financial Statements

      In accordance with our Debtor in Possession Loan and Security Agreement dated August 12, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Loan Agreement"), attached are the financial statements of Borrowers dated [_____, 20[__] (the "Reporting Date") and the year-to-date period then ended (the "Current Financials"). All capitalized terms used in this certificate have the meanings given to such terms in the DIP Loan Agreement.

      **A.**    **Preparation and Accuracy of Financial Statements.**  I certify that the Current Financials have been prepared in accordance with GAAP, subject to audit adjustments, and fairly present Borrowers' financial condition as of the Reporting Date and that the undersigned is the chief financial officer of [_____] and is duly authorized to execute and deliver this Compliance Certificate.

      **B.**    **Name of Borrower; Merger and Consolidation.**  I certify that:

(Check one)

    ☐    Each Borrower has not, since the date of the DIP Loan Agreement, changed its name or jurisdiction of organization, nor has it consolidated or merged with another Person.

    ☐    Each Borrower has, since the date of the DIP Loan Agreement, either changed its name or jurisdiction of organization, or both, or has consolidated or merged with another Person, which change, consolidation or merger: ☐ was consented to in advance by Lender in an Authenticated Record, and/or ☐ is more fully described in the statement of facts attached to this Certificate.

      **C.**    **Events of Default.**  I certify that:

(Check one)

    ☐    I have no knowledge of the occurrence of a Default or Event of Default under the DIP Loan Agreement, except as previously reported to Lender in a Record.

    ☐    I have knowledge of a Default or Event of Default under the DIP Loan Agreement not previously reported to Lender in a Record, as more fully described in the statement of facts attached to this Certificate, and further, I acknowledge that

Lender may under the terms of the DIP Loan Agreement impose the Default Rate at any time during the resulting Default Period.

**D.** **Litigation Matters.** I certify that:

(Check one)

☐ I have no knowledge of any material adverse change to the litigation exposure of any Borrower or any of its Affiliates.

☐ I have knowledge of material adverse changes to the litigation exposure of [_____] not previously disclosed in Schedule 5.7, as more fully described in the statement of facts attached to this Certificate.

**E.** **Financial Covenants.** I further certify that:

(Check and complete each of the following)

1. **Maximum Capital Expenditures.** Pursuant to Section 6.2(b) of the DIP Loan Agreement, for the [period between the date of the DIP Loan Agreement and the Reporting Date] [fiscal year-to-date period ending on the Reporting Date], Borrowers have incurred or contracted to incur Capital Expenditures of $[_____] in the aggregate, which ☐ satisfies ☐ does not satisfy the requirement that such Capital Expenditures not exceed $[_____] during such period.

2. **Minimum Gross Margin.** Pursuant to Section 6.2(c) of the DIP Loan Agreement, for the [period between the date of the DIP Loan Agreement and the Reporting Date] [fiscal year-to-date period ending on the Reporting Date], Borrowers have maintained a Gross Margin in excess of [_____] , which ☐ satisfies ☐ does not satisfy the requirement that Gross Margin exceed [_____] during such period.

Attached are statements of all relevant facts and computations in reasonable detail sufficient to evidence Borrowers' compliance with the financial covenants referred to above, which computations were made in accordance with GAAP.

_____
Chief Financial Officer

**Exhibit E**

**BORROWING BASE CERTIFICATE**

**Attached**

**NewAlliance Commercial Finance**
A Division of NewAlliance Bank

Date: August 12, 2010

## The Weck Corporation (dba Gracious Home) Borrowing Base Certificate

Pursuant to the Debtor in Possession Loan and Security Agreement dated as of August 11, 2010 as amended from time to time (the "Loan Agreement") between The Weck Corporation ("Borrower") and NewAlliance Bank ("Lender"), the undersigned hereby (a) certifies that he/she is authorized to execute this certificate, (b) certifies that he/she has personal knowledge of the facts set forth herein, (c) certifies that the contents of this Borrowing Base Certificate are true and complete (inclusive of all Indebtedness including all Bank Products) and have been computed in a manner consistent with the terms and conditions of the Loan Agreement, and (d) represents and warrants that: (i) there is not in existence any Default or Event of Default, (ii) all representations and warranties contained in the Loan Agreement and other loan documents are true and correct as of the date hereof, and (iii) in addition to, and not in limitation of the foregoing: (A) all sales and payroll taxes payable to date have been paid when due subject to any applicable grace periods,

