HAHN & HESSEN LLP
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400
Rosanne Thomas Matzat
Mark T. Power

*Proposed Attorneys for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- x
                                          :
In re                                     :     Chapter 11
                                          :
THE WECK CORPORATION,                     :     Jointly Administered
d/b/a Gracious Home, et al.               :
                                          :     Case No. 10-14349 (AJG)
                    Debtors.              :
------------------------------------------------------------- x
```

### DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE APPROVING BIDDING PROCEDURES AND NOTICE OF THE AUCTION RELATING THERETO AND GRANTING RELATED RELIEF

Gracious Home and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "Gracious Home" or the "Debtors"),[1] submit this motion (the "Motion") and respectfully represent:

#### Preliminary Statement

1. For many months, the Debtors have been in discussions with various parties-in-interest regarding the terms of a proposed plan of reorganization. During the past two months, the Debtors have focused their efforts on negotiations with Meridian Acquisition Ventures, LLC, a potential investor (the "Meridian Investor").

---

[1] The Debtors in these cases, together with the last four digits of their respective federal tax identification numbers, are as follows: The Weck Corporation 6057; West Weck, LLC 1934; Gracious Home.com, LLC 4754; Weck Chelsea, LLC 3431.

2.    As a result of the efforts of the Debtors and their professionals, as well as the Meridian Investor and its professionals, the Debtors have received an offer which the Debtors believe is most favorable to their creditor constituencies. The Meridian Investor has agreed with the Debtors that the best course of action would be to conclude the marketing process began prior to these chapter 11 cases by conducting an auction (the "<u>Auction</u>") at which additional proposals for the sponsorship and funding of a plan of reorganization for the Debtors would be entertained. The Auction will provide a vehicle for the Debtors to obtain the highest or best offer from potential investors, provide ultimate transparency to the marketing process, enable the Debtors to ensure that they have received maximum value for the Debtors' estates, and bring finality to the Debtors' marketing efforts. The Auction process will also provide all parties notice and an opportunity to put forward their final and best offer to fund the Debtors' chapter 11 plan and to participate in a competitive process. In addition, the Auction process provides for the involvement and input from the official committee of unsecured creditors, if any (the "<u>Creditors' Committee</u>") and NewAlliance Bank, as the holder of the Debtors' pre-petition secured debt and provider of debtor in possession financing ("<u>NAB</u>" or the "<u>Secured Lender</u>"), giving them the opportunity to participate in a process that maximizes potential recoveries to such parties or their constituency. The Debtors have determined to seek approval of bidding procedures that will govern the Auction ("<u>Bidding Procedures</u>"). The Bidding Procedures are attached hereto as "<u>Exhibit C</u>."[2]

3.    The Debtors' Bidding Procedures afford potential sponsors the opportunity to obtain information from the Debtors, submit higher or better proposals than the Investment Agreement (as defined below) and participate in the Auction. As demonstrated below, approval of the Bidding Procedures is in the best interest of the Debtors' estates and will

---

[2]  Capitalized terms not otherwise defined herein are defined as set forth in the Bidding Procedures.

foster an open and competitive process and secure the best terms for the benefit of all parties-in-interest.

4.      The precise process contemplated by this Motion was recently implemented in the *Extended Stay, Inc. et al.* Chapter 11 cases pending in this Court before The Honorable James Peck.  The process, which resulted in competitive bidding for plan sponsorship and confirmation of a plan of reorganization shortly thereafter for those debtors, should likewise be approved in these cases as being an efficient and effective mechanism for ensuring maximization of value to creditor constituencies.

## Background

5.      The Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on August 13, 2010 (the "Commencement Date").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered  pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (or such procedural consolidation and joint administration are presently pending).  The Debtors are authorized to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      It is anticipated that the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") will have appointed the Creditors' Committee in these cases prior to the return date of this Motion[3].

---

[3]     The United States Trustee has scheduled an organizational meeting of creditors on August 24, 2010 at which time it is anticipated that the Creditors' Committee in this case will be formed.

## Jurisdiction and Venue

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C.§§ 1408 and 1409.

