# EXHIBIT A

**INVESTMENT AND STANDBY PURCHASE AGREEMENT**

by and among

**THE WECK CORPORATION, WEST WECK, LLC,**

**GRACIOUS HOME.COM, LLC, WECK CHELSEA, LLC**

and

**GH ACQUISITION, LLC**

as Investor.

**Dated as of August 11, 2010**

# TABLE OF CONTENTS

Page

Section 1.   Investment...........................................................................................2

Section 2.   Fees and Expenses..................................................................................6

Section 3.   Representations and Warranties of the Debtors....................................7

Section 4.   Representations and Warranties of the Investor..................................12

Section 5.   Covenants............................................................................................13

Section 6.   Public Statements................................................................................15

Section 7.   Intentionally Omitted..........................................................................15

Section 8.   Employees............................................................................................15

Section 9.   Conditions to Debtors' Obligations to Close......................................16

Section 10.  Conditions to the Investor's Obligation to Close...............................17

Section 11.  Closing.................................................................................................19

Section 12.  Termination..........................................................................................20

Section 13.  No Survival..........................................................................................22

Section 14.  Notices.................................................................................................22

Section 15.  Assignment..........................................................................................24

Section 16.  Entire Agreement.................................................................................24

Section 17.  Governing Law, Venue........................................................................24

Section 18.  Waivers and Amendments...................................................................24

Section 19.  Miscellaneous......................................................................................25

Section 20.  Definitions...........................................................................................26

**Exhibit A**        Plan of Reorganization
**Exhibit B**        Bidding Procedures Order
**Annex I**          Assumed Liabilities

**Schedules to Be Delivered Pursuant to Section 1.8**

| | |
|---|---|
| **Schedule 1.2(b)** | Insurance Policies and Other Agreements |
| **Schedule 3.1(e)** | Absence of Certain Charges |
| **Schedule 3.1(f)** | Cure Costs |
| **Schedule 3.1(i)** | Debtors' Intellectual Property |
| **Schedule 3.1(*l*)** | Compliance with Environmental Laws |
| **Schedule 3.1(m)** | Compliance with ERISA |

185125/001-1909066.9

This INVESTMENT AND STANDBY PURCHASE AGREEMENT (this "**Agreement**"), dated as of August 11, 2010, is by and among The Weck Corporation, West Weck, LLC, Gracious Home.com, LLC, Weck Chelsea, LLC, (collectively, "**GH**" or the "**Debtors**"), and GH Acquisition, LLC ("**GHA**") or its designees and assigns (the "**Investor**").

## RECITALS

WHEREAS GH operates a housewares, hardware and home furnishings business in six store locations and an internet-based business, all operating under the name Gracious Home (the "**Business**");

WHEREAS GH intends to (a) commence voluntary bankruptcy cases under chapter 11 of title 11 of the United States Code (the "**Chapter 11 Cases**") by filing petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") no later than August 31, 2010 (the "**Outside Petition Date**" and the actual commencement date, the "**Petition Date**"), unless extended to a later date by written consent of the parties hereto;

WHEREAS on or prior to the date hereof, NewAlliance Bank, a Connecticut state chartered bank, acting through its NewAlliance Commercial Finance operating division ("**NAB**"), acquired from Manufacturers and Traders Trust Company ("**M&T**") the existing obligations (other than certain letters of credit) under the Modified and Extended Secured Non-Revolving Credit Note and Agreement dated as of February 16, 2010 entered into between GH, as borrowers, and M&T, as lender (the "**Prepetition Secured Debt**");

WHEREAS subject to the approval by the Bankruptcy Court of financing orders acceptable to NAB, NAB has agreed to provide GH with debtor in possession financing for up to an additional $3,425,000 of new cash availability during the pendency of the Chapter 11 Cases on a secured super priority basis (the "**DIP Credit Facility**") as well as authorize GH's post-petition use of cash collateral;

WHEREAS pursuant to the terms of this Agreement, GHA has agreed to be the sponsor of GH's Plan of Reorganization under Chapter 11 of the Bankruptcy Code, substantially in the form annexed hereto as Exhibit "A" (the "**Plan**" or "**Reorganization Plan**"). Under the terms of the Plan, GHA will become the successful plan sponsor (the "**Successful Plan Sponsor**") if its offer set forth in the Plan is determined by the Bankruptcy Court to be the highest or otherwise best offer for the GH assets. If GHA becomes the Successful Plan Sponsor, GHA will on the Effective Date of the Plan acquire substantially all of the GH assets and assume certain of its liabilities in exchange for the consideration set forth in the Plan; and

WHEREAS, within five (5) Business Days of the entry of an order by the Bankruptcy Court approving the bid procedures substantially in the form annexed hereto as Exhibit "B" (the "**Bidding Procedures Order**") governing the auction (the "**Auction**") for sponsorship of the Debtors' plan of reorganization, the Investor agrees to deposit the sum of $500,000 into escrow (the "**Deposit**"), pursuant to the terms of an escrow agreement in a mutually agreeable form (the "**Escrow Agreement**") to be entered into with Hahn & Hessen LLP, as escrow agent (the

"**Escrow Agent**") in connection with the Investor's commitments contained herein and relating to the Plan (as defined above).

WHEREAS, conditioned upon, among other things, GHA being declared the Successful Plan Sponsor, NAB has agreed to seek internal credit approval for up to $11 million in new financing to be provided to GHA on the Effective Date substantially on the terms set forth in the Exit Financing Term Sheet annexed as an exhibit to the Plan (the "**NAB Exit Financing**"), which funds will be used, together with the amounts to be provided by the investors in GHA to fund GHA's Investment (as hereinafter defined).

NOW THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and for other good and valuable consideration, the parties hereto, intending to be legally bound hereby, agree as follows:

**Section 1.    Investment.**

1.1    <u>Purchase and Sale of Assets</u>.  Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations, warranties and covenants set forth in this Agreement, on the Effective Date, the Debtors shall sell, convey, transfer, assign and deliver to Investor, and Investor shall purchase from the Debtors all of Debtors' right, title and interest in and to their assets and property, whether tangible or intangible, real, personal or mixed, except for the Excluded Assets, free and clear of all Liens, other than Permitted Liens (except to the extent such Permitted Liens are extinguished by the Bankruptcy Court pursuant to the Sale Order), including, but not limited to, all of such right, title and interest in and to all of the following (collectively, the "**Purchased Assets**").

1.2    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, from and after the Effective Date, Debtors shall retain all of their existing right, title and interest in and to any and all assets that are not Purchased Assets, and there shall be excluded from the sale, conveyance, assignment or transfer to Investor hereunder, and the Purchased Assets shall not include, the following (collectively, the "**Excluded Assets**"):

(a)    the Investment;

(b)    all insurance policies and other agreements listed on <u>Schedule 1.2(b)</u> and all rights thereunder;

(c)    all claims and causes of action under Sections 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and any other claims or causes of action belonging to Debtors or their estate (collectively, "**Avoidance Actions**"), other than those specifically described in Section 5.6 and those relating to the Purchased Assets;

(d)    all of Debtors' rights and causes of action arising under Section 502 and 503 of the Bankruptcy Code and Rule 3007 thereunder;

(e)    all Tax Returns of Debtors and all Books and Records (including working papers) related thereto, other than any such Tax documents related to the Purchased Assets, and any Books and Records which Debtors is required by law to retain; provided, however, that

2

GHA shall be entitled to access to such excluded Books and Record upon reasonable request to the Debtors;

(f) Tax refunds related to any taxable period (or portion thereof) ending on or prior to the Effective Date;

(g) This Agreement and the Transaction Agreements and all rights, claims and causes of action of the Debtors hereunder and thereunder;

(h) all of Sellers' certificates of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller as a corporation, limited liability company or other entity;

(i) any shares of capital stock or membership or other equity interests of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or membership or other equity interests of any Debtor;

(j) all rights under Contracts other than Assigned Leases or Assumed Contracts;

(k) all instruments, prepaid assets and deposits, letters of credit proceeds, unbilled costs and fees, tax assets and accounts, in each case, that relate to any Excluded Asset or any Retained Liability;

(l) any loans or notes payable to any Debtor from any employee of any Debtor other than a Transferred Employee;

(m) any documents and agreements relating to the Chapter 11 Cases;

(n) all rights, including the rights of offset and recoupment, claims, and causes of action relating to any Excluded Asset or any Retained Liability.

