HAHN & HESSEN LLP
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400
Rosanne Thomas Matzat
Mark T. Power

*Attorneys for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                                  :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **THE WECK CORPORATION,** | : | **Jointly Administered** |
| **d/b/a Gracious Home,** *et al.* | : | |
| | : | **Case No. 10-14349 (AJG)** |
| **Debtors.** | : | |
| | : | **Hearing Date: September 30, 2010** |
| | : | **Time:  9:30 a.m.** |

-------------------------------------------------------------- x

**SUPPLEMENT TO DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY**
**CODE APPROVING BIDDING PROCEDURES AND NOTICE OF THE**
**AUCTION RELATING THERETO AND GRANTING RELATED RELIEF,**
**INCLUDING (A) SCHEDULING OF HEARING APPROVING SALE OF ASSETS (B)**
**EXTENDING THE DEADLINE TO ASSUME OR REJECT UNEXPIRED LEASES OF**
**NONRESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. 365(d)(4); AND (C)**
**MUTUAL RELEASE OF CLAIMS UNDER PRE-PETITION INVESTMENT**
**AGREEMENT**

         Gracious Home and its debtor affiliates, as debtors and debtors in possession in

the above-captioned chapter 11 cases (collectively, "Gracious Home" or the "Debtors"),[1] by its

undersigned counsel, submit this supplement to the motion filed on August 24, 2010 (the

---

[1] The Debtors in these cases, together with the last four digits of their respective federal tax identification numbers, are as follows:  The Weck Corporation 6057; West Weck, LLC 1934;  Gracious Home.com, LLC 4754; Weck Chelsea, LLC 3431.

"Original Bid Motion")[2] seeking a modified form of order (the "Procedures Order") (i) approving certain procedures (the "Selection Procedures") in connection with the selection of a stalking horse bidder (the "Stalking Horse Bidder") in connection with a sale (the "Sale") of substantially all of the Debtors' assets (the "Acquired Assets"), as more particularly described in the proposed form of Asset Purchase Agreement (the "Asset Purchase Agreement")[3] between the Debtors and any Stalking Horse Bidder (ii) approving certain parameters for bidding protections (the "Bidding Protections"), including a "break-up fee" (the "Break-Up Fee"), to be permissibly agreed upon between the Debtors and the Stalking Horse Bidder; (iii) scheduling an auction (the "Auction") and a Sale hearing (the "Sale Hearing") with respect to the Sale to the Stalking Horse Bidder (or such higher and better bid received at the Auction), (iv) approving certain Bidding Procedures for the conduct of the Auction, (v) approving the form of Notice of the Stalking Horse Selection Process, Auction and the Sale Hearing,; (vi) authorizing and approving the Debtors' entry into a mutual settlement and release between the Debtors' estates and Meridian Acquisition Ventures, LLC, and its principals and affiliates ("Meridian"), upon receipt of consent thereto from the Official Committee of Unsecured Creditors (the "Committee") and NewAlliance Bank (the "Secured Lender") as the Debtors' pre and post petition lender; (vii) extending the deadline to assume or reject real property leases pursuant to Section 365(d)(4) of the Bankruptcy Code; and (viii) granting such other and further relief as the

---

[2] The Original Bid Motion is filed as Docket No. 56, captioned Motion for Entry of an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Approving Bidding Procedures and Notice of the Auction Related Thereto and Related Relief. The Original Bid Motion, as originally returnable on September 8, 2010, has been adjourned from time to time on the consent of the parties, at least in part to facilitate the very discussions and modifications provided for in this Supplement. Capitalized terms not otherwise defined are defined as set forth in the Original Bid Motion.

[3] A copy of the Asset Purchase Agreement, together with a copy of a proposed Agency Agreement which may be requested by certain potential Stalking Horse Bidders, will be made available to parties in interest and filed with the Bankruptcy Court no later than five (5) business days after entry of the Procedures Order. To the extent not attached thereto or filed therewith, any non-confidential schedules to the Purchase Agreement and Agency Agreement will be provided upon written request by the undersigned counsel when such schedules are available.

