HAHN & HESSEN LLP
488 Madison Avenue
New York, New York 10022
Telephone:     (212) 478-7200
Facsimile:     (212) 478-7400
Rosanne T. Matzat
Mark T. Power
Joseph Orbach

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x
                                                            :
**In re**                                                   :
                                                            :     **Chapter 11**
**THE WECK CORPORATION, *et al.*,**                         :
                                                            :     **Case No. 10-14349 (AJG)**
                                     **Debtors.**           :
                                                            :     **Jointly Administered**
                                                            :
----------------------------------------------------------- x


**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR APPROVAL OF (I) THE
SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO THE
HIGHEST BIDDER AT AUCTION, (II) ASSUMPTION AND ASSIGNMENT OF
LEASES AND EXECUTORY CONTRACTS IN CONNECTION THEREWITH AND
(III) VARIOUS RELIEF WITH REGARD TO GOING OUT OF BUSINESS SALES**


           The Weck Corporation, d/b/a Gracious Home, West Weck, LLC, Gracious

Home.com, LLC and Weck Chelsea, LLC, as debtors and debtors-in-possession (collectively, the

"Debtors"),[1] hereby submit this motion (the "Motion") for the entry of an order, pursuant to

sections 105, 363 and  365 of title 11 of the United States Code (the "Bankruptcy Code")

approving the sale of all or substantially all of the Debtors' assets free and clear of liens, claims,

---

[1]     The Debtors in these cases, together with the last four digits of their respective federal tax identification
        numbers, are as follows:  The Weck Corporation (6057); West Weck, LLC (1934); Gracious Home.com, LLC
        (3431); Weck Chelsea, LLC (4754).

interests and encumbrances to the highest bidder at auction, and the assumption and assignment of certain leases and executory contracts in connection therewith and various relief with regard to going out of business sales.  In support of this Motion, the Debtors respectfully state as follows:

## BACKGROUND

### General

1.     On August 13, 2010 (the "Petition Date"), the Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  On August 24, 2010, an official committee of unsecured creditors (the "Committee") was appointed.

### The Debtors' Businesses

2.     Founded in 1963, when now Chairman Natan Wekselbaum and his brother emigrated from Cuba, the Debtors began as a small neighborhood hardware store on Manhattan's Upper East Side.  Remaining family owned and operated for the ensuing 47 years, the Debtors operate today a housewares and home furnishings business under five (5) store location leases and an internet-based business, all under the name "Gracious Home."  In addition to basic hardware and plumbing supply, stores feature extensive selections of bedding and bath products, kitchen supplies and appliances, decorative hardware, window treatments, home décor, tableware, lightening and fixtures, fabrics, household appliances and vacuums and travel accessories.  In addition to its detailed product offering, Gracious Home offers a wide range of customized products and services, including personal shopping, key making, knife sharpening, lamp re-wiring, vacuum repairs, custom window treatments and stationary.  Having built their reputation and clientele on quality of service, the stores cater not only to the sophisticated, upper-

end, metropolitan consumer, but also architects, contractors, interior designers, electricians, plumbers, carpenters and developers.

**Preliminary Statement**

3.      While the Debtors' remain optimistic that the Auction (as defined below) will result in a sale to a purchaser who continues to operate the Debtors' business as a going concern, the Debtors' have prepared for the possibility that the highest or best bid at Auction will be a bid based on the liquidation of the Debtors' stores and inventory.  To this end, the Debtors have prepared this motion seeking alternative relief depending upon which type of bidder is successful at Auction.  The Debtors anticipate that the successful bidder at Auction may request modification   of the forms sale order attached hereto as Exhibit "A" and alternatively, Exhibit"B", and the Debtors will make available a blackline with the Court of the revised proposed sale order prior to the Sale Hearing (as defined below).

