# <u>EXHIBIT A</u>

# AGENCY AGREEMENT

This Agency Agreement is made as of November 16, 2010, by and between The Weck Corporation d/b/a/ Gracious Home, a New York corporation, and its affiliated debtors and debtors-in-possession (the "Merchant") and Gordon Brothers Retail Partners, LLC, a Delaware limited liability company (the "Agent").

# RECITALS

WHEREAS, on August 13, 2010 (the "Petition Date"), each entity comprising the Merchant filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), jointly administered under Case No.10-14349 (ALG) (collectively, the "Bankruptcy Case");

WHEREAS, pursuant to the terms of this Agreement, the Agent shall act as the Merchant's exclusive agent for the purposes of: (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on Exhibit 1 attached hereto, as may be amended from time to time in accordance with this Agreement and the Purchase Agreement (each individually, a "Store" and collectively the "Stores"), and the Merchandise located at the warehouse that has been or will be transferred to the Stores, by means of a promotional, store closing, "going out of business" or similar sale (as further described below, the "Sale") and (b) disposing of substantially all of the owned FF&E in the Stores and the Warehouse.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and

sufficiency of which is hereby acknowledged, the Agent and the Merchant hereby agree

as follows:

Section 1. <u>Defined Terms</u>. The terms set forth below are defined in

the Sections referenced of this Agreement:

| <u>Defined Term</u> | <u>Section Reference</u> |
|---|---|
| Additional Goods | Section 8.9(a) |
| Agency Accounts | Section 7.2(a) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent Indemnified Parties | Section 13.1 |
| Agent Letter of Credit | Section 3.3(b) |
| Agent's Fee | Section 3.1(b) |
| Agreement | Preamble |
| Applicable Cost Value | Section 5.4(a) |
| Approval Order | Section 2.2 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(b) |
| Central Service Expenses | Section 4.1 |
| Chapter 11 Cases | Preamble |
| Cost Value | Section 5.4(a) |
| Defective Merchandise | Section 5.3 |
| Designated Merchant Accounts | Section 7.2(b) |
| Display Merchandise | Section 5.3 |
| Warehouse Merchandise | Section 5.3 |
| Warehouses | Recitals |
| Estimated Guarantee Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.3 |
| Expense L/C | Section 4.2(b) |
| Expenses | Section 4.1 |
| FF&E | Section 5.3(a) |
| FF&E Election | Section 16.9 |
| Final Reconciliation | Section 5.2(b) |
| Gross Rings | Section 6.3 |

185125/001-1946661.1

| Defined Term | Section Reference |
|---|---|
| Guaranteed Amount | Section 3.1(a) |
| Guaranteed Amount Deposit | Section 3.3(a) |
| Guaranty Percentage | Section 3.1(a) |
| Inventory Completion Date | Section 5.1 |
| Inventory Date | Section 5.1 |
| Inventory File | Section 5.4(a) |
| Inventory Report | Section 3.3(a) |
| Inventory Taking | Section 5.1 |
| Inventory Taking Instructions | Section 5.1 |
| Inventory Taking Service | Section 5.1 |
| Lender | Section 3.3 (c) |
| Merchandise | Section 5.3 |
| Merchant | Preamble |
| Merchant Account Usage Period | Section 7.2(a) |
| Merchant Consignment Goods | Section 5.3(a) |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 16.9 |
| Payment Date | Section 3.3(a) |
| Petition Date | Recitals |
| Proceeds | Section 7.1 |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2(b) |
| Retail Value | Section 5.4 |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 2.2 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Sales Taxes Account | Section 8.3 |
| Sharing Threshold | Section 3.1(b) |
| Special Order Merchandise | Section 5.3 |
| Stores | Recitals |
| Supplies | Section 8.4 |
| WARN Act | Section 9.1 |
| Weekly Sales Reconciliations | Section 5.2(a) |

Section 2.        Appointment of Agent.

2.1  Appointment of Agent.  Effective upon the entry of the Approval

Order, the Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to

185125/001-1946661.1

serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and, to the extent designated by Merchant, disposing of Merchant's Owned FF&E, in accordance with the terms and conditions of this Agreement.

2.2    As soon as practicable after Merchant's execution of this Agreement, Merchant shall apply to the Bankruptcy Court for an order approving this Agreement in its entirety in form and substance reasonably satisfactory to Agent (the "Approval Order") and absent entry of the Approval Order, this Agreement shall be of no force and effect.  The Approval Order shall provide, among other things, that: (i) this Agreement is in the best interests of Merchant, Merchant's estate, creditors, and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon the payment of the Guaranteed Amount Deposit and delivery of the Agent Letter of Credit and Expense L/C, Agent shall be entitled to sell all Merchandise hereunder free and clear of all liens, claims, or encumbrances thereon; (v) upon the payment of the Guaranteed Amount Deposit and delivery of the Agent Letter of Credit and the Expense L/C, any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds shall attach only to the Guaranteed Amount, the Recovery Amount, if any, amounts payable by Agent to Merchant pursuant to Section 3.1(b) hereof, and amounts reimbursed by the Agent to Merchant on account of Expenses; (vi) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment, and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person;

4

(vii) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, and otherwise promote the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale, without further consent of any person (other than Merchant as provided for herein), in accordance with the terms and conditions of this Agreement and the sale guidelines attached hereto as Exhibit 2 (as the same may be modified and approved by the Bankruptcy Court) (the "Sale Guidelines"), and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing sales (the "Liquidation Sale Laws"), other than those designed to protect public health and safety; (viii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, customer lists, and logos relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (ix) each and every federal, state, or local agency, department, or governmental authority with regulatory authority over the Sale and all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including (without limitation) the conducting and advertising of the Sale in the manner contemplated by this Agreement, and no further approval, license, or permit of any governmental authority shall be required; (x) all utilities, landlords, creditors, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (xi) the Bankruptcy Court shall retain

5

jurisdiction over the parties to enforce this Agreement; (xii) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement, and Agent shall have no successor liabilities whatsoever; (xiii) sales of Merchandise shall be protected by section of 363(m) the Bankruptcy Code in the event that the Approval Order is reversed or modified on appeal; and (xiv) any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Chapter 11 Cases pursuant to Bankruptcy Code section 364(a) and secured by valid and perfected first-priority security interests in the Merchandise and the Proceeds granted pursuant to Bankruptcy Code section 364(d) junior only to (X) an amount equal to the unpaid portion of the Guaranteed Amount; (Y) the Recovery Amount, if any; and (Z) any amount owed by Agent to Merchant for Expenses (without the necessity of filing financing statements to perfect the security interests).

Section 3.    Guaranteed Amount and Other Payments.

3.1 Payments to Merchant.

(a)    As a guaranty of Agent's performance hereunder, Agent shall pay Merchant an amount equal to ninety-six percent (96.0%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise included in the Sale (the "Guaranteed Amount") which Guaranteed Amount shall be paid at such time and in such manner as specified in Section 3.3 below.

(b)    To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, (y) Expenses of the Sale and (z) five percent (5.0%) of the aggregate Cost Value of the Merchandise (the "Agent's Fee") (the sum of (x), (y) and (z),

6

the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant and fifty percent (50%) to Agent. All amounts, if any, to be received by Merchant from Agent in excess of the Sharing Threshold shall be referred to as the "Recovery Amount". Agent shall pay to Merchant the Guaranteed Amount and the Recovery Amount, if any, in the manner and times specified in Section 3.3 below. The Guaranteed Amount and the Recovery Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the final certified report of the inventory taking service after verification and reconciliation thereof by Agent and Merchant, (B) the aggregate Cost Value of the Warehouse Merchandise included in the Sale; and (c) the amount of Gross Rings, as adjusted for shrinkage per this Agreement. Agent shall pay the Recovery Amount as part of the weekly reconciliation conducted pursuant to Section 8.6, subject to the Final Reconciliation under Section 8.6.

