**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                     :

In re                     :         **Chapter 11**
                      :

**The Weck Corporation,** *et al.*,    :         **Case No. 10-14349 (AJG)**
                      :

          **Debtors.**       :
                      :

---------------------------------------------------------------- x

## FIRST AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**HAHN & HESSEN LLP**
Rosanne Thomas Matzat, Esq.
Mark Power, Esq.
Alison Papalexis, Esq.
488 Madison Avenue
New York, NY 10022
T (212) 478-7350
F (212) 478-7400

*Counsel to the Debtors and Debtors-In-Possession*

Dated: May 23, 2011
     New York, New York

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS ON **AUGUST 1, 2011 AT 4:00 P.M. (PREVAILING EASTERN TIME)**, UNLESS THE DEBTORS AND COMMITTEE AGREE TO EXTEND THE VOTING DEADLINE PRIOR TO THAT TIME. TO BE COUNTED, THE VOTING AND CLAIMS AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>SPECULATIVE</u>, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTORS OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THESE CHAPTER 11 CASES.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE DEBTORS' CHAPTER 11 PLAN OF LIQUIDATION TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, HOLDERS OF CLAIMS AND

INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CAUSE OF ACTION, CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE PLAN ADMINISTRATOR THE RIGHT TO BRING ANY CLAIM OR CAUSE OF ACTION BELONGING TO THE DEBTORS OR THEIR ESTATES AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' COURT-APPOINTED ADMINISTRATOR AND WIND-DOWN OFFICER HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD

NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTORS FILED THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN CLASS 2 SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

# TABLE OF CONTENTS

I.      SUMMARY ............................................................................................................1

      **A.**      Overview of Chapter 11 ..............................................................................1

      **B.**      Summary of Sale to Americas Retail ..........................................................1

      **C.**      The Purpose of the Plan .............................................................................3

      **D.**      Treatment of Claims and Interests .............................................................3

      **E.**      Entities Entitled to Vote on the Plan ..........................................................4

      **F.**      Solicitation Process ....................................................................................5

      **G.**      Voting Procedures ......................................................................................6

      **H.**      Confirmation Hearing .................................................................................7

II.     BACKGROUND TO THESE CHAPTER 11 CASES ....................................8

      **A.**      Debtors' Business .......................................................................................8

            **1.**      Debtor's Operations .......................................................................8

            **2.**      Employees ......................................................................................8

            **3.**      Directors and Officers ....................................................................9

      **B.**      Debtors' Organizational Structure .............................................................9

      **C.**      Retail Locations .........................................................................................9

             **1.**      Retail Stores ...................................................................................9

            **2.**      Corporate Accounts .....................................................................10

            **3.**      Internet ........................................................................................10

      **D.**      Summary of Prepetition Indebtedness and Financing ..........................11

             **1.**      Secured Debt ................................................................................11

            **2.**      Unsecured Debt ............................................................................11

            **3.**      Equity ...........................................................................................12

      **E.**      Financial Information ...............................................................................12

III.      EVENTS LEADING TO THESE CHAPTER 11 CASES ................................................12

          **1.**     Market Conditions ........................................................................12

          **2.**     Operational Issues .......................................................................13

          **3.**     Prepetition Lease Negotiations ...................................................13

          **4.**     Plan Support Agreement and Investment Purchase Agreement ...............13

IV.      ADMINISTRATION OF THE Debtors' CHAPTER 11 CASES ...................................14

      **A.**     Initial Motions and Certain Related Relief ........................................14

          **1.**     Motion to Approve Debtor in Possession Financing ................................14

          **2.**     Applications to Retain Professionals ........................................15

          **3.**     First Day Relief ........................................................................15

      **B.**     Unsecured Creditors Committee ....................................................16

      **C.**     Filing Schedules and Setting of Bar Dates .........................................16

      **D.**     Debtors' Objection to 503(b)(9) Claims ...........................................17

      **E.**     Other Relief Requested by the Debtors ...........................................17

          **1.**     Motion to Extend Exclusivity ......................................................17

          **2.**     Motion to Reject Leases of Retail Space .................................17

      **F.**     Sale of Assets .........................................................................18

          **1.**     Bidding Procedures and Marketing Efforts ...............................18

          **2.**     The APA and the Sale ................................................................18

          **3.**     Working Capital Adjustment ......................................................19

V.       SUMMARY OF THE PLAN....................................................................20

      **A.**     Provisions for Payment of Allowed Administrative Claims and Priority Claims .......................................................................................20

          **1.**     Treatment of Administrative Claims ......................................20

          **2.**     Treatment of Priority Claims ....................................................21

      **B.**     Classification of Claims and Interests................................................21

**C.**     Treatment of Claims and Interests .................................................................21

     **1.**     <u>Treatment of Class 1 Claims - Secured Claims</u> ..........................................21

     **2.**     <u>Treatment of Class 2 Claims - General Unsecured Claims</u> ......................21

     **3.**     <u>Treatment of Class 3 Interests</u>................................................................22

**D.**     Means for Implementing the Plan ...............................................................22

     **1.**     <u>Corporate Action</u>....................................................................................22

     **2.**     <u>Plan Administrator</u> .................................................................................22

     **3.**     <u>Resignation, Death or Removal</u> ..............................................................24

     **4.**     <u>Winding Up Affairs</u> ...............................................................................24

     **5.**     <u>Release of Liens</u> .....................................................................................24

     **6.**     <u>Rights of Action</u> .....................................................................................24

     **7.**     <u>Professional Fees and Expenses</u>..............................................................25

     **8.**     <u>Dissolution of the Committee</u> .................................................................25

     **9.**     <u>Post-Effective Date Committee Rights</u> ...................................................25

**E.**     Distributions................................................................................................25

     **1.**     <u>Reserve for Plan Expenses</u>......................................................................25

     **2.**     <u>Objections to Claims</u>...............................................................................26

     **3.**     <u>Record Date</u> ...........................................................................................26

     **4.**     <u>Manner of Payment Under the Plan</u> ........................................................26

     **5.**     <u>Disputed Claim Reserves</u> .......................................................................27

     **6.**     <u>Unclaimed Property</u> ...............................................................................27

     **7.**     <u>Withholding Taxes</u>.................................................................................27

     **8.**     <u>Fractional Cents</u> .....................................................................................27

     **9.**     <u>Payments of Less than Twenty Dollars</u> ..................................................27

     **10.**     <u>Setoffs</u> ...................................................................................................28

| | | | |
|---|---|---|---|
| **F.** | | Unexpired Leases And Executory Contracts .................................................................. | 28 |
| **G.** | | Conditions Precedent To Effectiveness Of The Plan ...................................................... | 28 |
| | **1.** | Conditions to Consummation .......................................................................... | 28 |
| | **2.** | Waiver of Conditions ...................................................................................... | 28 |
| | **3.** | Effect of Failure of Condition ........................................................................ | 29 |
| **H.** | | Effect of Confirmation .................................................................................................. | 29 |
| | **1.** | Vesting of Assets ............................................................................................ | 29 |
| | **2.** | Binding Effect ................................................................................................ | 29 |
| | **3.** | Preservation of Rights of Action by the Debtors and Post-Confirmation Debtor | 29 |
| **I.** | | Retention of Jurisdiction .............................................................................................. | 29 |
| **J.** | | Miscellaneous Provisions ............................................................................................ | 31 |
| | **1.** | Pre-Confirmation Modification ...................................................................... | 31 |
| | **2.** | Post-Confirmation Immaterial Modification ................................................... | 31 |
| | **3.** | Post-Confirmation Material Modification ....................................................... | 31 |
| | **4.** | Withdrawal or Revocation of the Plan ............................................................ | 32 |
| | **5.** | Successors and Assigns ................................................................................... | 32 |
| | **6.** | Exculpation ..................................................................................................... | 32 |
| | **7.** | Injunction ........................................................................................................ | 32 |
| | **8.** | Cramdown ........................................................................................................ | 33 |
| | **9.** | Governing Law ................................................................................................ | 33 |
| | **10.** | Notices ............................................................................................................ | 33 |
| | **11.** | Non-Voting Equity Securities ......................................................................... | 34 |
| | **12.** | Retiree Benefits ............................................................................................... | 34 |
| | **13.** | Saturday, Sunday or Legal Holiday ................................................................ | 34 |
| | **14.** | Section 1146 Exemption .................................................................................. | 34 |

**15.** <u>Severability</u> ...............................................................................................35

**VI.** Certain Federal Income Tax Consequences of the Plan .....................................................35

   **A.** Federal Income Tax Consequences ........................................................................36

     **1.** Federal Income Tax Consequences to Holders of General Unsecured Claims ...........................................................................................36

     **2.** Withholding and Reporting.................................................................................37

**VII.** Alternatives to Confirmation of the Plan ..........................................................................37

   **A.** Acceptance and Confirmation of the Plan ..............................................................37

   **B.** General Confirmation Requirements ......................................................................37

   **C.** Best Interest Test....................................................................................................37

   **D.** Financial Feasibility Test .......................................................................................39

   **E.** Acceptance by Impaired Classes ...........................................................................40

**VIII.** RECOMmENDATION....................................................................................................41

**<u>EXHIBITS</u>**

**Exhibit A**        Debtors' Chapter 11 Plan of Liquidation

**Exhibit B**        Statement of the Debtors' Receipts and Disbursements

# I. SUMMARY[1]

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances of the Joint Plan of Liquidation Proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan") filed with the Bankruptcy Court and (ii) the Confirmation Hearing scheduled for August 10, 2011 at 9:30 a.m. (prevailing Eastern Time).

The following summary is qualified in its entirety by the more detailed information and financial statements contained elsewhere in this Disclosure Statement.

## A. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code in a liquidation.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in the debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

## B. Summary of Sale to Americas Retail[2]

Founded in 1963, the Debtors began as a small neighborhood hardware store on Manhattan's Upper East Side. Remaining family-owned and operated for the ensuing 47 years, the Debtors operated a housewares and home furnishings business under six (6) store location leases and an internet-based business, all under the name *Gracious Home*.

---

[1]     Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

[2]     A more detailed summary of the sale process is set forth below.

Over the past several years, a number of internal and external factors severely impacted the Debtors, and, in particular their retail businesses, ultimately prompting the near-term liquidity pressures that precipitated the decision to commence these chapter 11 cases. Accordingly, on August 13, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the stated intent of restructuring and reorganizing their businesses.

Prior to the Petition Date, the Debtors reached a conditioned agreement with investor Meridian Ventures, LLC and the other pre-petition equity holders and senior management to restructure the Debtors' financial position in the context of a chapter 11 bankruptcy proceeding. The agreement among the Debtors and Meridian's designee GH Acquisition, LLC ("GHA") was reflected in the *Investment and Standby Purchase Agreement* (the "ISPA") dated as of August 11, 2010.