(B) Borrower is in compliance with all material terms of all leases or other agreements pursuant to which it occupies real estate and has not been notified that it is in default of any such leases or agreements, and (C) none of the insurance policies which Borrower is required to maintain under the Loan Agreement is set to expire earlier than ninety (90) days after the date hereof. The Borrower understands and agrees that the Lender will rely upon the representations and warranties set forth herein and upon the truth and accuracy of information contained herein in making any advance or other financial accommodation under the Loan Agreement.

### I. Accounts Receivable

**Third Party Credit Card Receivables**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Third Party Credit Card balance | | as of: | 8/12/2010 |  |  |
| | Advance Rate: | | 90% | $0 | (A) |
| **Trade Accounts Receivable Availability** | | as of: | 08/12/10 | $0 | (B) |
| **Total Accounts Receivable Availability (A + B)** | | | | **$0** | ( C) |

### II. Inventory (at cost):

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Total Inventory (per Perpetual) | | | as of: | 08/12/10 | $0 | (D) |
| Eligible Inventory | Adv. Rate | | NOLV | | $0 | (E) |
| inventory advance rate | 95.00% | X | 85.00% | | 80.8% | (F) |
| **Total Inventory Availability (E x F):** | | | | | **$0** | (G) |

| | | | | | |
|---|---|---|---|---|---|
| **III. Net Restricted Cash Held at NAB** | 100.00% | as of: | 8/12/2010 | **$0** | (H) |

**Less Availability Reserves:**

|  |  |  |  |
|---|---|---|---|
| Availability Block | | $0 | (I) |
| Pre-Petition Debt for Money Borrowed | | $0 | (J) |
| Pre-Petition Standby Letters of Credit (actual LCs at 1.5% for collateral LC) | | $0 | (K) | (To be redu |
| Carve-Out | | $0 | (L) |
| Other Borrowing Base Reserves | | $0 | At Lender Discretion, per the C |
| Total Availability Reserves: | | **$0** | (M) |
| **Net Available Borrowing Base (C + G + H - M):** | | **$0** | (N) |

**Availability Calculation:**

| IV. | | | | | |
|---|---|---|---|---|---|
| Beginning Principal Balance as of: | | | 8/12/2010 | 0.00 | |
| ADD: | Advances through | | 8/12/2010 | 0.00 | |
| | Fees as of | | 8/12/2010 | 0.00 | |
| | Adjustments | | 8/12/2010 | 0.00 | |
| LESS: | Payments through | | 8/12/2010 | 0.00 | |
| Loan Balance Prior to Today's Request | | | | 0.00 | (O) |
| Net Availability Prior to Today's Request (N - O) | | | | 0.00 | (P) |
| NAB Operating / Controlled Disb Acct# _____ | | | 0.00 | | |
| NAB Payroll Acct# _____ | | | 0.00 | | |
| *Today's Advance Request :* | | | | 0.00 | (Q) |
| Outstanding Revolving Loan Balance (O + Q) | | | | 0.00 | (R) |
| Outstanding Post-Petition L/C Balance | Standby | + | Documentary | 0.00 | (S) |
| | - | | - | | |
| **Total Outstandings (R+S)** | | | | **$0** | (T) |

| | | | |
|---|---|---|---|
| V. | **Minimum Availability per Credit Agreement** | **$0** | (V) |
| VI. | **Total Availability / (Shortfall) (line N - T)** | **$0** | (W) |
| VII. | **Total Outstandings + ACH Exposure (line T + AC)** | **$0** | (X) |
| VIII. | **Maximum Total Outstandings per Credit Agreement** | **$3,425,200** | (Y) |
| | **Grand Total Availability / (Shortfall)   Lesser of (line Y-T) or line W** | **$0** | (Z) |

| | | | | | |
|---|---|---|---|---|---|
| MEMO: ACH Exposure: | $0.00 | (AC) | Effective Advance Rate [(S+J+K) / (C+E+H) ] | #DIV/0! | (AA) |