## Events Leading up to the Filing

8.      In the early Spring of 2010, the Debtors engaged Triton Equity Partners LLC ("Triton") to assist them in addressing various operational, financial, real estate, investment banking and restructuring matters and issues, including, *inter alia*  a review of the Debtors' various obligations under their various leases and a long term strategy for operation of the Debtors' various stores and leases located, in separate premises, in a several block location on Third Avenue, New York, New York (collectively, the "Eastside Location").  A fundamental part of this strategy was the Debtors exploring alternative retail space available on a lower cost basis which would facilitate cost saving and operational consolidation.  In that context, the Debtors entered into discussions with Vornado Realty Trust ("VNO") with respect to certain alternative retail space potentially available on 1133 Third Avenue, New York, New York ("1133 Third Store").  From the Debtors' perspective, the 1133 Third Store represents an opportunity to consolidate all Third Avenue stores into a single location, in the same general geographic location as the existing Eastside Location, at an overall rental and operational savings and for an overall extended lease term, while also providing opportunities in merchandising and revenues.

9.      At the same time as the Debtors and Triton worked to accomplish operational savings and explore lease alternatives, the Debtors and Triton aggressively sought sources of capital which would allow the Debtors to accomplish this restructuring in a Chapter 11 proceeding.  By way of example, in the context of the VNO lease negotiations, the Debtors further aggressively explored with VNO, alternatives which might facilitate the Debtors'

4

operational, consolidation and strategic goals by means of a potential capital infusion by VNO into the Debtors. Such discussions, which extended over a several week period, were ultimately terminated by mutual agreement of the Debtors and VNO. Lease negotiations continued to progress and a non-binding term sheet (the "Flagship Store Term Sheet") has been completed.

10.     Thereafter, the Debtors and Triton entered into negotiations with the Meridian Investor with respect to an infusion of capital by the Meridian Investor on specific terms and conditions, which would allow the Debtors to achieve their goals of a restructuring and reorganization serving the best interests of the various parties in interest, including the Debtors' creditors. The result of those discussions was that the Debtors reached an agreement with GH Acquisition, LLC ("GHA" or "Plan Investor"), an entity formed by the Meridian Investor and (prospectively) certain other pre-petition equity holders and members of management, including co-founder and Chairman, Nathan Wekselbaum ("Wekselbaum") collectively as minority investors who would hold subordinated interests, to restructure the Debtors' financial position  in the context of a Chapter 11 bankruptcy proceeding. NAB has acquired the Pre-Petition Senior Secured Indebtedness and is providing debtor-in-possession financing. GHA, as Plan Investor, agreed to provide additional necessary capital to fund the Debtors' exit from Chapter 11 (which anticipates financing provided to be provided to GHA by NAB). Both the agreement of the Secured Lender to provide DIP financing and the agreement of the Plan Investor to provide investment capital were conditioned upon the Debtors immediately hiring Thomas Shull and Paul Jen (who are principals of the Meridian Investor), seasoned and experienced retailers, in senior management capacities. Accordingly, the Debtors entered into prepetition employment

185125/001-1914353.2

contracts with Mr. Shull as Chief Executive Officer ("Shull") and with Mr. Jen as Senior Vice President - Strategic Planning ("Jen").[4]

11.     The agreement among the Debtors and the Plan Investor is reflected in the Investment and Standby Purchase Agreement dated as of August 11, 2010 among those parties (the "Investment Agreement"), a copy of which Investment Agreement is annexed hereto as Exhibit "A."  As more fully described below, the Investment Agreement contemplates that the Debtors will file, and that the Plan Investor will support, a proposed Plan of Reorganization (the "Plan") which will provide for, among other things:  (a) the Plan Investor will acquire from the Debtors the Purchased Assets and assume the Assumed Liabilities (only) in exchange for the Investment; (b) the Secured Lender, as holder of the pre-petition indebtedness will reduce the pre-petition secured claims from an aggregate of approximately $11.3 million (plus any accrued interest and fees owing) to an lesser agreed upon amount; (c) the Secured Lender, having provided a debtor-in-possession credit facility to fund the Chapter 11 Cases, will seek approval to provide an exit credit facility, which approval must be obtained prior to the Auction; and (d) a distribution will be made available to general unsecured creditors from proceeds which would be otherwise distributable to the Senior Lender. A copy of the Plan is annexed hereto as Exhibit "B." Also in connection with the foregoing, the Flagship Store Term Sheet provides that GHA, and potentially other qualified Investors, until November 30, 2010, may have the opportunity to enter into a lease for the 1133 Third Store, which is a two level store running the entire Third Avenue block front and two corners between 67th and 66th Streets (subject to the terms of the Flagship Term Sheet).  The Plan provides that the Debtors enter into such new lease to replace and supplant the Eastside Location and serve as the new eastside flagship store.