1.3     Assumption of Certain Liabilities.  On the terms and subject to the conditions set forth herein, on the Effective Date, Investor shall assume and discharge or perform when due the Assumed Liabilities.  Investor will not assume or have any Liability or responsibility with respect to any Retained Liabilities.  For the avoidance of doubt, other than the Assumed Liabilities, Investor will not assume any Liability of any nature or kind whatsoever of Debtors.

1.4     Amounts Due under Executory Contracts and Unexpired Leases; Cure Costs. Debtors shall pay from the Investment all cure costs, compensation and expenses required to be paid in connection with the assumption and assignment of any assumed contract as set forth in Section 365 of the Bankruptcy Code ("**Cure Costs**"), including any cure costs relating to the leased real property.

185125/001-1909066.9

1.5     Retained Liabilities.  Debtors shall retain and be liable and responsible for all Retained Liabilities.

1.6     Investment.  Subject to the terms and conditions set forth herein, in consideration of its acquisition of the Purchased Assets, on the Effective Date, Investor shall pay to Debtors at the Closing an amount in cash sufficient to make the distributions provided for under the Plan and establish feasibility to confirm the Plan under Section 1129 of the Bankruptcy Code (the "**Investment**") in an amount not to exceed the sum of $13,425,000, comprised of the following components (i) $11,000,000 from the NAB Exit Financing, (ii) $500,000, plus any accrued interest earned on the Deposit; and (iii) $1,925,000, less any accrued interest earned on the Deposit, from additional cash paid by the Investor.

1.7     Deliveries by Investor.

(a)     Within five (5) Business Days of the entry of Bidding Procedures Order by the Bankruptcy Court, the Investor shall provide the Escrow Agent (i) with the Deposit to be held in escrow as a good faith deposit pursuant to the terms of the Escrow Agreement and (ii) with instructions to release the Deposit to the Debtors at the Closing.

(b)     Within the later of (i) three (3) Business Days before the Auction or (ii) September 30, 2010, the Investor shall provide the Debtors with a copy of a commitment letter from NAB with respect to the NAB Exit Financing, in a form reasonably satisfactory to the Debtors;

(c)     At the Closing, Investor shall deliver to Debtors the following:

(i)     the balance of the Investment in immediately available funds by wire transfer to an account or accounts which have been designated by Debtors at least two Business Days prior to the Closing;

(ii)     such instruments of assumption and other instruments or documents, in form and substance reasonably acceptable to Debtors, as may be necessary to effect Investor's assumption of the Assumed Liabilities and the effective assignment of any Assumed Contracts, Assigned Leases or other Purchased Assets;

(iii)     the certificate to be delivered pursuant to Section 11.3(b); and

(iv)     such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Debtors, as may be required to give effect to this Agreement.

1.8     Deliveries by Debtors.

(a)     No later than within three (3) Business Days of the entry of Bidding Procedures Order by the Bankruptcy Court, the Debtors shall provide the Investor with the Disclosure Schedules, which Disclosure Schedules must be reasonably satisfactory to the Investor. Unless the Investor advises the Debtors in writing within five (5) Business Days after receipt of such Disclosure Schedules that they are not reasonably satisfactory to the Investor, the

Disclosure Schedules will be deemed satisfactory to the Investor and the Debtors will be deemed to have satisfied this condition.

(b)      At the Closing, Debtors shall deliver, or cause to be delivered, to Investor the following:

(i)      bills of sale or other appropriate documents of transfer, in form and substance reasonably acceptable to Investor, transferring the tangible personal property included in the Purchased Assets to Investor;

(ii)      assignments, in form and substance reasonably acceptable to Investor and, if applicable, as required by any Government Entity with which Debtors's rights to any Transferred Intellectual Property have been filed, assigning to Investor the Transferred Intellectual Property;

(iii)      assignments of the Assigned Leases to Investor or one of its Affiliates, in each case in form and substance reasonably acceptable to Investor;

(iv)      assignment and assumption agreements, in form and substance reasonably acceptable to Investor and Debtors, assigning to Investor all rights of Debtors in and to all of the Assumed Contracts, exclusive of any Retained Liabilities;

(v)      the Books and Records which are not Excluded Assets;

(vi)      the certificate to be delivered pursuant to Section 11.2(a);

(vii)      a certified copy of the Confirmation Order;

(viii)      such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Investor, as may be required to give effect to this Agreement.

1.9      "As Is Where Is" Transaction.   Investor hereby acknowledges and agrees that, notwithstanding anything to the contrary contained herein, except as expressly set forth in Article III of this Agreement, Debtors makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets.   Without in any way limiting the foregoing, Debtors hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Investor further acknowledges that the Investor has conducted an independent inspection and investigation of the physical condition of all portions of the Purchased Assets and all such other matters relating to or affecting the Purchased Assets or Debtors as Investor deemed necessary or appropriate and that in proceeding with its acquisition of the Purchased Assets, Investor is doing so based solely upon such independent inspections and investigations.   Accordingly, Investor will accept the Purchased Assets at the Closing "AS IS" and "WHERE IS".

1.10    Allocation of the Investment; Tax Filings.

(a)    The Investment and the value of any Assumed Liabilities shall be allocated among the Purchased Assets as set forth in a schedule to be initially delivered by Investor to Debtors no more than 30 days following the Closing (the "**Allocation Schedule**"), which schedule shall be finalized in the manner described below, in compliance with Section 1060 of the Code and the regulations promulgated thereunder.  Debtors shall notify Investor within 15 days after the receipt of the draft Allocation Schedule if Debtors considers the amount allocated to any Purchased Assets to be inconsistent with applicable Tax law (including any determination of fair market value).  Debtors and Investor shall attempt to resolve any disagreement in good faith.  If Debtors and Investor fail to reach agreement as to an alternative allocation in the 10 days following such notice, the dispute with respect to the Allocation Schedule shall promptly be presented to an accounting firm mutually chosen by the parties (the "**Independent Accounting Firm**") for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable forms with the Internal Revenue Service and other Tax authorities.  The Independent Accounting Firm's review shall be final and binding on all parties.  The fees, costs and expenses incurred in connection therewith shall be shared equally by Debtors and Investor.

(b)    Each of Debtors and Investor shall (i) timely file all forms (including IRS Form 8594) and Tax Returns required to be filed in connection with the Allocation Schedule, (ii) be bound by such allocation for purposes of determining Taxes, (iii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation and (iv) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return, in any audit or proceeding before any taxing authority, in any report made for Tax, financial accounting or any other purposes, or otherwise, unless otherwise required pursuant to a Final Determination.  Each of Investor, on the one hand, and Debtors, on the other hand, will provide the other with copies of IRS Form 8594 and any required exhibits thereto, consistent with the allocation determined pursuant to this Section 1.10 upon request.  In the event that the allocation set forth on the Allocation Schedule is disputed by any taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

**Section 2.    Fees and Expenses.**

2.1    In the event a Qualified Bidder other than the Investor is determined by the Bankruptcy Court to be the Successful Plan Sponsor based on it having submitted the highest or otherwise best offer at the Auction, the Investor shall be paid (a) a Breakup Fee of 3% of the Investment or $402,750 (the "**Breakup Fee**"), which breakup fee and expense reimbursement shall be payable to the Investor out of the proceeds received upon the Effective Date of the alternative plan sponsored by Successful Plan Sponsor and (b) reimbursement of Expenses as provided in Section 2.2 below.