2

Court deems just and proper. In light of certain proposed provisions of the Debtors' continued financing and/or use of cash collateral which may require the proposed Sale to be approved by the Bankruptcy Court by early November, and exigent circumstances surrounding the Debtors' business operations which require expeditious action, and in light of the fact that the Original Bid Motion put parties on substantial notice of the nature of the supplemented relief requested herein, the Debtors are seeking immediate entry of the Procedures Order, with scheduling of a hearing on approval of the Sale on November 4, 2010.

### Preliminary Statement

1. As described more fully in the Original Bid Motion, the Debtors' pre-petition efforts to locate an investor or buyer for their businesses had culminated in an arrangement negotiated and documented pre-petition among the Debtors, Meridian and Secured Lender under the terms of a Plan Support Agreement (the "PSA") and under an Investment and Standby Purchase Agreement between a Meridian affiliate and the Debtors (the "Investment Agreement") each dated as of August 11, 2010. That procedure contemplated an Auction process to take place during October 2010 culminating in confirmation of a Plan of Reorganization in November 2010. Since the filing, certain events and negotiations, including input from the Committee, has caused both Meridian and the Debtors to mutually agree that termination of the Investment Agreement and the Plan Support Agreement is appropriate. While such termination modifies certain relief sought in the Original Bid Motion, the Debtors, with the support in principal of the Committee and Secured Lender[4], seek the ability to proceed on a modified expedited basis toward a closing of a sale of the Debtors' business no later than November 5, 2010.

---

[4] As of the filing of this Supplement, neither the Committee or the Secured Lender are in full agreement as to the precise timeline suggested herein, with the Secured Lender seeking a more aggressive Sale schedule and the Committee a more relaxed.

115350/214-1926308.5

2.        This same change in circumstances, termination of the Investment Agreement and business exigencies incident to timing further require changes in the terms of the continued financing of the Debtors by the Secured Lender.  Given that (a) current circumstances, including the termination of the Investment Agreement, would cause the Debtors to otherwise be in imminent risk of default by virtue of imminent passing of certain deadlines otherwise provided for in the proposed final debtor in possession financing order (the "Final Financing  Order"); (b) a revised Budget proposed by the Debtors to reflect post-petition operations indicates that the Debtors' can operate almost exclusively on use of cash collateral, without the need for new debtor in possession borrowings; and (c) in any event, the Committee and the Secured Lender have failed to reach agreement on certain material terms contained in the original proposed Final Financing Order,  a revised agreement and arrangement for continued funding of operations must be forthcoming.  The Debtors, the Secured Lender and the Committee intend to attempt work productively to reach such agreement prior to the September 30 hearing but in the event the parties are unable to do so, the Debtors may be required to withdraw or further modify not only the Original Bid Motion but the proposed supplemental relief requested herein.  **Accordingly, the continuing premise of the relief requested herein is that the parties have reached an agreement on a mutually acceptable Budget and continued use of cash collateral.**

3.        In large measure, the proposed modified timeline is not materially different than that suggested in the Original Bid Motion.  The Debtors seek to proceed immediately with marketing efforts culminating in the selection no later than October 25, 2010, of a Stalking Horse Bidder for the Sale of the Acquired Assets.  In connection therewith, the Debtors seek this Court's authority to offer certain Bidding Protections, not to exceed certain authorized parameters, to a selected Stalking Horse Bidder.  The bid received from the selected

Stalking Horse Bidder would then be subject to an Auction to take place no later than November 3, 2010, which Auction result would be approved at a Sale Hearing to be scheduled by this Court no later than November 4. 2010 with a view toward a potential closing as early as Friday, November 5, 2010.  The Debtors believe that this proposed process and schedule is reasonable and appropriate under the circumstances given the financing and business exigencies going into the holiday season, and the legitimate concerns of Secured Lender as balanced by the legitimate interests of the Committee.

    4. As incident to this change in circumstances, the Debtors have been asked to enter into a mutual release of claims between Meridian and the Debtors' estates, in exchange for payment of the sum of $41,000 to Meridian for additional reimbursement of legal expenses incurred by Meridian.  While the Debtors believe such exchange of mutual releases and payment is appropriate under the circumstances, given that Meridian principals held senior management positions with the Debtors' estates prior to termination of the Investment Agreement, the Debtors are reluctant consider such exchange without the consent of the Committee and Secured Lender. The Debtors therefore seek the Court's authority to enter into a termination agreement and mutual release with Meridian, and make the requisite payment, on receipt of such affirmative consents.