4.      On August 24, 2010, less than two weeks after the Petition Date, the Debtors' filed a Motion for Entry of an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Approving Bidding Procedures and Notice of the Auction Relating Thereto and Granting Related Relief [Docket Number 56] (the "Original Bid Procedures Motion").  The Original Bid Procedures Motion contemplated that the Debtors would conduct an auction (the "Auction") at which additional proposals for the sponsorship and funding of a plan of reorganization for the Debtors would be entertained.  As the case has developed and evolved, it became clear that the Debtors would be unable to conduct an auction for a plan sponsor, and instead turned their focus to a traditional section 363 sale at Auction.

5.      On September 28, 2010, the Debtors' filed their supplement to the Original Bid Procedures Motion (the "Supplemental Bid Procedures Motion") [Docket No. 133],

wherein the Debtors requested approval of various bidding procedures and the scheduling of a sale hearing.

6.     After further hearing before the Court on October 21, 2010, on October 22, 2010, the Court entered an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Approving Stalking Horse Selection Process, Bidding Procedures, Notice of Auction Relating Thereto, Scheduling Sale Hearing and Granting Related Relief [Docket No. 167] (the "Bid Procedures Order").  Pursuant to the Bid Procedures Order, the Debtors will be conducting the Auction on November 29, 2010, and the Court has scheduled a hearing to approve the highest and best offer resulting from the Auction (the "Sale Hearing") for November 30, 2010.

7.     While the Supplemental Bid Procedures Motion sought and provided support for much of the same relief requested herein, by this Motion the Debtors formally request approval of a sale of all or substantially all of the Debtors' assets to the highest or best bid (the "Successful Bidder") at Auction and the entry of the proposed sale order attached hereto as Exhibit "A" (if on a "going concern" basis) and Exhibit "B" (if on a liquidation or "going out of business" basis) (either alternatively, the "Sale Order").  Furthermore, as the Debtors have not limited the type of bids to be considered, in addition to "going concern" bids, the Debtors will consider bids for the rights to liquidate some or all of the inventory at the Debtors' retail stores, and have briefed the issues relating to liquidation or going out of business sales herein.

8.     Accordingly, the specific relief this motion seeks is (a) the approval of the Successful Bidder's asset purchase agreement (the "APA"), including the assumption and assignment of certain designated unexpired non-residential leases and executory contracts (the "Designated Contracts") in the event the winning bid is based on a going-concern of the Debtors' business, in accordance with Exhibit "A," or in the alternative, (b) the approval of the Successful

Bidder's agency agreement (the "Agency Agreement") and the wind down of the Debtors' business through an orderly liquidation and going out of business sales, if a "going out of business" sale bid is the highest or best bid at Auction, in accordance with Exhibit "B.[2]"

       9.     In connection with this Auction process, on October 29, 2010, the Debtors filed their Motion Pursuant to Section 365 of the Bankruptcy Code Fixing the Cure Amounts of Various Unexpired Leases and Executory Contracts (the "Cure Amount Motion") (Docket No. 179). Pursuant to the Cure Amount Motion, the Debtors will have sought an order (the "Cure Costs Order") to fix the amount required for the Successful Bidder at Auction to pay in order to have such Designated Contracts assumed and assigned to it. Accordingly, pursuant to this Motion, the Debtors only seek to satisfy the other requirements of section 365(b)(1) of the Bankruptcy Code governing the assumption and assignment of non-residential and executory contracts as the cure amounts will be fixed by the Cure Costs Order.

### Jurisdiction

      10.    This is a core proceeding pursuant to 28 U.S.C. § 157(b). This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested and Basis for Relief

**I.    Sale of Substantially All of the Debtors' Assets is Within the Debtors' Sound Business Judgment**

      11.    Bankruptcy Code Section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in relevant

---

[2]    In accordance with the Bid Procedures Order, copies of the forms of both an APA and an Agency Agreement were made available to Interested Parties and filed with the Court on November 2, 2010.

part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

12. A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so. See Comm. of Equity Sec. Holders v. Lionel Com. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); see also Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that "sound business purpose test" is appropriate); In re Del. & Hudson Ry. Co., 124 B.R. 169, 177 (D. Del. 1991) (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when sound business reason justifies such sale).