(c)     The Guaranteed Percentage has been fixed based upon the aggregate Cost Value of the Merchandise not being less than $8.5 million nor higher than $8.8 million (the "Merchandise Threshold"). To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less or more than the respective Merchandise Threshold amounts noted, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

3.2  Compensation to Agent. Subject to entry of the Approval Order:

(a) As its compensation for services rendered to Merchant, Agent shall be entitled to the Agent Fee, plus all remaining Proceeds of the Sale after payment

7

of the Guaranteed Amount, Expenses of the Sale, the Recovery Amount, if any, and all other amounts payable to Merchant from Proceeds thereof.

(b) Provided that no Event of Default has occurred and continues to exist on the part of the Agent, and after all payments are made to Merchant as required hereunder, all Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims and encumbrances of any kind or nature, subject to Merchant's right to payment of the Recovery Amount, if any, and the proceeds received by Agent from the disposition, in a commercially reasonable manner, of such unsold Merchandise shall constitute Proceeds hereunder. Notwithstanding the foregoing, Agent shall exercise commercially reasonable efforts to dispose all of the Merchandise during the Sale Term.

3.3 Payments to Merchant.

(a) No later than one (1) business day after the entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant (or Merchant's designee) eighty percent (80%) of the estimated Guaranteed Amount (the "Guaranteed Amount Deposit"), by wire transfer of readily available funds. Agent and Merchant shall calculate the amount of the Guaranteed Amount Deposit based upon the aggregate Cost Value of the Merchandise as of the Sale Commencement Date as reflected in Merchant's books and records (the "Estimated Guaranteed Amount").

(b) Agent shall pay the unpaid and undisputed balance of the Guaranteed Amount in readily available funds to Merchant (or Merchant's designee), no later than the earlier of (i) the date that is ten (10) business days after the Sale

185125/001-1946661.1

Commencement Date (in which case payment shall be of the undisputed portion of the balance of the Estimated Guaranteed Amount) and (ii) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise by the Inventory Taking Service, after verification thereof by Agent and Merchant (the "Inventory Report"), and Agent's failure to pay such balance or undisputed portion shall entitle the Merchant to draw upon the Agent Letter of Credit (as defined below) in accordance with section 3.3(d) to the extent of such balance or undisputed portion.  In the event that Agent has made payment to Merchant of the balance of the Estimated Guaranteed Amount pursuant to clause (b)(i) above prior to issuance of the Inventory Report, and after the issuance of the Inventory Report the actual Guaranteed Amount is greater than the sum of the Guaranteed Amount Deposit plus the payment of the undisputed portion of the Estimated Guaranteed Amount pursuant to Section 3.3(b)(i), Agent shall pay the remainder of the Guaranteed Amount to Merchant within two (2) business days after the Inventory Report has been issued.  In the event that there is a dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 5.2(c) hereof.

(c)  To the extent that Merchant is entitled to receive a Recovery Amount from Proceeds, such Recovery Amount shall be paid to Merchant as earned weekly.

(d)      To secure payment of the unpaid portion of the Guaranteed Amount from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable and unconditional standby letter of credit, substantially in the form of Exhibit

3.3(b) attached hereto, in the original face amount equal to the unpaid portion of the Estimated Guaranteed Amount as of the Payment Date (the "Agent Letter of Credit"). Agent shall use its best efforts to cause the Agent Letter of Credit to be delivered no later than the Payment Date. In the event that Agent shall fail to pay to Merchant any amount required to be paid hereunder, the Merchant shall be entitled to draw on the Agent Letter of Credit to fund such amount following five (5) days' written notice to Agent of the Merchant's intention to do so. The Agent Letter of Credit shall expire no less than sixty (60) days after the Sale Termination Date; provided, however, that the Merchant and Agent agree that after payment of the unpaid portion of the Guaranteed Amount (whether the Estimated Guaranteed Amount or the Guaranteed Amount calculated pursuant to the Inventory Report) pursuant to Section 3.3(a), the face amount of the Agent Letter of Credit shall be reduced in an amount(s) to be agreed upon by Merchant and Agent, but in any event not less than the sum of any and all amounts then due or to be due and payable from Agent in connection with the Guaranteed Amount.

(e) If and to the extent that Agent over-funds any amounts in respect of the Guaranteed Amount hereunder, then Merchant agrees to promptly reimburse such undisputed overpayment amounts to Agent. To the extent that any over-funded amounts in respect of the Guaranteed Amount hereunder on account of the Merchandise have been received by the Merchant's secured lender, New Alliance Bank (the "Lender"), and have not been reimbursed by Merchant, Agent shall inform the Lender of such overpayment in respect of the Guaranteed Amount hereunder on account of the Merchandise and Lender agrees to disgorge such overpayment actually received by Lender to Agent within ten (10) business days of such notice.

10

(f)     Merchant agrees that if at any time during the Sale Term Merchant holds any amounts due to Agent as Proceeds hereunder, Agent may, in its discretion, after five (5) business days notice to Merchant and Lender, offset such Proceeds being held by Merchant against any amounts due and owing to Merchant pursuant to this Section 3.3 or otherwise under this Agreement.  In addition, Merchant and Agent further agree that if at any time during the Sale Term, Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days notice to Merchant and Lender, offset such amounts being held by it against any amounts due and owing by, or required to be paid by, Merchant hereunder.

Section 4.                    Sale Expenses.

4.1  Expenses.  Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale.  As used herein, "Expenses" shall mean all Store-level operating expenses of the Sale which arise during the Sale Term and certain expenses associated with the Warehouse, limited to the following:

(a)     all base payroll and Retention Bonuses for all Retained Employees used by Agent in connection with the Sale for actual days/hours worked during the Sale Term as well as payroll for any of Merchant's former employees or temporary labor retained by Agent for the Sale;

(b)     any amounts payable by Merchant for benefits for Retained Employees including FICA, unemployment taxes, worker's compensation, and health care insurance and paid time-off benefits that accrue during the Sale Term used by Agent

11

in connection with the Sale, up to an aggregate of eighteen and seven tenths percent (18.7%) of base payroll for Retained Employees (the "Benefits Cap.")

(c)     Intentionally Omitted;

(d)     All advertising expense, including direct mailing, media, and signage expenses, including signwalkers;

(e)     local, leased line, satellite broadband connections and long distance telephone expenses incurred in the conduct of the Sale;

(f)     credit card, bank card fees, chargebacks, discounts, bad debt expense, and any other bank charges relating to Store or corporate accounts used in connection with the Sale;

(g)     costs of all security in the Stores and the Warehouse, including without limitation security systems, couriers and guard service, personnel and alarm services in the Stores and the Warehouse, as well as cash shortfalls in registers;

(h)     on-site supervision, including base fees and bonuses of Agent's field personnel, commercially reasonable travel expenses to and from the Stores and the Warehouse at the commencement and conclusion of the Sale, and incidental out-of-pocket expenses relating thereto;

(i)     Merchant's property insurance attributable to the Merchandise and comprehensive public liability insurance attributable to the Stores and Warehouse, during the Sale Term as reflected on Exhibit 4.1(i);

185125/001-1946661.1

(j)     any and all costs relating to the processing, transfer or consolidation of Merchandise between and among Stores and the Warehouse, including delivery and freight costs;

(k)     Retention Bonuses as described in Section 9.4 below;

(l)     actual Occupancy Expenses for the Stores and the Warehouse through the Sale Term, up to the amounts per Store as set forth on Exhibit 4.1(l) hereto;

(m)     Intentionally Omitted;

(n)     Central Services Expenses limited to $10,000 per week during the Sale Term;

(o)     costs for additional Supplies as requested by Agent;

(p)     housekeeping, cleaning services, and trash removal;

(q)     third party payroll processing fees.

(r)     50% of the fees and expenses of the Inventory Taking Service; and

(s)     Agent's cost of capital, and reasonable legal fees relative to this Agreement and related auction and Bankruptcy Court approval process and proceedings.

13

There will be no double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category. Notwithstanding anything herein to the contrary, to the extent that an Expense listed in Section 4.1 is also included on Exhibit 4.1(l), then Exhibit 4.1(l) shall control and such Expense shall not be double counted.

As used herein, the following terms have the following respective meanings:

"Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including (without limitation) MIS services, payroll processing, point-of-sale systems, accounting system, cash reconciliation, inventory processing and handling, and data processing and reporting.

"Excluded Benefits" means (i) the following benefits arising or accruing prior to the Sale Commencement Date: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, termination or severance pay and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including any payments due under the Worker Adjustment Retraining Notification Act ("WARN Act").