The ISPA permitted the Debtors, consistent with their fiduciary duties, to entertain higher or better offers from other potential investors. Accordingly, the Debtors sought approval of a bidding and auction process pursuant to which the Debtors would solicit higher and better proposals for the sponsorship and funding of a plan of reorganization. When Meridian subsequently withdrew from the investment process and it became clear that the Debtors would be unable to conduct an auction for a plan sponsor, focus turned to a traditional sale of substantially all of the Debtors' assets pursuant to sections 363 and 365 of the Bankruptcy Code.

The Debtors' assets were the subject of a court approved marketing process supported by the investment banking efforts of Triton Equity Partners, LLC ("Triton"). Having canvassed the marketplace, the Debtors determined that Americas Retail Flagship Fund, LLC ("Americas Retail") submitted the highest and/or best offer for the Debtors' assets, under the terms and conditions set forth in an asset purchase agreement dated as of November 26, 2010 (as amended, with all related sale documents, the "APA").

Pursuant to the terms of the APA, Americas Retail agreed to purchase substantially all of the assets of the Debtors' business, and assume certain liabilities (including certain real property leases for certain store locations), on the terms and conditions set forth therein.

On November 30, 2010, the Bankruptcy Court entered an Order approving the sale of substantially all of the Debtors' assets to Americas Retail under the terms contained in the APA. The sale closed on December 3, 2010 (the "Closing Date"). Americas Retail continues to operate the Debtors' business as a going concern outside of the bankruptcy process.

Following the Closing Date, certain issues arose between the Debtors and Americas Retail regarding the Working Capital Adjustment (defined below) provided for in the APA. The parties have resolved their disputes with respect to the Working Capital Adjustment on the terms and conditions set forth in that certain Stipulation Resolving Working Capital Adjustment Calculation, Asset Allocation and Office License Issues Under the Asset Purchase Agreement dated April 8, 2011, as approved by the Court on April 18, 2011 (Docket No. 355) (the "Working Capital Stipulation"), under terms whereby from the Purchase Price Escrow Fund (as defined below) (i) Americas Retail received $200,000 (from which Americas Retail paid the outstanding Sales Tax Amount of $31,672.36), (ii) the Debtors received the remaining balance of

$600,000 (plus accrued interest), and (iii) the Debtors and Americas Retail exchanged mutual releases.

Further, the APA provided for payment by Americas Retail of consideration in the form of a note in the face amount of $1,150,000 due for payment in the amount of $150,000 on March 3, 2011 and the balance due on January 6, 2012, bearing interest at a rate of 5.5% per annum (the "Note"). The initial payment of $150,000 was timely paid on March 3, 2011. As part of the resolution of the Working Capital Adjustment, and as approved in the Working Capital Stipulation, the parties have executed an amended and restated Note which reduces the remaining $1,000,000 payment due to $844,000 (including accrued interest), subject to certain early payment discounts whereby, subject to extension to March 31, 2012 if Americas Retail does not have availability of at least $2,000,000 (measured as cash on hand plus availability under any credit facility outstanding at such time, assuming the Note has been paid on such date) the balance of payment is due on January 6, 2012.

The resolution of the Working Capital Adjustment and receipt of payment on the Note are integral to the Debtors' ability to fund payments and distributions contemplated by the Plan. The Stipulation also further addresses Americas Retail's responsibility for liability and indemnity to the Debtors' estates in connection with vacating the Debtors' former headquarter office located at 632 Broadway.

## C.      The Purpose of the Plan

On March 10, 2011, the Debtors filed the a plan with the Bankruptcy Court to facilitate the liquidation of the Debtors' estates and the distribution of the Debtors' remaining assets-- principally cash--to holders of Allowed Claims. On May 23, 2011, the Debtors and the Official Committee of Unsecured Creditors (the "Committee") filed the First Amended Joint Plan of Liquidation, which Plan is the subject of this Disclosure Statement. A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

The Debtors and the Committee (together, the "Plan Proponents") believe that the Plan provides the best recoveries possible for holders of Allowed Claims and strongly recommend that, if such holders are entitled to vote, they vote to accept the Plan.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Plan does not contain a discharge for the Debtors as (1) the Plan is a liquidating plan, (2) the Debtors will not be engaging in business after the consummation of the Plan, and (3) the Debtors are not entitled to a discharge under section 727(a) of the Bankruptcy Code.

## D.      Treatment of Claims and Interests

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. THE RECOVERIES SET FORTH BELOW

ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE. THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS.

| Class/Type of Claim or Interest | Plan Treatment of Class | Projected Estimated Recovery Under Plan |
|---|---|---|
| Administrative Claims | Paid in full in Cash, or as otherwise agreed to by claimant | 100% |
| Priority Claims | Paid in full in Cash | 100% |
| Class 1 - Secured Claims | Paid in full in Cash or the return of the collateral securing such claim[3] | 100% |
| Class 2 - General Unsecured Claims | Each holder paid its Pro Rata distribution of the liquidated assets of the estates after the payment of the Administrative Claims, Priority Claims, Secured Claims and Plan Expenses. | 0% - 1.9% |
| Class 3 - Interests | No distribution. On the Effective Date, Class 3 Interests shall be deemed canceled, null and void. | 0% |

**The actual recoveries under the Plan by the Holders of Class 2 Claims will be dependent upon a variety of factors outlined herein.**

**E.     Entities Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan. Holders of Claims that are not Impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and therefore are not entitled to vote on the Plan. Holders of claims that are not entitled to

---

[3]     Any Deficiency claim will be treated as a Claim in Class 2.

4

receive or retain any property under the Plan are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and therefore are not entitled to vote on the Plan.

Claims and Interests are classified for all purposes, including voting, confirmation and distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or an Interest to be classified in a particular Class only to the extent that the Claim or the Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of a different Class.

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Not entitled to vote; Deemed to Accept |
| 2 | General Unsecured Claims | Impaired | Entitled to vote |
| 3 | Interests | Impaired | Not entitled to vote; Deemed to reject |

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

- The Plan Proponents **ARE** soliciting votes to accept or reject the Plan from holders of Class 2 Claims because such Claims are Impaired under the Plan and will potentially receive distributions under the Plan. Accordingly, holders of Class 2 Claims have the right to vote to accept or reject the Plan.

- The Plan Proponents **ARE NOT** soliciting votes from the holders of Class 1 Claims because Class 1, and the Claims of any holders in Class 1, are unimpaired under the Plan and are deemed to accept the Plan.

- The Plan Proponents **ARE NOT** soliciting votes from the Holders of Class 3 Interests. Class 3 Interests are Impaired and will receive no Distribution under the Plan and are deemed to reject the Plan.

For a detailed description of the Classes of Claims and Interests, as well as their respective treatment under the Plan, see Article 4 of the Plan.

### F.    Solicitation Process

The following documents and materials will constitute the Debtors' Solicitation Package:

- Plan;

- Disclosure Statement;

- Order approving the Disclosure Statement and related Solicitation Procedures ("Disclosure Statement Order");

- Notice of the hearing at which confirmation of the Plan will be considered ("Confirmation Hearing Notice");

- Appropriate Ballot and voting instructions; and

- Pre-addressed return envelope.

The Debtors intend to distribute the Solicitation Packages no fewer than twenty-eight (28) calendar days before the Voting Deadline. The Debtors submit that distribution of the Solicitation Packages at least twenty-eight (28) calendar days prior to the Voting Date will provide the requisite materials to Holders of Claims entitled to vote on the Plan in compliance with Bankruptcy Rules 3017(d) and 2002(b).

The Solicitation Package will be distributed to holders of Claims in Class 2 as of the Record Date and in accordance with the Solicitation Procedures. The Solicitation Package (except the Ballots) may also be obtained: (a) by writing (sent via first class mail) to The Garden City Group, Inc., (b) by email to The Garden City Group, Inc. at GraciousHomeinfo@gcginc.com, or (c) via PACER at https://ecf.nysb.uscourts.gov.

Other parties entitled to receive the Solicitation Package, including the Internal Revenue Service, will be served paper copies of the order approving the Disclosure Statement, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan and the Confirmation Hearing Notice.

## G.     Voting Procedures

**The Record Date is June 24, 2011**.  The Record Date is the date on which the holders of Claims that are entitled to vote to accept or reject the Plan will be determined.

**The Voting Deadline is 4:00 p.m. prevailing Eastern Time on August 1, 2011**.  To ensure that a vote is counted, holders of Class 2 Claims must: (a) complete the Ballot; (b) indicate a decision either to accept or reject the Plan; and (c) sign and return the Ballot to the address set forth on the enclosed pre-addressed envelope provided in the Solicitation Package or by delivery by first-class mail, overnight courier or personal delivery, so that all Ballots are **actually received** no later than the Voting Deadline, by The Garden City Group, Inc. at the address below.

ANY BALLOT THAT IS PROPERLY EXECUTED BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.  THE PLAN CONTEMPLATES SUBSTANTIVE CONSOLIDATION OF THE DEBTORS VARIOUS CASES.  ACCORDINGLY, YOU WILL BE AFFORDED ONLY ONE VOTE WITH RESPECT TO THE PLAN, IRRESPECTIVE OF WHETHER YOUR CLAIM

MAY LIE AGAINST MORE THAN ONE OF THE DEBTORS. IF YOU CAST MORE THAN ONE BALLOT VOTING THE SAME CLAIM ON OR BEFORE THE VOTING DEADLINE, THE LAST VALID BALLOT RECEIVED BEFORE THE VOTING DEADLINE WILL BE DEEMED TO REFLECT YOUR INTENT AND THUS WILL SUPERSEDE AND PRIOR BALLOTS. THE DEBTORS RESERVE THEIR RIGHTS TO (I) ACCEPT BALLOTS SUBMITTED AFTER THE VOTING DEADLINE AND (II) ACCEPT BALLOTS INDICATING A CHANGED VOTE AFTER THE VOTING DEADLINE

| **BALLOTS** |
| --- |
| Ballots must be **actually received** by the Voting Deadline at the following address: |
| If by hand delivery or overnight courier, to:<br><br>The Weck Corporation<br>c/o The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017 |
| If by U.S. Postal Service, to:<br><br>The Weck Corporation<br>c/o The Garden City Group, Inc.<br>PO Box 9666<br>Dublin, OH 43017-4966 |

Prior to deciding whether and how to vote on the Plan, each holder of a Claim in Class 2 should consider carefully all of the information in this Disclosure Statement, especially the risk factors described herein.

## H. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**The Confirmation Hearing will commence on August 10, 2011 at 9:30 a.m. prevailing Eastern Time**, before the Honorable Arthur J. Gonzalez, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, Room 523, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**The Plan Objection Deadline is 4:00 p.m. prevailing Eastern Time on August 3, 2011**. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and Committee in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline. In accordance with the Confirmation Hearing Notice filed with the Bankruptcy Court, objections to the Plan or requests for modifications to the Plan, if any, must:

- Be in writing;

- Conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

- State the name and address of the objecting Entity and the amount and nature of the Claim or Interest of such Entity;

- State with particularity the basis and nature of the objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and

- Be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** by the notice parties identified in the Confirmation Hearing Notice on or prior to the Plan Objection Deadline.

**THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO THE PLAN UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE PROCEDURES SET FORTH IN THE DISCLOSURE STATEMENT ORDER.**

## II.   BACKGROUND TO THESE CHAPTER 11 CASES

### A.   Debtors' Business

#### 1.   Debtor's Operations

Founded in 1963, when Debtors' Managing Member Natan Wekselbaum ("Wekselbaum") and his brother emigrated from Cuba, the Debtors began as a small neighborhood hardware store on Manhattan's Upper East Side. Remaining family-owned and operated for the ensuing 47 years, the Debtors operated a housewares and home furnishings business under six (6) store location leases and an internet-based business, all under the name *Gracious Home*.

#### 2.   Employees

As of the Petition Date, the Debtor employed approximately 315 non-union employees, comprised of 255 employed at the retail stores and 60 who were considered part of the Corporate Headquarters (defined below). In the context of the sale of substantially all of the Debtors' assets to Americas Retail, all of the Debtors' employees who had not otherwise left the Debtors' employ- with the exception of Wekselbaum and a few other employees - were offered employment by Americas Retail. Thereafter, the Debtors retained Robert L. Pressman and Elizabeth Obloy, through Triton, as wind-down officers in these chapter 11 cases to provide

assistance to the Debtors in such process. The Bankruptcy Court approved the employment of Pressman and Obloy on December 28, 2010 (effective as of December 3, 2010).

### 3. Directors and Officers

Both before and after the closing date of the sale to Americas Retail, Wekselbaum was and remains the sole Director and Managing Member of the Debtors.

## B. Debtors' Organizational Structure

Debtor, The Weck Corporation ("Weck Corp.") is a Subchapter S corporation, organized under the laws of the State of New York. Weck Corp. served as the principal obligor on the leases for the Eastside Location (as defined below) and the principal buying agent for inventory sold and distributed at all retail locations. As such, inventory was purchased by Weck Corp. and Weck Corp. stands as principal obligee on the Debtors' account receivable. West Weck, LLC ("West Weck") is a limited liability corporation organized under the laws of the State of New York and stood as principal obligor on the lease for the Westside Location (as defined below). Weck Chelsea, LLC ("Weck Chelsea") is a limited liability corporation organized under the laws of the State of New York and stood as principal obligor on the lease for the Chelsea Location (as defined below).[4] Gracioushome.com, LLC ("GH.com") is a limited liability corporation organized under the laws of the State of New York which operated the Debtors' retail internet site.

## C. Retail Locations

### 1. Retail Stores

The Debtors primarily sold their products through their retail stores. The six Gracious Home retail locations as of the Petition Date are detailed as follows:

> (a)    1992 Broadway, New York, NY 10023 (the "Westside Location");
>
> (b)    1220 Third Avenue, New York, NY 10021 (the "Eastside 1220 Third Store");
>
> (c)    1217 Third Avenue, New York, NY 10021 (the "Eastside 1217 Third Store");
>
> (d)    1201 Third Avenue, New York, NY 10021 (the "Eastside 1201 Third Store," and collectively with the Eastside 1220 Third Store and the Eastside 1217 Third Store, the "Eastside Location");
>
> (e)    766 Sixth Avenue, New York, NY 10010 (the "Chelsea Main Store");

---

[4]    Weck Corp. guaranteed the obligations under the lease for the Westside Location and the Chelsea Location.

(f)     45 West 25th Street, New York, NY 10010 (the "Chelsea Plumbing & Decorative Hardware Showroom" and collectively with the Chelsea Main Store, the "Chelsea Location").

For the fiscal year ending December 31, 2009, the retail stores accounted for approximately ninety-seven percent (97%) of the Debtors' revenues.

In addition to the forgoing, The Weck Corp. was lessor of certain commercial warehouse space located in Woodside, Queens, New York, which served as a central warehouse, storage and distribution center for all store locations and the internet sales (the "Warehouse"). The Weck Corp. was also the lessor of certain commercial space located at 632 Broadway, New York, New York 10012, which served as the Debtors' corporate headquarters (the "Corporate Headquarters"). A majority of the Debtors' business activities, including senior management, purchasing, strategic planning, corporate communications, marketing, finance, human resources, internet and IT took place at the Corporate Headquarters.

## 2.     Corporate Accounts

The Debtors developed an extensive and loyal following of commercial and trade customers, including architects, interior designers, contractors, electricians, plumbers, carpenters and developers working in and around New York City. Although new trade traffic could visit the displays at any of the Debtors' stores, a substantial amount of the Debtors' trade business was on a re-order basis.

Additionally, the Debtors developed substantial commercial business with hotels, schools and residential and commercial real estate firms which had corporate Gracious Home accounts for automatic and immediate order and re-order of janitorial supplies, light bulbs, house wares, and other operating essentials. In connection with the Debtors' commercial and trade accounts, the Debtors' professionals offered expert product advice, installation information, operating tutorials, detailed price estimates, special delivery services and other services as requested by the customer.

## 3.     Internet

The Debtors also sold their products directly to their consumers through their internet site, located at www.gracioushome.com. The Debtors' website allowed the Debtors significant access to their customers, which the Debtors tracked in a database populated with information from approximately 50,000 customers. The Debtors' website provided customers with the opportunity to sign up to obtain exclusive email-only offers, obtain internet-only promotions, and provided information about the Debtors' product lines and retail store locations.

For the 12 months prior to the Petition Date, the Debtors' website produced total sales of approximately $2,000,000 which accounted for approximately three percent (3%) of the Debtors' revenues.

### D.  Summary of Prepetition Indebtedness and Financing

#### 1.  Secured Debt

The Debtors were party to that certain Modified and Extended Secured Non-Revolving Credit Note and Agreement dated as of February 16, 2010 (the "Revolving Credit Agreement") entered into between The Weck Corporation, West Weck LLC, Gracious Home.com LLC and Weck Chelsea LLC, as Borrowers and Manufacturers and Traders Trust Company as Lender ("M&T" or "Lender") under the terms of which the Debtors were indebted to M&T for the principal sum of approximately $11,475,000 (inclusive of Standby Letters of Credit in the principal amount of approximately $2,385,000), exclusive of interest and fees unpaid as of the Petition Date (the "Pre-Petition Senior Secured Indebtedness").  The Pre-Petition Senior Secured Indebtedness was secured by fully perfected liens and security interests in substantially all of the Debtors' assets, which liens and security interests were granted under various General Security Agreements entered into by Debtors, Weck Corp., West Weck, and GH.com LLC on April 22, 2005 and Weck Chelsea on November 2, 2007.

The Revolving Credit Agreement, as modified and extended on February 16, 2010, provided for payments of principal during 2010, which last principal payment of approximately $90,000 was made on or after March 31, 2010.  No further principal payments were made after March 31, 2010, although a principal payment of $250,000 was due on or about June 15, 2010. The Debtors made interest payments on the Revolving Credit Agreement as scheduled thereunder.  The Pre-Petition Senior Secured Indebtedness under the Revolving Credit Agreement matured by its terms on June 15, 2010.  As of the Petition Date, such Pre-Petition Senior Secured Indebtedness totaled approximately $11,312,269.86

On August 11, 2010, the Pre-Petition Senior Secured Indebtedness was sold by M&T to NewAlliance Bank ("NAB").  In connection with NAB's acquisition of the Prepetition Senior Secured Indebtedness, the Debtors and NAB entered into a Forbearance Agreement and Amendment to Modified and Extended Non-Revolving Credit Note and Agreement.  As set forth more fully herein, NAB provided certain post-petition financing and use of cash collateral to the Debtors which enabled them to work toward their restructuring and ultimate sale.  The entire Pre-Petition Senior Secured Indebtedness (as well as all post-petition indebtedness) has been paid in full or otherwise forgiven pursuant to the sale of the Debtors' assets to Americas Retail.

Separate and apart from the Revolving Credit Agreement, the Debtors were indebted to (i) GE Commercial Distribution Finance Corporation ("GE") in the amount of approximately $18,000 on account of "floor financing" provided in connection with major appliance floor sample displays and air condition inventory, which indebtedness is secured by products and appliances located as display models in the various retail locations, and (ii) Hitachi Capital America Corp. in the amount of approximately $73,654.00 on account of *Gracious Home* delivery truck lease payments, which indebtedness is secured by said trucks.

#### 2.  Unsecured Debt

In 2010, the Debtors purchased their merchandise from approximately 1,000 suppliers, with the largest supplier accounting for approximately 13% of the Debtors' merchandise

purchases and the Debtors' 10 largest suppliers accounting for approximately 30% of such purchases. The Debtors purchased substantially all of their merchandise in the United States, the majority from domestic sources and the balance from importers.

As of the Petition Date, the Debtors owed their trade vendors approximately $7,692,106. In addition, monthly rental obligations for various of the Debtors' leases outstanding as of the Petition Date were approximately $783,567.

### 3. Equity

The Debtor corporations (i.e., The Weck Corporation, West Weck, LLC, GraciousHome.com, LLC and Weck Chelsea, LLC) are all owned and controlled by founder or interests of the family of founder, Wekselbaum, including spouse and children and certain family trusts (except for 8% of West Weck, LLC which is held by two former management employees).

### E. Financial Information

The Debtors attained revenue of approximately $60 million in fiscal year 2009 (year ending December 31, 2009), which represented a decline from fiscal year 2008 revenue, which was approximately $70.4 million. As of the Petition Dated, projections for fiscal year 2010 (year ending December 31, 2010) were approximately $58 million.

The Debtors have suffered substantial net earnings losses for the past several years. The loss in fiscal year 2008 was approximately $2.7 million. The loss in fiscal year 2009 was approximately $3.4 million. As of the Petition Date, the loss for fiscal year 2010 loss was projected to be approximately $3 million, exclusive of restructuring-related charges.

### III. EVENTS LEADING TO THESE CHAPTER 11 CASES

Several internal and external factors severely impacted the Debtors, and, in particular their retail businesses, ultimately prompting the near-term liquidity pressures that precipitated the decision to commence these chapter 11 cases.

### 1. Market Conditions

The Debtors operated in the highly-competitive retail industry, specifically in the home sector. Due to their extensive merchandise assortment, the Debtors competed against many different types and sizes of retailers operating in several different retail distribution channels. The Debtors, along with their competitors, were influenced by a number of factors affecting retail sales of home goods on a national level, including but not limited to, general economic conditions (including the housing market), the overall macroeconomic environment and related changes in the retailing environment, consumer preferences and spending habits.

Since the collapse of the U.S. subprime and Alt-A mortgage industry in the second quarter of 2008, the decline in the housing market and the tightening of the credit markets have led to a decline in consumer discretionary spending. This decline has had a significant adverse impact on many retail sectors, including house wares and home improvement, in the form of decreased sales.