Prepared by: _____   _____ (AB)

Name/Position                    Authorized Signature:

8/11/2010 5:42 PM

NAB - Gracious Home - BBC 08-09-10_AJM (form for DIP Agmt).xls

**Exhibit F**

**<u>FORM OF REVOLVING NOTE</u>**

**Attached**

# REVOLVING NOTE

$5,748,787.89                                                          August 12, 2010

**FOR VALUE RECEIVED**, the undersigned, **THE WECK CORPORATION,** a New York corporation, **WEST WECK, LLC,** a New York limited liability corporation, **WECK CHELSEA, LLC,** a New York limited liability corporation, and **GRACIOUS HOME.COM, LLC**, a New York limited liability corporation (collectively, the "Borrowers"), hereby promise to pay to the order of **NEWALLIANCE BANK** ("Lender"), acting through its NewAlliance Commercial Finance operating division, on the Termination Date described in the Debtor in Possession Loan and Security Agreement dated on or about the date hereof (as amended, restated, supplemented or otherwise modified, the "Agreement") and entered into by and among Lender and Borrowers, at Lender's office at 690 Canton Street, Suite 214 Westwood, MA 02090, or at any other place designated at any time by the holder, in lawful money of the United States of America and in immediately available funds, the principal sum of FIVE MILLION SEVEN HUNDRED FORTY-EIGHT THOUSAND SEVEN HUNDRED EIGHTY-SEVEN and 89/100 DOLLARS ($5,748,787.89) or the aggregate unpaid principal amount of all Advances under the Line of Credit made by Lender to Borrowers under the terms of the Agreement, together with interest on the principal amount computed on the basis of actual days elapsed in a 360-day year, from the date of this Revolving Note until this Revolving Note is fully paid at the rate from time to time in effect under the terms of the Agreement. Principal and interest accruing on the unpaid principal balance amount of this Revolving Note shall be due and payable as provided in the Agreement. This Revolving Note may be prepaid only in accordance with the Agreement.

This Revolving Note is the Revolving Note referred to in the Agreement, and is subject to the terms of the Agreement, which provides, among other things, for the acceleration of this Revolving Note. This Revolving Note is secured, among other things, by the Agreement and the Security Documents as defined in the Agreement, and by any other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements that may subsequently be given for good and valuable consideration as security for this Revolving Note.

Borrowers shall pay all costs of collection, including, without limitation, reasonable attorneys' fees and legal expenses, if this Revolving Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**THE WECK CORPORATION**

By:_____
    Name:
    Title:


**WEST WECK, LLC**


By:_____
    Name:
    Title:


**WECK CHELSEA, LLC**


By:_____
    Name:
    Title:


**GRACIOUS HOME.COM LLC**


By:_____
    Name:
    Title:

[Signature Page to Revolving Note]