---

[4]     The Shull and Jen employment contracts are terminable at will, without any adverse economic consequences to the Debtors, in the event an alternative investor, other than GAH, submits a higher or otherwise better offer at the Auction.

12.     Subject to the terms and conditions set forth therein, the Investment provided for under the Investment Agreement consists of payment by Plan Investor to Debtors of an amount in cash sufficient to make the distributions provided for under the Plan and establish feasibility to confirm the Plan, in an amount not to exceed the sum of $13,425,000.

## Relief Requested

13.     By this motion, the Debtors seek an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code approving the Bidding Procedures and the form and manner of notice of the Auction relating thereto, and granting related relief.  In addition, the Debtors further request that the Court waive the requirements of Bankruptcy Rule 6004(h) and implement the requested relief as soon as practicable.  A proposed order granting the relief requested (the "Proposed Order") is attached hereto as "Exhibit D."

14.     Concurrently herewith, the Debtors filed the Plan, which Plan is based on an the Investment Agreement.  The Plan is supported by the Secured Lender, which has issued a Credit Facility Letter (as precursor to a commitment letter to be provided prior to the Auction) to provide exit financing in connection with the Investment Agreement and  Plan (the Plan together with the Investment Agreement and the Exit Lending Credit Facility Letter, the "Plan Related Agreements")[5].  The Investment Agreement contemplates the commencement of an auction process pursuant to which the Debtors would solicit the highest or best proposals for the sponsorship and funding of a plan of reorganization.

15.     The Investment Agreement permits the Debtors to entertain higher or better offers from other potential investors.  Consistent with their fiduciary duties, the Debtors (through Triton) continue to makes themselves readily available to prospective investors seeking

---

[5]     The Plan is the subject of a Plan Support Agreement (the "PSA") dated August 11, 2010 entered into among the Debtors, the Meridian Investor, Shull, Wekelbaum and NAB.

to propose terms of a possible alternative transaction and related plan, while balancing the need to maintain the commitment from the Plan Investor in the interim. Specifically, and in light of the participation of certain senior management in the Plan Investor, Triton has taken on and will continue to take on, an authoritative role in fielding inquiries from, and providing information to, prospective competing plan sponsors and Interest Parties. Triton has extensive experience in this regard and has been and will continue to be an active and aggressive independent fulcrum for analyzing any competing bids.

16.

The Investment Agreement provided for certain bid protections (collectively, the "Bid Protections") in return for the Investment. The Bid Protections included provisions such that in the event a Qualified Bidder other than the Plan Investor is determined by the Bankruptcy Court to be the Successful Plan Sponsor based on it having submitted the highest or otherwise best offer at the Auction, the Plan Investor will be paid (a) a Breakup Fee of 3% of the Investment or $402,750 (the "Breakup Fee"), which breakup fee will be payable out of the proceeds received upon the Effective Date of the alternative plan sponsored by Successful Plan Sponsor and (b) reimbursement of expenses not to exceed One Hundred Fifty Thousand ($150,000) (exclusive of the $50,000 expense retainer paid prepetition to Plan Investor) as reimbursement for actual reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the Plan Investor and/or its members and Affiliates (the "Expense Reimbursement"). The Expense Reimbursement will also be due to the Plan Investor in the event the Plan is not confirmed or consummated for any reason other than due to a material breach of Investment Agreement by the Plan Investor.