2.2    In the event a Qualified Bidder other than the Investor is determined by the Bankruptcy Court to be the Successful Plan Sponsor based on it having submitted the highest or otherwise best offer at the Auction or in the event the Plan is not confirmed or consummated for

any reason other than due to a material breach of this Agreement by the Investor or its members and Affiliates as determined by final order of the Bankruptcy Court, the Investor and its members and Affiliates shall be paid an amount, not to exceed One Hundred Fifty Thousand ($150,000) (exclusive of the $50,000 expense retainer previously paid to Investor) as provided in the Bidding Procedures, as reimbursement for actual reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the Investor and/or its members and Affiliates.

2.3    The provision for the payment of the Breakup Fee and Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investor would not have entered into this Agreement and such Expenses, subject to the entry of the Bidding Procedures Order, shall constitute an allowed administrative expense of the Debtors under Sections 503(b)(l) and 507(a)(2) of the Bankruptcy Code.

2.4    Except as provided in Section 2.2, the payment of the Expenses and return of the Deposit pursuant to Sections 12.5 shall be the sole and exclusive remedy available to the Investor in the event that the completion of the Investment and the consummation of the Plan (the "**Closing**") does not occur, <u>provided</u>, that this Section 2.4 shall not relieve the Debtors from any Liability arising from, other than the exercise of its rights under Section 12.4, any willful or intentional breach that has been the cause of or resulted in the failure of the Closing to occur.

**Section 3.**    <u>**Representations and Warranties of the Debtors.**</u>

3.1    The Debtors hereby jointly and severally represent and warrant to, and agree with, the Investor that, except as set forth in the Disclosure Schedules:

(a)    <u>Organization and Qualification</u>. Each Debtor is duly organized, validly existing and in good standing under the laws of its state of incorporation or organization and has all requisite corporate or other organizational power and authority to carry on its business as it is currently conducted or as currently contemplated to be conducted after consummation of the transactions contemplated hereunder and under the Plan and to own, lease and operate its properties where such properties are now owned, leased or operated.

(b)    <u>Corporate Power and Authority</u>.

(1)    Each Debtor has or, to the extent executed in the future, shall have when executed the requisite corporate or other organizational power and authority to enter into, execute and deliver this Agreement and each other agreement to which it shall be a party as contemplated by this Agreement or the Plan (together, the "**Transaction Agreements**") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), respectively, to perform its obligations hereunder and thereunder. Each Debtor has taken or shall take all necessary corporate or other organizational action required for the due authorization, execution, delivery and performance by it of the Transaction Agreements.

(2)    Prior to the execution by the Debtors and filing with the Bankruptcy Court of the Plan, the Debtors shall have the requisite corporate or other organizational power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), to perform their obligations thereunder, and shall have taken by the Effective Date all necessary corporate or other organizational actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)    <u>Execution and Delivery; Enforceability</u>.

(1)    Each Transaction Agreement has been, or prior to its execution and delivery shall be, duly and validly executed and delivered by each Debtor to the extent a party thereto, and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 6004(h), each such document shall constitute a valid and binding obligation of the Debtors, enforceable against the Debtors to the extent a party thereto in accordance with its terms.

(2)    Upon confirmation of the Plan and the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rule 3020(e), the Plan shall constitute a valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms.

(d)    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Debtors or any of their properties is required for the execution and delivery by the Debtors of the Transaction Agreements or the Plan and performance of and compliance by the Debtors with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except the entry of the Disclosure Statement Solicitation and Approval Order (as specified in Section 12.3(a) hereof) and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable.  No consent, approval or authorization of any Person (other than a court or governmental agency) is required in connection with the execution and delivery of the Transaction Agreements or the consummation by the Debtors of the transactions contemplated herein and therein, except for any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Debtors' performance of their obligations under this Agreement.

(e)    <u>Absence of Certain Changes</u>.  Except as set forth on <u>Schedule 3.1(e)</u>, since August 1, 2010, except for actions to be taken pursuant to the Transaction Agreements and the Plan:

(1)     there has not been any material change in the capital stock or equity or other ownership interests or any material change in long-term debt of the Debtors (other than planned draws under the DIP Credit Facility) or any material dividend or distribution of any kind declared, set aside for payment, paid or made by the Debtors on any class of capital stock;

(2)     no event, fact or circumstance has occurred which has had or would reasonably be expected to give rise to, individually or in the aggregate, a Material Adverse Change;

(3)     the Debtors have not entered into any contract, agreement or arrangement that will be in effect on the Effective Date and that (i) has, or that the Debtors reasonably expect to have, any future Liability or payments materially in excess of the amounts projected in the DIP Budget; (ii) is not terminable by the Debtors by notice of not more than ninety (90) days; and (iii) was not entered into in the ordinary course of business;

(4)     the Debtors have not made any material changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

(5)     the Debtors have not paid, discharged, waived, compromised, settled or otherwise satisfied any material legal proceeding, whether now pending or hereafter brought, (i) at a cost materially in excess of the amount accrued or reserved for it, (ii) pursuant to terms that impose material adverse restrictions on the business of the Debtors as currently conducted or (iii) on a basis that reveals a finding or an admission of a material violation of law by the Debtors; and

(6)     the Debtors have not waived any material right, claim or debt.

(f)     <u>Material Contracts</u>.

(1)     Except as otherwise provided herein and subject to the payment of any required cure costs as set forth on <u>Schedule 3.1(f)</u>, on and as of the Effective Date, each Material Contract that shall survive the Chapter 11 Cases (i) shall be a legal, valid and binding obligation of the Debtors, to the extent a party thereto, and each other party thereto (subject to bankruptcy laws), (ii) to the knowledge of the Debtors, shall be in full force and effect and (iii) shall be enforceable against the Debtors, to the extent a party thereto, and each other party thereto (subject to bankruptcy laws) in accordance with its terms.  Other than a breach or default that occurred as a result of the filing of the Chapter 11 Cases, with respect to each Material Contract, (x) the Debtors, to the extent a party thereto, is not in material default or breach of such Material Contract, and (y) there does not exist any event, condition or omission that would constitute such a default or breach, whether by lapse of time or notice or both.  To the knowledge of the Debtors, no party to any Material Contract is in material breach or default of such Material Contract, has repudiated any material provision thereof or terminated any Material Contract.

185125/001-1909066.9

(g)     <u>Pending Litigations or Causes of Action</u>.  There is no action, suit, proceeding or investigation pending or, to the knowledge of the Debtors, threatened or affecting the Debtors or any of the properties, assets or businesses of the Debtors, which, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Change or which questions the validity of any action taken or to be taken by the Debtors pursuant to or in connection with this Agreement.

(h)     <u>Labor Relations</u>.

(1)     The Debtors are not parties to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization;

(2)     the Debtors are not the subject of any material proceeding asserting that they or any Subsidiary have committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel them to bargain with any labor organization as to wages or conditions of employment;

(3)     there are no material current or, to the knowledge of the Debtors, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Debtors or any and no such activities have occurred during the past 12 months;

(4)     no material grievance, arbitration, litigation or complaint or, to the knowledge of the Debtors, investigations relating to labor or employment matters is pending or, to the knowledge of the Debtors, threatened against the Debtors;

(5)     the Debtors have complied and are in compliance in all material respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and are not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent); and

(6)     the Debtors have complied in all material respects with their payment obligations to all employees of the Debtors in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any agreement, plan, program or any statute or other law.

(i)     <u>Title to Intellectual Property</u>.  The Debtors own, or possess valid and enforceable rights to use, all material Intellectual Property, including, without limitation, that which is set forth on <u>Schedule 3.1(i)</u>, used in the conduct of their respective businesses as of the date of this Agreement (collectively, "**Debtors Intellectual Property**").  All applications to register and registrations of any Debtors Intellectual Property owned by the Debtors are listed in <u>Schedule 3.1(i)</u>, and (i) are valid and in full force and effect; (ii) have not, except in accordance with the ordinary course practices of the Debtors lapsed, expired or been abandoned (provided that the foregoing will not be deemed a representation that any registration for any trademark

will issue upon application therefor); (iii) are not the subject of any opposition or cancellation filed with the United States Patent and Trademark Office, domain name registrar or any other applicable Intellectual Property registry; and (iv) are exclusively owned by the Debtors. Upon the Effective Date, all of the rights, title and interests in and to the Debtors Intellectual Property shall be transferred to the Investor free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan. The Debtors have not received any written notice in the past two (2) years that they are in default (or with the giving of notice or lapse of time or both, would be in default) under any material contract relating to any Debtors Intellectual Property. To the knowledge of the Debtors, no Debtors Intellectual Property rights owned by the Debtors are being infringed by any other Person and the conduct of the Debtors' businesses as conducted do not infringe, misappropriate, or otherwise violate in any respect any Intellectual Property rights of others. The Debtors have not received any written notice of any claim of infringement, misappropriation, or violation with any such rights of others in the past thirty (30) months. To the knowledge of the Debtors, the Debtors have required each third party contractor who has developed for the benefit of the Debtors any Debtors Intellectual Property to execute a consulting agreement assigning the intellectual property therein to the Debtors.