<u>**Approval of Marketing and Stalking Horse Selection Process.**</u>

    5. The Original Bid Motion, PSA and Investment Agreement contemplated that an Auction process to take place during October 2010 culminating in confirmation of a Plan of Reorganization in November 2010.  In large measure, the contemplated timeline is no different than that suggested in the Original Bid Motion except that rather than Meridian serving as the Stalking Horse Bidder entitled to the Bid Protections set forth in the Original Motion,

5

Triton Equity Partners LLC ("Triton"), the Debtors' investment banker[5], in direct coordination with the BDO Seidman ("BDO"), the Committee's financial advisors, will actively market the businesses for sale, with a view toward reaching agreement on a highest and best Stalking Horse Bidder, no later than October 25, 2010.  The Committee and the Debtors, through Triton and BDO, have agreed on a set of procedures in connection therewith so as to assure that the Committee would be actively advised of the marketing status and participate as necessary therein, a copy of which procedures are annexed hereto as Exhibit "A".  Triton and BDO will report on all progress and the status of such marketing efforts to the Secured Lender, the Committee and the Debtors.  The Debtors and the Committee are in agreement that these marketing procedures can be modified by agreement from time to time as may be agreed upon and appropriate to allow the parties flexibility and to allow the processes and the marketing efforts to achieve the desired results.

6.     The proposed Asset Purchase Agreement will provide for a going concern sale of the Acquired Assets, which the Debtors believe presents the best opportunity to maximize recoveries for creditors and preserve hundreds of jobs for the Debtors' employees.  While it is anticipated that a number of the Debtors' leases will be assumed and assigned to the Successful Bidder at closing, the proposed Asset Purchase Agreement provides the Successful Bidder with the flexibility to defer its decision on certain store locations after the proposed closing  through a 120 day designation period.  During this 120 day period, the Successful Bidder will have the ability to direct the Debtors to assume and assign to the Successful Bidder or its designee or reject the underlying leases with respect to certain store locations.  To preserve the right to

---

[5] Triton's retention as investment banker is also returnable on September 30, 2010.  The Debtors, Triton and the Committee have worked out a modification of the Success Fee provided for in connection with Triton's retention and a consensual order will be submitted to the Court for consideration.  In reliance thereon (and even prior to final resolution of the Committee's issues), Triton has worked aggressively in furtherance of its role as investment banker in these cases without the benefit of an order.

potentially implement this provision in the event the Successful Bidder requests inclusion of these "designation rights" as an Acquired Asset, the Debtors herein seek an extension under Bankruptcy Code Section 365(d)(4) of the time to assume or reject leases for 90 days past the current 120 day period.

### Bid Protections

7.      In connection with selection of the Stalking Horse Bidder, the Debtors ask for the Court's authorization to offer selected Stalking Horse Bid protections not to exceed certain levels and parameters, all as agreed upon between the Debtors and the Committee, as follows:

> Bid Protection. If the Stalking Horse Bidder is not the Successful Bidder, the Debtors may, in certain circumstances, pay to the Stalking Horse Bidder (i) a Break-Up Fee equal not to exceed the 2.5% of the cash consideration proposed to be paid for the Acquired Assets, upon closing a competing transaction; plus (ii) reimbursement of expenses not to exceed $50,000 as reimbursement for actual reasonable out-of-pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by the Stalking Horse Bidder in connection with the Sale (the "Expense Reimbursement").

> Initial Qualified Bid. If the Stalking Horse Bidder is the Successful Bidder after an Auction in which the Stalking Horse Bidder has bid an amount in excess of the consideration provided for in the Asset Purchase Agreement submitted by such Stalking Horse Bidder, the Stalking Horse Bidder will, at the Closing under the Purchase Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to (a) the amount of the Successful Bid less (b) the Break-Up Fee and the Expense Reimbursement (to the extent incurred).

> Bid Increments. During the Auction, bidding shall begin initially with the highest Qualified Bid and subsequently continue in minimum increments of at least $50,000 higher than the previous bid.

115350/214-1926308.5

8.     The Debtors believe that these Bid Protections are well within the parameters of those typically approved by the Courts of the Southern Distinct of New York, and will have the benefit of encouraging prospective bidders to submit more substantial bids in connection with the Selection Process than might otherwise be submitted in connection with a "naked auction" process.