13. Courts have applied four factors in determining whether a sound business justification exists: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. See Lionel, 722 F.2d at 1071 (setting forth "sound business" purpose test); see also Del. & Hudson Ry., 124 B.R. at 175 (adopting Lionel factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business); cf. In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting articulated business justification test of Lionel and adding "good faith" requirement).

14. There is more than adequate business justification to sell the Acquired Assets[3] to the Successful Bidder and to enter into the APA and/or any Agency Agreement in these cases. Based upon the results of their exhaustive analysis of the Debtors' ongoing and

---

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the APA and/or Agency Agreement, as applicable.

future business prospects, the Debtors' management and financial advisor have concluded that the best way to maximize the value of the estates is to sell the Debtors' business as a going business concern, thereby preserving the substantial goodwill of the businesses, maintaining customer relationships and avoiding a liquidation sale or sales at depressed prices. The Debtors believe that a Sale in accordance with the procedures approved by this Court is the best method to potentially achieve that result and thereby enhance recoveries to the estate.

15. By virtue of the Auction process, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check," which is the best means for establishing whether a fair and reasonable price is being paid. The participation of Triton (the Debtors' financial advisor) and BDO (the Committee's financial advisor) in the Auction is designed to assure that the Purchase Agreement and/or the Agency Agreement will be the product of arms'-length negotiations between the Debtors and the Successful Bidder. Additionally, the Bidding Procedures ensure that a prospective purchaser will not be able to exert any undue influence over the Debtors. Under the circumstances, this Court should be in the position at the Sale Hearing to find that (a) the sale of the Acquired Assets is the result of good faith arms-length negotiations and (b) the Stalking Horse Bidder or the Successful Bidder is entitled to all of the protections of Bankruptcy Code section 363(m).

16. All creditors and parties in interest have received adequate notice of the Bidding Procedures and the Sale Hearing pursuant to the Bidding Procedures Order. Such notice was reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in this case, those parties potentially interested in bidding on the Acquired Assets and others whose interests are potentially implicated by the proposed Sale. The Debtors submit that such notice is sufficient for entry of the Sale Order and

satisfies requisite notice conditions for approval of the Sale under Section 363(b) of the Bankruptcy Code.

17.     Under these circumstances, therefore, sound business reasons exist that justify the sale of the Acquired Assets outside the ordinary course of business and prior to the confirmation of a reorganization plan.  Accordingly, this Court should approve the Sale.

**II.     The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f)
        for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

18.     Under Bankruptcy Code section 363(f), a debtor-in-possession may sell property free and clear of any interest in such property of an entity other than the estate only if, among other things:

1.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.     such entity consents;

3.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.     such interest is in bona fide dispute; or

5.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of anyone of its five requirements will suffice to approve the sale of the Acquired Assets "free and clear" of liens, claims, encumbrances and interests (collectively, the "Encumbrances").  See 11 U.S.C. § 363(f); Mich. Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (recognizing that Bankruptcy Code section 363(f) is written in disjunctive, and holding that court may approve sale "free and clear" provided that at least one subsection of section 363(f) is met), cert.

dismissed, 503 U.S. 978 (1992); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

19.    The Debtors believe that the only entity holding a lien on the Acquired Assets is NewAlliance Bank (the "Secured Lender").   The Secured Lender is aware of the Auction processes, and thus, the Debtors are confident that they will obtain any necessary consent on or before the Sale Hearing, thereby satisfying Bankruptcy Code section 363(f)(2).   In any event, to the extent that there exist other possible holders of encumbrances or such consent is for some reason not obtained, the Debtors submit that one of the subsections of Bankruptcy Code section 363(f) applies, and that any such encumbrance will be adequately protected by having it attach to the net proceeds of the Sale (the "Sale Proceeds"), subject to any claims and defenses the Debtors may possess with respect thereto.   Accordingly, the Sale should be approved under Bankruptcy Code section 363(f).