"Occupancy Expenses" means base rent, percentage rent, utilities, CAM, telecom/phone costs, real estate and use taxes, POS maintenance, store security systems, repairs and maintenance, taxes and licenses, insurance (including without limitation general liability, property, crime, umbrella, bond and flood insurance), store supplies, cleaning expenses and equipment rental all of the foregoing as categorized and described on Exhibit 4.1 attached hereto.

14

"Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses in excess of $10,000 per week; (iii) any Occupancy Expenses in excess of the aggregate amounts for each location set forth on Exhibit 4.1(l); and (iv) any other costs, expenses, or liabilities arising during the Sale Term in connection with the Sale, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term.

4.2 Payment of Expenses. Effective from and after entry of the Approval Order:

(a) Agent shall be responsible for the payment of all Expenses whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (*i.e.*, Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 5.2, provided, however, in the event that the actual amount of an expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amount, which amount will be reconciled once the actual amount of such Expense becomes available. Agent and/or Merchant may review or audit the Expenses at any time. Agent shall be obligated to pre-fund any Occupancy Expenses and payroll-related expenses consistent with the Merchant's customary rent and payroll funding practices and timing.

185125/001-1946661.1

(b)     To secure payment of the Expenses, Agent shall deliver to Merchant an irrevocable and unconditional standby letter of credit, naming Merchant, as beneficiary, in the original face amount equal to three (3) weeks estimated Occupancy Expenses and payroll and benefit Expenses, substantially in the form of Exhibit 4.2(b) attached hereto (the "Expense L/C").  The Expense L/C shall be delivered to Merchant no later than two (2) business days after the Sale Commencement Date, shall be issued by a bank selected by Agent and reasonably acceptable to Merchant, and shall contain terms, provisions and conditions mutually acceptable to Merchant and Agent.  The Expense L/C shall expire no earlier than sixty (60) days after the Sale Termination Date.  Unless the parties shall have mutually agreed that they have completed the final reconciliation under this Agreement, then, at least thirty (30) days prior to the initial or any subsequent expiry date, Merchant shall receive an amendment to the Expense L/C solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If Merchant does not receive such amendment to the Expense L/C no later than ten (10) days before the expiry date, then all amounts hereunder shall become immediately due and payable and Merchant shall be permitted to draw under the Expense L/C in payment of amounts owed and Merchant shall hold the balance of the amount drawn under the Expense L/C as security for amounts that may become due and payable to Merchant hereunder.

Section 5.                    Inventory Valuation; Merchandise.

5.1  (a)          Inventory Taking.  Merchant and Agent shall cause to be taken a SKU physical inventory of the Merchandise located in the Stores and Warehouse (the "Inventory Taking"), which Inventory Taking shall be completed, subject to

16

availability of the Inventory Taking Service, in all of the Stores and the Warehouse no later than seven (7) business days after the Sale Commencement Date (the "Inventory Completion Date", and the date of the Inventory Taking at each location being the "Inventory Date" for each such location).   Merchant and Agent shall jointly employ RGIS, WIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking.  The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as Exhibit 5.1 (the "Inventory Taking Instructions").  Merchant and Agent shall each be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service.  Except for the Inventory Taking costs payable to the Inventory Taking Service, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant, Agent and Lender may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking in each of the Stores, the applicable Stores shall be closed to the public and no sales or other transactions shall be conducted.  Merchant and the Agent further agree that until the Inventory Taking in each particular Store or the Warehouse is completed, neither Merchant nor Agent shall:  (i) transfer any Merchandise to or from that Store or Warehouse, (ii) move Merchandise within or about the Store or Warehouse so as to make any such items unavailable for counting as part of the Inventory Taking, and/or (iii) remove any hang tags, price tickets or inventory control tags affixed to any Merchandise.  Merchant and Agent agree to cooperate with each other to conduct the

185125/001-1946661.1

Inventory Taking commencing at a time that would minimize the number of hours that such locations would be closed for business.

     5.2  <u>Reconciliation</u>

     (a) On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to jointly prepare a reconciliation of the weekly Proceeds of the Sale, Expenses, and any other Sale related items that either party may reasonably request (the "<u>Weekly Sales Reconciliations</u>").

     (b) Within fourteen (14) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale, including (without limitation) a summary of Proceeds, Expenses, and any other accounting required hereunder (the "<u>Final Reconciliation</u>") and deliver the same to each other, the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within ten (10) days of completion of the Final Reconciliation, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.

     (c) In the event that there is a dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third

business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for a determination. Merchant and Agent hereby agree to submit to the jurisdiction of the Bankruptcy Court for such determination.

5.3 <u>Merchandise Subject to this Agreement</u>.

For purposes of this Agreement, "<u>Merchandise</u>" shall mean (i) all saleable finished goods inventory that is owned by Merchant and located at the Stores and the Warehouse as of the Sale Commencement Date, including, Merchandise subject to Gross Rings; (ii) subject to Section 5.4(b), Defective Merchandise, and On Order Merchandise; (iii) subject to Section 8.5, Returned Merchandise; and (iv) subject to Section 8.8, Special Order Merchandise. Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Stores (collectively, "<u>FF&E</u>"), <u>provided</u> <u>that</u>, subject to Merchant's exercise of the FF&E Election, Agent shall be permitted to sell Owned FF&E; (4) Excluded Defective Merchandise; and (5) Merchant Consignment Goods.

"<u>Defective Merchandise</u>" means any goods reasonably agreed upon by the Merchant's representative and the Agent's representative during the Inventory Taking as defective or otherwise not saleable in the ordinary course of Merchant's business, as to which Merchant and Agent mutually agree as to the Cost Value of such Defective Merchandise. Merchandise on display at the Stores shall not per se constitute Defective Merchandise unless such merchandise is (a) otherwise damaged or defective, (b) missing

19

its original packaging, (c) no longer subject to the manufacturer's warranty, or (d) a display item used for special order purposes, or provided by the manufacturer at a zero or reduced cost for display purposes.

"Excluded Defective Merchandise" means (i) those items of Defective Merchandise that are not saleable because they are so damaged or defective that such inventory cannot be used for the purpose for which they were intended; and (ii) items of Defective Merchandise for which the Merchant and the Agent cannot agree upon a Cost Value.

"Special Order Merchandise" means all items of Merchandise specially ordered prior to the Sale Commencement Date for a customer at the Stores pursuant to binding agreements, invoices or other legal documentation, where (A) the documentation is clear as to the name, address, telephone number, date of last payment and balance due, if any, from the customer, and (B) the goods subject to special order are fully described in the documentation.

.

"Merchant Consignment Goods" shall have the meaning assigned to such term in Section 5.5 below.

"On Order Merchandise" shall mean merchandise currently ordered by Merchant, which goods shall be delivered to the Warehouse or the Stores.

5.4   Valuation.

(a)      For purposes of this Agreement, (i) "Cost Value" shall mean with respect to each item of Merchandise, the actual cost for such item of Merchandise in Merchant's pricing files, as reflected on the file provided to Agent on November  21, 2010 entitled "Perpetual%20Inventory%20as%20of%20112110(1).xlsx" (the "Inventory File"); and (ii)

"Retail Value" shall mean the lowest ticketed, marked, shelf, or file price of each item of Merchandise as of and after October 1, 2010, except for Merchandise from Store number 5 (the Chelsea Store) shipped to the Warehouse, where its Retail Value shall be ten percent (10%) of its Retail Value as defined.

(b)     With respect to Defective Merchandise, the Cost Value shall be mutually agreed to between Merchant and Agent.

(c)     Excluded Defective Merchandise located in the Stores, shall be identified and counted during the Inventory Taking, and thereafter removed from the sales floor and segregated from Merchandise.  The procedure for counting and segregating the Excluded Defective Merchandise is set forth on Exhibit 5.1.

(d)     On Order Merchandise received at the Stores after ten (10) days following the Sale Commencement Date shall be valued at Cost Value, multiplied by the inverse of the prevailing Sale discount at the time of receipt as the Stores.

5.5     <u>Excluded Goods</u>.