In addition to the difficult conditions affecting the national economy, the Debtors were specifically affected by the health of the New York City economy. As reported in May 2010, since August 2008, the net job loss in New York City was 131,000 jobs (down from a peak of 184,000 jobs as recently as December 2009), with most of those jobs in the private sector--particularly the financial and legal industries. These were the jobs held by many of the Debtors' customers, adversely impacting the Debtors' sales levels beginning in fiscal year ending December 31, 2007.

### 2.  Operational Issues

The Debtors experienced a number of operational challenges which impacted the performance of their various business sectors. Further, the Debtors expended considerable sums building the Chelsea Main Store, which opened in the Fall of 2008 at the height of the recession and incurred significant losses during the two years of operations. These challenges, combined with their declining revenues and operating losses, severely impacted the Debtors' ability to operate successfully in the marketplace.

In the early Spring of 2010, the Debtors engaged Triton to assist them in addressing these various operational issues, including the implementation of a workforce reduction, consolidation of product lines, institution of credit card receivable financing and other efficiencies designed to realize significant cost reductions. Over the ensuing ninety (90) days, the Debtors, assisted by Triton, negotiated, structured and implemented these various measures, including a prepetition reduction of work force.

### 3.  Prepetition Lease Negotiations

The Debtors, assisted by Triton, further undertook a review of the Debtors' obligations under their various leases and in conjunction with Debtors' attorneys, determined that certain of such leases and locations contained over market terms, were subject to near-term expiration dates which could force the Debtors to renegotiate some of their key store leases at potentially materially higher rental rates, provided for space in excess of the Debtors' needs, and could potentially allow the Debtors an opportunity to seek economic value via transfer and assignment.

The Debtors ultimately determined that a restructuring of their businesses could not be completed outside of the chapter 11 process, and that the commencement of these chapter 11 cases would provide the opportunity to right-size the Debtors' businesses through (i) the evaluation and elimination of liabilities that served as a drain on the Debtors' profitability, (ii) operational improvements, and (iii) consolidation or improvement of retail operations by rejection and/or the transfer and assignment of certain leases.

### 4.  Plan Support Agreement and Investment Purchase Agreement

At the same time as the Debtors and Triton worked to accomplish operational savings and explore lease alternatives, the Debtors and Triton aggressively sought sources of capital which would allow the Debtors to accomplish a restructuring in the context of a chapter 11 proceeding. After exploring various alternatives, the Debtors and Triton entered into negotiations with Meridian Acquisition Ventures, LLC ("Meridian") with respect to an infusion of capital by

Meridian on specific terms and conditions which would allow the Debtors to achieve their pre-petition goals of restructuring and reorganizing their business and capital structure.

After extensive negotiations, the Debtors reached an agreement with Meridian, through its designee GH Acquisition, LLC ("GHA"), and the other pre-petition equity holders and senior management, including Wekselbaum, to restructure the Debtors' financial position in the context of a chapter 11 bankruptcy proceeding under which, subject to certain conditions, NAB agreed to acquire the Pre-Petition Senior Secured Indebtedness and provide debtor-in-possession and exit financing, and Meridian and Wekselbaum agreed to provide capital to fund the Debtors' exit from Chapter 11. The agreement among the Debtors and GHA was reflected in the ISPA. At the time of the filing, the Debtors contemplated that their restructuring would take place in accordance with the ISPA.

## IV.    ADMINISTRATION OF THE DEBTORS' CHAPTER 11 CASES

### A.    Initial Motions and Certain Related Relief

Immediately following the Petition Date, the Debtors devoted substantial effort to stabilizing their operations and preserving and restoring their relationships with vendors, customers and employees. To that end, the Debtors sought and obtained a number of orders from the Bankruptcy Court to minimize disruption to their operations and facilitate the administration of these chapter 11 cases. Several of these orders are briefly summarized below.

#### 1.    Motion to Approve Debtor in Possession Financing

On August 18, 2010, the Bankruptcy Court approved an interim order authorizing the Debtors to obtain debtor in possession financing (the "Interim DIP Order"). Pursuant to the Interim Dip Order, the Bankruptcy Court authorized (a) the Debtors to immediately obtain up to $500,000.00 in financing from NAB in accordance with the terms of the Interim DIP Order and the DIP Loan Documents (as defined in the Interim DIP Order), (b) NAB, as the lender under the Pre-Petition Senior Secured Indebtedness, to consent to the Debtors' use cash collateral and the priming of the pre-petition liens by the DIP liens (subject to an agreed upon budget), and (c) the Debtors to grant a first priority lien and super-priority administrative status to NAB to secure advances made under the DIP facility (subject to a limited carve out). The Interim DIP Order contemplated support by the Debtors and Meridian of the transaction contemplated by the ISPA so as to result in confirmation of a plan of reorganization by mid-October 2010.

After the ISPA was terminated between the Debtors and Meridian in late September 2010, further negotiations took place among NAB, the Debtors and the Committee which resulted, in the Bankruptcy Court entering an order on October 22, 2010 permitting the Debtors' use of NAB's cash collateral (the "Cash Collateral Order") on the terms and conditions set forth in the Cash Collateral Order and the agreed upon budget annexed thereto. The Cash Collateral Order adopted a revised timeline for completion of a sale of the Debtors' businesses by early December 2010. Pursuant to the Cash Collateral Order, the Debtors were authorized to grant a super-priority administrative expense claim with respect to all Adequate Protection Obligations (as defined in the Cash Collateral Order).

In addition, under the terms of the Cash Collateral Order, additional adequate protection was granted to NAB and in exchange for agreement to a timeline for the sale of the assets acceptable to the Debtors and the Committee, NAB was provided a "Backstop" up to the amount of $750,000 for any shortfall between the "Net Sales Proceeds" of any such sale and an "Agreed Payoff Amount." The Backstop was secured by certain assets pledged in support thereof by Wekselbaum and a back-up bid by Wekselbaum for the Debtors' intellectual property assets. In exchange for collateralization of this Backstop, "Mutual Releases" were to be exchanged by and among the Debtors and the Committee and Wekselbaum and various family interests of Wekselbaum (the "NW Parties") and NAB. Finally, the terms of the Cash Collateral Order provided that recoveries and proceeds of avoidance actions under sections 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code (the "Avoidance Actions") against parties other than insiders (as such term is defined in section 101(31) of the Bankruptcy Code) of any of the Debtors were waived and released.

### 2. Applications to Retain Professionals

To assist the Debtors in carrying out their duties as debtors in possession and to represent the Debtors' interests in these chapter 11 cases, the Debtors retained Hahn & Hessen LLP ("H&H") as its bankruptcy counsel. The Bankruptcy Court approved the retention of Hahn & Hessen LLP on September 1, 2010 effective as of the Petition Date. The Debtors also retained the following professionals to assist the Debtors and H&H in the administration of these cases:

> (a)     Triton as financial advisory firm and investment banker for the Debtors;
>
> (b)     The Law Offices of Andrew E. Hazen as special real estate and corporate counsel to the Debtors; and
>
> (c)     McGladrey and Pullen LLP as accountant and tax advisory firm to the Debtors.

The Debtors also retained The Garden City Group, Inc. ("Garden City") as claims and noticing agent in these chapter 11 cases.

On September 1, 2010, the Court entered an order authorizing the Debtors to employ certain professionals in the ordinary course of their business, subject to certain conditions (the "Ordinary Course Professional Order"). Pursuant to the Ordinary Course Professional Order, the Debtors retained Winston & Strawn P.C. as intellectual property counsel and Epstein Becker & Green as labor and employment counsel. These firms were retained to assist the Debtors with legal issues arising in connection with the day-to-day operation of the Debtors' business.

### 3. First Day Relief

On August 17, 2010, the Court entered orders, (a) authorizing the Debtors to honor certain prepetition customer programs, (b) authorizing the Debtors to pay prepetition sales and use taxes on an interim basis (final order entered on September 1, 2010), (c) authorizing the Debtors to continue their workers' compensation program and their insurance programs on an

interim basis (final order entered on September 1, 2010), (d) approving the continued use of the Debtors' cash management system on an interim basis, and (e) authorizing the Debtors to pay prepetition employee wages and to continue employee benefit programs on an interim basis (final order entered on September 1, 2010).

On September 1, 2010, the Court entered an order prohibiting utilities from discontinuing service to the Debtors on account of their bankruptcy filing and setting up a two-week escrow account as adequate assurance to the Debtors' utility providers on an interim basis (final order entered on September 30, 2010).

The relief granted in these orders helped stabilize the Debtors' business in the initial weeks of these chapter 11 cases.

## B.     Unsecured Creditors Committee

On August 24, 2010, the U.S. Trustee for the Southern District of New York appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.  The members of the Committee include: True Value Company; John Matouk & Co., Inc.; Habidecor & Abyss, Inc.; Yves Delorme, Inc.; Satco Products, Inc.; and The Townsend House Corporation.[5]

The Committee retained Lowenstein Sandler P.C. as its counsel and BDO Seidman as its financial advisor.  On October 8, 2010, the Bankruptcy Court entered an order approving the retention of Lowenstein as counsel to the Committee, effective as of August 24, 2010.

## C.     Filing Schedules and Setting of Bar Dates

The Debtors filed their Schedules and Statements of Financial Affairs on September 27, 2010.  On October 7, 2010, the Bankruptcy Court entered the Bar Date Order [Docket No. 156], which set forth the following dates by which proofs of claims must be filed:

- General Bar Date and 503(b)(9) Bar Date:  November 30, 2010 at 5:00 p.m. prevailing Eastern Time; and

- Governmental Bar Date:  February 9, 2011 at 5:00 p.m. prevailing Eastern Time.

Subject to certain limited exceptions contained in the Bankruptcy Code and as set forth in the Bar Date Order, other than Claims arising from the rejection of executory contracts after the General Bar Date, all proofs of Claim were to be submitted by the applicable Bar Date.

In accordance with the Bar Date Order, on or before October 18, 2010, written notice of the Bar Dates and the Proof of Claim Form were mailed to, among others, all known holders of claims listed on the Schedules at the addresses stated therein.  Pursuant to the Bar Date Order:

> [A]ny holder of a claim against a Debtor that is required but fails
> to file a proof of such claim in accordance with this Bar Date

---

[5] Hanover Estates LLC was initially appointed a member of the Committee but subsequently resigned.

Order on or before the applicable Bar Date shall be forever barred from asserting such claim against the Debtors and their estates, and such holder shall not be permitted to vote to accept or reject any chapter 11 plan filed in these chapter 11 cases, or participate in any distribution in the Debtors' chapter 11 cases on account of such claim or to receive further notices regarding such claim.

Class 2 General Unsecured Claims as filed total $13.5 million. After appropriate objection, the Debtors expect this amount to be reduced to $13 million.