**Exhibit G**

**<u>EXISTING LETTERS OF CREDIT</u>**

**Attached**

## Existing Letters of Credit

| Number | Amount | Date | Expiration | Applicant | Beneficiary |
|---|---|---|---|---|---|
| SB-907742-2000 | $60,000.00 | 5/13/2005 | 5/12/2011 | The Weck Corporation | 179 East 70th St. Corporation |
| SB-907738-2000 | $50,000.00 | 5/13/2005 | 5/12/2011 | The Weck Corporation | Renaissance 632 Broadway LLC |
| SB-907747-2000 | $65,000.00 | 5/13/2005 | 5/12/2011 | The Weck Corporation | Dolton Associates, LLC |
| SB-907745-2000 | $556,920.89 | 5/13/2005 | 5/12/2011 | The Weck Corporation | 201 East 69 llc |
| SB-907743-2000 | $75,000.00 | 5/13/2005 | 5/12/2011 | The Weck Corporation | Fraydun Realty Company |
| SB-907741-2000 | $216,667.00 | 5/13/2005 | 5/12/2011 | The Weck Corporation | Lincoln Square Commercial Holding |
| SB-909945-2000 | $25,000.00 | 1/26/2007 | 2/1/2011 | The Weck Corporation | Shoppers Charge Accounts Co. |
| SB-911001-0001 | $1,050,000.00 | 11/7/2007 | 11/7/2010 | Weck Chelsea, LLC | Marine Estates LLC |
| SB-911469-0001 | $225,000.00 | 3/31/2008 | 3/31/2011 | Weck Chelsea, LLC | Hanover Estates LLC |
|  | $2,323,587.89 |  |  |  |  |

## Schedule 5.1

**Trade Names**

Gracious Home

**Chief Executive Office / Principal Place of Business**

632 Broadway, New York, New York 10021

**Other Inventory and Equipment Locations**

1) 1197-1201 Third Avenue, New York, New York 10021

2) 1217 Third Avenue, New York, New York 10021

3) 1220 Third Avenue, New York, New York 10021

4) 1992 Broadway, New York, New York 10023

5) 766 Sixth Avenue, New York, New York 10010

6) 45 West 25th Street, New York, New York 10010

7) 30-30 60th Street, Woodside, New York

## **Schedule 5.2**

### **Capital Chart**

(a)    The Weck Corporation

       (i)     Natan Wekselbaum    57%

       (ii)    2003 Trust f/b/o Caroline Wekselbaum    21.5%

       (iii)   2003 Trust f/b/o Charles Wekselbaum    21.5%

(b)    West Weck, LLC

       (i)     Natan Wekselbaum    49%

       (ii)    Caroline M. Wekselbaum    21%

       (iii)   Charles S. Wekselbaum    21%

       (iv)   Robert Battista    5%

       (v)     Jordan Smilowitz    3%

       (vi)   Nancy Wekselbaum    1%

(c)    Gracious Home.com, LLC

       (i)     Natan Wekselbaum    32%

       (ii)    Nancy Wekselbaum    32%

       (iii)   Caroline M. Wekselbaum    18%

       (iv)   Charles S. Wekselbaum    18%

(d)    Weck Chelsea, LLC

       (i)     Natan Wekselbaum    30%

       (ii)    Caroline M.  Wekselbaum    35%

       (iii)   Charles S. Wekselbaum    35%

## Schedule 5.5

### Subsidiaries

*(None - N/A)*

## Schedule 5.7

### Litigation Matters

*(None - N/A)*

## Schedule 5.8

### Owned Intellectual Disclosures[1]

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---|---|---|---|---|---|
| European Community | GRACIOUS HOME | 001619774 | April 26, 2002 | Retail gift, hardware, housewares and home furnishing store services, in Class 42 | Registered<br><br>Renewal Due: April 19, 2020 |
| United States | GRACIOUS | 3,029,630 | December 13, 2005 | Picture frames, in Class 20 | Registered<br><br>Affidavit of Use Due: 12/13/2011 |
| United States | GRACIOUS | 3,036,142 | December 27, 2005 | Cleaning preparations, namely tile cleaners and tile polishes, in Class 3 | Registered<br><br>Affidavit of Use Due: 12/27/2011 |
| United States | GRACIOUS | 3,011,708 | November 1, 2005 | Candles, in Class 4 | Registered<br><br>Affidavit of Use Due:11/1/2011 |
| United States | GRACIOUS | 3,024,023 | December 6, 2005 | Hand tools, namely, screwdrivers, in Class 8 | Registered<br><br>Affidavit of Use Due: 12/6/2011 |
| United States | GRACIOUS | 3,085,757 | April 25, 2006 | Flashlights, lamps, lampshades | Registered<br><br>Affidavit of |