17. The provision for the payment of the Breakup Fee and Expense Reimbursement are an integral part of the transactions contemplated by the Investment

8

Agreement, without which the Plan Investor would not have entered into Investment Agreement Accordingly, the Investment Agreement provides that subject to the entry of the Bidding Procedures Order, these amounts constitute an allowed administrative expense of the Debtors under Sections 503(b)(l) and 507(a)(2) of the Bankruptcy Code.

18.     The Debtors believe that the Auction will facilitate the competitive process that began prior to the Debtors' chapter 11 cases and will provide a formal mechanism for the Debtors to entertain any remaining higher or better offers.  In order to provide further transparency to the Debtors' marketing process, provide all parties-in-interest with appropriate notice of the Auction, and ensure that parties in interest cannot collaterally attack the results of the Auction at a later date, the Debtors determined that it was in the best interests of the estates to seek Court approval of the Bidding Procedures.

## The Bidding Procedures

19.     The Bidding Procedures were developed by the Debtors, and approved by the Plan Investor.  The Debtors intend to work with the Creditors' Committee and the Secured Lender to discuss and incorporate as many of their comments and suggestions as the Debtors deem appropriate to the hearing date for this Motion.

20.     The salient points of the Bidding Procedures are as follows:[6]

- Within five business days of the entry of the Proposed Order or such date thereafter as is reasonably practical to arrange for publication, the Debtors shall publish the notice of the Auction, substantially in the form attached hereto as "Exhibit E," (the "Notice of Auction") with any modifications necessary for ease of publication, once in *The New York Times* (New York Edition).

- All proposals (the "Proposals") are due no later than noon (prevailing Eastern Time) on October 5, 2010 (the "Proposal Deadline").

---

[6]     The description of the Bidding Procedures set forth herein is for summary purposes only and in case of any conflict between the Bidding Procedures and this Motion, the Bidding Procedures attached hereto as "Exhibit B" will be govern.

- Each potential investor (each an "<u>Interested Party</u>") must submit a $500,000 deposit with its Proposal.

- Each Proposal must be fully binding and committed, not subject to any further financing, diligence, or approvals or other conditions not set forth in the form of the Investment Agreement.

- Each Proposal must be accompanied by a mark-up of the Plan, as well as the Investment Agreement and the other plan-related documents. Such markup must show, among other things, the amount of the proposed Investment, identify any assumed liabilities as part of the Investment, identify which of the Debtors' real property leases and executory contracts the Interested Party intends to assume or reject and/or replacement or new real property leases (e.g., 1133 Third Store) as part of its Proposal, and identify which members of senior management and employees, if any, the Interested Party intends to extend employment offers to post-emergence and on what terms.

- include a detailed provision for treatment of the claim of the Secured Lender, including, in light of the Secured Lender's fully preserved right to credit bid under Sections 363(k) and 1129 of the Bankruptcy Code, provision for payment in full of the pre-petition and debtor-in-possession obligations owed to the Secured Lender;

- Copies of all Proposals will be provided by the Debtors to the Creditors' Committee and the Secured Lender.

- On or before October 7, 2010, the Debtors intend to select, in their business judgment, those Proposals that qualify for participation in the Auction (each such party, a "<u>Qualified Bidder</u>" and a "<u>Qualified Proposal</u>," respectively), taking into account, in such selection, both issues of feasibility and operational requirements, including those that materially impact the business in connection with the Debtors' collective flagship store(s) (*e.g.*, continuation of leases at Eastside Location and/or the entering into of the 1133 Third Leases[7]) and the right of the Secured Lender, which right shall be fully preserved, to credit bid all or any part of its pre-or post petition debt.[8]

- Only those Proposals that (i) were submitted on or before the Proposal Deadline, (ii) taking into account the right of the Secured Lender to be paid in full its pre-petition and debtor-in-possession obligations and the Secured Lend**er's** fully preserved right to credit bid under Sections 363(k) and 1129 of the Bankruptcy Code, provide incremental value to the Debtors' estates as compared to the

---

[7]   The terms of the 1133 Third Lease are substantially reflected in Flagship Store Term Sheet dated August 10, 2010 which will be made fully available to any Interested Party, as well as the Creditors' Committee and the Secured Lender.