(j)     No Broker's Fees.  No Debtor is a party to any contract, agreement or understanding with any Person (other than this Agreement and the Debtor's agreement with Triton Equity Partners, LLC, to be submitted to the Bankruptcy Court for approval) that would give rise to a valid claim against a Debtor or the Investor for a brokerage commission, finder's fee or like payment in connection with the Investment.

(k)     Title to Personal Property.  The assets of the Debtors, include all of the properties, assets and rights that are currently used in, or are material or necessary for, the conduct of the Business of the Debtors (collectively, the "**Business Assets**").  Upon the Effective Date, all of the rights, title and interests in and to the Business Assets shall vest in the Investor free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind, except as provided in the Plan.

(l)     Compliance with Environmental Laws.  Except as provided on Schedule 3.1(*l*), the Debtors are in compliance with all applicable Environmental Laws, except for such noncompliance as would not reasonably be expected to result in material liabilities under Environmental Laws.

(m)     Compliance With ERISA.  Except as set forth on Schedule 3.1(m), none of the Debtors maintains, contributes to, or is a party to, (i) any "employee benefit plan," as defined in Section 3(3) of ERISA, or (ii) any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation other than workers compensation, unemployment compensation and other government programs, under which a Debtor has any present or future obligation or liability with respect to the Transferred Employees.  No Debtor has been a party to or sponsored a multi-employer plan or a defined benefit plan.  Debtors and all fiduciaries of the such plans have fully complied with their obligations and all duties under ERISA.  There has been no prohibited transaction under Section 4975 of the Code or Section 406 or ERISA or otherwise with respect to any such plan.  Each such plan has been maintained in accordance with applicable laws and in compliance with its terms.  Debtors have no current or

future liabilities with respect to post-employment or post-retirement benefits for former or retired employees.

(n) <u>Insurance</u>. The Debtors have insurance covering its properties, operations, personnel and businesses, including, without limitation, business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to the Debtors'. The Debtors (i) have not received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) do not have any reason to believe that they shall not be able to renew their existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue their business.

(o) <u>Alternate Transactions</u>. As of the date hereof, the Debtors are not parties to any binding commitment to pursue, implement or effectuate any Alternate Transaction.

**Section 4.** <u>**Representations and Warranties of the Investor.**</u>

4.1 The Investor represents, warrants and agrees with the Debtors as set forth below. Each such representation, warranty and agreement is made as of the date hereof and the Effective Date.

(a) <u>Incorporation</u>. The Investor has been duly organized and is a validly existing limited liability company, in good standing under the laws of the State of Delaware.

(b) <u>Corporate Power and Authority</u>. The Investor has the requisite limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c) <u>Execution and Delivery</u>. This Agreement has been duly and validly executed and delivered by the Investor and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) <u>Financial Capability</u>. The Investor will have at the Closing sufficient cash to enable it to pay the Investment.

(e) <u>No Conflict</u>. The execution and delivery by the Investor of each of the Transaction Agreements to which it is a party and the compliance by the Investor with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (i) shall not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) shall not result in any violation of the provisions of the governance documents of the Investor, and (iii) shall not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization,

injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of its properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(f)     Consents and Approvals.   No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties, other than the Bankruptcy Court, is required to be obtained or made by the Investor for the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(g)     No Violation or Default; Compliance with Laws.   The Investor is not in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

## Section 5.     **Covenants.**

From and after the date hereof, until the earlier of the Effective Date or the effective date of any termination pursuant to Section 12 hereof:

5.1     Bidding Procedures Order.   The Debtors shall file within five business (5) days of the Petition Date a motion seeking to approve the Bidding Procedures Order.

5.2     Confirmation Order.   The Debtors shall file a proposed Confirmation Order in form and substance approved by the Investor.   At the request of the Investor, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the Investor and each of its members.

5.3     Disclosure Statement.   The Debtors shall file a Disclosure Statement in form and substance approved by the Investor.   At the request of the Investor, the Debtors shall exercise the right to seek confirmation of the Plan under Section 1129(b) of the Bankruptcy Code in the manner reasonably requested by the Investor and each of its members.

185125/001-1909066.9

5.4     Hearing on Confirmation.  The Debtors shall use their commercially reasonable efforts to have the hearing on confirmation of the Plan scheduled as soon as possible after the Bankruptcy Court enters the order approving the Disclosure Statement.

5.5     Conduct of Business.  During the period from the date of this Agreement to the Effective Date (except as otherwise expressly provided by the terms of this Agreement, the Plan or any other order of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11 Cases), the Debtors shall carry on their businesses in the ordinary course and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current business organizations, keep available the services of their current officers and employees and preserve their relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Debtors; provided, however, that nothing contained herein shall restrict the Debtors' ability to reject or assume and/or assign any Contracts or real property leases pursuant to an order of the Bankruptcy Court.

5.6     Further Assurances.  Subject to all terms and conditions of this Agreement, after the entry of the Confirmation Order, each party shall, at the request of any other party hereto and without further conditions or consideration, take such other actions as such other party may reasonably request in order to more effectively consummate the transactions contemplated hereby and in accordance with and subject to the terms and conditions of this Agreement and the Transaction Agreements, including, using commercially reasonable efforts to cause the satisfaction of all conditions to the other party's conditions to Closing and the Effective Date to occur that are in such party's control to occur.  Without limiting the generality of the foregoing, the Debtors shall, and shall cause their officers, employees, agents and representatives to, use commercially reasonable efforts to obtain any third party consents as shall be required to be obtained in connection with the consummation of the transactions contemplated hereby and by the Plan.  From and after the Closing, Debtors shall refer all inquiries with respect to the Purchased Assets and the Assumed Liabilities to the Investor, and the Investor shall refer all inquiries with respect to the Excluded Assets and the Retained Liabilities to Debtors.  In addition, absent the Investor's written consent, Debtors agree not to bring, directly or indirectly or through the assignment to others, any claims for Avoidance Actions against Transferred Employees, members of Senior Management, and the suppliers, vendors and customers of the Debtors which have the same or similar relationships with the Investor on and after the Closing.

5.7     Access to Information.  Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Debtors shall afford the Investor and its members and Affiliates, attorneys, accountants and other advisors or representatives, and reasonable access, throughout the period prior to the Effective Date, to its employees, consultants, properties, books, contracts and records and, during such period, the Debtors shall furnish promptly to the Investor and its members or Affiliates all information concerning their businesses, properties and personnel as may be reasonably requested by the Investor or its members or Affiliates.  Unless otherwise agreed to by the Debtors and the Investor, any such examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under Applicable Law.

5.8     Notices.  Between the date hereof and the Closing, each party shall give prompt written notice to the other parties hereto of (i) the occurrence, or failure to occur, of any event of

185125/001-1909066.9

which such party is aware which occurrence or failure would be likely to cause (a) any representation or warranty of such party contained in this Agreement to be untrue or inaccurate in any material respect, (b) any covenant of such party contained in this Agreement not to be satisfied or (c) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any notice or other communication from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by this Agreement or the Transaction Agreements, (iii) any notice or other communication from any governmental entity in connection with the transactions contemplated by this Agreement or the Transaction Agreements, (iv) any action commenced, or, to the knowledge of such party, threatened, relating to or involving or otherwise affecting such party or the transactions contemplated by this Agreement or the Transaction Agreements, and (v) any failure of any such party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

5.9     Support by Investor.  The Investor agrees that it shall not consent to, or otherwise directly or indirectly support any restructuring or reorganization plan for the Debtors that is inconsistent with this Agreement or the Plan.