9.     From Qualified Bidders, the Debtors, after consultation with the Committee and Secured Lender, intend to select a Stalking Horse Bidder no later than October 25, 2010, which Stalking Horse Bidder will be required to have demonstrated its bona fides, signed the form of Asset Purchase Agreement (and Agency Agreement if relevant), and provide a deposit of not less than $500,000.

10.     After selection of the Stalking Horse Bid, notice of the terms thereof, as well as a copy of the executed Asset Purchase Agreement (and/or Agency Agreement), will be made available to all parties in interest so requesting, will be filed with the Bankruptcy Court and will be made available on the website maintained in these cases by The Garden City Group as the Debtors' claims agent (the "Claims Agent").  That Stalking Horse Bidder, will be afforded the Bid Protections in an Auction scheduled to take place no later than November 3, 2010.

### The Auction and Bidding Procedures

11.     In addition to the Bid Protections previously described, the Debtors seek approval of Bidding Procedures that will govern the Auction itself.  The Bidding Procedures as modified to reflect the change in circumstances incident to termination of the Investment Agreement and revised timeline is attached hereto as "<u>Exhibit B</u>.[6]"

---

[6]  The form of Exhibit "B" as filed is subject to further review by the Committee.

12.     As suggested in the Original Bid Motion, the Bidding Procedures were developed by the Debtors, and approved by Meridian, with the Debtors stated intention to work with the Creditors' Committee and Secured Lender to incorporate as many of their comments and suggestions as the Debtors deemed appropriate prior to the hearing date for the Original Bid Motion.  In that regard and in light of the termination of the Investment Agreement, the Debtors, working with the Committee and the Secured Lender, have developed modifications to the proposed Bid Procedures.

13.     The salient points of the Bidding Procedures as revised and applicable at the Auction, are as follows:

- Within five business days of the entry of the Proposed Order or such date thereafter as is reasonably practical to arrange for publication, the Debtors shall publish the notice of the Stalking Horse Bidder Selection Process, Auction and Sale Hearing, substantially in the form attached hereto as "Exhibit C,[7]" (the "Notice of Stalking Horse Bibber Selection Process, Auction and Sale Hearing") with any modifications necessary for ease of publication, once in *The New York Times* (New York Edition).

- The Stalking Horse Bidder shall be designated as such no later than October 25, 2010.  Within one business day thereof,  a copy of the Asset Purchase Agreement (or Agency Agreement (if relevant)) signed by the Stalking Horse Bidder, will be made available to all parties in interest so requesting, will be filed with the Bankruptcy Court and will be posted on the website maintained in these cases by the Claims Agent.  Such Stalking Horse Bidder, will then be afforded Bid Protections within  the parameters set forth above.

- All proposals for consideration at the Auction to compete with the Stalking Horse Bid (the "Proposal") are due no later than noon (prevailing Eastern Time) on November 2, 2010 (the "Proposal Deadline").

- Each potential investor (each an "Interested Party") must submit a $500,000 deposit with its Proposal.

- Each Proposal must be fully binding and committed, not subject to any further financing, diligence, or approvals or other conditions not set forth in the form of the Asset Purchase Agreement (and Agency Agreement (if relevant)).

---

[7] The form of Exhibit "C" as filed is subject to further review by the Committee

- Each Proposal must be accompanied by a mark-up of the Asset Purchase Agreement (and the Agency Agreement (if relevant)). Such markup must show, among other things, (i) the amount of the proposed consideration, (ii) identify any assumed liabilities as part of the Sale, (iii) identify which of the Debtors' real property leases and executory contracts the Interested Party intends to assume or reject and any designation rights it seeks in connection with such leases (iii) its stated intentions with respect to replacement or new real property leases (e.g., 1133 Third Lease) and (iv) identify which members of senior management and employees, if any, the Interested Party intends to extend employment offers to post-emergence and on what terms.

- The Debtors will allow each Interest Party reasonable access upon reasonable advance notice to meet with and interview the Debtors' senior management team and other employees reasonably requested during normal business hours; *provided however*, that such access shall not unduly interfere with the operation of the business.

- Copies of all Proposals will be provided by the Debtors to the Creditors' Committee and the Secured Lender.