## III.    The Procedures for Assumption and Assignment of Executory Executory Contracts and Unexpired Leases Should Be Authorized

20.    Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).   The assumption or rejection of an unexpired lease by a debtor is subject to review under the business judgment standard.   See In re Federated Dep't Stores, Inc., 131 B.R. 808,811 (S.D. Ohio 1991).

21.    If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.   See, e.g., Sharon Steel Com. v. Nat'l Fuel Gas Distribution, 872 F.2d 36,39-40 (3d Cir. 1989).   In applying the "business judgment" standard, courts show great deference to the debtor's decision to assume or reject.   See Summit Land Co. v. Allen (In re Summit Land Co.), 13 RR. 310, 315

(Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of debtor's decision to assume or reject executory contract "should be granted as a matter of course").

22.     As set forth above, the Debtors are proposing to sell substantially all of their assets to the Successful Bidder.  In furtherance of this Sale, the Debtor and the Successful Bidder will have entered into the APA, pursuant to which the Successful Bidder may assume certain contracts and/or leases (i.e. the Designated Contracts), with non-assumed leases and executory contracts to be promptly rejected thereafter. This will enable the Debtors' to extract value from leases and executory contracts with value to the estates while isolating those contracts and/or leases that provide no benefit to the Debtors' estates.  Moreover, with respect to leases, prompt rejection will enable affected landlords to better mitigate their damages by facilitating prompt remarketing of the rejected leases to other potential tenants.

23.     Furthermore, the Debtors believe that with respect to those leases and/or contracts designated by the Successful Bidder to be assumed and assigned to it, the Debtors and the proposed assignee will provide sufficient evidence of the Successful Bidder's ability to perform under the terms of such contracts or leases.  Bankruptcy Code section 365(b)(1) provides that "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless [the trustee] provides adequate assurance of future performance under such contract or lease."  11 U.S.C. § 365(b)(1).

24.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "'practical pragmatic construction.'"  EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), affd, 993 F.2d 300 (2d Cir. 1993); See Carlisle Homes, 103 B.R. at 538 ("Although no single solution will satisfy

every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

25.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596,605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

26.    To the extent that any defaults exist under any executory contract or unexpired lease that is assumed and assigned, such defaults will be cured prior to the assumption and assignment in the amount that was fixed pursuant to the Cure Amount Motion.  Moreover, the Debtors will adduce facts at the Sale Hearing to show the financial credibility, experience in the industry and willingness and ability to perform under any assumed leases of the Successful Bidder.

27.    The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance under the contracts and leases to be assumed, as required under Bankruptcy Code section 365(b)(1).[4]  The Court should therefore authorize the procedures for the assumption and assignment of leases and contacts in accordance with the Successful Bidder's designation as set forth herein.

## IV.    A Successful Bidder Should Be Entitled to the Protections of Section 363(m)

---

[4]    On November 10, 2010, the Debtors filed a Response to the Motion of 20 East 69 LLC and TF Cornerstone Inc. to Compel the Debtors to Provide Information to Enable Landlord to Make Timely Assessment of Prospective Assignees of Leases, which suggests procedures which should allow the Debtors' landlords a package of adequate assurance of future performance materials from Qualified Bidders as early in the process as reasonably feasible.

28.     Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997); In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

29.     The Debtors will adduce facts at the Sale Hearing on any objections, demonstrating that any Successful Bidder for the Acquired Assets had negotiated at arms' length with all parties represented by their own counsel.  Accordingly, the order approving the Sale will include a provision that the Successful Bidder for the Acquired Assets is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.  The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Acquired Assets and that closing of the same will occur promptly.