(a)     Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If Merchant elects at the beginning of the Sale Term, Agent shall accept Excluded Defective Merchandise for sale as "Merchant Consignment Goods" at prices established by the Agent.  The Agent shall retain 30% of the sale price (less Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive 70% of the receipts in respect of such sales (less Sales Taxes).  Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis,

21

immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.6 below.  If Merchant does not elect to have Agent sell Excluded Defective Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable after the Sale Commencement Date.

Section 6.                    Sale Term.

6.1  Term.  The Sale shall commence at each of the Stores no later than December  2, 2010 (the "Sale Commencement Date").  Agent shall complete the Sale at the Stores, and shall vacate all of the Store premises on or before February 28, 2011 unless extended by mutual agreement of Agent and Merchant following a commensurate extension of the expiry date of any Agent Letter of Credit or the Expense L/C (as may be so extended, the "Sale Termination Date"), provided that Agent may terminate the Sale at any retail store location upon five (5) days' notice (the "Vacate Notice") to Merchant (the end of such notice period, as to each such Store, as applicable, the "Vacate Date").  The period for the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term."

6.2  Vacating the Stores. At the conclusion of the Sale, Agent agrees to leave the Stores and the Warehouse in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of FF&E which may be abandoned in place in the Stores and the Warehouse. Agent shall vacate the Stores on or before the Sale Termination Date, as provided for herein, at which time Agent shall surrender and deliver the Store premises and Store keys to Merchant.  Agent's obligations to pay all Expenses,

including Occupancy Expenses, for each Store subject to Vacate Notice shall continue until the later of (a) the applicable Vacate Date for such Store, or (b) the last day of the calendar month in which the Vacate Date for such Store occurs. All assets of Merchant used by Agent in the conduct of the Sale (*e.g.*, FF&E, etc.) shall be returned by Agent to Merchant or left at the Store at the end of the Sale Term to the extent the same have not been used in the conduct of the Sale or sold (*e.g.*, FF&E). Agent shall be responsible for all Occupancy Expenses (irrespective of any per diem cap on Occupancy Expenses) for a Store for which Merchant is or becomes obligated resulting from Agent's failure to timely vacate.

6.3  Gross Rings.  In the event that the Sale commences at any Store subject to Inventory Taking prior to the completion of the Inventory Taking at such Store, then for the period from the Sale Commencement Date for such Store until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store. Agent and Merchant shall keep a strict count of register receipts and reports to determine the actual Cost Value and Retail Price of the Merchandise sold by SKU.  All such records and reports shall be made available to Agent, Merchant and Lender during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included in Merchandise and, as soon as determinable, Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of one and one-half percent (1.5%) of the aggregate Cost Value of

185125/001-1946661.1

the Merchandise (without taking into account any of Agent's point of sale discounts or point of sale markdowns) sold during the Gross Rings period.

6.4   Intentionally Omitted.

Section 7.                          <u>Sale Proceeds</u>.

7.1   <u>Proceeds</u>.  For purposes of this Agreement, "<u>Proceeds</u>" shall mean the aggregate of:  (a) the total amount (in U.S. dollars) of all sales of Merchandise made under this Agreement, exclusive of Sales Taxes, and (b) any proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.  Proceeds shall also include any and all proceeds received by Agent from the disposition of unsold Merchandise at the end of the Sale whether through salvage, bulk sale or otherwise.

7.2   <u>Deposit of Proceeds</u>.

(a)  Within (i) seven (7) days after the Sale Commencement Date, Agent may establish its own depository accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable by Agent hereunder (the "<u>Agency Accounts</u>"), which accounts may be the Designated Merchant Accounts (as defined below) so long as Merchant and Agent agree, and Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; <u>provided</u>, <u>however</u>, upon request, Agent shall deliver to Merchant

24

copies of all bank statements and other information relating to such accounts.  Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(b) During the period between the Sale Commencement Date and the date Agent establishes the Agency Accounts, all Proceeds of the Sale (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into Merchant's existing accounts designated for the Stores and Merchant's existing credit card collection account, which accounts shall be designated solely for the deposit of Proceeds of the Sale (including credit card proceeds) and the disbursement of amounts payable by Agent hereunder (the "Designated Merchant Accounts").  Commencing on the first business day following the payment of the Guaranteed Amount Deposit and the posting of the Agent Letter of Credit and the Expense L/C, and on each business day thereafter (or as soon thereafter as is practicable), Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited in such accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date, if any).  Following payment of the Guaranteed Amount Deposit and delivery of the Agent Letter of Credit and the Expense Letter of Credit, during the applicable Merchant Account Usage Period, or such other extended date as shall be agreed between Merchant and Agent, the Lender agrees not to take any action with respect to such Proceeds deposited into the Designated

Merchant Accounts; provided, however, the Lender retains all of its rights and remedies with respect to the proceeds deposited into such Designated Merchant Accounts that do not constitute Proceeds of the Sale.

7.3 <u>Credit Card Proceeds</u>.  Agent shall have the right (but not the obligation) to use Merchant's credit card facilities (including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts) for credit card Proceeds.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's Merchant identification number(s).  All credit card Proceeds will constitute the property of Agent and shall be deposited into the Designated Merchant Accounts or Agency Accounts, as the case may be. To the extent credit card proceeds are deposited into the Designated Merchant Accounts, Merchant shall transfer such Proceeds to Agent daily (within one business day) by wire transfer of immediately available funds.  At Agent's request, Merchant shall cooperate with Agent to establish merchant identification numbers under Agent's name to enable Agent to process all credit card Proceeds for Agent's account.  Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

26

7.4  <u>Petty Cash</u>. In addition to the Guaranteed Amount, Agent shall reimburse Merchant on and as of the start of business on the Sale Commencement Date for all cash in the Stores. Agent shall purchase, on a dollar for dollar basis, all cash located in the Stores, which shall be determined, and paid for, as of the Sale Commencement Date.

Section 8.  <u>Conduct of the Sale</u>.  From and after entry of the Approval Order:

8.1  <u>Rights of Agent</u>.  Agent shall be permitted to conduct the Sale in accordance with the Sale Guidelines, the Approval Order, and in accordance with applicable law (except as otherwise provided in the Approval Order).  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right, limited only by the Sale Guidelines and the Approval Order:

(a)  to establish and implement advertising and promotion programs consistent with a "going out of business" "store closing", "sale on everything", "everything must go",  or similar theme (including, without limitation, by means of media advertising, A-frame, similar interior and exterior signs and banners, and use of sign walkers) in a manner consistent with the Sale Guidelines and the Approval Order; <u>provided</u> <u>however</u> the content of all such advertising and signage shall be approved in advance by _____ or another designated officer of Merchant, upon ____ business days prior notice of such advertising which shall be sent by email to _____, which approval shall not be unreasonably withheld or delayed, and

27

which approval shall be deemed to be granted unless denied in writing prior to the expiration of such time period;

(b)     to establish Store hours that are consistent with the terms of applicable leases, and local laws and regulations, including without limitation Sunday closing laws;

(c)     except as otherwise expressly included as an Expense, to use without charge during the Sale Term, all FF&E, advertising materials, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), customer lists, Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(d)     to use Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale; provided, however, that in the event that Agent expressly requests Merchant to provide services other than those normally provided to the Stores and relating to the sale of Merchandise by Merchant, Agent shall be responsible for the actual incremental cost of such services as an Expense.  Agent shall exercise due care and return to the Merchant immediately at the end of the sale all materials and supplies except materials and supplies expended; and

(e)     to transfer Merchandise between and among the Stores and the Warehouse, the costs of which shall be paid by Agent as an Expense of the Sale;

provided, however, the Agent shall not transfer Merchandise between Stores unless the Inventory Taking at the transferring and receiving Stores has been completed.

8.2 Terms of Sales to Customers.

(a) Final/As Is Sales. All sales of Merchandise will be "final sales" and "as is", and all advertisements and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash, nationally recognized bank credit cards, and Merchant's proprietary credit card and financing arrangements currently utilized by Merchant.

(b) Gift Certificates. During the Sale Term Agent will accept Merchant's gift certificates, gift cards and Store credits issued by Merchant prior to the Sale Commencement Date, provided that Agent shall be reimbursed by Merchant in connection with the Sale reconciliation contemplated under Section 5.2 hereof on a dollar for dollar basis for any such gift certificates, gift cards and store credits honored by Agent.