**D.      Debtors' Objection to 503(b)(9) Claims**

The Bar Date Order established November 30, 2010 (the "503(b)(9) Bar Date") as the deadline to file claims arising under Section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). As of the 503(b)(9) Bar Date, approximately one hundred forty-two 503(b)(9) Claims in the aggregate amount of $814,089 were submitted to the Bankruptcy Court or Garden City. In accordance with the Procedures authorized in the Bar Date Order, on January 28, 2011, the Debtors filed an Omnibus Objection to 503(b)(9) Claims [Docket No. 317], objecting to a number of 503(b)(9) Claims (the "Disputed 503(b)(9) Claims") on the grounds set forth therein.

On March 23, 2011, the Bankruptcy Court entered an order reflecting the final allowed amount of 503(b)(9) Claims, which amount totals $642,227.17.

**E.      Other Relief Requested by the Debtors**

**1.      Motion to Extend Exclusivity**

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization or liquidation for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing chapter 11 plan. However, a court may extend these periods "for cause" upon request of a party in interest. The Debtors' exclusive period to file a plan was originally set to expire on December 11, 2010. Accordingly, on October 29, 2010, the Debtors filed a motion seeking the extension of the period during which the Debtors have the exclusive right to file a chapter 11 plan to March 11, 2011, and extension of the period during which the Debtors may solicit acceptances thereof to May 10, 2011. The Court granted the motion by order dated November 17, 2010.

The Debtors timely filed their Plan and Disclosure Statement on March 10, 2011 and this First Amended Joint Plan and Disclosure Statement on May 23, 2011.

**2.      Motion to Reject Leases of Retail Space**

After evaluating their various retail leases, the Debtors determined in their sound business judgment that the rejection of the leases for the Eastside 1217 Third Avenue Store and the Chelsea Main Store, both of which were no longer useful or beneficial to the Debtors'

ongoing operations, would maximize the value of the estate for all creditors. Accordingly, on September 20, 2010, the Debtors filed a motion to reject the Eastside 1217 Third Store lease effective September 30, 2010, and the Main Chelsea Store lease effective October 31, 2010. The Court granted the motion by order dated October 7, 2010. The Debtors conducted a "Closing Location" sale at the Chelsea Main Store and consolidated the inventory located at the 1217 Third Avenue Store to the other Eastside Location. The Debtors vacated and surrendered both premises on a timely basis.

## F.    Sale of Assets

### 1.    Bidding Procedures and Marketing Efforts

The ISPA among the Debtors and GHA permitted the Debtors, consistent with their fiduciary duties, to entertain higher or better offers from other potential investors. The Debtors believed that an Auction would facilitate the competitive process that began prior to the Debtors' chapter 11 cases and would provide a formal mechanism for the Debtors to entertain alternative offers.

On August 24, 2010, the Debtors' filed a Motion for Entry of an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Approving Bidding Procedures and Notice of the Auction Relating Thereto and Granting Related Relief [Docket Number 56] (the "Original Bid Procedures Motion"). The Original Bid Procedures Motion contemplated, in accordance with the ISPA, the commencement of an auction process pursuant to which the Debtors would solicit higher and better proposals for the sponsorship and funding of a plan of reorganization. However, when Meridian withdrew and the ISPA was terminated, it became clear that the Debtors would be unable to conduct an auction for a plan sponsor, and instead turned their focus to a traditional sections 363 and 365 sale of substantially all of their assets.

Accordingly, on September 28, 2010, the Debtors' filed their supplement to the Original Bid Procedures Motion [Docket No. 133] (the "Supplemental Bid Procedures Motion"), wherein the Debtors requested approval of various bidding procedures and the scheduling of an auction (the "Auction") and sale hearing. After extensive negotiations between NAB, the Committee and the Debtors, on October 22, 2010, the Court entered an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Approving Stalking Horse Selection Process, Bidding Procedures, Notice of Auction Relating Thereto, Scheduling Sale Hearing and Granting Related Relief [Docket No. 167] (the "Bid Procedures Order"). Pursuant to the Bid Procedures Order, the Auction was scheduled for November 29, 2010, and a hearing to approve the highest and best offer resulting from the Auction (the "Sale Hearing") was scheduled for November 30, 2010.

On November 19, 2010, after a several month marketing period, the Debtors designated, subject to satisfaction of certain conditions, Americas Retail as the Stalking Horse Bidder under the terms of a Stalking Horse Bid set forth in that certain Asset Purchase Agreement by and between the Debtors and Americas Retail dated as of November 18, 2010.

### 2.    The APA and the Sale

On November 26, 2010, Americas Retail, having submitted the only qualified bid for substantially all of the Debtors' assets, was selected by the Debtors as the Successful Bidder (the

"Successful Bidder") and the Auction was cancelled.[6]  Notwithstanding the designation of Americas Retail as the Successful Bidder, the Debtors and Americas Retail agreed on a First Amendment to the Asset Purchase Agreement dated as of November 26, 2010 which provide enhanced sale terms (as amended, with all related sale documents, the "APA").

Pursuant to the terms of the APA, Americas Retail purchased substantially all of the assets of the Debtors' business, and assumed certain liabilities, on the terms and conditions set forth therein.  Americas Retail will continue to operate the Debtors' business as a going concern outside of chapter 11.

On November 30, 2010, the Court entered an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 for Approval of (I) the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances to the Highest Bidder at Auction, (II) Assumption and Assignment of Certain Leases and Executory Contracts in Connection Therewith, and (III) Certain Related Relief [Docket No. 247] (The "Sale Order").  A closing on the sale (the "Sale") of substantially all of the Debtors' assets to Americas Retail consistent with the terms of the APA and Sale Order occurred on December 3, 2010 (the "Closing Date").  Subsequently, pursuant to that certain Mutual Release dated March 28, 2011 entered into by the Debtors, the Committee, the NW Parties and NAB, the Mutual Releases contemplated under the Cash Collateral Order were exchanged.[7]

### 3.      Working Capital Adjustment

Under the terms of the APA, the Debtors and Americas Retail agreed that the Purchase Price under the APA would be (i) decreased by an amount equal to the amount by which the Closing Date Working Capital is less than $7,500,000, and (ii) increased by an amount equal to fifty percent (50%) of the amount Closing Date Working Capital is more than $8,250,00 and less than $9,000,000 (the "Working Capital Adjustment").  Accordingly, Americas Retail deposited $800,000, comprised of a $750,000 Purchase Price Escrow Amount and a $50,000 Sales Tax Escrow Amount (together, the "Purchase Price Escrow Fund"), with the Escrow Agent to be disbursed in accordance with the Working Capital Adjustment.

After the Closing Date, the Debtors delivered a Closing Date Statement to Americas Retail stating the Debtors' computation of the Working Capital Adjustment, the determination of which was disputed by Americas Retail.  After extensive negotiations, the Debtors and Americas Retail agreed to resolve their disputes with respect to the Working Capital Adjustment on the terms and conditions set forth in the Working Capital Stipulation.  On April 18, 2011, upon Court approval of the Working Capital Stipulation, (i) Americas Retail received $200,000 from the Purchase Price Escrow Fund (from which Americas Retail paid the outstanding Sales Tax Amount of $31,672.36), (ii) the Debtors received the remaining balance of $600,000 (plus accrued interest), and (iii) the Debtors and Americas Retail exchanged mutual releases.  The

---

[6] The Debtors also received several liquidation bids (the "Liquidation Bids").  However, the Debtors determined, with the assistance of their professionals, that none of the Liquidation Bids exceeded the value of the Stalking Horse Bid submitted by Americas Retail.

[7] The NW Parties have agreed to withdraw any and all claims filed against the Debtors in these chapter 11 cases.

Working Capital Stipulation further provides that the TSA shall remain in full force and effect in accordance with its terms, subject to certain modifications set forth therein.

In addition, the APA provides for consideration in the form of the $1,150,000 Note. The initial payment of $150,000 was due and timely paid on March 3, 2011. In accordance with the Working Capital Stipulation, the Debtors and Americas Retail executed an amended and restated Note which reduces the remaining $1,000,000 payment due to $844,000 (including accrued interest), subject to a reduction in amount if the Note is prepaid before maturity and an increase in amount upon the occurrence of certain events of default.[8] The balance of payment remains due on January 6, 2012, subject to extension to March 31, 2012 if Americas Retail does not have availability of at least $2,000,000 (measured as cash on hand plus availability under any credit facility outstanding at such time, assuming the Note has been paid on such date) on January 6, 2012.

## V.    SUMMARY OF THE PLAN

### A.    Provisions for Payment of Allowed Administrative Claims and Priority Claims

Administrative Claims and Priority Claims are not classified in the Plan. The treatment of and consideration to be received by holders of Allowed Administrative Claims and Allowed Priority Claims pursuant to Article II of the Plan will be in full and complete satisfaction, settlement, release and discharge of such Claims. The Debtors' obligations in respect of such Allowed Administrative and Priority Claims will be satisfied in accordance with the terms of the Plan.

### 1.    <u>Treatment of Administrative Claims</u>

Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim will be paid in respect of such Allowed Claim (i) the full amount thereof, without interest, in Cash, as soon as practicable after the later of (a) the Effective Date, (b) the date on which such Claim becomes an Allowed Claim, or (c) such other date as the holder of an Allowed Administrative Claim and the Debtors might otherwise agree, or (ii) such lesser amount as the holder of an Allowed Administrative Claim and the Debtors might otherwise agree on such date as the holder of an Allowed Administrative Claim and the Debtors might otherwise agree.

503(b)(9) Claims as described more fully herein constitute Administrative Claims under the Bankruptcy Code, which claims are payable as set forth above. Notwithstanding the foregoing, the Debtors will seek authority, but not direction, in the Confirmation Order to make payment of some amount of these 503(b)(9) Claims upon entry of the Confirmation Order, but prior to the Effective Date, which amount will represent forty-five percent (45%) of the allowed

---

[8] Americas Retail may repay the Note in whole or in part at any time. Provided that an event of default has not occurred, Americas Retail may pay the Note in full prior to August 1, 2011 at a discount for a total payment of $800,000. Additionally, provided that an event of default has not occurred, Americas Retail may pay the Note in full on or after August 1, 2011 and prior to the maturity date in accordance with the payment schedule set forth in the amended and restated Note.

amounts of the 503(b)(9) Claims. The remaining fifty-five percent (55%) of the 503(b)(9) Claims shall be paid upon the Effective Date.

## 2. Treatment of Priority Claims

Each holder of an Allowed Priority Claim will be paid in respect of such Allowed Claim (i) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (a) the Effective Date, (b) the date on which such Claim becomes an Allowed Claim, or (c) such other date as the holder of an Allowed Administrative Claim and the Debtors might otherwise agree, or (ii) such lesser amount as the holder of an Allowed Priority Claim and the Debtors might otherwise agree on such date as the holder of an Allowed Administrative Claim and the Debtors might otherwise agree.