[1] All Intellectual Property is owned by The Weck Corporation

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---------|------|-------------------|--------------------|-----------------------|--------|
| | | | | and faucets, in Class 11 | Use Due: 4/25/2012 |
| United States | GRACIOUS | 3,024,024 | December 6, 2005 | Cups; salt shakers, peppers shakers, mugs, and sponges for household purposes, in Class 21 | Registered<br><br>Affidavit of Use Due: 12/6/2011 |
| United States | GRACIOUS | 3,036,143 | December 27, 2005 | Domestic textiles, namely, shower curtains, flat bed sheets, fitted bed sheets, pillowcases, pillow shams, duvet covers, in Class 24 | Registered<br><br>Affidavit of Use Due: 12/27/2011 |
| United States | GRACIOUS | 3,024,025 | December 6, 2005 | Retail gift, hardware, housewares, home furnishing and furniture store services, in Class 35 | Registered<br><br>Affidavit of Use Due: 12/6/2011 |
| United States | GRACIOUS HOME | 0,947,721 | November 21, 1972 | Retail gift, hardware, housewares and home furnishing store services, in Class 42 | Registered<br><br>Renewal Due: 11/21/2012 |
| United States | GRACIOUS HOME | 2,284,659 | October 12, 2000 | Interior and/or | Registered |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---------|------|-------------------|--------------------|-----------------------|--------|
| | | | | exterior paint, in Class 2; Cleaning preparations, namely tile cleaners and tile polishes, in Class 3; Candles, in Class 4; Hand tools, namely, screwdrivers and screwdriver bit kits, in Class 8; Flashlights, lamps, lampshades and faucets, in Class 11; Wall clocks, in Class 14; Gift wrapping paper and framed photographic, pictorial and lithographic prints, in Class 16; Picture frames and decorative pillows, in Class 20; Non-metal and non-precious metal housewares, namely, | Renewal Due: 10/12/2010 |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---|---|---|---|---|---|
| | | | | plates, cups, saucers, bowls, creamers, sugar bowls, teapots, coffee pots, serving platters, spoon rests, candlesticks; butter dishes, salt shakers, pepper shakers, egg cups, pitchers, soup tureens, canisters, mugs, flower pots, vanity trays, wastepaper baskets, tissue box covers, cachepots, drinking glasses, namely, tumblers, soap dishes, toothbrush holders, skin and hand lotion pumps for home use, cotton jars, cotton swab jars carafes, picnic baskets and sponges for household purposes, in | |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---------|------|-------------------|--------------------|-----------------------|--------|
| | | | | Class 21; Domestic textiles, namely, dinner napkins, cocktail napkins, placemats, tablecloths, shower curtains, bath towels, hand towels, bath sheets, washcloths, flat bed sheets, fitted bed sheets, pillowcases, pillow shams, duvet covers, dust ruffles, mattes lasses and bed spreads and comforters, decorative textile trim, in Class 24; Apparel, namely baseball caps, in Class 25; Decorative key tassels, decorative tie backs and ribbons, in Class 26 | |
| United States | GRACIOUS HOME | 3,264,838 | July 17, 2007 | Online retail store services in the field of | Registered Affidavit of |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---|---|---|---|---|---|
| | | | | retail gift, hardware, housewares and home furnishings, in Class 35 | Use Due: 7/17/2013 |
| United States | GRACIOUS HOME | 3,351,200 | December 11, 2007 | Paper and cardboard gift boxes, in Class 16 | Registered<br><br>Affidavit of Use Due: 12/11/2013 |
| United States | GRACIOUS HOME | 3,351,201 | December 11, 2007 | Tape measures, in Class 9 | Registered<br><br>Affidavit of Use Due: 12/11/2013 |
| United States | GRACIOUS HOME | 3,351,202 | December 11, 2007 | Framed decorative mirrors, in Class 20 | Registered<br><br>Affidavit of Use Due: 12/11/2013 |
| United States | GRACIOUS HOME | 3,351,209 | December 11, 2007 | Chemically-treated paper for the prevention of tarnishing, in Class 1 | Registered<br><br>Affidavit of Use Due: 12/11/2013 |
| United States | GRACIOUS HOME (stylized)<br><br>GRACIOUS HOME | 3,351,799 | December 11, 2007 | Retail store services in the field of gifts, hardware, housewares and home furnishings, Class 35 | Registered<br><br>Affidavit of Use Due: 12/11/2013 |
| United States | GRACIOUS HOME (stylized) | 3,408,659 | April 8, 2008 | Credit card services, in Class 36 | Registered<br><br>Affidavit of Use Due: 4/8/2014 |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---------|------|-------------------|--------------------|-----------------------|--------|
| | **GRACIOUS HOME** | | | | |
| United States | GRACIOUS HOME est. 1963 (Stylized)<br><br>**GRACIOUS HOME**<br>*est 1963* | 3,807,720 | June 22, 2010 | Online retail and retail store services in the field of retail gift, hardware, house wares and home furnishings, in Class 35 | Registered<br><br>Affidavit of Use Due: 6/22/2016 |
| United States | GRACIOUS HOME in Color (Blue)<br><br>**GRACIOUS HOME** | 77/554,673 | August 25, 2008 | Chemically-treated paper for the prevention of tarnishing, in Class 1;<br><br>house mark for potpourri, bath soap, skin soap, bath salts, body cream, moisturizers, hand cream, skin lotions, hair and body wash, shampoo, sachets, perfume, cologne, body sprays, essential oils for use in the manufacture of scented | Pending |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---------|------|-------------------|--------------------|-----------------------|--------|
| | | | | products, and room fragrances, namely, room mists and potpourri oil refreshers; cleaning preparations, namely, floor tile cleaners and floor tile polishes, in Class 3; | |
| | | | | candles, in Class 4 | |
| | | | | hand tools, namely, screwdrivers and screwdriver bits, in Class 8; | |
| | | | | tape measurers, in Class 9; | |
| | | | | flashlights, lamps, lampshades and faucets, in Class 11 | |
| | | | | picture frames and decorative pillows; framed decorative mirrors, in | |