[8]   Notwithstanding anything to the contrary in the Bidding Procedures, the Plan Investor is deemed to be Qualified Bidder and the Investment Agreement is deemed a Qualified Proposal.

Investment Agreement in excess of (i) the amount of the Break Up Fee plus (ii) not less than $500,000, (iii) state that they are binding and irrevocable offers, not subject to financing, diligence, approvals or other conditions not set forth in the Investment Agreement, (iv) are accompanied by a $500,000 deposit that was submitted on or before October 5, 2010, and (v) included the conditions specified above, may be deemed Qualified Proposals (unless waived or modified in the business judgment of the Debtors).

- The Debtors will notify each Interested Party that is a Qualified Bidder and qualifies to participate in the Auction in accordance with the Bidding Procedures, in writing, on or before 5:00 p.m. on October 8, 2010. Only Qualified Bidders may participate at the Auction and bid for the Debtors' assets.

- On or before 9:30 a.m. on October 12, 2010, the Debtors shall select, in their business judgment, the transaction they intend to use to commence the Auction (the "Pre-Auction Successful Bid").

- If the Debtors receive a timely Qualified Bid other than that represented by the Investment Agreement, the Auction will be held on October 12, 2010 at 10:00 a.m.. At the close of the Auction, the Debtors will identify the Qualified Bidder with the highest or otherwise best bid (the "Successful Bid," and such bidder, the "Successful Bidder").

- If no Qualifying Bid other than that represented by the Investment Agreement is received the Auction will not take place and a disclosure statement hearing will be scheduled for October __, 2010, at which the Court will consider the adequacy of the information set forth in the disclosure statement filed with respect to the Investment Agreement.

- Following the selection of the Successful Bid, the Debtors will (i) immediately cease and cause to be terminated any ongoing solicitation, discussions and negotiations with respect to any other bids or proposals and (ii) not solicit any inquiries or proposals, and (iii) no additional bids or proposals will be accepted or considered by the Debtors, unless and until the earlier of (1) the termination of the Investment Agreement by and among the Successful Bidder and the Debtors and (2) entry of an order of the Bankruptcy Court denying confirmation of the Plan sponsored by the Successful Bidder.

21. The Bidding Procedures allow parties with a potential interest in the Debtors both notice and sufficient time to finalize diligence and submit fully-financed binding proposals by the conclusion of the bidding period. The Bidding Procedures also allow the Debtors sufficient time to assess and develop such proposals and discuss them with the advisors to the Creditors' Committee and the Secured Lender. The Bidding Procedures and the Auction

process are designed to encourage all parties to put their best proposals forward, bring finality to the Debtors' competitive plan process, and create a path towards confirmation of a plan that embodies the highest and best available recoveries to creditors.

**Basis for Relief Requested**

A.      **Sound Business Reasons Exist to Approve the Bidding Procedures**

22.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the [Debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary to carry out the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105(a).

23.      Courts in the Second Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon a finding that such use is supported by sound business reasons. See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him … a good business reason to grant such an application."); Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources), 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Enron Corp., 2003 WL 1562202, at *19 (Bankr. S.D.N.Y. Mar. 21, 2003). Accordingly, courts in the Second Circuit "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." In re Global Crossing, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing Paramount Commc'n Inc. v. QVC Network, Inc., 637 A.2d 34, 45 n. 17 (Del. 1994)); accord In re Johns Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("[w]here the debtor

12

articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtors' conduct."

24.     Direct precedent for implementation of the Auction and Bidding Procedures process proposed hereunder exists in this Court.  Specifically, in connection with the *Extended Stay, Inc. et al*., Case No. 09-13764 (JMP) Chapter 11 proceeding, analogous procedures and process was approved by the Honorable James Peck to enhance the likelihood that competitive bidding for plan sponsorship would be fully vetted.  The resultant vibrant Auction lead the way to a (reasonably) smooth and expedited plan confirmation.  The Debtors believe that their Chapter 11 cases would greatly benefit by such approach.