## Section 6.     Public Statements.

6.1     Neither the Debtors nor the Investor shall issue any public announcement, statement or other disclosure with respect to this Agreement or the transactions contemplated herein without the prior consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed, other than to the extent required by Applicable Laws (including, without limitation, the Bankruptcy Code or Bankruptcy Rules) or as otherwise ordered by the Bankruptcy Court.

## Section 7.     Intentionally Omitted.

## Section 8.     Employees.

8.1     Offers of Employment.  Effective as of the Closing, Investor may, in its sole discretion (subject to Section 8.6), offer employment to any and all employees and for those employees on disability, FMLA, military or other leave or absence other than vacation or jury duty; provided, however, that Investor agrees to offer employment to a sufficient number of employees, at positions having comparable duties, hours, salary and medical, pension and other welfare benefits as their current employment, to avoid causing the Debtors to incur any obligations or liabilities under WARN.  All or such shall employees who accept Investor's offer of employment are referred to herein collectively as the "**Transferred Employees**".

8.2     Terms of Employment of Transferred Employees.  Investor may, in its sole discretion (subject to Section 8.6), offer each Transferred Employees terms and conditions of employment, including but not limited to benefits, base compensation, retirement and savings plans, and incentive compensation.  To the extent an employee becomes a Transferred Employee, Investor agrees to

(a)     provide such Transferred Employees with any benefits accruals, including the amount of accrued but unused vacation time and sick leave time;

(b) grant such Transferred Employees a credit for the amount of years of service of such Transferred Employee for purposes of eligibility, vesting of benefits, calculation of severance pay, determination of vacation time, sick leave, or other approved or statutory leave of absence, or for purposes of determining the amount of benefit coverage under any plan of Investor providing for medical, dental, and prescription drug coverage and accrual of other benefits; and

(c) assume the medical insurance plan of the Debtors solely with respect to the Transferred Employees; subject to there being no underfunding of liabilities owed under such plan and further provided that the remaining term of such plan shall not exceed one year from the Closing.

8.3 <u>No Successor Employer Liability</u>. Investor shall not, for any purposes, be deemed a successor employer of any of the Debtors' employees, and that Investor expressly does not assume any liabilities as a successor employer.

8.4 <u>401(k) Plan</u>. As of the Closing, Investor agrees to be substituted as the administrator of and assume all responsibilities for administrating the Debtors' employee 401(k) plan; subject to there being no underfunding of liabilities or obligations with respect thereto.

8.5 <u>COBRA</u>. Investor, at no expense to Debtors, shall provide the benefits, if any, required from and after the Closing pursuant to Section 4980B of the Code or Part 6 of Title I of ERISA for any Employee who is or becomes entitled to such continuation medical coverage from Investor after the Closing.

8.6 <u>New Management Employment Contracts</u>. On the Closing, the Investor and members of Senior Management shall enter into New Employment Agreements.

**Section 9. <u>Conditions to Debtors' Obligations to Close</u>.**

9.1 The obligations of the Debtors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Effective Date of each of the following conditions:

(a) <u>Confirmation Order</u>. The Confirmation Order shall be a Final Order (as such term is defined in the Plan).

(b) <u>Conditions to Effective Date</u>. The conditions to the occurrence of the Effective Date of the Plan shall have been satisfied or waived by the Debtors and the Investor in accordance with the Plan.

(c) <u>New Employment Agreements</u>. The Investor and members of Senior Management shall have entered into New Employment Agreements.

(d) <u>Employment Offers.</u> Investor shall have offered employment to a sufficient number of employees to avoid causing the Debtors to incur any obligations or liabilities under WARN consistent with Section 8.1.

185125/001-1909066.9

(e)     Consents.  All other material governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received and remain in effect.

(f)     No Legal Impediment to Issuance.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan, the Investment or the transactions contemplated by this Agreement or the Plan.

(g)     Representations and Warranties.  The representations and warranties of the Investor contained in Section 4 hereof shall be true and correct in all material respects (without giving effect to any limitations as to materiality set forth therein) as of the date hereof and at and as of the Effective Date with the same force and effect as if made at and as of such date (or, in the case of representations and warranties made as of a specific date, as of such date).

(h)     Covenants.  The Investor shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including, without limitation, in any Transaction Agreement) in all material respects through the Effective Date.

9.2     All or any of the conditions set forth in this Section 9 may be waived in writing, in whole or in part by the Debtors in their sole discretion.

## Section 10.     Conditions to the Investor's Obligation to Close.

10.1     The obligations of the Investor hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Effective Date of each of the following conditions:

(a)     Bidding Procedures Order.  The Bankruptcy Court shall have entered the Bidding Procedures Order or an alternative form of order reasonably satisfactory to the Investor.

(b)     Approval of Plan Documents.  The Investor shall have approved, which approval shall not to be unreasonably withheld, prior to filing with the Bankruptcy Court any documents, amendments or supplements relating to the Plan and Disclosure Statement (collectively, the "**Plan Documents**").

(c)     Plan.  The Debtors shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Debtors prior to the Effective Date.

(d)     Alternate Transaction.  The Debtors shall not have entered into any binding commitments with respect to an Alternate Transaction.

185125/001-1909066.9

(e)    Confirmation Order.

(1)    The Confirmation Order, in form and substance approved by the Investor, approving the Plan (including, without limitation, all Plan Documents) shall provide, among other things, that: (i) all right, title and interest in and to Purchase Assets shall be sold, assigned, transferred and disposed of to the Investor free and clear of any and all claims, liens and encumbrances of any entity (as such term is defined in Section 101(15) of the Bankruptcy Code); (ii) the Investor is acting in good faith and its assets and property and are entitled to the protections afforded good faith Investors under the Bankruptcy Code; (iii) except with respect to Assumed Liabilities as expressly provided for in Section 2.1 of the Plan, Investor shall not be a successor to any of the debtors in the Chapter 11 Cases by reason of any theory of law or equity; (iv) the Debtors and the Investor are authorized to consummate the transactions contemplated herein and in the Plan and enter into, execute and deliver all necessary documents, including those required in connection with the Exit Financing; and (v) the Investor shall have no successor or transferee liability of any kind, nature or character; and

(2)    The Confirmation Order shall be a Final Order (as such term is defined in the Plan).

(f)    Other Plan Related Documents.  All motions and other documents to be filed with the Bankruptcy Court in connection with this Agreement, the Plan, the Investment, and payment of the fees contemplated hereunder and under the Plan will be in form and substance reasonably acceptable to the Investor.

(g)    Conditions to Effective Date.  The conditions to the occurrence of the Effective Date of the Plan shall have been satisfied or waived by the Debtors and the Investor in accordance with the Plan.

(h)    New Employment Agreements.  The Investor and members of Senior Management shall have entered into New Employment Agreements.

(i)    Consents.  All other material governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Plan shall have been made or received and remain in effect.

(j)    No Legal Impediment to Issuance.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan, the Investment or the transactions contemplated by this Agreement or the Plan.

(k)    Representations and Warranties.  The representations and warranties of the Debtors, contained in Section 3 hereof shall be true and correct (without giving effect to any limitations as to materiality or Material Adverse Change set forth therein) as of the date hereof and at and as of the Effective Date with the same force and effect as if made at and as of such

date (or, in the case of representations and warranties made as of a specific date, as of such date), except to the extent that any failure of such representations and warranties, individually or in the aggregate, to be true and correct has not caused, and would not reasonably be expected to cause, a Material Adverse Change.

(l)     Covenants.  The Debtors shall have performed and complied with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including, without limitation, in any Transaction Agreement) in all material respects through the Effective Date.

(m)     Real Property Lease Assumptions, Assignments or Rejections.     The Debtors have not assumed, assigned, rejected or entered into any real property leases during these Chapter 11 Cases without the written consent of the Investor.