- By 5:00 p.m. on November 2, 2010, the Debtors intend to select, in their business judgment, those Proposals that qualify for participation in the Auction (each such party, a "<u>Qualified Bidder</u>" and a "<u>Qualified Proposal</u>," respectively), taking into account, in such selection, both issues of feasibility and operational requirements, including those that materially impact the business in connection with the Debtors' collective flagship store(s) (*e.g*., continuation of leases at Eastside Location and/or the entering into of the 1133 Third Lease) and the right of the Secured Lender, which right shall be fully preserved, to credit bid all or any part of its pre-or post petition debt.

- Only those Proposals that (i) were submitted on or before the Proposal Deadline, (ii) provide incremental value to the Debtors' estates as compared to the Stalking Horse Bid in excess of (a) the amount of the Breakup Fee and Expense Reimbursement plus (b) not less than $50,000, (iii) state that they are binding and irrevocable offers, not subject to financing, diligence, approvals or other conditions not set forth in the Asset Purchase Agreement (and the Agency Agreement (if relevant)), (iv) are accompanied by a $500,000 deposit that was submitted on or before Noon on November 2, 2010, and (v) include the conditions specified above, may be deemed Qualified Proposals (unless waived or modified in the business judgment of the Debtors).

- The Debtors will notify each Interested Party that is a Qualified Bidder and qualifies to participate in the Auction in accordance with the Bidding Procedures, in writing, on or before 5:00 p.m. on November 2, 2010. Only Qualified Bidders may participate at the Auction and bid for the Debtors' assets.

10

- On or before 9:30 a.m. on November 3, 2010, the Debtors shall select, in their business judgment, the transaction they intend to use to commence the Auction (the "<u>Pre-Auction Successful Bid</u>").

- If the Debtors receive a timely Qualified Bid other than that represented by the Stalking Horse Bid, the Auction will be held on November 3, 2010 at 10:00 a.m. At the close of the Auction, the Debtors will identify the Qualified Bidder with the highest or otherwise best bid (the "<u>Successful Bid</u>," and such bidder, the "<u>Successful Bidder</u>").

- If no Qualifying Bid other than that represented by the Stalking Horse Bid is received, the Auction will not take place and the Stalking Horse Bid will be identified as the Successful Bid.

- A hearing to approve the Sale to the Successful Bidder will be scheduled for November 4, 2010.

- A closing of the Sale will be scheduled to take place on November 5, 2010

14.     The Bidding Procedures allow parties with a potential interest in the Debtors both notice and sufficient time to finalize diligence and submit fully-financed binding proposals by the Proposed Deadline. The Bidding Procedures also allow the Debtors sufficient time to assess and develop such proposals and discuss them with the advisors to the Creditors' Committee and the Secured Lender. The Bidding Procedures and the Auction process are designed to encourage all parties to put their best proposals forward, bring finality to the Debtors' competitive Sale process, and create a path towards achieving the highest and best available recoveries to creditors.

<strong><u>Release of Meridian</u></strong>

15.     As indicated earlier, Meridian and the Debtors have agreed to a mutual termination of the Investment Agreement and in connection therewith, Mr. Tom Shull and Mr. Paul Jen are no longer serving in management capacities with the Debtors. The Debtors have been advised that Meridian believes it has certain rights in connection with the Investment Agreement and the pre-petition Services Agreement under which Mssrs. Shull and Jen were

11

employed derivatively by the Debtors. While the Debtors contest any such continuing rights, Meridian has indicated a willingness to exchange mutual releases with the Debtors' estates in exchange for payment of the sum of $41,000, representing reimbursement of legal fees incurred by Meridian.[8] While the Debtors believe such exchange of mutual releases and payment is appropriate under the circumstances, given that Meridian principals held senior management positions with the Debtors' estates prior to termination of the Investment Agreement, the Debtors are reluctant consider such exchange without the consent of the Committee and Secured Lender. Accordingly, the Debtors seek authority to enter into a termination agreement and mutual release with Meridian, and make the requisite payment, only upon receipt of consent from the Secured Lender and the Committee to execution thereof. To date, the Committee has indicated that it has no inclination to so consent.

### BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

16.    Authority for grant of Bidding Protections to a Stalking Horse Bidder, including a Break-Up Fee, are set forth in the Original Bid Motion. Additional authority for the relief as modified by change in circumstances is set forth below.[9]

### Sale of Substantially All of the Debtors' Assets is Within the Debtors' Sound Business Judgment

17.    Bankruptcy Code Section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in relevant

---

[8] Meridian received a deposit of $50,000 from the Debtors' pre-petition against reimbursement of legal fees. The $41,000 payment being sought represents additional legal fees presumably beyond this prior $50,000.