**IV.     Sale of the Assets Does Not Require the
        Appointment of a Consumer Privacy Ombudsman**

30.     Under section 363(b)(1), a debtor may sell or lease its customer list so long as it complies with the debtor's privacy policy.  See 11 U.S.C. § 363(b)(1)(A).  If a sale is inconsistent with the debtor's privacy policy, section 332 governs the appointment of a consumer privacy ombudsman.  11 U.S.C. § 332(b)(1).

31.    The full text of the Debtors' privacy policy is available at the Debtors' website at http://www.gracioushome.com.  In summary, the Debtors' privacy policy[5] provides that:

- When a visitor browses the Debtors' website, the Debtors may collect personal information in order to communicate promotional offers to such visitor and better track customer preferences;

- If the Debtors revise their policy, they will post a notice on their website. This notice will include the effective date of the revised policy.

Here, should the Debtors sell their customer lists as a result of the Auction, the Debtors will ensure that the Sale is consistent with the Debtors' current privacy policy by ensuring that the Successful Bidder agrees to abide by the same privacy policy as currently exists.  Therefore, the appointment of a consumer privacy ombudsman is unnecessary at this time.

## V.    Approval of the Agency Agreement is Warranted

32.    As previously discussed, while the Bidding Procedures provide for a going concern sale of substantially all of the Debtors' assets, they also allow for the Successful Bidder to be a bid based on a going out of business sale.  If a going out of business sale based bid is the highest or best bid at Auction, the Agency Agreement will provide the Debtors' with several benefits, including but not limited to, (a) allowing a professional liquidator to sell the merchandise at the store through the Store Closing Sales (as herein defined) and (b) representing a cost-effective manner for the Debtors and the Agent to conduct the Store Closing Sales, because the Agent has extensive knowledge, expertise and experience in conducting liquidation sales and is responsible for the payment of all expenses related thereto.

---

[5]    This is only a summary of the Debtors' privacy policy and is qualified in its entirety by the actual terms and conditions of such policy posted on the Debtors' website.

33.     The terms of the Agency Agreement are fair and reasonable and consistent in all respects with the "market" basis on which similar going out of business sales have been approved by and conducted under the auspices of this Court.  Accordingly, the Debtors believe that they are exercising sound business judgment and request that the Court approve the Agency Agreement.

34.     Finally, section 105(a) of the Bankruptcy Code provides in relevant part that the "court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The Debtors submit that approval of the Agency Agreement is in the best interests of the Debtors' estates and their creditors and is therefore well within the Court's equitable powers under section 105 of the Bankruptcy Code.

**VI.     Relief Requested With Respect to Store Closings**

35.     As suggested earlier, several of the potential bidders are retail liquidators who have expressed interest in consummating a going out of business or similar type sales (a "Store Closing Sale").  In the event that the Debtors accept a bid with respect to a Store Closing Sale, and some or all of the Debtors' stores are liquidated, the Debtors further request the relief described herein.

**A.     The Court Should Invalidate Any Restrictions in Restrictive Documents That May Impair the Debtors' Ability to Conduct the Store Closing Sale**

36.     The Debtors further request an order invalidating any restrictions in any Restrictive Documents (as defined herein) that may impair the Debtors' ability to conduct the Store Closing Sale.  Specifically, the stores subject to the Store Closing Sale (the "Closing Stores") will be located on properties that are leased by the Debtors.  In certain cases, the contemplated Store Closing Sale may be inconsistent with certain provisions of such leases or other documents with respect to any such leased premises (the "Premises"), including (without

limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions (collectively, the "<u>Restrictive Documents</u>").