8.3 Sales Taxes. (a) During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf. All Sales Taxes shall be deposited into segregated accounts designated by Merchant and Agent solely for the deposit of such Sale Taxes (the "Sales Taxes Account"). Provided that Agent has

29

collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4  Supplies.  Agent shall have the right to use all existing supplies (e.g., boxes, bags, twine) (the "Supplies") located at the Stores at no charge to Agent.  In the event that additional supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent if available, for which Agent shall reimburse Merchant at Merchant's cost therefor.  Merchant does not warrant that the

30

existing Supplies as of the Sale Commencement Date are adequate for the purposes of the Sale.

8.5 <u>Returns of Merchandise</u>. Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("<u>Returned Merchandise</u>") in accordance with Merchant's return policies in effect as of the Sale Commencement Date, during the first 60 days of the Sale. If such Returned Merchandise is saleable as first-quality Merchandise, it shall be included in Merchandise and valued at the Cost Value applicable to such item multiplied by the inverse of the prevailing discount on similar such items of Merchandise as of the date of receipt in the applicable Store. In the event that Returned Merchandise constitutes Defective Merchandise ("<u>Returned Defective Merchandise</u>"), Merchant and Agent shall mutually agree upon the "Cost Value" for such item of Returned Defective Merchandise; <u>provided</u> <u>however</u>, in the event that Merchant and Agent cannot mutually agree upon the Cost Value for such Returned Defective Merchandise, or such Returned Defective Merchandise constitutes Excluded Defective Merchandise, then such Returned Defective Merchandise shall constitute Merchant Consignment Goods or Excluded Defective Merchandise and excluded from the Sale. The aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5), and the Guaranteed Amount shall be adjusted accordingly. Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise. Beginning on the thirty first (31st) day after the Sale Commencement Date, Agent shall, unless otherwise instructed by Merchant, cease accepting returns of Merchandise sold by Merchant prior to the Sale Commencement

31

Date.  All payments by Agent and Merchant required under this Section 8.5 shall be made in connection with Weekly Sales Reconciliation.

8.6  <u>Force Majeure</u>.  If any casualty or act of God or act of terrorism prevents or substantially inhibits the sale of any Merchandise or the conduct of business in the ordinary course at any Store, then such Store and the remaining Merchandise located at such Store shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that (i) the proceeds of any insurance attributable to such Merchandise or business interruption shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant shall reimburse Agent for the amount the Guaranteed Amount is so reduced prior to the end of the Sale Term.

8.7  <u>Merchant's Right to Monitor</u>. Merchant shall have the right to monitor the Sale and activities attendant thereto, and to be present in the Stores during the hours when the Stores are open for business, <u>provided</u> <u>that</u> Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation, and shall promptly notify Agent of such emergency.  Any expenses incurred in connection with this paragraph shall be borne by Merchant.

8.8  <u>Special Order Merchandise</u>.  (a)  Promptly after the execution of this Agreement, Merchant shall notify each customer for whom Merchant has ordered Special

Order Merchandise and request such customers to pick up and pay the balance owed for the applicable item(s) within fourteen (14) days of the delivery of the Special Order Merchandise. Any Special Order Merchandise unclaimed by customers by such date shall be returned to the Store's sale floor for sale by Agent. To the extent that any such Special Order Merchandise is salable as first-quality Merchandise, it shall be included in Merchandise and valued at the Cost Value applicable to such item multiplied by the inverse of the prevailing discount on similar such items of Merchandise as of the date of receipt in the applicable Store. In the event that Special Order Merchandise constitutes Defective Merchandise (" Special Order Defective Merchandise"), Merchant and Agent shall mutually agree upon the "Cost Value" for such item of Special Order Merchandise; provided however, in the event that Merchant and Agent cannot mutually agree upon the Cost Value for such Special Order Merchandise, or such Special Order Merchandise constitutes Excluded Defective Merchandise, then such Special Order Merchandise shall constitute Merchant Consignment Goods or Excluded Defective Merchandise and excluded from the Sale. The aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Special Order Merchandise included in Merchandise (determined in accordance with this Section 8.8), and the Guaranteed Amount shall be adjusted accordingly. Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Special Order Merchandise. Any increases in the Guaranteed Amount in connection with Special Order Merchandise shall be accounted for and paid by Agent pursuant to Weekly Sales Reconciliation.

8.9 <u>Additional Goods</u>. (a) Agent may (but shall not be required to), at Agent's sole cost and expense (which cost and expense may be recovered by Agent

33

as set forth in subparagraph (b) below), supplement the Merchandise in the Stores with goods, of like kind and quality, as is customarily sold in the Stores (the "Additional Goods"). Sales of Additional Goods shall be run through Merchant's cash register systems, provided, however, that Agent shall mark the Additional Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Goods from the sale of Merchandise. At all times and for all purposes, the Additional Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity (including, without limitation, Merchant and the Lender) shall have any claim against any of the Additional Goods or their proceeds, except to the extent set forth in Section 8.9(b). The Additional Goods shall at all times remain subject to the exclusive control of Agent, and Agent shall, at Agent's sole cost and expense (and not as an Expense of the Sale), insure the Additional Goods and, if required, promptly file any proofs of loss with regard thereto with Agent's insurers. Merchant and Agent shall reconcile the proceeds from the sale of Additional Goods as part of the Weekly/Final Sales Reconciliation process.

(b)     As consideration for allowing the Agent to supplement the Merchandise with Additional Goods pursuant to the terms and conditions of Section 8.9(a), Agent shall pay to Merchant five percent (5%) of the gross proceeds of the sale of Additional Goods after payment of applicable Sales Taxes.

Section 9.                     <u>Employee Matters.</u>

9.1 <u>Merchant's Employees</u>. Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent

may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, payroll, benefits, WARN Act claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments any of its employees in anticipation of the Sale or prior to the Sale Termination Date.  Merchant has not terminated and shall not during the Sale Term terminate any employee benefits or benefit programs.

9.2  <u>Termination of Employees</u>. Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto so that Merchant may coordinate the termination of such employee; <u>provided</u>, <u>however</u>, that, in the event that Agent determines to cease using an employee "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the fourteen (14)  day notice period shall not apply,

provided further, however, that Agent shall immediately notify Merchant of the basis for such "cause" so that Merchant can arrange for termination of such employee. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee.

9.3 Payroll Matters. During the Sale Term, Merchant shall process the base payroll for all Retained Employees and any former employees and temporary labor retained by Agent. Each Tuesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Merchant shall transfer, or to the extent that the Payment Date has passed, Agent shall transfer, to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, worker's compensation and benefits for such week which constitute Expenses hereunder.

9.4 Employee Retention Bonuses. Agent shall have the right to elect to pay, as an Expense, retention bonuses (each a "Retention Bonus") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of 10% of base payroll, for all Retained Employees who do not voluntarily leave employment and are not terminated "for cause". Subject only to limitation of 10% of base payroll, the actual amount to be paid shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system. Agent

36

shall provide Merchant with a copy of Agent's Retention Bonus plan within five (5) business days after the Sale Commencement Date.

Section 10.    Conditions Precedent and Subsequent.  The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)    All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default (as defined herein) shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(b)    Merchant shall have obtained any necessary consent to the Sale from its secured lenders.

(c)    Merchant shall have obtained the Approval Order on or before December 1, 2010, and the Approval Order shall not have been stayed nor shall an application for a stay of the Approval Order be pending.

Section 11.    Representations and Warranties.

11.1    Merchant's Representations, Warranties Covenant, and Agreements.  Merchant hereby represents, warrants, covenants, and agrees in favor of Agent as follows:

37

(a)  Merchant: (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of its organization stated above; (ii) has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including the jurisdiction in which the Stores are located.