## B. Classification of Claims and Interests

Administrative Claims and Priority Claims are unclassified. For purposes of the Plan, all other Claims and Interests are classified as follows:

1. Class 1 will consist of the Secured Claims.

2. Class 2 will consist of all General Unsecured Claims.

3. Class 3 will consist of all Interests.

## C. Treatment of Claims and Interests

The treatment of and consideration to be received by holders of Allowed Claims and Interests pursuant to Article IV of the Plan will be in full and complete satisfaction, settlement, release and discharge of such Claims and Interests, but will not impact the ability of the holder of such claim or interest to assert such claim or interest against any non-Debtor. The Debtors' obligations in respect of such Claims and Interests will be satisfied in accordance with the terms of the Plan.

## 1. Treatment of Class 1 Claims - Secured Claims

Class 1 Secured Claims are Unimpaired. Each holder of an Allowed Class 1 Claim will be deemed to have an Allowed Secured Claim to the extent of the collateral securing such Claim. As soon as practicable after the Effective Date, such holder will receive either (a) Cash equal to the Allowed amount of such Secured Claim or (b) return of the collateral securing such claim and any Deficiency Claim arising on account of such Secured Claim will be treated as a Class 2 General Unsecured Claim. The holders of Claims in this Class, if any, are not entitled to vote to accept or reject the Plan.

## 2. Treatment of Class 2 Claims - General Unsecured Claims

Class 2 General Unsecured Claims are Impaired. Each holder of an Allowed Class 2 Claim will receive in respect of such Claim its Pro Rata distribution of the liquidated assets of the Debtors' estates after the payment of the Administrative Claims, Priority Claims, Secured

Claims and Plan Expenses. The holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### 3. Treatment of Class 3 Interests

Class 3 Interests are impaired. The holders of Class 3 Interests will receive no Distribution. On the Effective Date, all Class 3 Interests will be deemed canceled, null and void and of no force and effect. The holders of Class 3 Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### D. Means for Implementing the Plan

At the present time, the Debtors' estates. maintain cash balances[9] representing (a) the proceeds of the Closing of the sale under the APA, including (i) the payment of the $150,000 initial payment on the Note, and (ii) amounts paid to the Debtors under the Working Capital Adjustment, plus (b) other balances collected by the Debtors from various deposits and refunds, less (c) amounts paid to various professionals on account of administrative fees and expenses in accordance with various orders of the Bankruptcy Court. A complete statement of the Debtors' receipts and disbursements since the Closing of the APA is attached here to as Exhibit B.

**The effectiveness of the Plan, including the ability of the Debtors to make both the payments to Allowed Administrative Claimants (including the final fifty-five (55%) percent payment on account of 503(b)(9) Claims), and any Distribution to the holders of Class 2 General Unsecured Claims is dependent on the Debtors receiving the balance of payment from Americas Retail on account of the Note.**

### 1. Corporate Action

On the Effective Date and automatically and without further action, (a) each of the Debtors will be deemed merged and substantially consolidated into the Post-Confirmation Debtor, and (b) the Plan Administrator will be deemed the sole shareholder, officer and director of the Post-Confirmation Debtor. The Plan will be administered by the Plan Administrator and all actions taken thereunder in the name of the Post-Confirmation Debtor will be taken through the Plan Administrator.

### 2. Plan Administrator

On the Effective Date, the Plan Administrator, an individual to be jointly selected by the Debtors and the Committee, will begin acting for the Post-Confirmation Debtor in the same fiduciary capacity as applicable to a board of directors, subject to the provisions of the Plan. Without the need for further Bankruptcy Court approval, the initial Plan Administrator will be entitled to compensation and reimbursement for his or her actual and necessary expenses incurred in connection with the performance of his duties in accordance with Schedule "A" annexed to the Plan. The Plan Administrator will not be liable for any action he or she takes or omits to take that he or she believes in good faith to be authorized or within his or her rights or

---

[9] All Debtors accounts are held in Hahn & Hessen LLP escrow accounts held solely for the benefit of the Debtors' estates.

powers. All distributions to be made to Creditors under the Plan will be made by the Plan Administrator, who will deposit and hold all Cash in trust for the benefit of Creditors (including Professionals) receiving distributions thereunder. The duties and powers of the Plan Administrator will be undertaken in consultation with the Post-Effective Date Committee. The Post Effective Date Committee shall consist of three (3) members, shall be selected jointly by the existing Creditors' Committee and the Debtors and shall come into existence on the Effective Date for the purpose of overseeing the activities of the Plan Administrator. Those duties and powers include the following:

(a) To exercise all power and authority that may be exercised, commence all proceedings (including the power to continue any actions and proceedings that may have been commenced by the Debtors prior to the Effective Date) that may be commenced and take all actions that may be taken by any officer, director or shareholder of the Post-Confirmation Debtor with like effect as if authorized, exercised and taken by unanimous action of such officers, directors and shareholders, including consummating the Plan and all transfers thereunder on behalf of the Post-Confirmation Debtor;

(b) To enforce and collect the Note;

(c) To prepare and file Federal and State tax returns for the Debtors;

(d) To maintain all accounts, make distributions and take all other actions consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Debtors or Post-Confirmation Debtor;

(e) When appropriate, to take all steps necessary to terminate the corporate existence of the Debtors;

(f) To prosecute objections to Claims and compromise or settle any Claims (Disputed Claims or otherwise);

(g) To retain and/or engage Professionals or other Persons selected to assist the Plan Administrator in connection with the above duties, including any professionals retained in the Chapter 11 Case, and to pay all fees and expenses incurred by such Professionals consistent with Article 5.7(b) of the Plan; and

(h) To take all other actions not inconsistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable in connection with the administration of the Plan.

### 3. Resignation, Death or Removal

The Plan Administrator may be removed (i) by the Post-Effective Date Committee; or (ii) or by the Bankruptcy Court, upon application for good cause shown. In the event of the resignation or removal, death or incapacity of the Plan Administrator, the Post-Effective Date Committee will designate another Person to become Plan Administrator, and thereupon the successor Plan Administrator, without any further act, will become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.

### 4. Winding Up Affairs

Following the Confirmation Date, the Post-Confirmation Debtor will not engage in any business activities or take any actions, except those necessary to effectuate the Plan and wind up the affairs of the Debtors. On and after the Effective Date, the Plan Administrator may, in the name of the Post-Confirmation Debtor and in consultation with the Post-Effective Date Committee, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Plan Administrator may, without application to or approval of the Bankruptcy Court, pay the charges that the Post-Confirmation Debtor incurs after the Effective Date for Professional fees and expenses related to the winding up of the Debtors' affairs and administration and implementation of the Plan. The Post-Confirmation Debtor will indemnify and hold the Plan Administrator harmless from and against any and all claims, actions, investigations or liabilities incurred in the performance of the Plan Administrator's duties under the Plan other than as a result of the Plan Administrator's willful misconduct, gross negligence, or malfeasance.

### 5. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of the Debtors' estate will be released, and all the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests will revert to the Post-Confirmation Debtor and its successors and assigns.

### 6. Rights of Action

Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, on the Effective Date, any right, claim or cause of action, belonging to the Debtors or their estate against any Person or Entity, including without limitation, any claim to avoid a transfer under Section 544, 547, 548, 549 or 553(b) of the Bankruptcy Code that was not previously released by the Debtors will be retained by the Post-Confirmation Debtor, to the extent not previously adjudicated, assigned and/or released. The Plan Administrator will pursue, settle or release all reserved rights of action, as appropriate, in accordance with the best interests of and for the benefit of the Creditors entitled to receive distributions under the Plan. The Plan Administrator, after consultation with the Post-Effective Date Committee, will be entitled to settle any such rights of action without

further order of the Bankruptcy Court, but will be entitled to seek such authorization in his or her discretion.

### 7. Professional Fees and Expenses

Each Professional Person retained or requesting a compensation in the Chapter 11 Case, pursuant to Section 327, 328, 330, 331 or 503(b) of the Bankruptcy Code, in connection with fees incurred prior to the Effective Date, will file an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case before the sixtieth (60th) day after the Effective Date. Objections to such applications, if appropriate, must be filed on or before the twentieth (20th) day after the date such application is filed.

Professionals that perform post-Effective Date services for the Plan Administrator and/or the Post-Effective Date Committee will provide monthly invoices to the Plan Administrator, the Post-Effective Date Committee and counsel to the Debtors describing the services rendered, and the fees and expenses incurred in connection therewith, on or before the 20th day following the end of the calendar month during which such services were performed. Professionals who timely tender such invoices will be paid by the Plan Administrator for such services from the Plan Expense Reserve Fund not less than fifteen (15) days after the submission of said monthly invoices, unless, within said fifteen (15) day period, a written objection to such payment is made by the Plan Administrator, the Post-Effective Date Committee, or counsel to the Debtors. To the extent a written objection to a Professional's monthly invoice cannot be resolved by the parties, payment of such invoice, will be made only upon Final Order of the Bankruptcy Court.

### 8. Dissolution of the Committee

The Committee will dissolve upon the Effective Date and its members will be released and discharged from all further authority, duties, responsibilities and obligations relating to or arising from the Chapter 11 cases.

### 9. Post-Effective Date Committee Rights

The Post-Effective Date Committee will be entitled to consult with and Professionals retained and/or engaged by the Plan Administrator, provided, however that if a conflict should arise between the Post-Effective Date Committee and the Plan Administrator, the Post-Effective Date Committee will be entitled to retain its own Professionals and the Plan Administrator will pay all fees and expenses incurred by such Professionals consistent with Article 5.7(b) of the Plan.

## E. Distributions

### 1. Reserve for Plan Expenses

Prior to making any distributions, the Plan Administrator will set aside, deduct and reserve an amount of Cash equal to the estimated amount of Plan Expenses in the Reserve Fund. Any Cash in such Reserve Fund that the Plan Administrator deems to be excess prior to the closing of these Chapter 11 Cases will be distributed to holders of Allowed Claims pursuant to Article 4 of the Plan; provided, however, that in the event the amount to be distributed to

Creditors would result in a distribution of less than one-half of one percent of the aggregate Allowed General Unsecured Claims, such amount will be donated to Tina's Wish Foundation.

## 2. Objections to Claims

Objections to Claims must be filed with the Bankruptcy Court and served upon Creditors no later than sixty (60) days after the Effective Date, provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Plan Administrator, without notice or a hearing. Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of claim filed after the Bar Date will be automatically disallowed as a late filed claim, without any action by the Post-Confirmation Debtor, unless and until the party filing such Claim obtains the written consent of the Post-Confirmation Debtor to file such Claim late or obtains an order of the Bankruptcy Court upon notice to the Post-Confirmation Debtor that permits the late filing of the Claim, in which event, the Post-Confirmation Debtor will have sixty (60) days from the later of (i) the date of such written consent or order; or (ii) the date the Claim is filed to object to such Claim, which deadline may be extended by the Bankruptcy Court upon motion of the Post-Confirmation Debtor, without notice or a hearing.

Subject to Bankruptcy Court approval, objections to Claims may be litigated to judgment, settled or withdrawn by the Plan Administrator, in consultation with the Post-Effective Date Committee.