185125/001-1909423.1

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---------|------|-------------------|--------------------|-----------------------|--------|
| | | | | Class 20; house mark for a full line of non-metal and non-precious metal housewares, namely, plates, cups, saucers, bowls, creamers, sugar bowls, teapots, coffee pots, serving platters, spoon rests, candlesticks; butter dishes, salt shakers, pepper shakers, egg cups, pitchers, soup tureens, canisters, mugs, flower pots, vanity and valet trays, wastepaper baskets, ceramic tissue box covers, cachepots, drinking glasses, namely, tumblers, soap dishes, | |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---|---|---|---|---|---|
| | | | | toothbrush holders, skin and hand lotion dispensers for home use, jars, carafes, fitted picnic baskets and picnic baskets and sponges for household purposes, in Class 21

House mark for a full line of domestic textiles, namely, dinner napkins, cocktail napkins, placemats, tablecloths, shower curtains, bath towels, hand towels, bath sheets, washcloths, flat bed sheets, fitted bed sheets, pillowcases, pillow shams, duvet covers, dust ruffles, bed covers, bed spreads and comforters; | |

| Country | Mark | Serial / Reg. No. | Filing / Reg. Date | Goods and/or Services | Status |
|---------|------|-------------------|--------------------|-----------------------|--------|
| | | | | ornamental items used for decorating, namely, textile tie backs, in Class 24; online retail and retail store services in the field of retail gift, hardware, house wares and home furnishings, in Class 35; Credit card services, in Class 36 | |
| United States | LOOK NO FURTHER | 2,152,208 | April 21, 1998 | Retail store services in the field of hardware, housewares and home furnishings, in Class 35 | Registered Renewal Due: 4/21/2018 |
| Venezuela | GRACIOUS HOME | 021215 | June 27, 2003 | Promotion, exhibition, demonstration and sale of hardware, gifts and domestic utensils, Class 35 | Registered Renewal Due: June 27, 2013 |

# Schedule 5.15

## Employee Benefit Plans

*(None - N/A)*

# Schedule 5.16

## Environmental Matters

*(None - N/A)*

# Schedule 6.3

## Permitted Liens

1. **GE Capital/Capital Solutions (The Weck Corporation)** - GE Capital/Capital Solution's lien is secured by products and appliances located as display models in the various retail locations.