25.     The Debtors carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will result in the successful restructuring of the Debtors and the creation of significant value for all parties-in-interest.  This process includes, *inter alia,* an Auction, which serves to complete the competitive process that was begun prior to these chapter 11 cases and will provide a mechanism to solicit additional offers from financially capable and interested investors.  In the Debtors' business judgment, the Bidding Procedures will ensure that they can effectively manage the proposals already received, maximize recoveries for stakeholders, and provide the Debtors' marketing process with the finality necessary to effectuate a successful emergency from chapter 11.

26.     Moreover, the Bidding Procedures are designed to attract the maximum number of bidders which providing the Debtors with the flexibility to select the transaction that optimizes value for all parties-in-interest.  Further, the Bidding Procedures are fair and open, and do not unfairly favor the Plan Investor or any other Interested Party.  Finally, the Bidding Procedures establish a time frame that will allow potential investors sufficient time to conduct

13

due diligence, arrange financing, and construct and submit informed competing bids, while still providing for the expeditious reorganization of the Debtors.

27. The Bidding Procedures provide that the close of the Auction is and will be considered to be the final opportunity for any party to submit proposals to the Debtors to fund or sponsor a plan of reorganization or exercise any rights and remedies such party may have in respect of the Debtors' assets, making it clear that the Auction process is designed to bring finality and certainty to the Debtors' plan process and ensuring that the highest or best plan available for the Debtors' estates and creditors is confirmed and implemented without delay or distraction.

28. Working through Triton, the Debtors and their other professionals have and will continue to work with the Plan Investor and other parties who have indicated an interest in submitting bids pertaining to the Auction and ultimately sponsoring the Debtors' plan. The Debtors have entered into confidentiality and non disclosure agreements with various parties. Coupled with the Debtors' previous marketing efforts, the conduct of the Auction in accordance with the terms of the Bidding Procedures constitutes an exercise of sound business judgment because the proposed process will (i) secure the long-term commitment of capital by the Successful Bidder, thereby providing the liquidity necessary to emerge from chapter 11 and continue the Debtors' business; and (ii) provide the Debtors with the ability to explore the possibility of even greater value from alternative plan sponsors. For the foregoing reasons, the Debtors submit the Bidding Procedures should be approved by the Court.

**B. The Court Should Waive the Stay Period Required By**
.          **Rule 6004(h) of the Federal Rules of Bankruptcy Procedure**

29. Pursuant to Rule 6004(h) of the Bankruptcy Rules, unless the court orders otherwise, all orders authorizing the use of property pursuant to section 363 of the Bankruptcy

185125/001-1914353.2

Code are automatically stayed for 14 days after entry of the order FED. R. BANKR. P. 6004(h). The Debtors hereby request a waiver of Rule 6004(h) so that the Debtors may immediately, implement the Bidding Procedures. Specifically, the Debtors respectfully request that the 14-day stay under Bankruptcy Rule 6004(h) be waived and the Proposed Order be effective immediately.

## Notice

30.     No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for any Creditors' Committee, (iii) the twenty (20) largest unsecured creditors; (iv) the attorneys for the Secured Lender; (v) the attorneys for the Meridian Investor; (vi) parties to the debtors various leases; (vi) parties purporting to assert liens against the Debtors' assets; and (vii) all parties who have requested notice in these chapter 11 cases. The Debtors submit that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request that the Court entered the Proposed Order and grant the Debtors such other and further relief as the Court deemed just and proper.

Dated: August 24, 2010
       New York, New York

                                    **HAHN & HESSEN LLP**


                                    By /s/ Mark T. Power____
                                         Mark T. Power
                                         Rosanne T. Matzat
                                         488 Madison Avenue
                                    New York, New York 10022
                                    (212) 478-7200

                                    *Proposed Attorneys for Debtors and Debtors-in-Possession*

15