(n)     Material Adverse Change.  No Material Adverse Change shall have occurred from the date hereof to the Effective Date.

(o)     Delivery of Schedules.  No later than within three (3) Business Days of the entry of Bidding Procedures Order by the Bankruptcy Court, the Debtors shall have provided the Investor with the Disclosure Schedules, which Disclosure Schedules must be reasonably satisfactory to the Investor as provided in Section 1.8 (a).

10.2     All or any of the conditions set forth in this Section 10 may be waived in writing, in whole or in part by the Investor in its sole discretion.

**Section 11.     Closing.**

11.1     The Closing shall take place at the offices of Hahn & Hessen LLP, in New York, New York, on the Effective Date, provided that all of the conditions to the closing contained in Sections 9 and 10 have been satisfied or waived by the Debtors or the Investor (as applicable) and provided that this Agreement has not been terminated in accordance with Section 12, or at such other location or such other date as may be mutually agreed by the Debtors and the Investor.  The Closing shall be deemed to be effective as of 12:01 a.m. on the Effective Date and all documents and instruments shall be deemed to have been delivered simultaneously at such time.

11.2     At the Closing, the Debtors shall deliver to the Investor the following:

(a)     A certificate of an officer of the Debtors to the effect that the conditions to the closing contained in Section 10 have been satisfied or waived and that the Debtors have complied with all of the covenants contained in this Agreement in all material respects; and

(b)     The items set forth in Section 1.8 (b)(i) through (iv), (vii) and (viii).

11.3     At the Closing, the Investor shall deliver or cause to be delivered to the Debtors the following:

(a)     Payment of the Investment, <u>provided</u>, that the Deposit shall be applied against the Investment as set forth and in accordance with the Escrow Agreement and Bidding Procedures;

(b)     A certificate of the Investor to the effect that the conditions to the closing contained in Section 9 have been satisfied or waived and that the Investor has complied with all of the covenants contained in this Agreement in all material respects; and

(c)     The items set forth in Section 1.7 (c) (ii) and (iv).

**Section 12.     Termination.**

12.1     <u>Automatic Termination</u>.   This Agreement shall automatically terminate if any court of competent jurisdiction or other competent governmental or regulatory authority issues a final nonappealable order making illegal or otherwise restricting, preventing, or prohibiting the transactions set forth in this Agreement or the Plan in a manner that cannot be reasonably remedied by the Debtors or the Investor.

12.2     <u>Termination by Mutual Consent</u>.   This Agreement may be terminated at any time prior to the Effective Date upon the mutual written consent of the Debtors and the Investor.

12.3     <u>Termination by the Investor</u>.   Prior to the Effective Date, the Investor may terminate this Agreement upon written notice to the Debtors of the occurrence of any of the following events, at which time the commitment of the Investor to pay the Investment under Section 1 as set forth in this Agreement shall terminate and all of the obligations of the Debtors (other than the obligations of the Debtors to pay the Expenses and to satisfy their indemnification obligations set forth in this Agreement) shall be of no further force or effect:

(a)     the Bankruptcy Court fails to enter the Disclosure Statement and Solicitation Approval Order on or before October 15, 2010;

(b)     the Confirmation Order, has not been entered by the Bankruptcy Court on or before November 30, 2010;

(c)     the Effective Date does not occur on or before December 31, 2010 other than due to a material breach of this Agreement by the Investor or its members and Affiliates;

(d)     the withdrawal, amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any document related to the Plan or Disclosure Statement (including, without limitation, any documents in the supplement to the Plan, any motion, notice, exhibit, appendix or order) by the Debtors, which withdrawal, amendment, modification or filing is inconsistent with this Agreement, except as reasonably agreed to in writing by the Investor;

(e)     the filing by the Debtors of any motion or other request for relief seeking (i) to voluntarily dismiss any of the Chapter 11 Cases, (ii) to convert any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (iii) to appoint a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

185125/001-1909066.9

(f)     the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) appointing a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (iv) making a finding of fraud, dishonesty, or misconduct by any officer or director of the Debtors;

(g)     a material breach by the Debtors of any of their obligations under this Agreement that is not cured within five (5) Business Days after receipt of written notice thereof to the Investor;

(h)     one or more of the conditions precedent to occurrence of the Effective Date or to the obligations of the Investor set forth in this Agreement becomes impossible to satisfy on or before the Effective Date other than due to a material breach of this Agreement by the Investor or its members and Affiliates;

(i)     at any time after the occurrence of a Material Adverse Change; and

(j)     the Debtors have not provided the Investor with the Disclosure Schedules, which Disclosure Schedules must be reasonably satisfactory to the Investor as provided in Section 1.8 (a), no later than within three (3) Business Days of the entry of Bidding Procedures Order by the Bankruptcy Court,

12.4     <u>Termination by the Debtors</u>.  The Debtors may terminate this Agreement upon written notice to the Investor at any time prior to the Effective Date, after (i) a material breach of this Agreement by the Investor, (unless any entity that is part of the Debtors are then in material breach of this Agreement), which breach is not cured within five (5) Business Days following the receipt by the Investor of notice of such breach, (ii) the failure by the Investor to comply with Section 1.7 within any of the time frames set forth therein, (iii) a Qualified Bidder other than the Investor is determined by the Bankruptcy Court to be the Successful Plan Sponsor based on it having submitted the highest or otherwise best offer at the Auction, (iv) the Plan is not confirmed or consummated for any reason other than due to a material breach of this Agreement by the Debtors, (v) the Effective Date does not occur on or before December 31, 2010 for any reason other than due to a material breach of this Agreement by the Debtors; (vi) the entry of an order by the Bankruptcy Court (A) dismissing any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) appointing a trustee pursuant to Section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, or (vii) one or more of the conditions precedent to occurrence of the Effective Date or to the obligations of the Debtors set forth in this Agreement becomes impossible to satisfy on or before the Effective Date for any reason other than due to a material breach of this Agreement by the Debtors, at which time the commitment of the Investor to fund the Investment as set forth in this Agreement shall terminate and all of the obligations of the Debtors shall be of no further force or effect, except as set forth in Section 2 and Section 12.5.  In the event this Agreement is terminated by the Debtors in accordance with this Section 12.4 due to a material breach by the Investor which breach is not cured within five (5) Business Days following the receipt by the Investor of notice of such breach, the Debtors, in addition to its other rights and remedies, shall be entitled to retain the Deposit. The Debtors and the Investor acknowledge and agree that for purposes of

determining whether the Debtors shall be entitled to retain the Deposit, the failure by the Investor to comply with Section 1.7(b) shall not be considered a material breach by the Investor.

12.5　Consequences of Termination. In the event this Agreement is terminated other than pursuant to Section12.4 (i), in addition to the payment of the Expenses as set forth in Section 2.2 above, the Investor shall be entitled to the return of the Deposit, all as set forth in and in accordance with the Escrow Agreement and Bidding Procedures. If the Agreement is terminated pursuant to the terms of Sections 12.1, 12.2 and 12.3, this Agreement shall forthwith become void and there shall be no further obligations on the part of the Debtors or the Investor, except for the obligations of the Debtors to return the Deposit and pay the Expenses, which shall survive termination of this Agreement and shall remain in full force and effect; provided, further that nothing in Section 12.4 or this Section 12.5 shall relieve any party from Liability for any willful breach of this Agreement.

12.6　Payments Upon Termination. Upon termination of this Agreement pursuant to this Section 12.6, payment of all amounts due under this Agreement pursuant to Section 12.5 hereof shall be made no later than the close of business on the third Business Day following the date of such termination, except for amounts owing by the Debtors to the Investor for the reimbursement of Expenses for which the Investor has not then made a request, payment of which amounts shall be made not later than five (5) Business Days following the Investor's request.

**Section 13.　No Survival.**

13.1　The representations and warranties of the Debtors and the Investor contained in this Agreement or in any certificate delivered hereunder shall not survive the Closing hereunder.