[9] The Debtors are optimistic that the Selection Process and Auction will result in a going concern Sale for the Acquired Assets. In the event the Successful Bid is from a Qualified Bidder which intends to conduct a liquidation or going out of business sale, the Debtors will be prepared to brief for consideration at the Sale Hearing, any potential additional issues which may be raised thereby.

115350/214-1926308.5

part:  "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

18.     A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so.  See Comm. of Equity Sec. Holders v. Lionel Com. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); see also Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that "sound business purpose test" is appropriate); In re Del. & Hudson Ry. Co., 124 B.R. 169, 177 (D. Del. 1991) (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when sound business reason justifies such sale).

19.     Courts have applied four factors in determining whether a sound business justification exists:  (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided.  See Lionel, 722 F.2d at 1071 (setting forth "sound business" purpose test); see also Del. & Hudson Ry., 124 B.R. at 175 (adopting Lionel factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business); cf. In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting articulated business justification test of Lionel and adding "good faith" requirement).

20.     There is more than adequate business justification to sell the Acquired Assets to the Stalking Horse Bidder or the Successful Bidder and to enter into the Purchase Agreement (and any Agency Agreement (if relevant)) in these cases.  Based upon the results of their exhaustive analysis of the Debtors' ongoing and future business prospects, the Debtors'

management and financial advisor have concluded that the best way to maximize the value of its estate is to sell the Debtors' business as a going business concern, thereby preserving the substantial goodwill of the businesses, maintaining customer relationships and avoiding a liquidation sale or sales at depressed prices. The Debtors believe that a Sale in accordance with the procedures set forth in the Bidding Procedures is the best method to potentially achieve that result and thereby enhance recoveries to the estate.

21.     By making the sale of the Acquired Assets to the Stalking Horse Bidder subject to competing bids, the Debtors' enhance their ability to receive the highest and best value for their business. By virtue of the Auction process, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check," which is the best means for establishing whether a fair and reasonable price is being paid.

22.     The participation of Triton and BDO in the Stalking Horse Bid Selection Process and the Auction is designed to assure that the Purchase Agreement and the Agency Agreement will be the product of arms'-length negotiations between the Debtors and the Stalking Horse Bidder. Additionally, the Bidding Procedures ensure that a prospective purchaser will not be able to exert any undue influence over the Debtors. Under the circumstances, this Court should be in the position at the Sale Hearing to find that (i) the sale of the Acquired Assets is the result of good faith arms-length negotiations and (ii) the Stalking Horse Bidder or the Successful Bidder is entitled to all of the protections of Bankruptcy Code section 363(m).

23.     Furthermore, the Debtor and their assets were marketed prior to Petition Date, providing additional support for both approval of the Sale and the expedited schedule requested by the Debtors. Triton, upon being retained by the Debtors in May 2010 immediately

commenced soliciting sources of capital that could be used to finance the Debtors' business and potential purchasers for certain of the Debtors' assets.

24. Finally, all creditors and parties in interest will receive adequate notice of the Bidding Procedures and the Sale Hearing pursuant to the procedures proposed above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in this case, those parties potentially interested in bidding on the Acquired Assets and others whose interests are potentially implicated by the proposed Sale. The Debtors submit that such proposed notice is sufficient for entry of the Sale Order and satisfies requisite notice conditions for approval of the Sale under Section 363(b) of the Bankruptcy Code.

25. Under these circumstances, therefore, sound business reasons exist that justify the sale of the Acquired Assets outside the ordinary course of business and prior to the confirmation of a reorganization plan. Accordingly, this Court should approve the Sale.