        37.     Store closing or liquidation sales, such as the Sale described herein, are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts, despite provisions of recorded documents or agreements purporting to forbid such sales in the ordinary course of business. Indeed, other such restrictive provisions in leases have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. <u>See</u> <u>In re Bradlees Stores, Inc.</u>, Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. January 4, 2001) (authorizing debtors to conduct "going-out-of-business" sales notwithstanding state rules or statutes governing closing, liquidation or "going-out-of-business" sales, and notwithstanding provision in leases restricting debtors' ability to conduct such sales); <u>In re R.H. Macy & Co.</u>, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (finding anti-store closing sale covenant in lease unenforceable against debtor "because it conflicts with the debtor's fiduciary duty to maximize estate assets"); <u>In re Ames Dep't Stores, Inc.</u>, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (finding that "to enforce the anti-GOB sale clause of the [l]ease would contravene overriding federal policy requiring debtors to maximize estate assets by imposing additional constraints never envisioned by Congress"); <u>see also</u> <u>In re Tobago Bay Trading Co.</u>, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-"going-out-of-business" sales clause in lease unenforceable); <u>In re Lisbon Shops, Inc.</u>, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (finding that lease could not restrict debtor from conducting "going-out-of-business" sales).

38. Thus, the Court should ensure that no clause in any of the Restrictive Documents is an impediment to the Store Closing Sale, the Closing Store closures, or the activities in connection therewith, as interested parties are adequately protected by the terms and conditions of the proposed Store Closing Sale procedures included in the Agency Agreement. To the extent such provisions exist in any Restrictive Documents, they should not be permitted to interfere with, or otherwise restrict the Debtors or the Successful Bidder from conducting the Store Closing Sale or the closing of such Closing Stores.

**B.    The Store Closing Sale Should be Exempt from Certain Federal, State, And Local Laws, Statutes, Rules, and Ordinances Related to Store Closing and Liquidation Sales**

39. New York City in which the all Closing Stores are located, may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) federal, state, and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing or permitting requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the Store Closing Sale, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws").

40. Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws. Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the Store Closing Sale to proceed notwithstanding contrary Liquidation Sale Laws. See 11 U.S.C. § 105(a).

41. The Debtors, therefore, request that, pursuant to Bankruptcy Code section 105(a), this Court authorize the Debtors to conduct the Store Closing Sale without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.

42. Because the Debtors and their assets are subject to this Court's jurisdiction, this Court will be able to supervise the Store Closing Sale. The Store Closing Sale is a legitimate method by which the Debtors can maximize the return from the Sale of the merchandise for the benefit of their estates and creditors. Moreover, creditors are adequately protected by the notice of this Motion and the jurisdiction and supervision of this Court. Accordingly, this Court should dispense with any requirement that the Debtors comply with technical requirements that are not intended to curtail persons from conducting a Store Closing Sale with bankruptcy court supervision, including bulk sales laws.

43. Moreover, 28 U.S.C. § 959, which requires trustees (and, thus, debtors in possession) to otherwise comply with state and other laws in performance of their duties, does not apply to the Store Closing Sale. Courts have held that 28 U.S.C. § 959 does not apply to debtors or their agents when they are liquidating assets. See, e.g., Cal. State Bd. of Equalization v. Goggin, 191 F. 2d 726 (9th Cir. 1951) (holding that 28 U.S.C. § 959 does not apply to transactions that are in the nature of liquidation), cert. denied, 342 U.S. 909 (1952); see also In re Borne Chem. Co., Inc., 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applicable only when property is being managed or operated for purpose of continuing operations).

44. Here, the Store Closing Sale will continue for a limited duration, all advertising will fairly describe the Store Closing Sale, and no aspect of the relief sought is intended to alter laws or regulations affecting public safety. For these and other reasons, 28

U.S.C. § 959(b) should not be read to apply to the Store Closing Sale, as the Debtors will be ceasing their operations at the Closing Stores with the knowledge and oversight of their creditors and this Court and in accordance with the Court-approved Sale Guidelines.