(b)  Subject to entry of the Approval Order, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor. Subject to entry of the Approval Order, no contract or other

38

agreement to which Merchant is a party or by which Merchant is otherwise bound will prevent or impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E (such Owned FF&E being identified in Exhibit 11.1(c)(1)) to be included in the Sale free and clear of all liens, claims and encumbrances of any nature, other than the liens listed on Exhibit 11.1(c) and any applicable statutory liens.  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (including any proceeds from the sale of Owned FF&E) other than as provided for herein (including those listed on Exhibit 11.1(c)).  Any Approval Order shall provide that all such liens shall be transferred to and attach only to the Guaranteed Amount and other amounts payable to Merchant hereunder.

(d)     Merchant has maintained its pricing files (including the Inventory File and Retail Value files and information) in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdown).  All pricing files and records (including the Inventory File and Retail Value files and information) requested by Agent relative to the Merchandise have been and will continue to be made available to Agent.  All such pricing files and records (including Inventory File and Retail Value files and information) are and shall continue to be true and accurate

39

in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods as of the dates and for the periods indicated therein.  Merchant represents that (a) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (b) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)	Merchant shall ticket or mark all items of inventory received at the Stores prior to and after the Sale Commencement Date in a manner consistent with similar inventory located at the Stores and in accordance with Merchant's historic practices and policies relative to pricing and marking inventory.

(f)	Since August 1, 2010, Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course, except as otherwise set forth herein.

(g)	Except as may be restricted by virtue of Merchant's chapter 11 filing, Merchant covenants to continue to operate the Stores in the ordinary course of business from the date of this Agreement to the Sale Commencement Date, in that  (i) Merchant shall continue selling inventory during such period at customary prices, (ii) Merchant shall not promote or advertise any sales or in-store promotions (including POS promotions) to the public except for Merchant's historic and customary promotions for all of its locations, (iii) Merchant shall not return Mercahndise to vendors and, shall not transfer Merchandise or Supplies between or among Stores outside of the ordinary course

40

of business, (iv) Merchant shall not make any management personnel moves or changes at the Stores without Agent's prior consent (which consent will not be unreasonably withheld), (v) Merchant shall continue to handle Return to Vendor, to be repaired and damaged merchandise in the ordinary course and (vi) Merchant will continue to replenish inventory, in the ordinary course of Merchant's business through November 30, 2010.

(h)     No action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(i)     To the best of Merchant's knowledge, all Merchandise is in compliance with all applicable federal, state, or local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices regarding product recalls prior to the Sale Commencement Date.

(j)     Throughout the Sale Term, Agent shall have the right to the uninterrupted use and occupancy of, and peaceful and quiet possession of the Stores and the Warehouse, the assets currently located at the Stores and the Warehouse, and the services provided at the Stores.  Merchant shall throughout the Sale Term maintain in good working order, condition and repair, at its sole expense (except to the extent such amounts are included in Occupancy Expenses), all cash registers, heating systems, air

conditioning systems, elevators, escalators, Store alarm systems, and all other mechanical devices used in the ordinary course of operation of the Stores.

(k)     Except any amounts owing as a result of the commencement of the Chapter 11 Cases, Merchant has paid and will continue to pay throughout the Sale Term, (i) all self-insured or Merchant funded employee benefit programs for employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs, (ii) all casualty, liability, workers' compensation and other insurance premiums, (iii) all utilities provided to the Stores, and (iv) all applicable taxes.

(l)     Merchant has not and shall not throughout the Sale Term take any actions the result of which would have a material adverse effect on the Agent's ability to conduct the Sale.

(m)     Merchant is not a party to any collective bargaining agreements with its employees at the Stores and, to the best of Merchant's knowledge; no labor unions represent Merchant's employees at the Stores.

(n)     All information provided by Merchant to Agent in the course of Agent's due diligence and preparation and negotiation of this Agreement (including information as to the Store inventories and operating expenses) is as of the date hereof and shall remain true and accurate in all material respects.

(o)     Supplies have not been, since October 1, 2010, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the

42

Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

(p)     The Cost Value of seasonal clearance inventory, defined as Merchandise that has been discounted on a point of sale basis of 50% off the original ticket, shall equal no more than 2% of the Merchandise.  The cost factor, meaning the relationship of Cost Value to Retail Value of the Merchandise on the Sale Commencement Date is reflected on Exhibit 11.1(p) hereof.  If such representation of the cost factor is breached, then the adjustment of the Guaranty Percentage shall be determined by Exhibit 11.1 (p) hereof (which if applicable would be cumulative to any adjustment (if applicable) contemplated by Section 3.1(c) above).

11.2     <u>Agent's Representations and Warranties</u>.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a) Agent: (i) is validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite power and authority to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b) Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency

43

Documents and to perform its obligations thereunder. Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c) No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12.        Insurance.

12.1    Merchant's Liability Insurance. Subject to Agent's payment of all associated Expenses, Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection

44

with Merchant's operation of the Stores, and shall cause Agent to be named an additional insured with respect to all such policies.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least  thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change.  In the event of a claim arising during the Sale Term under any such policies Agent shall be responsible for the payment of all deductibles, retention's or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Merchant, or Merchant 's employees, independent contractors or agents (other than Agent's employees and contractors).

      12.2    <u>Merchant's Casualty Insurance</u>.  Subject to Agent's agreement to pay all associated Expenses, Merchant will provide throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the cost value thereof.  In the event of a loss to the Merchandise during the Sale Term, the proceeds of such insurance attributable to the Merchandise plus any self insurance amounts and the amount of any deductible (which amounts shall be paid by Agent), shall constitute Proceeds hereunder and shall be paid to Agent.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change.

Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3  <u>Worker's Compensation Insurance</u>.  Subject to Agent's agreement to pay all associated Expenses, Merchant shall at all times during the Sale Term maintain in full force and effect worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4  <u>Agent's Insurance</u>.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant.  In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors).

12.5  <u>Risk of Loss</u>.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of

Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Merchant and Agent agree that Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors or employees located at the Stores (an "Agent Claim").  In the event of any such liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's historic policies and procedures, and shall provide a copy of the initial documentation relating to such claim to Agent.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide a copy of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party.

Section 13.    Indemnification.

13.1    Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims,

47

demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)     Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term, except as a result of Agent's failure to comply with section 9.3 of this Agreement;

(c)     subject to Agent's compliance with its obligations under Section 9.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof, except as a result of Agent's failure to comply with section 8.3 of this Agreement;

(d)     any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act), except for Agent Claims;

(e) the negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents or representatives; and

(f) the Additional Merchandise and the inclusion of the same in the Sale.

13.2 <u>Agent Indemnification</u>. Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b) any harassment or any other unlawful, tortuous or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its representatives;

(c) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment;

(d) any Agent Claims; and

(e) the negligence or willful misconduct of Agent or any of its officer, directors, employees, agents or representatives.

Section 14. <u>Defaults</u>. The following shall constitute "<u>Events of Default</u>" hereunder:

185125/001-1946661.1

(a)      Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured five (5) days after receipt of written notice thereof to the defaulting party; or

(b)      Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and/or during the Sale Term; or

(c)      The Sale is terminated or materially interrupted or impaired at the Stores for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon five (5) business days' written notice to the other party.

Section 15.      <u>Security Interest</u>.  Without limiting the Agent's offset rights under Section 3.3(d) above, if any, in consideration of Agent's payment of the Guaranteed Amount Deposit, Expenses and the provision of services hereunder to Merchant, the Approval Order shall grant to Agent effective as of the Payment Date, pursuant to Bankruptcy Code § 364(d), a valid and perfected first priority security interest in and lien upon the Merchandise, Owned FF&E (provided Merchant has made the lump sum payment election provided for in Section 16.9 hereof, or alternatively, Agent's disposition commission), the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.5 hereof, and the Proceeds to secure all obligations of Merchant to Agent hereunder, junior only to (a) an amount equal to the

50

unpaid portion of the Guaranteed Amount, (b) the Recovery amount, if any; and (c) any amount owed by Agent to Merchant for Expenses, without the necessity of filing financing statements to perfect the security interests. Merchant shall execute all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest.

Section 16.                    Miscellaneous.