Distributions with respect to and on account of Claims to which objections have been filed will be made as soon as practicable after an order, judgment, decree or settlement agreement with respect to such Claim becomes a Final Order provided that the applicable Creditor will not receive interest on its Allowed Claim, despite anything contained herein to the contrary, from the date the objection is filed and served to the date of allowance of such Claim.

## 3. Record Date

As of the close of business on the Record Date, the various transfer and claims registers for each of the Classes of Claims as maintained by the Debtors or their respective agents will be deemed closed, and there will be no further changes in the record holders of any of the Claims. The Debtors, the Plan Administrator and the Post-Confirmation Debtor will have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date. The Debtors and the Plan Administrator will be entitled to recognize and deal under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

## 4. Manner of Payment Under the Plan

Unless the Person receiving a payment agrees otherwise, any payment in Cash to be made by the Plan Administrator or the Post-Confirmation Debtor will be made, at the election of the Plan Administrator or the Post-Confirmation Debtor (as the case may be), by check drawn on a domestic bank or a wire transfer from a domestic bank.

5. **Disputed Claim Reserves**

On and after the Effective Date, the Plan Administrator will establish and maintain reserves for all Disputed Claims. For purposes of establishing a reserve, Cash will be set aside equal to the amount that would have been distributed to the holders of Disputed Claims in such Class had their Disputed Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Plan Administrator. If, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefor will be distributed by the Plan Administrator to the Creditor. The balance of such Cash, if any remaining after all disputed claims have been resolved, will be distributed Pro Rata to all holders of Claims in accordance with Article 4 of the Plan. No payments or distributions will be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order or stipulation of the parties.

6. **Unclaimed Property**

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property will be deemed forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property as well as any further distribution to such Creditor will be forfeited by the Creditor and held by the Plan Administrator to be distributed to other Creditors in accordance with the Plan.

7. **Withholding Taxes**

Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law will be deducted from distributions under the Plan. All Persons holding Claims will be required to provide any information necessary to effect the withholding of such taxes.

8. **Fractional Cents**

Any other provision of the Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment will reflect a rounding down of such fraction to the nearest whole cent.

9. **Payments of Less than Twenty Dollars**

If a Cash payment otherwise provided for by the Plan with respect to an Allowed Claim would be less than twenty ($20.00) dollars (whether in the aggregate or on any payment date provided in the Plan), notwithstanding any contrary provision of the Plan, the Plan Administrator will not be required to make such payment, the affected Creditor's Claim will be deemed disallowed solely for distribution purposes, and such funds will be otherwise distributed to holders of Allowed Claims in accordance with Article 4 of the Plan.

## 10. Setoffs

Except as otherwise provided for in the Plan, the Plan Administrator may, but will not be required to, set off against any Claim and the payments to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtors or their estate may have against the Creditor, but neither the failure to do so nor the allowance of a Claim under the Plan will constitute a waiver or release by the Debtors or their estate of any Claim it may have against the Creditor.

## F. Unexpired Leases And Executory Contracts

Any and all pre-Petition Date leases or executory contracts not previously rejected by the Debtor, unless specifically assumed pursuant to order(s) of the Bankruptcy Court prior to the Confirmation Date; or the subject of a pending motion on the Confirmation Date to either assume, or assume and assign, such lease or executory contact will be deemed rejected by the Debtor on the Confirmation Date.

All proofs of claim with respect to claims arising from the rejection of executory contracts or leases must, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30) days after the entry of the Confirmation Order. Any proof of claim that is not timely filed will be released, discharged and forever barred from assertion against the Debtors, their estate or property, or the Post-Confirmation Debtor.

## G. Conditions Precedent To Effectiveness Of The Plan

### 1. Conditions to Consummation

The Plan will not become effective unless and until each of the following conditions has been satisfied:

(a) The Bankruptcy Court will have entered the Confirmation Order; and

(b) The Confirmation Order will have become a Final Order; and

(c) There are sufficient liquid assets to make the requisite distributions in full to holders of Administrative Claims and Priority Claims.

### 2. Waiver of Conditions

The Proponents, in their respective sole discretion, may at any time, without notice or authorization of the Bankruptcy Court, waive the condition set forth in Section 8.1(b) of the Plan, by a writing signed by an authorized representative of the Debtors and the Committee. The Proponents each reserve the right to assert that any appeal from the Confirmation Order will be moot after consummation of the Plan.

### 3. Effect of Failure of Condition

In the event that the condition specified in Section 8.1(b) of the Plan has not occurred or been waived on or before May 15, 2012 on the assumption the Plan is confirmed on or before August 1, 2011, the Confirmation Order may be vacated upon order of the Bankruptcy Court after motion made by either Proponent.

## H. Effect of Confirmation

### 1. Vesting of Assets

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Property of the Debtors, including, but not limited to, the Note and the rights of the Debtors pursuant to the APA and the TSA, will vest in the Post-Confirmation Debtor free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, the Post-Confirmation Debtor may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

### 2. Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date the provisions of the Plan will bind the Debtors, the Post-Confirmation Debtor and any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

### 3. Preservation of Rights of Action by the Debtors and Post-Confirmation Debtor

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, the Post-Confirmation Debtor will retain and may enforce, in conjunction with the Plan Administrator, any claims, demands, rights and causes of action that the Debtors or their estate holds or may hold against any entity, including any recovery actions and any currently pending actions. Other than as previously released, the Post-Confirmation Debtor or its successors may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Post-Confirmation Debtor or its successors holding such claims demands, rights or causes of action. Further, to the extent retained under the APA, the Post-Confirmation Debtor retains its right to file and pursue, in conjunction with the Plan Administrator, any adversary proceedings against any creditor or vendor related to debit balances or deposits owed to any Debtors.

## I. Retention of Jurisdiction

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been

made and performed by the Plan Administrator, the Bankruptcy Court will retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

(a)    <u>Claims</u>.  To determine the allowability, classification or priority of Claims against the Debtors upon objection by the Plan Administrator or any other party in interest.

(b)    <u>Injunctions, etc</u>.  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to therein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Entity.

(c)    <u>Professional Fees</u>.  To determine any and all applications for allowance of compensation and expense reimbursement of Professionals (including Professionals retained by the Plan Administrator or Post-Effective Date Committee) for periods before or after the Effective Date, as provided for in the Plan.

(d)    <u>Certain Priority Claims</u>.  To determine any Priority Claims, Administrative Claims, or any request for payment of Administrative Claims.

(e)    <u>Adversary Proceedings</u>.  To adjudicate any and all adversary proceedings, applications and contested matters that may be commenced or maintained pursuant to the Bankruptcy Code or the Plan.

(f)    <u>Dispute Resolution</u>.  To resolve any dispute arising under or related to (i) the implementation, execution, consummation or interpretation of the Plan and the making of distributions thereunder, including, without limitation, any dispute concerning payment of professional fees and expenses of the Plan Administrator and (ii) the APA, TSA or the collection of the Note.

(g)    <u>Leases and Executory Contracts</u>.  To determine any and all motions for the rejection, assumption or assignment of executory contracts or unexpired leases, and to determine the allowance of any Claims resulting from the rejection of executory contracts and unexpired leases.

(h)    <u>Actions</u>. To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted prior to the closing of the Chapter 11 Cases, including any remands.

(i)    <u>General Matters</u>. To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

(j)    <u>Plan Modification</u>. To modify the Plan under Section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes.

(k)    <u>Aid Consummation</u>. To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code.

(l)    <u>Implementation of Confirmation Order</u>. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated.

(m)    <u>Final Order</u>. To enter a Final Order closing the Chapter 11 Case.

## J.    Miscellaneous Provisions

### 1.    <u>Pre-Confirmation Modification</u>

The Plan may be altered, amended or modified, as agreed to by both Proponents, before the Confirmation Date as provided in Section 1127 of the Bankruptcy Code.

### 2.    <u>Post-Confirmation Immaterial Modification</u>

The Proponents, or following the Effective Date, the Plan Administrator, with the consent of the Post-Effective Date Committee, may, subject to approval of the Bankruptcy Court without notice to holders of Claims and Interests, insofar as it does not materially and adversely affect the interest of holders of Claims, alter, amend or modify the Plan in such a manner and to such extent as may be necessary to expedite consummation of the Plan.

### 3.    <u>Post-Confirmation Material Modification</u>

The Plan may be altered or amended after the Confirmation Date by the Plan Administrator, with the consent of the Post-Effective Date Committee, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing as provided in Section 1127 of the Bankruptcy Code.

### 4.     Withdrawal or Revocation of the Plan

The Proponents each reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Proponents revoke or withdraw the Plan, then the result will be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred.

### 5.     Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Entities.

### 6.     Exculpation

**Except as otherwise provided by the Plan or the Confirmation Order, on the Effective Date to the extent permitted by applicable law, the Debtors, their directors, officers, members, employees and agents, the Committee and its members, and the Proponents' attorneys, financial advisors except Meridian (including such attorneys and financial advisors successors or assigns, and any direct or indirect members, managing members, owners, employees, officers, shareholders or directors), and Triton Equity Partners LLC, (including its successors or assigns, and any direct or indirect members, managing members, owners, employees, officers, shareholders or directors, including specifically Robert Pressman and Elizabeth Obloy), as court appointed Administrator and Wind Down Officers of the Debtors,  shall be deemed released by each of them against the other, and by all holders of Claims or Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission in connection with, or arising out of, the Chapter 11 Case, including, without limiting the generality of the foregoing, all retentions, motions and applications, sales of assets, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan provided, however, no such parties shall be discharged from obligations under the Plan or of any claim or cause of action arising from or related to acts or omissions which constitute willful misconduct, gross negligence, fraud or criminal conduct under the laws of the United States or any state or local authority.  All such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.  Nothing in this Section 11.6 shall release or otherwise impair any claims against Meridian or claims against non-debtors on account of guarantees of the Debtor's obligations.**

### 7.     Injunction

**Except as otherwise provided in the Plan, on and after the Confirmation Date, all Entities who have held, hold or may hold Claims against the Debtors or Interests in the Debtors are, with respect to any such Claims or Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum)**

against or affecting the Debtors, the Post-Confirmation Debtor, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree or order against the Debtors, the Post-Confirmation Debtor, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Post-Confirmation Debtor, any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities and (d) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan. Nothing in this Section 11.7 shall release or otherwise impair any claims against Meridian or claims against non-debtors on account of guarantees of the Debtor's obligations.**

### 8. <u>Cramdown</u>

To the extent any Impaired Class of Claims entitled to vote on the Plan votes to reject the Plan, the Proponents reserve the right to request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code with respect to such Class.

### 9. <u>Governing Law</u>

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under the Plan will be governed by and construed and enforced in accordance with the laws of the State of New York.