2. **Hitachi Capital America Corporation (The Weck Corporation)** - Hitachi has a lien on two "*Gracious Home*" delivery trucks.

3. **Panasonic Corporation of North American (The Weck Corporation)** -Panasonic has a purchase money security interest in all inventory of goods and merchandise bearing certain Panasonic trademarks and a lien on all inventory of goods and merchandise now held or hereafter acquired bearing the same. No known balance owing.

4. **TruServ Corporation (West Weck, LLC)** - TruServ has a lien on substantially all of the assets of West Weck, LLC. No known balance owing.

## Schedule 6.4

### Indebtedness

1. The Weck Corporation is indebted to GE Capital/Capital Solutions in the amount of approximately $18,000 on account of "floor financing" provided in connection with major appliance floor sample displays and air condition inventory, which indebtedness is secured by products and appliances located as display models.

2. The Weck Corporation is indebted to Hitachi in the amount of approximately $73,654 in connection with loan payments for two "*Gracious Home*" delivery trucks.

# Schedule 6.5

## Guaranties

*(None - N/A)*

# Schedule 6.6

## Investments in Subsidiaries

*(None - N/A)*

## Schedule 6.27

### Current Deposit Accounts[2]

| Account Description | Bank Name and Address | Last Four Digits of Account No. |
|---|---|---|
| Weck Corp. Checking | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, New York 10036 | 000000773107297 |
| West Weck Checking | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, New York 10036 | 000000795724632 |
| Weck Chelsea Checking | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, New York 10036 | 000000795724491 |
| Weck Corp. Savings | JP Morgan Chase<br>1166 Avenue of the Americas<br>New York, New York 10036 | 000002749356644 |
| Weck Corp. Checking | HSBC<br>80 8th Avenue<br>New York, New York 10011 | 697805018 |
| West Weck Checking | HSBC<br>80 8th Avenue<br>New York, New York 10011 | 697805000 |
| Weck Chelsea Checking | HSBC<br>80 8th Avenue<br>New York, New York 10011 | 697805034 |
| Gracious Home.com Checking | HSBC<br>80 8th Avenue<br>New York, New York 10011 | 697805026 |
| Savings | M&T<br>401 Broad Hollow Road<br>Melville, New York 11747 | 9839785129 |
| Savings | M&T<br>401 Broad Hollow Road<br>Melville, New York 11747 | 15004213311323 |
| Weck Corp. Funding | M&T<br>401 Broad Hollow Road<br>Melville, New York 11747 | 9846387190 |
| Gracious Home. com Funding | M&T<br>401 Broad Hollow Road<br>Melville, New York 11747 | 9846387208 |

[2] New DIP Accounts to be opened at NewAlliance Bank in substitution for some or all hereof.

| | | |
|---|---|---|
| Weck Chelsea Funding | M&T<br>401 Broad Hollow Road<br>Melville, New York  11747 | 9846387216 |
| West Weck Funding | M&T<br>401 Broad Hollow Road<br>Melville, New York  11747 | 9846387224 |
| Weck Corp. Checking | M&T<br>401 Broad Hollow Road<br>Melville, New York  11747 | 61000000144064 |
| Gracious Home.com Checking | M&T<br>401 Broad Hollow Road<br>Melville, New York  11747 | 61000000144048 |
| Weck Chelsea Checking | M&T<br>401 Broad Hollow Road<br>Melville, New York  11747 | 61000000144056 |
| West Weck Checking | M&T<br>401 Broad Hollow Road<br>Melville, New York  11747 | 61000000144030 |