**Section 14.　Notices.**

14.1　All notices, communications and deliveries required or permitted by this Agreement shall be made in writing signed by the party making the same, shall specify the Section of this Agreement pursuant to which it is given or being made and shall be deemed given or made (a) on the date delivered if delivered by telecopy or other standard form of written telecommunication (e.g., e-mail) and confirmed by receipt of electronic confirmation or other evidence of receipt) (b) on the date delivered, if delivered in person, (c) on the third (3rd) Business Day after it is mailed if mailed by registered or certified mail (return receipt requested) (with postage and other fees prepaid), or (d) on the day after it is delivered, prepaid, by an overnight express delivery service that confirms to the sender delivery on such day, as follows:

> (1)　if to GH, to:
>
> The Weck Corporation d/b/a Gracious Home
> 632 Broadway, Suite 401
> New York, New York 10012
> Attention:　Jordan Smilowitz, President
> Email: jsmilowitz@gracioushome.com
> Telephone:　212-901-6307
> Facsimile:　212-677-8010

with copies (which shall not constitute notice) to counsel for GH:

Rosanne T. Matzat, Esq.
Mark T. Power, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022
Email: rmatzat@hahnhessen.com
Email: mpower@hahnhessen.com
Telephone:     212.478.7200
Facsimile:     212.478.7400

And to special counsel for GH:

Drew Hazen, Esq.
The Law Offices of Andrew Hazen,
30 Glenn Street, Suite 301
White Plains, New York 10603
Email: drew@drewslaw.com
Telephone:     914-761-0381
Facsimile:     914-948-3371

And the financial advisor to GH:

Triton Equity Partners, LLC
Attention: Robert L. Pressman
Chief Executive Officer
81 Newtown Lane, Suite 351
East Hampton, New York 11937
Email: rpressman@tritonequity.com
Telephone:     631-613-6655
Facsimile:     631-613-6659

(2)      if to GHA:

Thomas C. Shull
28 Leeward Lane
Riverside, CT 06878
Email:       shulltc@aol.com
Telephone:   203-249-6094
Facsimile:   203-637-5576

with copies (which shall not constitute notice) to:

Morton M. Rosenfeld, Esq.
Rosenfeld, Wolff & Klein

1901 Avenue of the Stars, Suite 500
Los Angeles, California 90067
Email:       mrosenfeld@rwak.com
Telephone:   310-556-1221
Facsimile:   310-556-0401

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by telecopier or e-mail shall be effective upon oral or machine confirmation of receipt.

**Section 15.    <u>Assignment</u>.**

15.1    This Agreement shall be binding upon, and shall inure to the benefit of and be enforceable by, the parties hereto and their respective successors and assigns. This Agreement is not assignable, in whole or in part, absent the express written consent of the Debtors.

**Section 16.    <u>Entire Agreement</u>.**

16.1    This Agreement, including, without limitation, the agreements and documents accompanying this Agreement or attached as exhibits to and the documents and instruments referred to in this Agreement, constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties shall continue in full force and effect.

**Section 17.    <u>Governing Law, Venue</u>.**

17.1    THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. THE INVESTOR HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

**Section 18.    <u>Waivers and Amendments</u>.**

18.1    This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court. No delay on the part

of any party in exercising any right, power or privilege pursuant to this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor shall any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity. Notwithstanding anything to the contrary in this Agreement, no amendment that increases the Investor's obligations with respect to the Investment shall be effective against the Investor without the Investor's consent.

**Section 19.** **Miscellaneous.**

19.1 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party (including, without limitation, via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

19.2 <u>Headings</u>. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of this Agreement.

19.3 <u>Severability</u>. If any provision of this Agreement or the application thereof to any Person or circumstances is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to Persons or circumstances other than those as to which it has been held invalid, void or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effectuate the original intent of the parties.

19.4 <u>Specific Performance</u>. The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions without the necessity of posting bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

19.5 <u>Joint and Several Obligations</u>. The agreements, representations, warranties, covenants and obligations of the Debtors under this Agreement are, in all respects, joint and several as among the Debtors.

19.6 <u>Interpretation and Construction</u>. This Agreement has been freely and fairly negotiated among the parties hereto. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no

185125/001-1909066.9

presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Unless the context requires otherwise, any agreements, documents, instruments or laws defined or referred to in this Agreement will be deemed to mean or refer to such agreements, documents, instruments or laws as from time to time amended, modified or supplemented, including, without limitation, (a) in the case of agreements, documents or instruments, by waiver or consent and (b) in the case of laws, by succession of comparable successor statutes. All references in this Agreement to any particular law will be deemed to refer also to any rules and regulations promulgated under that law. The words "include," "includes" and "including" will be deemed to be followed by "without limitation." The word "or" is used in the inclusive sense of "and/or" unless the context requires otherwise. References to a Person are also to its permitted successors and assigns. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context requires otherwise. When a reference in this Agreement is made to an Article, Section, Exhibit, Annex or Schedule, such reference is to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement unless otherwise indicated. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. For all purposes of this Agreement, "Debtors" shall include the reorganized Debtors and the Investor's "members and/or Affiliates" shall include the Sponsors.

19.7 <u>Non-Recourse</u>. No past, present or future director, officer, employee, incorporator, member, partner or equity holder of any Debtor or Investor shall have any liability for any obligations or liabilities of such Debtor or Investor under this Agreement or any Transaction Agreements, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby.

**Section 20.** **<u>Definitions</u>.**

"<u>Affiliate</u>" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling", "controlled by" and "under common control with" have correlative meanings.

"<u>Agreement</u>" or "<u>this Agreement</u>" means this Investment and Standby Purchase Agreement, together with the schedules, annexes and exhibits hereto.

"<u>Allocation Schedule</u>" has the meaning specified in Section 1.10(a) hereof.

"<u>Alternate Transaction</u>" means if the Bankruptcy Court determines by Final Order that a Party other than the Investor is the Successful Plan Sponsor based on such party having submitted the highest or otherwise best offer at the Auction.

"Applicable Law(s)" means all applicable provisions of any constitution, statute, law, ordinance, code, rule, regulation, decision, order, decree, judgment, release, license, permit, stipulation or other official pronouncement enacted or issued by any federal, state, local or foreign legislative, executive, judicial or other public authority, agency, department, bureau, division, or court.

"Assigned Lease" means an unexpired lease that, pursuant to the Plan, is deemed to have been assumed by the applicable Debtor and assigned to the Investor as of the Effective Date.

"Assumed Contract" means an executory contract that, pursuant to the Plan, is deemed to have been assumed by the applicable Debtor and assigned to the Investor as of the Effective Date.

"Assumed Liabilities" means (i) the obligations arising under any Assigned Lease or Assumed Contract after the assignment to Investor, and (ii) the Liabilities of Debtors set forth in Annex I hereof.

"Auction" has the meaning specified in the Recitals.

"Avoidance Actions" has the meaning specified in Section 1.2(c) hereof.

"Bankruptcy Code" has the meaning specified in the Recitals.

"Bankruptcy Court" has the meaning specified in the Recitals.

"Bankruptcy Rules" has the meaning specified in Section 3.1(b)(i) hereof.

"Bidding Procedures Order" means an Order pursuant to Sections 105(A) and 363 of the Bankruptcy Code Approving Bidding Procedures and Notice of the Auction Relating thereto and Granting Related Relief, substantially in the form annexed hereto as Exhibit "B" establishing the procedures relating to the solicitation, submission, acceptance and approval of bids to become the Successful Plan Sponsor.

"Books and Records" means all books, ledgers, files, reports, plans, records, manuals and other materials (in any form or medium) of, or maintained for, the Business.

"Breakup Fee" means any breakup fee and/or expenses reimbursement approved by the Bankruptcy Court in favor of the Investor in connection with this Agreement and the Bidding Procedures Order as set forth in Section 2.1 hereof.

"Business" has the meaning specified in the Recitals.

"Business Assets" has the meaning specified in Section 3.1(k) hereof.

"Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.

"Chapter 11 Cases" has the meaning specified in the Recitals.

"Claims" means any right to payment from Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Closing" has the meaning specified in Section 2.4 hereof.

"COBRA" means the U.S. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended or any similar state or local Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Reorganization Plan under Section 1129 of the Bankruptcy Code.