**The Sale Satisfies the Requirements
of Bankruptcy Code Section 363(f) for a Sale Free and Clear of
Liens, Claims, Encumbrances and Interests**

26. Under Bankruptcy Code section 363(f), a debtor-in-possession may sell property free and clear of any interest in such property of an entity other than the estate only if, among other things:

1. applicable nonbankruptcy law permits sale of such property free and clear of such interest;
2. such entity consents;
3. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
4. such interest is in bona fide dispute; or
5. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

15

11 U.S.C. § 363(f).  Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of anyone of its five requirements will suffice to approve the sale of the Acquired Assets "free and clear" of liens, claims, encumbrances and interests (collectively, the "Encumbrances").  See 11 U.S.C. § 363(f); <u>Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)</u>, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (recognizing that Bankruptcy Code section 363(f) is written in disjunctive, and holding that court may approve sale "free and clear" provided that at least one subsection of section 363(f) is met), <u>cert. dismissed</u>, 503 U.S. 978 (1992); <u>Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot),</u> 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

27.     The Debtors believe that the only entity holding a lien on the Acquired Assets is the Secured Lender.  The Secured Lender is aware of the proposed Sale processes, and thus, the Debtors are confident that they will obtain any necessary consent on or before the Sale Hearing, thereby satisfying Bankruptcy Code section 363(f)(2).  In any event, to the extent that there exist other possible holders of encumbrances or such consent is for some reason not obtained, the Debtors submit that one of the subsections of Bankruptcy Code section 363(f) applies, and that any such encumbrance will be adequately protected by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Sale should be approved under Bankruptcy Code section 363(f).

### The Procedures for Assumption and Assignment of
### <u>Executory Contracts and Unexpired Leases Should Be Authorized</u>

28.     Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The assumption or rejection of an unexpired lease by a debtor is subject to

review under the business judgment standard.  See In re Federated Dep't Stores, Inc., 131 B.R. 808,811 (S.D. Ohio 1991).

29.    If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  See, e.g., Sharon Steel Com. v. Nat'l Fuel Gas Distribution, 872 F.2d 36,39-40 (3d Cir. 1989).  In applying the "business judgment" standard, courts show great deference to the debtor's decision to assume or reject.  See Summit Land Co. v. Allen (In re Summit Land Co.), 13 RR. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of debtor's decision to assume or reject executory contract "should be granted as a matter of course").

30.    As set forth above, the Debtors are proposing to sell substantially all of their assets to the Stalking Horse Bidder or other entity submitting a higher or otherwise better offer.  In furtherance of this Sale, the Debtor and the Stalking Horse Bidder will have entered into the Purchase Agreement, pursuant to which the Stalking Horse Bidder may acquire, among other things, a right to designate certain contracts and/or leases as ones to be assumed and assigned to it or its designee or, alternatively, to be rejected.  The transfer of designation rights to the Successful Bidder and the Successful Bidder's exercise such designation rights satisfies the "business judgment" standard.  This procedure will streamline the Debtors' ability, in accordance with the Successful Bidder's designation, to reject contracts and/or leases that provide no benefit to the Debtors' estates.  Moreover, with respect to leases, prompt rejection will enable affected landlords to better mitigate their damages by facilitating prompt remarketing of the rejected leases to other potential tenants.

31.    Furthermore, the Debtor believes that with respect to those leases and/or contracts designated by the Stalking Horse Bidder or the Successful Bidder to be assumed and

115350/214-1926308.5

assigned to it or its designee, the Debtors and the proposed assignee will provide sufficient evidence of the Stalking Horse Bidder's, Successful Bidder's or other assignee's ability to perform under the terms of such contracts or leases. Bankruptcy Code section 365(b)(1) provides that "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless [the trustee] provides adequate assurance of future performance under such contract or lease." 11 U.S.C. § 365(b)(1).

32. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "'practical pragmatic construction.'" EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), affd, 993 F.2d 300 (2d Cir. 1993); see Carlisle Homes, 103 B.R. at 538 ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

33. Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

34. To the extent that any defaults exist under any executory contract or unexpired lease that is assumed and assigned, such defaults will be cured prior to the assumption and assignment. Moreover, the Debtors will adduce facts at the Sale Hearing to show the

18

financial credibility, experience in the industry and willingness and ability to perform under any assumed leases of either the Stalking Horse Bidder or the Successful Bidder.

35.    The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or the Successful Bidder to provide adequate assurance of future performance under the contracts and leases to be assumed, as required under Bankruptcy Code section 365(b)(1).  The Court should therefore authorize the procedures for the assumption and assignment of leases and contacts in accordance with the Stalking Horse Bidder's or Successful Bidder's designation as set forth herein.