45.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.   To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code.   In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.   See, e.g., In re Shenango Group, Inc., 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").   While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, see In re Baker & Drake, 35 F. 3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation.   Id. at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

46.     Here, section 363 of the Bankruptcy Code, which allows the Debtors to operate their businesses in a way that maximizes recoveries for creditors, will be severely undermined if the Court does not provide for the waiver of the Liquidation Sale Laws.   Similar

relief has been granted in this jurisdiction and other bankruptcy cases in other jurisdictions. <u>See, e.g.</u>, <u>In re Goody's Family Clothing, Inc.</u>, Case No. 08-11153 (Bankr. D. Del. 2008); <u>In re FAO, Inc.</u>, Case No. 03-61826 (LK) (Bankr. D. Del. 2003); <u>In re Golf America Stores, Inc.</u>, Case No. 02-12313 (PJW) (Bankr. D. Del. 2002) ; <u>In re Bradlees, Inc.</u>, Case No. 00-16033 (BRL) (Bankr. S.D.N.Y. 2000); <u>In re Big V Stores</u>, Case No. 00-4372 (PJW) (Bankr. D. Del. 2000).

47.     Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the Store Closing Sale.  The Debtors only request that this Court authorize the Debtors and/or the Agent to conduct the Store Closing Sale without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the Store Closing Sale as store closings or similar type sales, or transferring merchandise to or between the Closing Stores.  The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

48.     The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sale, or the advertising and promotion (including through the posting of signs) of such Store Closing Sale, in the manner set forth in the Sale Order.

## VII.    The Court Should Authorize the <br> Abandonment of Inconsequential Property

49.     During the course of the Sale (particularly a going out of business sale), the Debtors may determine that the costs associated with holding and/or selling certain property exceed the likely proceeds that may be realized upon its sale. As such, the property is of

inconsequential value and benefit to the Debtors' estates and may, in certain instances, be burdensome to the Debtors' estates. To maximize the value of the Debtors' assets to be realized in connection with the Sale, the Debtors request authority under section 554(a) of the Bankruptcy Code to abandon such property which the Debtors, in the exercise of their business judgment, determine to be burdensome, or of inconsequential value and benefit to the Debtors' estates.

**VIII.  The Court Should Waive or Reduce the Periods Required By Rule 6004(h) of the Federal Rules of Bankruptcy Procedure**

50.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.  See Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

51.     As described above, the Debtors believe that, absent a prompt sale, the value of their assets will rapidly decline because the Debtors lack sufficient funding to continue operations.  Consequently, any order approving the Sale Motion should be effective immediately by providing a waiver of the 14-day stay under Bankruptcy Rules 6004(h).

**Notice**

52.     The Debtors intend to serve notice provide further notice of this Motion on (i) the Office of the U.S. Trustee, (ii) counsel to NewAlliance Bank, the Debtors' secured creditor, (iii) counsel to the Official Committee of Unsecured Creditors, (iv) the counterparties to the Designated Contracts, and (iv) all other parties who have timely filed requests for notice under Rule 2002.  The Debtors submit that no other or further notice need be provided.[6]

---

[6]     Notice of the Sale Hearing has already been provided to all parties-in-interest to this Sale pursuant to the Supplemental Bid Procedures Motion.

**No Prior Request**

53.     No prior request for the relief sought in this Motion has been made to this or any other Court, except to the extent certain relief was requested in connection with the Supplemental Bid Procedures Motion.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form annexed hereto as Exhibit "A", or in the alternative, Exhibit "B," granting the relief requested herein and such other further relief as it deems just and proper.

Dated:   November 10, 2010
         New York, New York

HAHN & HESSEN LLP


By:     /s/  *Rosanne T. Matzat* _____
            A Member of the Firm

488 Madison Avenue
New York, New York 10022
Telephone:     (212) 478-7200
Facsimile:      (212) 478-7400
Rosanne T. Matzat
rmatzat@hahnhessen.com
Mark T. Power
mpower@hahnhessen.com
Joseph Orbach
jorbach@hahnhessen.com

*Attorneys for Debtors and Debtors in Possession*