16.1    Notices. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

| | |
|---|---|
| If to Agent: | Gordon Brothers Retail Partners, LLC<br>101 Huntington Avenue, 10th Floor<br>Boston, MA 02199<br>Attention:    Mitch Cohen<br>Facsimile: |
| and | |
| With a copy (which shall not constitute notice) to: | [_____]<br>[_____]<br>Attention:    [_____]<br>Facsimile:    [_____] |
| And | |
| If to Merchant: | The Weck Corporation d/b/a Gracious Home<br>632 Broadway, Suite 401<br>New York, New York 10012<br>Attention:    Jordan Smilowitz, President<br>Email: jsmilowitz@gracioushome.com<br>Telephone:    212-901-6307<br>Facsimile:    212-677-8010 |
| With a copy (which shall not constitute notice) to: | Rosanne T. Matzat, Esq.<br>Mark T. Power, Esq.<br>Hahn & Hessen LLP<br>488 Madison Avenue<br>New York, NY 10022<br>Email: rmatzat@hahnhessen.com |

51

Email: mpower@hahnhessen.com
Telephone:    212.478.7200
Facsimile:    212.478.7400


And the financial advisor to Sellers:    Triton Equity Partners, LLC
Attention:    Robert L. Pressman
                    Chief Executive Officer
81 Newtown Lane, Suite 351
East Hampton, New York 11937
Email: rpressman@tritonequity.com
Telephone:    631-613-6655
Facsimile:    631-613-6659


With copies to:

If to Lender:

New Alliance Bank
Westwood Business Centre
690 Canton Street, Suite 214
Westwood, MA  02090
Attn:   Allan J. Marzen
Phone: (781) 251-5705
Cell:    (917) 714-5557
Email:
amarzen@NewAllianceBank.com


With a copy (which shall not
constitute notice) to:

Greenberg Traurig LLP
One International Place
Boston, MA 02110
Attn:   Jeffrey M. Wolf, Esq.
Phone: (617) 310-6041
Fax:    (617) 310-6001
Cell:    (617) 901-1689
Email:   wolfje@gtlaw.com


If to Committee:

Lowenstein Sandler P.C.
1251 Avenue of the Americas
New York, New York 10020
Attn:    Sharon L. Levine
Phone: (973) 597-2374
Fax:    (973) 597-2375
Email:    slevine@lowenstein.com

16.2     Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles thereof.

16.3     Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

16.4     Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto along with the written consent of the Lender, which consent shall not be unreasonably withheld or delayed.

16.5     No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, and their respective successors and assigns including, but not limited to, any chapter 11 or chapter 7 trustee.

185125/001-1946661.1

16.7     Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8     Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9     FF&E. With respect to the FF&E owned by Merchant and located at the Stores, at Merchant's sole option, exercisable by Merchant in writing on an individual Store by Store basis within ten (10) days after the Sale Commencement Date, and on a Warehouse by Warehouse basis within ten (10) days after the Sale Commencement Date, Agent shall, at Merchant's election ("FF&E Election"), sell the FF&E in any such Store or Warehouse, as applicable.  In the event Merchant exercises the FF&E Election with respect to the Owned FF&E in any Store or Warehouse, Agent be entitled to receive a commission equal to twenty five percent (25%) of the gross proceeds from the sale of such FF&E (net of sales taxes); provided, however, Merchant shall be responsible for payment of all actual expenses incurred in connection with the disposition and removal of the Owned FF&E in accordance with a budget to be mutually agreed upon between Merchant and Agent; provided further, however, Merchant may elect to receive, in lieu of proceeds net of expenses and Agent's commission, a lump sum payment, on a per Store or Warehouse basis, as applicable, in an amount to be agreed upon between Merchant and Agent, in which case all costs and expenses associated with the disposition thereof shall be borne by Agent.  In either event, as of the Sale

54

Termination Date, Agent may abandon, in place, any unsold FF&E, at the Stores or Warehouses, as applicable. In the event that Merchant elects to have someone other than the Agent dispose of the Owned FF&E, Agent agrees that it shall cooperate with such party, provided, however, it is understood that such third party's efforts shall not interfere with Agent's conduct of the Sale.

16.10   Reporting. If requested, Agent shall furnish Merchant with weekly reports including, without limitation, reports that comply with the Merchant's current weekly cash reporting to its central office, reflecting the progress of the Sale which shall specify the Proceeds received to date and shall furnish Merchant with such other information regarding the Sale as Merchant reasonably requests. The Agent will maintain and provide to Merchant sales records to permit calculation of and compliance with any percentage rent obligations under Store leases. During the course of the Sale, Merchant shall have the right to have representatives continually act as observers of the Sale in the Stores so long as they do not interfere with the conduct of the Sale.

16.11   Agent.   All references to "Agent" hereunder shall mean _____.

16.12   Survival.  All representations, warranties, covenants and agreements made by the parties hereto shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement through the Sale Termination Date.

16.13   Bidding Procedures.   In consideration of Agent conducting its due diligence and entering into this Agreement, which serves as a base by which other offers

may be measured and is subject to higher and better offers by other entities seeking to act as Agent (the "Competing Bidders"), by way of a bidding process, all subject to the approval of the Bankruptcy Court, Merchant shall have obtained an order from the Bankruptcy Court (the "Bid Procedures Order") of procedures embodying the following terms: (a) all Competing Bidders must agree to be bound by all of the terms and conditions of this Agreement except as modified as to price and other economic terms; (b) all Competing Bidders must provide adequate assurance of their ability to perform their obligations pursuant to any bid; (c) all Competing Bidders must provide value to the estate equal to the value in this Agreement plus an amount equating to at least $50,000 over the Guaranteed Amount and the Breakup Fee ("Overbid"); (d) to the extent that an Overbid is received that complies with (a) through (c) above, at an auction, each bidder shall be required to bid in aggregate Cost Value increments equating to $50,000 increments; and (e) if the Bankruptcy Court approves an Overbid with a Competing Bidder, which Competing bid is consummated, Merchant will pay within five (5) business days of the closing of such Competing Bid to Agent a break-up fee equal to two and one half percent (2.5%) of the Guaranteed Amount, plus reimbursement of up to $50,000 for actual reasonable out of pocket costs, fees, expenses, disbursements and other charges paid by or due and payable by Agent in connection with this Agency Agreement and related auction and Bankruptcy Court process (the "Breakup Fee") and Lender will subordinate its liens as necessary to effect this payment.

185125/001-1946661.1

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

GORDON BROTHERS RETAIL
PARTNERS, LLC

By: _____
Its: _____
          TIMOTHY SHILLING
          VICE PRESIDENT

THE WECK CORPORATION
On Behalf of Itself and its Affiliated Debtors
and Debtors-in-Possession

By: _____
Its: _____

CONSENTED AND AGREED TO
AS IT RELATES TO SECTIONS [3.3, 8.6, 15, AND 16.3] HEREOF:
BY:

NEW ALLIANCE BANK

By: _____
Name:
Title:

57

# Gracious Home
## Store List
### Exhibit 1

| Store No. | Store | Address | City | State | Zip Code | Square Ft |
|---|---|---|---|---|---|---|
| 3 | 1992 Broadway | 1992 Broadway @ 67th St. | New York | NY | 10023 | 21,500 |
| 1 | 1220 3rd Ave | 1220 3rd Ave. @ 70th St. | New York | NY | 10021 | 11,132 |
| 4 | 1201 3rd Ave. | 1201 3rd Ave. @ 70th St. | New York | NY | 10021 | 9,332 |
| 5 | Chelsea Design Showroom | 45 West 25th St. | New York | NY | 100100 | 8,500 |
| **4** | | | | | | **12,616** |
| 80 | Warehouse | 30-30 60th St | Woodside | NY | 11377 | 100,000 |

# Gracious Home
# EXHIBIT 3.1(c)

### MERCHANDISE THRESHOLD ($000's)

| Decremental Dollars in Inventory | Cost Value of the Merchandise | Decremental Percent in Guarantee |
|---|---|---|
| THRESHOLD | 8,800 | |
| 100 | 8,700 | 0.000% |
| 100 | 8,600 | 0.000% |
| 100 | 8,500 | 0.000% |
| 100 | 8,400 | -0.200% |
| 100 | 8,300 | -0.200% |
| 100 | 8,200 | -0.250% |
| 100 | 8,100 | -0.250% |
| 100 | 8,000 | -0.300% |
| 100 | 7,900 | -0.300% |
| 100 | 7,800 | -0.350% |
| 100 | 7,700 | -0.350% |
| 100 | 7,600 | -0.350% |
| 100 | 7,500 | -0.350% |

Note: The adjustments will be cumulative and prorated between intervals.