### 10. <u>Notices</u>

Any notice required or permitted to be provided under the Plan must be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

    (a)    To the Plan Administrator:

        Robert L. Pressman
        **TRITON EQUITY PARTNERS, LLC**
        641 Lexington Avenue
        Suite 1400
        New York, NY 10022

    (b)    To the Committee, c/o:

        Bruce S. Nathan, Esq.
        LOWENSTEIN SANDLER PC

1251 Avenue of the Americas
New York, NY 10020

- and -

Thomas A. Pitta, Esq.
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, New Jersey 07068

(c)      To the Debtors, c/o:

Mark T. Power, Esq.
Rosanne Thomas Matzat, Esq.
**HAHN & HESSEN, LLP**
488 Madison Avenue
New York, NY 10022

### 11.      <u>Non-Voting Equity Securities</u>

To the extent applicable, the Debtors will comply with the provisions of Section 1123(a)(6) of the Bankruptcy Code.

### 12.      <u>Retiree Benefits</u>

From and after the Effective Date, to the extent required by Section 1129(a)(13) of the Bankruptcy Code, the Post-Confirmation Debtor will continue to pay all retiree benefits (as defined in Section 1114 of the Bankruptcy Code), if any, established or maintained by the Debtors prior to the Effective Date.  The Debtors believe there are no such benefits.

### 13.      <u>Saturday, Sunday or Legal Holiday</u>

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

### 14.      <u>Section 1146 Exemption</u>

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by, the Plan or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by, the Plan will not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

### 15. <u>Severability</u>

If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as so altered or interpreted. In the event of any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan may, at the Debtors' option remain in full force and effect and not be deemed affected; provided, however, that the Debtors retain the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**Circular 230 Disclaimer**: To ensure compliance with requirements imposed by the Internal Revenue Service (the "IRS"), we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code of 1986, as amended (the "IRC"), or (ii) promoting, marketing or recommending to another party any transaction or tax matter(s) addressed herein.

The following discussion summarizes certain federal income tax consequences of the Plan to the Debtors and to holders of General Unsecured Claims. This summary does not address the federal income tax consequences to holders whose Claims are paid in full, in Cash, or which are otherwise not Impaired under the Plan (i.e., Allowed Administrative Claims, Priority Claims and Secured Claims).

This summary is based on the IRC, the Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS currently in effect. These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, investors in pass-through entities, broker dealers and tax-exempt organizations). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest.

Due to the possibility of changes in law, differences in the nature of various Claims, differences in individual Claim holder's methods of accounting, and the potential for disputes as

to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties. No ruling has been applied for or obtained from the IRS, and no opinion of counsel has been requested or obtained by the Debtors with respect to any of the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.**

A.     **Federal Income Tax Consequences**

      1.     **Federal Income Tax Consequences to Holders of General Unsecured Claims**

In accordance with the Plan, each Holder of an Allowed General Unsecured Claim against the Debtors (such holders are referred to in this section as "Unsecured Creditors") will be entitled to receive his, her or its Pro Rata share of the proceeds of the Debtors' assets. Each holder of an Unsecured Claim will recognize gain or loss upon receipt of such Pro Rata share equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in his, her or its Claim. The amount realized is equal to the value of such Creditor's Pro Rata share of the proceeds of the Debtors' assets. Any gain or loss realized by an Unsecured Creditor should constitute ordinary income or loss to such creditor unless such Claim is a capital asset in the hands of such Unsecured Creditor. If a Claim is a capital asset and it has been held for more than one year, such Creditor will realize long-term capital gain or loss.

The federal income tax consequences to Unsecured Creditors will differ and will depend on factors specific to each such Creditor, including, but not limited to: (i) whether the Unsecured Creditor's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Unsecured Creditor's Claim, (iii) the type of consideration received by the Unsecured Creditor in exchange for the Claim, (iv) whether the Unsecured Creditor is a United States person or a foreign person for United States federal income tax purposes, (v) whether the Unsecured Creditor reports income on the accrual or cash basis method, and (vi) whether the Unsecured Creditor has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH UNSECURED CREDITOR. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH CREDITOR OBTAIN**

HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN.

### 2. Withholding and Reporting

Payments of interest, dividends and certain other payments are generally subject to backup withholding at the rate of 28% unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor. The Plan Administrator may be required to withhold the applicable percentage of any payments made to a holder of a Claim who does not provide his, her or its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the taxpayer by the IRS to the extent that the backup withholding results in an overpayment of tax by such taxpayer in such taxable year.

**THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.**

## VII. ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Debtors believe that the Plan provides a recovery to Creditors that is greater than or equal to the probable recoveries by Creditors if the Debtors estates were liquidated under chapter 7 of the Bankruptcy Code.

### A. Acceptance and Confirmation of the Plan

The Debtors believe that the Plan satisfies all the requirements for confirmation.

### B. General Confirmation Requirements

Bankruptcy Code § 1129(a) contains several requirements for confirmation of a plan. Among those requirements are that a plan be proposed in good faith, that certain information be disclosed regarding payments made or promised to be made to insiders, and that the plan comply with the applicable provisions of chapter 11. The Debtors believe that the Plan complies with these requirements, including those requirements discussed below.

### C. Best Interest Test

Each holder of a Claim or Interest in an Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the

Plan, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each holder of a Claim or Interest equals or exceeds the value that would be allocated to such holders in a liquidation under chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Debtors believe the holders of Claims against and Interests in the Debtors will have an equal or greater recovery as a result of the sale of the Debtors' assets as discussed herein and under the Plan than could be realized in a chapter 7 liquidation for the following reasons:

The Post-Confirmation Debtors are liquidating and therefore are not seeking to require Creditors to accept non-cash consideration so the Debtors can pursue going-concern value. Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a chapter 7 trustee.

To determine the value that a holder of a Claim or Interest in an Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' assets if the Debtors' chapter 11 cases had been converted to a chapter 7 liquidation case and the Debtors' assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case.

As explained below, the Liquidation Value available for satisfaction of Claims and Interests in the Debtors would be reduced by: (a) the costs, fees and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a trustee and his or her counsel and other professionals retained, (b) the fees of the chapter 7 trustee, and (c) certain other costs arising from conversion of these chapter 11 cases to chapter 7.

The Debtors believe that Creditors have benefited and will continue to benefit from the liquidation by the Debtors under the terms of the Plan. If the Debtors' assets are liquidated by a chapter 7 trustee, the Debtors project that the maximum recovery would be substantially less. The Debtors have already reduced virtually all of its assets to Cash through a sale of substantially all of its assets to Americas Retail, which was approved by the Bankruptcy Court. Therefore, the Debtors have already established systems and protocols for the efficient disposition of its assets and is in the process of liquidating its limited remaining assets.

Moreover, under the Plan, the Debtors will avoid the increased costs and expenses of a chapter 7 liquidation, including the fees payable to a chapter 7 trustee and his or her professionals. Although the Debtors have already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. Bankruptcy Code § 326(a) permits reasonable compensation not to exceed 3%

of the proceeds in excess of $1 million distributable to creditors.[10]  The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed General Unsecured Claims against the Debtors.  Moreover, these chapter 7 trustee fees would reduce the assets available for distribution to Creditors from additional recoveries such as expunged administrative claims and the proceeds of successful litigation or settlement.

In contrast, the Plan Administrator will be reasonably familiar with the Debtors' operations and the issues pertaining thereto; therefore, the estates will avoid the significant administrative burden associated with the familiarization process of a chapter 7 trustee and his or her legal and accounting professionals.  Further, to the extent there are any causes of action or disputes with respect to the APA, the Plan Administrator, with the assistance and oversight of the Post-Effective Date Committee, will be familiar with the facts and legal theories pertaining to such causes of action and disputes.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to Creditors.  Bankruptcy Rule 3002(c) provides that conversion of a chapter 11 case to chapter 7 will trigger a new bar date for filing claims against the Debtors' estates, and that the new bar date will be 90 days after the first date set for the meeting of creditors called under section 341 of the Bankruptcy Code.  Not only would a chapter 7 liquidation delay distribution to Creditors, but it is possible that additional claims that were not asserted in the chapter 11 cases, or were late-filed, could be filed.  Reopening the bar date in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file claims against the Debtors' estates.

For the reasons set forth above, the Debtors believe that the Plan meets the requirements of the Best Interest Test.

## D.  Financial Feasibility Test

Even if the Plan is accepted by Class 2 General Unsecured Claims, and even if the Bankruptcy Court determines that the Plan satisfies the Best Interest Test, the Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

The Debtors forecast that the Cash payments to be made pursuant to the Plan will be funded through the amounts obtained from the sale of substantially all the Debtors' assets to Americas Retail and collection of a promissory note issued by Americas Retail in connection therewith.  Since a form of liquidation is proposed in the Plan and no further financial reorganization of the Debtors is contemplated, the Debtors believe that the Plan meets the feasibility requirement.

---

[10] Bankruptcy Code § 326(a) permits a chapter 7 trustee to receive 25% of the first $5,000 distributed to creditors, 10% of additional amounts up to $50,000, 5% of additional distributions up to $1 million and reasonable compensation up to 3% of distributions in excess of $1 million.

## E.     Acceptance by Impaired Classes

Bankruptcy Code § 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by Impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan.  A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan.  Solicitation of acceptances from such a class is not required.  A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (ii) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (i)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (ii) for the sale, subject to Bankruptcy Code § 363(k), of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (i) or (ii) of this paragraph; or (iii) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is

entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (ii) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

Class 1 (Secured Claims) is not Impaired by the Plan. Pursuant to Bankruptcy Code § 1126(f), Class 1 is conclusively presumed to have accepted the Plan, and the votes of holders of Claims in Class 1 will therefore not be solicited.

Class 2 (General Unsecured Claims) is Impaired and the holders of Claims in Class 2 will be entitled to vote to accept or reject the Plan.

Class 3 (Interests) is Impaired, however, the holders of Class 3 Interests are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of such Interests. Class 3 is therefore deemed to have rejected the Plan pursuant to Bankruptcy Code § 1126(g). The Plan provides fair and equitable treatment to these holders because there are no Classes junior to this Class, and no Class senior to this Class is being paid more than in full on its Allowed Claims.

As Class 3 Interests are Impaired and conclusively presumed to reject the Plan, in the event that Class 2 votes to accept the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to Bankruptcy Code § 1129(b) with respect to Class 3 Interests.

## VIII.  RECOMMENDATION

The Proponents believe that the Plan affords holders of Claims the potential for the greatest realization from the assets of the Debtors' Estates and, therefore, is in the best interests of all holders of Claims. Accordingly, the Proponents recommend that all holders of Claims vote to accept the Plan.

Dated:  May 23, 2011

                                        Respectfully submitted,
                                        **THE WECK CORPORATION, et al.**

                                        /s/ *Robert L. Pressman*
                                        Robert L. Pressman

                                        *Court-Appointed Administrator and Wind-Down*
                                        *Officer for the Debtors*

**HAHN & HESSEN LLP**
Counsel to the Debtors
488 Madison Avenue
New York, NY 10022
T (212) 478-7350
F (212) 478-7400