"Contracts" means all agreements, contracts, leases and subleases, purchase orders, arrangements, commitments and licenses (other than this Agreement) that are related to the Business, or to which any of the Purchased Assets are subject, whether written or oral, except to the extent included in Excluded Assets.

"Copyrights" has the meaning set forth in the "Intellectual Property" definition.

"Credit Facility" has the meaning specified in the Recitals.

"Cure Costs" has the meaning specified in Section 1.4 hereof.

"Debtors" has the meaning specified in the Preamble.

"Debtors Intellectual Property" has the meaning specified in Section 3.1(i) hereof.

"Deposit" has the meaning specified in the Recitals.

"DIP Budget" means the DIP Operating Budget provided with the DIP Credit Facility, as may be amended from time to time.

"DIP Credit Facility" has the meaning specified in the Recitals.means

"Disclosure Schedules" means the schedules to be provided pursuant to Section 1.8(a) hereof.

"Disclosure Statement" means a disclosure statement with respect to the Reorganization Plan.

"Effective Date" means the date on which the Reorganization Plan is substantially consummated as defined in the Reorganization Plan.

"Environmental Law" means each federal, state, local and foreign Law and regulation relating to pollution, protection or preservation of human health or the environment including ambient air, surface water, ground water, land surface or subsurface strata, and natural resources, and including each Law and regulation relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacturing, processing, distribution, use, treatment, generation, storage, containment (whether above ground or underground), disposal, transport or handling of Materials of Environmental Concern, or the preservation of the environment or mitigation of adverse effects thereon and each Law and regulation with regard to record keeping, notification, disclosure and reporting requirements respecting Materials of Environmental Concern.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning specified in the Recitals.

"Excluded Assets" has the meaning specified in Section 1.2 hereof.

"FMLA" means the Family and Medical Leave Act of 1993, as amended.

"GHA" has the meaning specified in the Preamble.

"Government Entity" means any United States federal, state or local or non United States governmental or regulatory authority, agency, commission, court, body, arbiter or other governmental entity, public or private.

"Independent Accounting Firm" has the meaning specified in Section 1.10(a) hereof.

"Intellectual Property" means, collectively, patents, trademarks, service marks, trade names, trademark registrations, service mark registrations, domain names, copyrights, licenses and know-how (including, without limitation, trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures, as well as other inventions, works of authorship, confidential information, technology, software and documentation, data and databases, and web sites), and any registrations or applications to register the foregoing.

"Investment" has the meaning specified in Section 1.6 hereof.

"Investor" has the meaning specified in the Preamble.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for taxes, including, without limitation, taxes arising as a result of the transactions contemplated by this Agreement or the Plan.

"Lien" means all mortgages, deeds of trust, leases, guarantees, security agreements, security interests, pledges, options, hypothecations, charges, obligations, rights, restrictions,

29

interests and encumbrances and includes but is not limited to any and all "liens" as defined in Bankruptcy Code § 101(37).

"Material Adverse Change" means

(a)    The failure by the Debtors to resolve their real property leases for their stores located on Third Avenue, New York City (the "Third Avenue Stores") and, as a result of such failure (i) the Debtors are prevented from operating store(s), with a company-wide product mix that is in the aggregate materially the same or similar to their current product mix, located within a five (5) block radius of the Third Avenue Stores for a period of more than thirty (30) days (except that, with respect to plumbing, decorative hardware and lighting, Debtors may relocate all or any of said departments to Debtors' existing location at 45 West 25th Street), or (ii) the Debtors incur additional operating losses in excess of $500,000;

(b)    The occurrence of an Event of Default under the DIP Credit Facility, which Event of Default has not been cured;

(c)    Any one or more changes, events, occurrences or effects, which individually or together with any other changes, events, occurrences or effects, have or result in, or would reasonably be expected to have or result in, any material adverse change to or effect on the business, results of operations, liabilities, finances, properties, assets or condition (financial or otherwise) of the Debtors or the ability of the Debtors to perform their obligations set forth in this Agreement and the Plan, in each case except for any such change, event or effect (a) resulting from any changes in any applicable law, or in generally accepted accounting principles, which take effect after the date hereof; (b) resulting from the announcement or performance of this Agreement or the transactions contemplated hereby; (c) resulting from any act or omission of the Debtors taken at the written direction of the Investor; or (d) resulting from the filing of the Chapter 11 Cases.

"Material Contract" means those contracts, agreements or arrangements (i) which are material to the business, results of operations, liabilities, finances, properties, assets or condition (financial or otherwise) of the Debtors or the ability of the Debtors to perform their obligations set forth in this Agreement and the Plan, or (ii) the loss, termination, repudiation or breach of which would cause, or would reasonably be expected to cause, a Material Adverse Change, including, without limitation, those contracts listed on Schedule 3.1(f) hereto.

"M&T" has the meaning specified in the Recitals.

"NAB" has the meaning specified in the Recitals.

"NAB Exit Financing" has the meaning specified in the Recitals.

"New Employment Agreements" means the employment agreement to be entered into between the Investor and each member of Senior Management, on terms reasonably satisfactory to both parties.

"Outside Petition Date" has the meaning specified in the Recitals.

185125/001-1909066.9

"Permitted Lien" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) mechanics', workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the ordinary course of business or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been made in accordance with GAAP to the extent required thereby; (c) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Government Entity having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not reasonably be expected to, individually or in the aggregate, materially impair the use or operation of the affected property or the conduct of the Business thereon as it is currently being conducted; (d) Liens for any financing secured by an asset, where the financing obligation is an Assumed Liability and such asset is an Purchased Asset; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not materially impair the use or occupancy of such real property in the operation of the Business taken as a whole; (f) matters that would be disclosed on an accurate survey of the real property; (g) other Liens, none of which, individually or in the aggregate, materially impairs the use or operations of the affected property or the conduct of the Business therewith as it is currently being used and conducted; and (h) Liens to the extent released at or prior to the Closing, whether pursuant to the Confirmation Order or otherwise.

"Person" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization, any other business entity, or a government entity (or any department, agency, or political subdivision thereof).

"Petition Date" has the meaning specified in the Recitals.

"Plan" has the meaning specified in the Recitals.

"Plan Documents" has the meaning specified in Section 10.1(b) hereof.

"Prepetition Secured Debt" has the meaning specified in the Recitals.

"Purchased Assets" has the meaning specified in Section 1.1 hereof.

"Qualified Bidder" has the meaning specified in the Bidding Procedures Order.

"Retained Liability" shall mean any Liability of any nature or kind whatsoever relating to the Business or the Purchased Assets that exists, or arises out of the operation or ownership of the Purchased Assets or the Business, prior to the Effective Date and that is not an Assumed Liability.

"Senior Management" means each of Natan Wekselbaum, Jordan Smilowitz, and Jim Linsalata.

"Successful Plan Sponsor" has the meaning specified in the Recitals.

185125/001-1909066.9

"Tax" or "Taxes" means any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the IRC), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto), in each case imposed by any Government Entity.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transaction Agreements" has the meaning specified in Section 3.1(b)(i) hereof.

"Transferred Employees" has the meaning specified in Section 8.1 hereof.

"Transferred Intellectual Property" shall mean any Intellectual Property included in the Purchased Assets.

"WARN" means, as may be applicable, the Federal Worker Adjustment and Retraining Notification Act, and/or the New York State WARN Act.

**[Remainder of this page intentionally left blank.]**

185125/001-1909066.9

THE WECK CORPORATION

By: _____
Name: Natan Wekselbaum
Title: Chairman


WEST WECK, LLC

By: _____
Name: Natan Wekselbaum
Title: Managing Member


GRACIOUS HOME.COM, LLC,

By: _____
Name: Natan Wekselbaum
Title: Managing Member


WECK CHELSEA, LLC

By: _____
Name: Natan Wekselbaum
Title: Managing Member

GH ACQUISITION, LLC

By: Meridian Acquisition Ventures, LLC
Its: Managing Member

By: _____
Name: Thomas C. Shull
Title: Managing Member