### A Successful Bidder Should Be Entitled to the Protections of Section 363(m)

36.    Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

37.    The Debtors will adduce facts at the Sale Hearing on any objections, demonstrating that any Successful Bidder for the Acquired Assets had negotiated at arms' length with all parties represented by their own counsel.  Accordingly, the order approving the Sale will include a provision that the Successful Bidder for the Acquired Assets is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.  The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price

19

will be received by the Debtors for the Acquired Assets and that closing of the same will occur

promptly.

## Extension of Time Under Section 365(d)(4) of the Code Is Appropriate

38.     Section 365(d)(4) of the Bankruptcy Code provides as follows:

(A)     Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of-

(i)     the date that is 120 days after the date of the order for relief; or

(ii)     The date of the entry of an order confirming a plan.

(B)

(i)     The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause,

(ii)     If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

Accordingly, if a court finds that cause exists, the court may grant an extension up to 90 days

after the initial 120-day period allotted to debtors under the Bankruptcy Code to assume or reject

nonresidential real property leases.

39.     Courts recognize a benefit to granting additional time under Code section

365(d)(4). See, e.g., South Street Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94

F.3d 755, 760-61 (2d Cir. 1996); In re Channel Home Ctrs., Inc., 989 F.2d 682, 687-88 (3d Cir.

1993), cert denied 510 U.S. 865 (1983).  "Nothing prevents a bankruptcy court from granting an

extension because a particular debtor needs additional time to determine whether assumption or

rejection of particular leases is called for by the plan of reorganization that it is attempting to

20

develop." In re Channel Home Ctrs., 989 F.2d at 689; see also Coleman Oil Vo. v. Circle K Corp. (In re Circle K Corp.), 127 F.3d 909 (9th Cir. 1997), *cert denied* 522 U.S. 1148 (1998).

40.     The term "cause" as used in Bankruptcy Code Section 365(d)(4) is undefined. In determining whether cause exists for an extension of the initial 120-day period, courts have relied on a non-exclusive list of factors, including the following:

(1)      whether the debtor was paying for the use of the property;

(2)      whether the debtor's continued occupation could damage the lessor beyond the compensation available under the Bankruptcy Code;

(3)      whether the lease is the debtor's primary asset;

(4)      whether the debtor has had sufficient time to formulate a plan of reorganization; and

(5)      the complexity of the case facing the debtor.

South St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys, Inc., 94 F3d 755, 760-61 (2d Cir. 1996; see also In re Wedtech Corp., 72 B.R. 464, 471-72 (Bankr. S.D.N.Y. 1987).

41.     In this case, the foregoing factors weigh in favor of granting the requested extension.  The Debtors would expect that several of the Debtors' leases will be assumed and assigned to the Successful Bidder on the closing date.   Leases not assumed and assigned, however, shall, under the proposed Asset Purchase Agreement,  be subject to the Successful Bidder's designation rights,  Pursuant to such rights, as proposed, the Successful Bidder will have 120 days from the closing date in which to decide whether the remaining leases should be assumed and assigned or otherwise rejected.  This designation period allows the Successful Bidder a full opportunity to explore the alternatives presented by the 1133 Third Lease to consolidate the Debtors' Eastside operations, which in and of itself, may represent the basis under which an Interested Party may give additional value.

42.     The anticipated closing date on the Sale is November 5, 2010 and accordingly, the designation period would expire on March 5, 2011.  Since the 120 day period afforded under Bankruptcy Code section 365(d)(4 would expire on March 13, 2011, the relief requested is within the statutory constrictions.

43.     Accordingly, the Debtors respectfully submit that this Court should grant the Debtors an extension of time within which the Debtors may assume or reject their real property leases, through the date that is 210 days from the Commencement Date, without prejudice to the Debtors' right to seek further extensions of such deadline with the consent of the affected lessors as provided in Bankruptcy Code Section 365(d)(4)(B)(ii).

**WHEREFORE** the Debtors respectfully request that the Court entered the Proposed Order as modified by this Supplement and grant the Debtors such other and further relief as the Court deemed just and proper.

Dated: September  28, 2010
        New York, New York

                              **HAHN & HESSEN LLP**


                              By /s/ Mark T. Power_____
                                  Mark T. Power
                                  Rosanne T. Matzat
                                  488 Madison Avenue
                              New York, New York 10022
                              (212) 478-7200

                              *Proposed Attorneys for Debtors and Debtors-in-Possession*