If the inventory value is higher than 8,800 or lower than 7,500 it shall result in a breach.

EXHIBIT 4.1 (I)

**Per Diem Rent and Operating Expenses by Location**

| December - 2010 | Rent Expenses | Budget Utilities | Budget Telephone | Budget R&M | Budget IT Expense | Per Diem Cash Rent & Expenses |
|---|---|---|---|---|---|---|
| **1210 Third Ave** | | | | | | |
| Cash Rent | 31,428 | | | | | |
| Real Estate Tax | 8,277 | | | | | |
| Commercial Rent Tax | 1,500 | | | | | |
| Cash Rent for Month | 41,205 | | | | | |
| | | | | | | |
| **1220 Third Ave** | | | | | | |
| Cash Rent | 56,000 | | | | | |
| Real Estate Tax | 20,713 | | | | | |
| Commercial Rent Tax | 3,500 | | | | | |
| Cash Rent for Month | 80,213 | | | | | |
| | | | | | | |
| **1220 & 1210 Combined** | | | | | | |
| Cash Rent | 87,428 | | | | | |
| Real Estate Tax | 28,990 | | | | | |
| Commercial Rent Tax | 5,000 | | | | | |
| Cash Rent for Month | 121,418 | 9,900 | 3,200 | 1,900 | 400 | **4,413.48** |
| | | | | | | |
| **1201 Third Ave** | | | | | | |
| Cash Rent | 130,636 | | | | | |
| Real Estate Tax | 3,337 | | | | | |
| Commercial Rent Tax | 5,000 | | | | | |
| Cash Rent for Month | 138,973 | 7,800 | 800 | 850 | 200 | **4,794.29** |
| | | | | | | |
| **1992 Broadway** | | | | | | |
| Cash Rent | 144,142 | | | | | |
| Real Estate Tax | 30,704 | | | | | |
| Commercial Rent Tax | 6,000 | | | | | |
| Cash Rent for Month | 180,846 | 28,200 | 1,200 | 4,800 | 400 | **6,949.86** |
| | | | | | | |
| **45 West 25th Street** | | | | | | |
| Cash Rent | 37,500 | | | | | |
| Real Estate Tax | 755 | | | | | |
| Commercial Rent Tax | 2,000 | | | | | |
| Cash Rent for Month | 40,255 | 3,600 | 700 | 100 | 300 | **1,450.16** |
| | | | | | | |
| **632 Broadway** | | | | | | |
| Cash Rent | 29,321 | | | | | |
| Real Estate Tax | 3,028 | | | | | |
| Commercial Rent Tax | 1,500 | | | | | |
| Cash Rent for Month | 33,849 | 4,100 | 4,300 | 1,500 | 20,000 | **2,056.43** |
| | | | | | | |
| **Warehouse** | | | | | | |
| Cash Rent | 62,139 | | | | | |
| Real Estate Tax | 4,328 | | | | | |
| Commercial Rent Tax | - | | | | | |
| Cash Rent for Month | 66,467 | 13,500 | 200 | 3,000 | 100 | **2,686.02** |
| | | | | | | |
| **Total All Locations** | **581,808** | **57,200** | **7,200** | **10,250** | **21,000** | **17,936.76** |

All information is subject to errors, omissions, change, or revocation.

Future results may materially differ from forecast and past performance.

Higher or lower sales and higher or lower operating expenses and margins may occur.

| | **January - 2011** Rent Expenses | Budget Utilities | Budget Telephone | Budget R&M | Budget IT Expense | **Per Diem Cash Rent & Expenses** |
|---|---|---|---|---|---|---|
| **1210 Third Ave** | | | | | | |
| Cash Rent | 31,428 | | | | | |
| Real Estate Tax | 8,277 | | | | | |
| Commercial Rent Tax | 1,500 | | | | | |
| Cash Rent for Month | 41,205 | | | | | |
| | | | | | | |
| **1220 Third Ave** | | | | | | |
| Cash Rent | 56,000 | | | | | |
| Real Estate Tax | 20,713 | | | | | |
| Commercial Rent Tax | 3,500 | | | | | |
| Cash Rent for Month | 80,213 | | | | | |
| | | | | | | |
| **1220 & 1210 Combined** | | | | | | |
| Cash Rent | 87,428 | | | | | |
| Real Estate Tax | 28,990 | | | | | |
| Commercial Rent Tax | 5,000 | | | | | |
| Cash Rent for Month | 121,418 | 9,900 | 3,200 | 1,900 | 400 | **4,413.48** |
| | | | | | | |
| **1201 Third Ave** | | | | | | |
| Cash Rent | 130,636 | | | | | |
| Real Estate Tax | 3,337 | | | | | |
| Commercial Rent Tax | 5,000 | | | | | |
| Cash Rent for Month | 138,973 | 7,000 | 800 | 850 | 200 | **4,768.48** |
| | | | | | | |
| **1992 Broadway** | | | | | | |
| Cash Rent | 158,611 | | | | | |
| Real Estate Tax | 30,704 | | | | | |
| Commercial Rent Tax | 6,000 | | | | | |
| Cash Rent for Month | 195,315 | 28,500 | 1,200 | 4,800 | 400 | **7,426.28** |
| | | | | | | |
| **45 West 25th Street** | | | | | | |
| Cash Rent | 37,500 | | | | | |
| Real Estate Tax | 755 | | | | | |
| Commercial Rent Tax | 2,000 | | | | | |
| Cash Rent for Month | 40,255 | 2,200 | 700 | 100 | 300 | **1,405.00** |
| | | | | | | |
| **632 Broadway** | | | | | | |
| Cash Rent | 29,321 | | | | | |
| Real Estate Tax | 3,028 | | | | | |
| Commercial Rent Tax | 1,500 | | | | | |
| Cash Rent for Month | 33,849 | 3,900 | 4,300 | 1,500 | 20,000 | **2,049.98** |
| | | | | | | |
| **Warehouse** | | | | | | |
| Cash Rent | 62,139 | | | | | |
| Real Estate Tax | 4,328 | | | | | |
| Commercial Rent Tax | - | | | | | |
| Cash Rent for Month | 66,467 | 13,500 | 200 | 3,000 | 100 | **2,686.02** |
| | | | | | | |
| **Total All Locations** | **596,277** | **55,100** | **7,200** | **10,250** | **21,000** | **18,335.77** |

All information is subject to errors, omissions, change, or revocation.
Future results may materially differ from forecast and past performance.
Higher or lower sales and higher or lower operating expenses and margins may occur.

# Gracious Home
## EXHIBIT 11.1(p)

## Cost Factor Threshold

| Incremental Cost Factor Percentage | Cost Factor | Decremental Percent in Guarantee |
|---|---|---|
| 0.10% | 40.44% | -0.500% |
| 0.10% | 40.34% | -0.500% |
| 0.10% | 40.24% | -0.500% |
| 0.10% | 40.14% | -0.450% |
| 0.10% | 40.04% | -0.450% |
| 0.10% | 39.94% | -0.450% |
| 0.10% | 39.84% | -0.450% |
| 0.10% | 39.74% | -0.450% |
| 0.10% | 39.64% | -0.450% |
| 0.10% | 39.54% | -0.450% |
| 0.10% | 39.44% | -0.450% |
| 0.10% | 39.34% | -0.450% |
| 0.10% | 39.24% | -0.450% |
| 0.10% | 39.14% | -0.450% |
| 0.10% | 39.04% | -0.450% |
| 0.10% | 38.94% | -0.400% |
| 0.10% | 38.84% | -0.400% |
| 0.10% | 38.74% | -0.400% |
| 0.10% | 38.64% | -0.400% |
| 0.10% | 38.54% | -0.400% |
| 0.10% | 38.44% | -0.400% |
| 0.10% | 38.34% | -0.400% |
| 0.10% | 38.24% | 0.000% |
| | 38.14% (Cost Factor Representation) | |

Note: -.50% for each .10% decrement in cost factor in excess of 40.44%

All adjustments shall be cumulative and prorated between intervals.